***UNITED STATES v. DURON-DE LUNA***

United States District Court
District of Colorado

Case No. 22-cr-00018-RMR

---

### Exhibit D

**Transcript of Evidentiary Hearing
February 2, 2022**

***United States v. Carrillo-Lopez***
**Case No. 20-026-MMD-WGC**



DEFENDANT'S EXHIBIT
D
22-cr-00018-RMR

<pre>
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
 2      BEFORE THE HONORABLE MIRANDA M. DU, CHIEF DISTRICT JUDGE
                       ---o0o---
 3

 4      United States of          :
        America,                  : No. 3:20-cr-026-MMD-WGC
 5                                 :
                   Plaintiff,      : February 2, 2021
 6                                 :
             -vs-                  :
 7                                 : United States District Court
        Gustavo Carrillo-Lopez,    : 400 S. Virginia Street
 8                                 : Reno, Nevada  89501
                   Defendant.      :
 9      _____:

10

11

12                      TRANSCRIPT OF
                     EVIDENTIARY HEARING

13

14      A P P E A R A N C E S:

15      FOR THE GOVERNMENT:      Peter Walkingshaw
                                 Assist. United States Attorney
16

17      FOR THE DEFENDANT:       Lauren Gorman
                                 Assist. Federal Public Defender
18

19

20      Proceedings recorded by mechanical stenography produced
        by computer-aided transcript
21

22

23      Reported by:             KATHRYN M. FRENCH, RPR, CCR
                                 NEVADA LICENSE NO. 392
24                                CALIFORNIA LICENSE NO. 8536

25
</pre>

```
 1          Reno, Nevada, Tuesday, February 2, 2021, 9:00 a.m.

 2                          ---OoO---

 3

 4          THE COURT:  Good morning.

 5          Are you ready to proceed?

 6          THE CLERK:  This is the date and

 7  time set for evidentiary hearing in case number

 8  3:20criminal-026-MMD-WGC, United States of America

 9  versus Gustavo Carrillo-Lopez.

10              Present via video conference for the

11  government is Peter Walkingshaw.

12              Present via video conference for the

13  defendant is Lauren Gorman.

14              Defendant is not present.  Ms. Gorman

15  will place on the record the reasons why he is not

16  present.

17              The Spanish interpreters, Judy Jenner and

18  Olivia Reinshagen-Hernandez, have been released for

19  the day.

20          THE COURT:  Thank you, Miss Clerk.

21              Ms. Gorman, I understand there was an issue

22  with the transportation of Mr. Carrillo-Lopez, and that

23  he is waiving his appearance at this evidentiary hearing

24  this morning.

25              Is that correct?
```

```
 1              MS. GORMAN:  That's correct, Your Honor.
 2              I'll also note that a waiver is not even
 3    formally required under Rule 43, uh, because it's not
 4    one of those hearings where he is actually required to
 5    be present.
 6              THE COURT:  Even assuming that, he has a
 7    right to appear and that a waiver is required, are you
 8    representing that he is waiving his right to appear?
 9              MS. GORMAN:  I am, Your Honor.
10              THE COURT:  All right.  Thank you,
11    Ms. Gorman.
12              And I agree, given that this is an
13    evidentiary hearing where I'm expecting to hear expert
14    testimony, I think that Mr. Carrillo-Lopez's appearance
15    is not required.  And assuming it is, I will accept the
16    waiver and we'll proceed.
17              MS. GORMAN:  Thank you, Your Honor.
18              And Your Honor, possibly, can I just make
19    some sort of preliminary remarks to kind of streamline
20    this presentation?
21              THE COURT:  What preliminary remarks do you
22    have to offer?
23              MS. GORMAN:  One, I understand that there
24    were multiple motions and supplements filed.  I would
25    just ask for the purpose of a streamlined presentation,
```

1    for those to be incorporated into the record, rather

2    than admitted independently as exhibits.

3             And then with respect to the two experts

4    testifying, I understand that the government would

5    like to invoke the Rule of Exclusion.  While that is

6    entirely within this Court's discretion, the Rule of

7    Exclusion does not necessarily apply to experts; and

8    particularly in this case, where I think it would

9    avoid duplication of testimony.  And where these are

10   experts who generally rely upon each other and in

11   their respective fields and draw on each other's

12   scholarship, just in general, I don't think the Rule

13   of Exclusion is necessary and I think it could

14   streamline the proceeding not to have it, whereas one

15   expert could comment on another's and, et cetera.

16            THE COURT:  Well, I would note that for

17   purposes of the motion, counsel, you know -- both of

18   you know -- that the Local Rules provide for a motion, a

19   response, and a reply.  And in this case, there's been

20   multiple notices supplementing what's been filed.

21   I've allowed it without any party requesting leave,

22   primarily, because some of the filings, I think are --

23   would have been allowed anyway, given the reason --

24   the case law that's been developing.  And given the

25   importance of the issue here, I want to make sure that

1   the record is thorough, which is another reason why I

2   haven't intervened to let you know that you shouldn't

3   continue to keep filing notices of supplementation.

4           It's not easy for me, or my law clerk,

5   when I am reviewing the filings and then discover, the

6   next morning or the next evening, that there's a new

7   supplement.  I hope that this hasn't happened before I

8   issued the order.  Regardless, I'm going to accept the

9   filings.  It's part of the record.  If you want to

10  refer to the ECF number for the filing as part of the

11  evidentiary hearing today, I don't have an issue with

12  that.

13          With respect to the Rule of Exclusion, I'll

14  let Mr. Walkingshaw respond as to why he believes that

15  the Court should permit the rule to be invoked for the

16  two expert witnesses.

17          MR. WALKINGSHAW:  Thank you, Your Honor.

18          And if I can also briefly be heard on the

19  supplementation issue as well.  But to answer the

20  Court's first question, the two experts are both going

21  to be testifying, in large part, to historical facts.

22  They rely on similar methods and methodologies.  The

23  purpose of the Rule of Exclusion is to avoid having one

24  witness tailor their testimony based on what they've

25  heard other witnesses say.  While experts are sometimes

6

```
1    allowed -- or exempt from the rule of exclusion, I
2    believe the case cited by Ms. Gorman, in correspondence
3    with Ms. Vannozzi, refers to experts that are essential
4    to the management of litigation, which doesn't appear
5    to be applicable in this case.  And I believe there's
6    representation as to some ambivalence as to whether or
7    not the rule is invoked.
8              So for those reasons, I think this is
9    a fairly classic instance in which I think the rules
10   should be observed, given the historical facts that we
11   expect to have entered into the record today.
12             THE COURT:  So is there a concern that
13   somehow the -- I want to understand the argument that
14   the "experts may tailor their testimony."  So generally
15   with fact witnesses, there's concern that one's
16   recollection may be influenced by hearing what
17   another's recollection is.  But, here, the witnesses
18   are offering their testimony as to their expertise.  So,
19   I'm trying to understand how they would tailor their
20   testimony that would present a concern that one would
21   normally find with fact witnesses.
22             MR. WALKINGSHAW:  Well, Your Honor, I
23   believe that not only will the witnesses be testifying
24   to historical facts, but also will be commenting on
25   scholarship associated with the history of immigration.
```

1    I believe Mae Ngai is cited by both of them fairly

2    extensively.  And to the extent that those discussions,

3    either on direct or on cross, you know, may influence

4    the way that that scholarship is framed or presented, I

5    really think that the expert should be testifying from

6    their own expertise, as opposed to what they've heard in

7    prior testimony.

8                    THE COURT:  All right.

9                    I'm going do deny the government's request

10   to invoke the Rule of Exclusion.  This is an evidentiary

11   hearing.  The evidentiary rules are more relaxed.  In

12   addition, I'm hearing testimony from expert witnesses

13   who I would expect to testify and present their own

14   expertise.  So to the extent that they their testimony

15   reveals that they're influenced by each other's

16   testimony, I will take that into account and consider

17   the weight of the testimony.  But in terms of concern

18   that they may be somehow tailoring their testimony

19   and adopting each other's testimony, I don't think

20   that's a concern here, at least as -- based on just my

21   general understanding as to how experts present their

22   testimony.  For those reasons, I'm going to deny the

23   request.

24                    And so if the other expert is in the waiting

25   room and wants to sign into the video conference, he

1    may do so.

2                THE CLERK:  Your Honor, I'm admitting them

3    into the main conference right now.

4                THE COURT:  And Mr. Walkingshaw, you wanted

5    to be heard on the issue of supplementation.

6                MR. WALKINGSHAW:  Thank you, Your Honor.

7                THE COURT:  Is there something else you want

8    to add other than what you indicated in the response

9    that's filed as -- which is the last document filed as

10   ECF 46?

11               MR. WALKINGSHAW:  Yes, Your Honor.

12               I do believe, in terms of the notices

13   filed, there is fairly substantial substantive

14   difference.  The notice that I filed on Thursday was

15   case law that's developed since briefing ended.  And

16   appears based on the two notices filed on Friday,

17   that the defendant is coming to the hearing with a

18   substantially different theory of an equal protection

19   claim than what was fairly presented in the briefs.

20               The briefs refer, entirely, to a failure

21   to reckon with the 1929 law.  It appears, now, that a

22   theory is being put forward that the 1952 law was

23   independently motivated by racial animus.  Your Honor,

24   I would ask for post-hearing briefing hearing on that

25   issue, to the extent the Court is going to consider it.

1  I believe the Court's comments were entirely correct

2  that the record here should be fulsome so the Court

3  should be given as much opportunity as possible to fully

4  deliberate on the issues.  I think post-hearing briefing

5  would properly frame and present them.

6          I'll also note that the pretrial motion

7  deadline has been extended until June of this year.

8  Trial is not until August.  So I think in order to,

9  you know, promote a fulsome record, I think post-hearing

10 briefing is really the appropriate course in this

11 case.

12         MS. GORMAN:  Your Honor, may I respond?

13         THE COURT:  Yes.

14         MS. GORMAN:  Your Honor, to be very

15 clear, my position is that the legislative body that

16 deliberated about this law is the legislator whose

17 intent matters.  But based on the government's response,

18 and particularly based on the supplementation in

19 addition, sort of calling the Court's attention that

20 the judges who have ruled on 1326, specifically have

21 done two things:  Both refused to allow having an

22 evidentiary hearing which witnesses could testify on,

23 and then rely upon the codification of this law in 1952,

24 without allowing evidence that there's no evidence of

25 animus.  So, I think this record should be as complete

 1   as possible.

 2            It's not a deviation from the original

 3   position.  But in the event that this court finds

 4   that the legislative intent regarding, particularly,

 5   1952 is relevant -- which is the government's,

 6   essentially, exclusive position, is that the Court

 7   should not rely on 1929 when eugenics was, I think,

 8   undisputedly a motivating factor in the passage of

 9   illegal re-entry, then, you know, testimony regarding

10   1952 is certainly appropriate.

11            And going forward, I just want to be

12   very clear that this law was passed in 1929.  It was

13   recodified in 1952.  And subsequently, there's been

14   various amendments.  So I don't think the amendments,

15   necessarily, have the legislative intent regarding these

16   amendments, and I don't think are necessarily legally

17   relevant.  But, I do think what's very important is for

18   this court to have a full a record as possible, going

19   from the events leading up to 1929, up until the last

20   amendment, though our original position remains the

21   same.  And if this court intends to rely on 1952, it

22   should have an evidentiary record and history to support

23   that, and that has, historically, been the government's

24   position, that we should just ignore 1929, even though

25   the law has been in continual effect since 1929.  And

1    so I guess -- I have no opposition to post-hearing

2    briefing if the Court should find it appropriate,

3    but these supplements, and particularly testimony

4    regarding 1952, and even beyond, are in response to

5    the government's position that that is sort of the

6    relevant legislative context.

7               THE COURT:  But, to be fair, the government

8    took that position in its response to the initial motion

9    and you did not offer these additional supplementations

10   in the reply.  It was after briefing closed and after

11   the last hearing that the supplementations were filed.

12               Is that correct?

13               MS. GORMAN:  I mean --

14               THE COURT:  So, in other words, the

15   government's position has not been a mystery.  It

16   stated its position in its response to the motion,

17   that the Court should focus on the 1952 codification.

18               MS. GORMAN:  So we intend to present

19   evidence that both addresses the government's

20   position, which I think is perfectly permissible in

21   any litigation, but, particularly --

22               THE COURT:  But Mr. Walkingshaw's point

23   is that you didn't do that in the reply brief.  That

24   was the opportunity to respond to the government's

25   position, in the reply brief.  Instead, you waited

1    until after briefing closed, after the hearing, to

2    provide these additional supplemental authorities.

3    That's his point.

4            MS. GORMAN:  Yes, Your Honor.  And I, as

5    I said before, our original position is the same; that

6    it's the legislative body that initially deliberated

7    about and then passed this law, that is the legislator

8    that matters.

9            The government's supplements, in

10   particular, call attention to cases where the Court

11   says, okay, Arlington Heights applies, but you've

12   shown no legislative animus with regard to 1952,

13   so we're going to deny on that basis.  Hence, the

14   supplementation.  So it's not a concession that

15   1952's legislative intent is the legislative intent

16   that matters, but I do think for the Court to consider,

17   fairly, the government's position, and our position,

18   the Court should have as full an evidentiary record

19   as possible.

20           So while we're not conceding that point,

21   these are a historian and a political scientist who

22   are both eminent scholars that can speak to the

23   government's position as well as the defense's position.

24   And I think -- we are not afraid of this legislative

25   history or this historical context, and the Court can,

1    essentially, use the expertise to evaluate the

2    government's position and the defense's position.  And

3    whichever way the Court rules, I think that these

4    experts -- in particular Professor Lytle Hernandez,

5    is going to focus on the events leading up to 1929.

6    Professor Gonzalez O'Brien can speak to that, but also,

7    sort of, his expertise is more contemporary as well,

8    and I think the Court should have as complete a record

9    as possible.

10                  THE COURT:  Ms. Gorman, that's the reason

11   why I granted the evidentiary hearing request.  I

12   just made an observation that the government stated

13   its position in its response, not just in the

14   supplementation that was filed, and so I believe --

15   and I find that Mr. Walkingshaw's point is a fair

16   one; and that is, that defendant did not offer these

17   additional authorities in its reply brief.  It's only

18   after briefing closed, and after the hearing, that these

19   additional authorities were offered -- this additional

20   evidence of the legislative history from the 1952

21   codification was offered.

22                  I'm just making a note that I agree with

23   him, and so I'm going to grant -- because -- well, I

24   start with the premise that the issue is important

25   enough, but I want the parties to have the full

1    opportunity to present briefing and any expert

2    testimony.  So to the extent that the government

3    requests additional briefing after the hearing, I'm

4    going to grant it because, as I said, I find the

5    defendant could have offered these additional

6    authorities in the reply brief, in response to the

7    government's position in its response brief.

8              I would have to say that I'm not going to

9    take any additional evidence after today's hearing.

10   The post-hearing brief will be for you to present legal

11   arguments so that -- I do need to close the briefing

12   period so I can decide the motion, which has to be

13   decided at some point.  I'm not going to keep leaving

14   the briefing period open.

15             With that, I'll hear from the expert

16   testimony.

17             MR. WALKINGSHAW:  Your Honor --

18             MS. GORMAN:  And Your Honor, just to --

19   okay.  Pardon me.

20             Just to be clear, you know, some of

21   the expert testimony, particularly Professor Gonzalez

22   O'Brien, I think then should particularly speak to 1952,

23   et cetera, and there's, obviously, been no opposition

24   to the scope of his testimony and it was filed with the

25   Court.

1                    THE COURT:  I'm going to permit it.

2                    Mr. Walkingshaw, what's your point?

3                    MR. WALKINGSHAW:  Your Honor, just before

4      testimony gets underway, I do want to make sure that

5      the government's position is clear -- and there was a

6      bit of an exchange between the Court and Ms. Gorman.

7                    The government's position is not that 1952

8      is the exclusive determination that the Court should

9      consider.  The government's position is that the, the

10     history of this law begins with 1952, but it continues

11     through the amended versions that were subsequently

12     passed.

13                    I bring this only up so that there's no

14     confusion when the experts present testimony, such

15     that -- I just don't -- I believe this is more than

16     fairly presented in our briefs, but I don't want there

17     to be any claim of unfair surprise as to what our

18     position actually is.  Ms. Gorman said that she believes

19     that the amendments are not legally relevant.  We don't

20     agree.  We think they are.  So I just thought I would

21     put that on the record before testimony commences.

22                    THE COURT:  At the last hearing, the

23     government conceded that the passage of the 1929

24     law was made -- motivated, was motivated by racial

25     animus, at least to satisfy the Arlington Hill (sic.)

1    factors, is that right -- Arlington Heights factors.

2              MR. WALKINGSHAW:  The Arlington Heights.

3    Motivated in part-

4              THE COURT:  Arlington Heights.  I say

5    Arlington Heights in my mind so often, I only think of

6    Arlington.  But, Arlington Heights.

7              MR. WALKINGSHAW:  Yes, Your Honor.

8              But as the Court may recall, the government

9    also put forth the position that Congress gets a clean

10   slate when it passes new legislation or recodifies or

11   re-adopts legislation in the absence of racial animus.

12             THE COURT:  And given the government's

13   concession, I had initially thought that an evidentiary

14   hearing was not required.  But after hearing additional

15   arguments, I granted Ms. Gorman's request to offer

16   testimony to provide context.

17             And so with that, Ms. Gorman, I don't

18   think that the experts need to necessarily focus too

19   many details on the legislative history in 1929, except

20   to the extent that -- I know what you're trying to do.

21   You're trying to present this additional testimony to

22   show that there should not be a -- that that history

23   and that environment permeated and led to the 1952

24   codification, and Congress should not be able to just

25   distance itself from the prior history.  I know that's

1    the defendant's position.   Nevertheless, I don't think

2    that the experts needs to spend an exhaustive amount

3    of their testimony relating to the history in 1929.

4    But, I'll give you enough leave to present testimony.

5              MS. GORMAN:  Thank you, Your Honor.

6              We expect Professor Lytle Hernandez's

7    testimony to be briefer, particularly in light of that

8    previous concession.  But, thank you, Your Honor.

9              THE COURT:  All right.

10             Let's proceed then.

11             THE CLERK:  Will the witness, Professor

12   Lytle Hernandez -- thank you very much.

13
                   **KELLY LYTLE HERNANDEZ,**
14        called as a witness on behalf of the Defendant,
                was sworn and testified as follows:
15

16             THE CLERK:  Please state for the record your

17   full name and spell your last name.

18             THE WITNESS:  Kelly Lytle Hernandez.

19   It's two last names:  L-y-t, as in Tom, l-e.

20   H-e-r-n-a-n-d-e-z.

21             THE COURT:  And please spell your first name

22   as well.

23             THE WITNESS:  K-e-l-l-y.

24             THE CLERK:  Thank you.

25             MS. GORMAN:  May I proceed, Your Honor?

```
 1              THE COURT:  Yes.
 2                   DIRECT EXAMINATION
 3   BY MS. GORMAN:
 4       Q.   Thank you for coming, Professor Hernandez.
 5            And I want to just jump right in by talking
 6   about your expertise and your qualifications by
 7   training.  So can you please describe your knowledge,
 8   training, and education, and as it relates to the
 9   history of the criminalization of immigration
10   enforcement in particular.
11       A.   Sure.
12            Well, I have my Ph.D in U.S. History from UCLA,
13   with, really, areas of specialization in policing and
14   immigration.  And I've written two books on this
15   subject:  Migra!:, A History of the U.S. Border Patrol,
16   which is focused on the story of how the U.S. Border
17   Patrol became the focus on the -- Mexican -- U.S.
18   southern border.  That was published by the University
19   of --
20            (Zoom audio interruption.)
21            THE CLERK:  Professor Hernandez, you are
22   cutting in and out.  Please make sure you're close to
23   your microphone.
24            THE COURT:  And it seems like you trail at
25   the end of your sentences, so -- I don't know if it's
```

1    because of the mic or because you are not sitting as

2    close to the mic.

3               THE WITNESS:  I'll move closer.

4               Does that help?

5               MS. GORMAN:  Yes.  We'll try it.

6               THE WITNESS:  Should I resume?

7               THE COURT:  Yes.

8               THE WITNESS:  Okay.

9               So, <u>Migra</u> was published by University of

10   California Press, an academic peer review press.

11              My second book, <u>City of Inmates:  Conquest,</u>

12   <u>Rebellion, and the Rise of Human Caging in Los Angeles</u>,

13   is the book that really has a chapter that focuses on

14   the criminalization of unlawful entry and re-entry into

15   the United States.  That, too, was published by a peer

16   reviewed academic press, University of North Carolina.

17   And it won multiple prizes, which is you can think of

18   that as another form of peer review.

19   BY MS. GORMAN:

20      Q.   So, and to be specific, you hold an endowed chair

21   currently at UCLA, is that correct?

22      A.   Sure.  I hold the Tom Lifka Endowed Chair in

23   history at UCLA.  I was also awarded a MacArthur Genius

24   Fellowship for my historical and contemporary work.

25   And I sit on the Pulitzer Prize Board as the historian.

1    Q.   Thank you, Professor Hernandez.

2         And Professor Hernandez, I know this is probably

3    an obvious question, but are you familiar with the

4    Declaration that was drafted in connection with this

5    case by you?

6    A.   Yes.   That Declaration is based on my work from

7    Migra and City of Inmates.

8    Q.   And can you, additionally, and to the best of

9    your knowledge, is everything that you presented in

10   that Declaration true and correct, to the best of your

11   knowledge?

12   A.   To the best of my knowledge, yes.

13   Q.   And in terms of additional, sort of, credentials,

14   do you attend any academic conferences, present

15   comments, chair panels, and -- in the department of

16   history or regarding immigration law enforcement?

17   A.   Sure.   I'm quite active in the scholarly circles

18   around immigration, so I attend the Western Historical

19   Association meeting regularly, the Organization of

20   American Historians' annual meeting regularly.   I'm an

21   elected member of the Society of American Historians.

22   I've been a member of the Immigration and Ethnic History

23   Society.   I regularly present at universities across the

24   country on this topic and subject, and regularly engage

25   with my colleagues across the country, and in Mexico

1    and around the world, on immigration and policing.

2        Q.   Thank you, Professor Lytle Hernandez.

3            And then just sort of briefly -- I will focus

4    your testimony on the events leading up to 1929 -- but

5    can you explain to the Court your understanding how

6    the 1929 Act is connected to the Section 1326 offense

7    at issue in this case?

8        A.   Sure.

9            So it's my understanding that the 1929 Act

10   is the very first time that Congress criminalized

11   unauthorized entry and re-entry, post-deportation, into

12   the United States.  And, that the basic framework of

13   that statute carries forward into 1952 and beyond.

14       Q.   Thank you.

15           And I just want to get into the historical

16   sweep leading up to this 1929 piece of legislation,

17   so can you give me just a summary timeline of the

18   developments in U.S. Mexico relation, just the

19   historical developments in immigration policy in

20   the late 19th and early 20th century preceding the

21   1929 Act?

22               THE COURT:  I'm going to intervene for

23   a moment, Ms. Gorman.

24               Because you're presenting Professor

25   Hernandez as an expert witness, do you want the Court

```
 1    to certify her as an expert in any particular area?
 2              MS. GORMAN:  Oh.  Sorry.  Yes, Your Honor.
 3    And I skipped over that part.
 4              Would this court certify Professor Lytle
 5    Hernandez specifically as a historian, but as an
 6    expert in history, with particular expertise in
 7    criminalization, and the criminalization of migration?
 8              THE COURT:  Does the government have any
 9    objection?
10              MR. WALKINGSHAW:  Your Honor, we have no
11    objection to Professor Hernandez being certified as an
12    expert in the history of immigration or the history of
13    border -- border immigration enforcement.
14              If I recall correctly, I believe there
15    was, uh -- she said a chapter in her book City of
16    Inmates dealt with the criminalization of immigration.
17    And I believe the Court is the expert in the law and its
18    history, so we would ask that the Court sort of -- I
19    think that designation would not be appropriate, but
20    that a slightly different one would be.
21              THE COURT:  I'm sorry.  I'm trying to
22    understand what is the objection to Professor
23    Hernandez's expertise.
24              So Ms. Gorman asked the Court certify
25    Professor Hernandez as an expert in history, with a
```

1    particular emphasis on criminalization of immigration

2    and -- well, I think that's where she ended it.

3              MR. WALKINGSHAW:  Yes.

4              THE COURT:  And what's your objection?  Do

5    you object that Professor Hernandez does not have this

6    expertise?

7              MR. WALKINGSHAW:  I believe it would be

8    more appropriately characterized as an expertise in

9    the history of border enforcements, immigration

10    enforcements, immigration.  But criminal -- I didn't

11    really catch criminalization of immigration in the

12    discussion that was had.

13             MS. GORMAN:  Your Honor, it may be easier to

14    ask Professor Hernandez where -- where are your areas of

15    expertise, particularly as a historian?  Where have you

16    emphasized your work?

17              THE WITNESS:  Sure.

18            So I often describe myself as a historian

19    of race, immigration, and police and incarceration in

20    the United States.  More broadly, I have spent most

21    of my 15, 20 years as a professional scholar looking

22    really deeply at the intersection between immigration

23    control and the criminal justice system.

24             MS. GORMAN:  So, Your Honor, I think

25    that maybe Professor Lytle Hernandez description of

1    her own expertise might be a more appropriate basis

2    for the Court to certify Professor Lytle Hernandez as

3    an expert, rather than my characterization.

4              THE COURT:  Well, for the purposes of

5    the hearing that's going to be presented -- so, of

6    course, Professor Hernandez seems to have a wide area

7    of expertise.  I want to focus on the area at issue

8    here.

9              So, which of her characterizations as to

10   her expertise would you want the Court to certify,

11   Ms. Gorman?

12             MS. GORMAN:  And I think Professor Lytle

13   Hernandez said it perfectly, when she talked about the

14   history in terms of race, policing, and immigration

15   because those are the three facets that are at issue

16   in this case.  And immigration, of course, I think would

17   have to include migration, and so -- but I think that

18   is encompassed, at least, by the word "immigration."

19             MR. WALKINGSHAW:  Yeah, that's fine with the

20   government, Your Honor.

21             THE COURT:  All right.

22             What's the request again, Ms. Gorman?

23             MS. GORMAN:  I think the Court can tether

24   the expertise of Professor Lytle Hernandez to her

25   areas of expertise, specifically with respect to

1    race, policing, and immigration.  And that would

2    encompass border enforcement.  I'm using "policing"

3    very broadly.

4              THE COURT:  So is the request that the

5    Court certify Professor Hernandez as an expert in the

6    history -- in history, with a particular emphasis

7    between the intersection between race, policing, and

8    immigration?

9              MS. GORMAN:  Correct, Your Honor.

10             THE COURT:  All right.  The request is

11   granted and the Court will so certify.

12   BY MS. GORMAN:

13     Q.  Professor Lytle Hernandez, can you give this

14   court just a historical sweep leading up to this

15   legislative enactment in 1929?  So, a summary of

16   the timeline and developments in immigration and

17   immigration policy between the late 19th and early

18   20th century preceding the Act?

19     A.  Sure.  I'd be happy to.  That's a massive

20   question.  I will try --

21     Q.  Sorry.

22     A.  -- to keep my answer here around the issues of

23   how racial animus motivated the passes of immigration

24   law in the late 19th and early 20th century, leading up

25   to the 1924 Act in particular.

1    So, the federal government first began to take

2    the reigns of immigration control in the 1870s and there

3    were a variety of pressures at play during that time.

4    One of the most important ones was coming out of the

5    American west and California, with a concern about

6    the large number of Chinese immigrants who had arrived

7    in California during the Gold Rush and during the

8    construction of the transcontinental railroad.

9    White workers, white settlers in California

10   opposed the arrival of Chinese immigrants; and, more

11   important, the notion that Chinese immigrants would

12   remain permanently in the state and become Chinese

13   Americans.  And so it's really California that pushes

14   for the first set of racially targeted and explicit

15   immigration laws, which is the infamous Chinese

16   Exclusion Act of 1882, which banned the arrival of

17   Chinese laborers into the United States for 10 years.

18   That same year, Congress passes a series of

19   other restrictions that are, you know, much more

20   around contractors or prostitution.  And moving out

21   of the Chinese Exclusion Act, Congress passes a series

22   of exclusions targeting multiple populations; um,

23   epileptics, illiterates, people likely to become a

24   public charge, anarchists and so on.  But this

25   racial animus component remains a driving force in the

1  construction and implementation of immigration law, and

2  it hits a high fever pitch in 1917, around World War I,

3  where we passed the 1917 Immigration Act.  And that's

4  an important piece because it introduces the Asiatic Bar

5  Zone, which bans all persons of Asian origins from

6  entering the United States, and institutes a literacy

7  test for all people entering the United States.

8       Now, this is a nice comparison because the

9  Asiatic Bar Zone clearly racialized.  It's explicitly

10 racialized and it's born out of the Chinese exclusion

11 period.  But, the literacy test is inexplicitly

12 racialized.  It is developed and intended to keep

13 out southeastern -- southern and eastern Europeans,

14 in particular, who are presumed to be unable to pass

15 the literacy test.  So, there are two examples there

16 that are kind of implicit and explicit forms of

17 racialized control.

18      Then we head into the 1920s, where it becomes

19 even more intense, the racial animus.  The 1920s, in

20 the Declaration, is a moment in the United States that

21 people often refer to as the "Tribal Twenties;" that

22 Arianism is really at a high pitch.  Eugenics is a

23 very popular science of, quote, racial betterment.  And

24 this broader cultural environment pushes toward the

25 passage of the 1924 Immigration Act, which affirmed the

1    Asiatic Bar Zone, which introduces a new set of

2    quotas, national quotas, that effectively restrict

3    immigration to the United States from southern and

4    eastern Europe.

5         The thing that's interesting about the

6    national quotas is that they only apply to the Eastern

7    Hemisphere, and that an exemption was written in for

8    the Western Hemisphere immigrants.  And where that

9    exemption comes from is this debate that's happening

10   in the world of white supremacy in the United States;

11   that there are some folks who believe in, sort of, a

12   more ethno-racial for of white supremacy, that we only

13   want to have, sort of, a "whites only" nation.  And

14   those are the nativists.

15        And there's another set of folks who say, well,

16   we certainly want to have a white dominant society,

17   but we need marginalized non-white workers to come and

18   to go, to do the things that we don't want to do.

19        So scholars, like, Lisa Low, and others, talk

20   about this as there's the dualing sides of White

21   Supremacy, between the more capitalist and cultural

22   emphases of that initiative.

23        And so, um, after you get the passage of the

24   1924 legislation with restrictions on southern, eastern

25   Europe -- it's called a Nordic victory -- with the

1    Western Hemisphere exemption, you see a pretty rapid

2    turn to focusing on getting Mexican immigrants included

3    on the quota that system, or somehow restricted from

4    entering the United States.

5        And this is sort of the debate in the 1920s

6    that's circulating around Mexican immigration in

7    particular, that something leads us into the 1929

8    legislation.

9    Q.   Then talk to me about -- so the Western

10   Hemisphere is then exempted from this quota, and

11   you talked about the, sort of, American corporate

12   interests -- talk to me more about, I guess, how that

13   animated the legislative history that ultimately

14   resulted in illegal re-entry in 1929, or how that

15   tension manifested itself in that legislative history.

16   A.   Sure.

17       So after the passage of the 1924 law,

18   immediately, nativists and Congress begin to lobby

19   and to forward legislation to get Mexican immigrants,

20   in particular -- the Western Hemisphere in general,

21   but Mexican immigrants in particular -- added to the

22   national quota system.  There's two major pieces

23   of legislation, one in 1926 and one in 1928, that

24   proposed to do just this.  The debates in Congress are

25   intense.  Major employers and industries across the

Case 1:22-cr-00018-RMR   Document 25-4   Filed 06/15/22   USDC Colorado   Page 31 of 199
Case 3:20-cr-00026-MMD-WGC   Document 49   Filed 02/05/21   Page 30 of 198

30

1    person west go to Congress, hold hearings in protest

2    to adding Mexican immigrants to the quota.

3         Why?

4         At this moment, they're concerned that they

5    will be cut off from access to Mexican workers.  And

6    they want Mexican workers, yes, as laborers, but they

7    want Mexican workers as a particularly racialized

8    and marginalized and, understood, as a controllable

9    form, temporary form of labor.

10        And in the end, that lobby wins out and the

11   nativists are furious in Congress.  And Albert Johnson,

12   who is one of the leading members of Congress pushing

13   for immigration control and adding Mexicans to the quota

14   system, you know, by 1928, he just said, look, we're

15   not going to be able to get Mexicans added to the quota

16   system.  The debates have been too intense.  So, we're

17   going to have to pursue this through other means.  And

18   the next year you get the 1929 Act, which criminalizes

19   unauthorized entry and re-entry into the United States.

20        Now, I want to add something here.  This is

21   really important about how this scheme was developed

22   with Mexican immigrants, sort of, in mind as being the

23   primary targets of that legislation.  There were a

24   series of studies conducted by the Immigration Service

25   in the 1920s, which found or asserted that about half

1    of the Mexican immigrants who enter the United States

2    entered without authorization, if not more.

3         In 1928, the Department of State discourages

4    counselor officials, U.S. counselor officials in

5    the United States from issuing visas to Mexican

6    immigrants, so it becomes extraordinarily difficult

7    for Mexican immigrants, in particular workers, to get

8    a visa into the United States, around 1928 and 1929.

9         And by the late 1920s, the U.S. Border Patrol,

10   which had been established in 1924, had really recast

11   the popular image of the so-called, quote, illegal

12   immigrant.  In the late 19th century, that iconic

13   illegal was a Chinese immigrant.  Border Patrol

14   practice -- which if you want to get into, we can

15   certainly do -- shifted that notion.  So the people,

16   when they sort of conjured up the image of who was

17   undocumented, by the late 1920s, they would conjure

18   up an image of a Mexican immigrant.

19        All this comes together to create a logic of

20   the moment that, if we criminalized unauthorized entry

21   into the United States, we could be assured that the

22   bodies that are going to be delivered up are going

23   to be Mexican immigrants in particular, as opposed to

24   unauthorized immigrants in general.

25        Q.  When you talk about the desire to have a

1  temporary labor force, what is it about Mexican

2  migrants that makes them desirable as workers?  What

3  is -- I mean, is it there vulnerability?  Their -- I

4  mean, what -- is it stereotypes?  What is it about the

5  migrants from south of the border that makes them such

6  a desirable labor force, that you have such intense

7  tension between, I guess, the eugenics and corporate

8  interests?

9      A.   That's a good question.

10         I would say that there's nothing about them

11  in particular as human beings.  It's about the social

12  structure into which they're entering.  So by the

13  1920s you have, across the southwest, a social system

14  in place, a racialized subjugation system in place

15  that mirrors what's happening in the American South.

16         So what we know in the American south as the

17  Jim Crow system is becoming, in the southwest, what we

18  call the Juan Crow system, where Mexican children are

19  separated in the public school system; where Mexican

20  immigrants are unwelcome, and sometimes in explicit

21  forms, especially in Texas, not allowed to sit in

22  the restaurant, right, police systems across the

23  southwest disparately target Mexican immigrants, or

24  policing Mexican Americans as well.

25         So this Juan Crow regime, and you read it, I

1    believe, in the Declaration -- let me find the page

2    number for you -- uh, was something that the employers

3    believed in across the southwest as their mechanism for,

4    quote, we can and do control them.  So, it's the forms

5    of racialized subjugation that Mexican immigrants

6    enter into that makes them the desirable laboring

7    population.

8        Q.  So were Mexican immigrants, did they have any

9    sort of protections; or, did they have less protections

10   then, let's say, American citizens?

11       A.  Do you mean as sort of labor protections, formal

12   labor protection or -- could you clarify yourself.

13       Q.  Yes.

14       A.  Yeah.  Uh, no, they don't have any more

15   protections.  I mean, I would say that they are more

16   vulnerable to policing, whether it be local policing,

17   border patrol policing in particular.  Uh, that -- you

18   know, I think that would be my answer.

19       Q.  So you started talking about, I think, two

20   things.  One is, like, the ability to exclude.  And

21   one is the ability to control.  Is that, like, a fair,

22   accurate -- or sort of a fair representation of at least

23   your understanding?

24       A.  Yeah.  I like the way you put that.

25           So the nativists are looking to exclude.  The

1   agribusiness, the railroad, the employers across the

2   southwest, they're looking to control.  And they really

3   kind of -- they come to a compromise.  And one of the

4   things that's really interesting that happens in

5   the 1920s, is the employers are learning the power of

6   deportability.  And they say this expressly in the

7   Congressional Record, when they go to Congress, like,

8   uh, they're saying -- it's in the Declaration -- one

9   of the things we like about Mexican workers is that

10  they're, quote, deportable.  They won't stick around.

11  If we have trouble with them, we can always, you know,

12  pick them up and kick them out.

13       Agribusinees flips that and says, well, what

14  do you want us to do, invite African Americans or black

15  Puerto Ricans in the U.S. to do this work?  Well,

16  they're not deportable, and that's not the kind of

17  labor that we want.  They're not even -- we want to

18  make sure that they can be removed.

19       So there's, absolutely, an explicit dynamic of

20  racialized labor control that is happening during this

21  time period.

22  Q.   Then is it your opinion that the illegal re-entry

23  provision of the 1929 law was intended to target

24  Latinos?

25  A.   That is my professional opinion.  Yes.

1    Q.   And I know that I -- I don't want to go -- you

2    know, I understand your expertise is largely 1929, but

3    I also want to talk about did they have to accommodate

4    illegal re-entry or the criminalization of this

5    migration?  Do they have do anything, like build prisons

6    or jails or places to hold people?

7    A.   Well, the impact of this new legislation was

8    immediate.  And I write about this in my book City of

9    Inmates.  The number of prosecutions increase.  The

10   number of Mexican immigrants in particular being

11   imprisoned on this charge.  And that's in the Bureau

12   of Prisons annual reports, the attorney general annual

13   reports.  But, it's also in the Bureau of Prisons

14   internal correspondence records, where a lot of this

15   material is available.

16       And so they build three new prisons, largely to

17   accommodate the number of Mexican immigrants being

18   incarcerated on what would become 1326.

19       You know, it's really interesting -- and I

20   believe it's the Attorney General's annual report of

21   1930 -- they take a moment and pause and say, you know,

22   prior to 1929, we just had about a 1,000 prosecutions

23   per year.  Post-1929, immediately, we've got about 7,000

24   prosecutions this year.  And they write that is due to

25   the passage of the Immigration Act of March 4th, 1929.

1        And so they build a Latino prison, the Tucson

2   Prison Camp, which is outside of Tucson, and,

3   eventually, Terminal Island, outside of Los Angeles.

4   Largely motivated by the need to incarcerate people

5   on immigrations offenses.

6               THE COURT:  Ms. Gorman, would you -- I'm

7   going to intervene for one moment.  Give me one moment

8   to take a short break here.  I need to repair or to

9   fix a problem.

10              MS. GORMAN:  I'm going to stop my video

11  for a second because I'm getting sounds from my son's

12  room.

13              THE COURT:  All right.  Thank you, counsel.

14              MS. GORMAN:  Sorry, Your Honor.  I don't

15  know if anyone could hear, but I could hear my son.

16  He's in school.

17              THE COURT:  I'm ready to resume then, if

18  you are.

19              MS. GORMAN:  Well, unless this court has

20  specific questions for Professor Lytle Hernandez, you

21  know, I can pass this witness.

22              THE COURT:  I'm sorry.  What was the

23  question?

24              MS. GORMAN:  I said unless the Court -- and

25  I wanted -- and I meant to say this at the beginning,

 1    that the Court should feel free to interrupt me because

 2    I think what's relevant is also what the Court wants

 3    to consider in this hearing.  But unless the Court has

 4    additional questions for Professor Lytle Hernandez, I

 5    would pass the witness.

 6                 THE COURT:  All right.  Thank you.  I do

 7    not.

 8                 Mr. Walkingshaw.

 9                 MR. WALKINGSHAW:  May I proceed?

10                 THE COURT:  Yes.

11                 MR. WALKINGSHAW:  Thank you, Your Honor.

12                        **CROSS-EXAMINATION**

13    BY MR. WALKINGSHAW:

14       Q.  Good morning, Professor.

15       A.  Good morning.

16       Q.  And I apologize, I've heard it both ways.  Do you

17    prefer Professor Lytle Hernandez or Professor Hernandez?

18       A.  Lytle Hernandez, please.

19       Q.  It's not everyday that I get to speak with a

20    MacArthur Genius, so I want to make sure I get it

21    right.

22            So are you familiar with the motion that's been

23    filed in this case?

24       A.  Yes.

25       Q.  And it cites your work in a number of places,

1   correct?

2        A.   I believe so.

3        Q.   Both Migra, and your book, City of Inmates.

4        A.   I believe so.

5        Q.   Yeah.  So -- and you referenced a little bit

6   ago the Attorney General reports regarding enforcement

7   post-1929, correct?

8        A.   Correct.

9        Q.   Okay.

10       So I'd like to ask you about a few things related

11  to that.  In -- in the motion, it quotes your work as

12  saying:  "Within a year of the 1929 law's passage, the

13  government had prosecuted 7,001 border crossing crimes.

14  By 1939, that number rose to over 44,000."

15       You were speaking about that a bit ago, correct?

16       A.   Correct.

17       Q.   So that statistic you cite, what does "border

18  crossing crimes" mean?  Is there a particular statute?

19  Is it divided up?  Uh --

20       A.   Yeah.  It's described in the record, especially

21  in the annual reports, as Immigration Act crimes.

22  That's sort of the quote.  When you look more deeply

23  into the narrative of the annual reports -- for example,

24  I cited the 1930 annual report in which it's attributed

25  -- that rise is attributed to the enforcement of the

1    Immigration Act of March 4, 1929.

2         And then also when you look really closely to the

3    Bureau of Prisons' records, it's clear that they're

4    talking about people who are arrested in prison for

5    unlawful re-entry in particular.

6    Q.   Okay.

7         And the decade between 1929 and 1939 largely

8    corresponds to the Great Depression, correct?

9    A.   That's correct.

10   Q.   And jobs in the United States were largely

11   understood to be scarce in this period, correct?

12   A.   Very correct.

13   Q.   And you've written in your book Migra, that:

14   "Mexican labor immigration surged with the massive

15   expansion of southwestern agribusiness in this period,"

16   correct?

17   A.   The surge happened during the 1920s.

18   Q.   Okay.  So -- and you've cited statistics in

19   that period suggesting that "border crossings undertaken

20   by Mexican nationals skyrocketed to over a million in

21   that decade."

22        Yes?

23   A.   During the 1920s; correct.

24   Q.   Yes.

25        And you stated in the past -- I believe as

1   recently as last week in another hearing -- "immigration

2   requires a push, a pull, and a process," correct?

3       A.   Correct.

4       Q.   Can you explain a little bit what you mean by

5   that?

6       A.   Sure.

7           Well, this is established in immigration theory

8   that you need a reason why people want to leave their

9   homes, right?  That's a pretty deep and profound need

10  to leave your home.  And that could be many things.  It

11  could be war or violence or it could be the need for

12  labor.  Um, it could be a family needs to reconnect with

13  someone who has left.  The needs could be many.  That

14  push can come from many factors.

15          A pull factor is why do you choose to go where

16  you go?  And a pull factor can be your family is in

17  this other place or better jobs are in that other place

18  or safety and security seems to be in that other place.

19  Those are all kind of pull factors.

20          The other piece that's really important that, you

21  know, the last, really, 20, 30 years, that migration

22  scholars have taken a more closer look at is that

23  process piece, right?  There has to be some way for

24  you to get from point A to point B, so that you'll

25  go there.  And during this time period for Mexican

1    immigrants, that process was largely the railroad,

2    right, which had been built by U.S. investors in Mexico.

3    It could also be by foot, but, largely, the railroad

4    played a big role.

5        Q.   Okay.  So fair to say in this period the -- as

6    far as Mexican labor immigrants went, the push from

7    Mexico would be a dearth of economic opportunity,

8    correct?

9        A.   Yes.

10       Q.   And then a pull from the United States would be

11   a severer economic opportunity, correct?

12       A.   Yeah.  That's correct.

13            And I would frame that as a more integrated

14   story, in the sense that what creates the push factors

15   in Mexico is the increasing integration of the U.S.

16   in Mexican economies that begins, um, late 19th century,

17   but it really escalates as you move into 1910, the

18   1920s, and continued, even, into the 1930s.

19            And so it's the rise of U.S. investment in

20   Mexico, with the railroads and the mines and cotton

21   and whatnot, that displaces a rural population, forces

22   them to find work which is insufficient and which has

23   segregated, uh, protocols, even within Mexico, according

24   to, sort of, U.S. Gemco (phonetic) law.  And then people

25   begin to take those railroads north.  And, they're often

1    invited into the United States by labor recruiters.

2        Q.   And they're looking for jobs, correct?

3        A.   Yes.  Certainly.

4        Q.   Yeah.  And it's fair to say that this pull,

5    this looking for jobs is the trend that remained a

6    factor driving labor migration from Mexico to the

7    United States in the decades following the 1920s,

8    correct?

9        A.   That is correct.

10       Q.   Okay.

11            In fact, undocumented immigration also rose

12   during the 1940s, correct?

13       A.   That's correct, alongside the Bracero program.

14       Q.   Right.

15            And workers in America who competed with these

16   immigrants for jobs, typically, opposed this migration,

17   correct?

18       A.   Yeah, until the 1970s, labor option was opposed

19   to immigrate in general.

20       Q.   And you wrote in your book Migra, specifically,

21   "Leaders of the Mexican American middle class --" so

22   these are people of Mexican descent, who are American

23   citizens "-- in the 1950s, supported aggressive

24   immigration enforcement," correct?

25       A.   Yeah.  I mean, that goes back to the 1920s.

1    Certainly, you see that at politics and in place.

2       Q.   And one of the reasons they did that I believe

3    you wrote in Migra, is because they thought that

4    increased border enforcement would improve job security

5    and living conditions for Mexican-American workers,

6    correct?

7       A.   Yeah.   There was a notion that there was a, sort

8    of, zero sum game of jobs, right, and that people of

9    Mexican descent, largely because of segregation in the

10   United States and because of that racial subrogation,

11   gave this notion that Mexican-origin folks had to fight

12   for the same jobs as to opposed to having all jobs open

13   to them, and that certainly helped to create this notion

14   that they were in competition with each other.

15       There was this really great labor organizer -- I

16   know.   I'm getting a little off-topic -- named Ernesto

17   Galarza during this time period.   He tested that.

18       Q.   Thank you.

19       Although fair to say that this hostility to

20   labor competition isn't unique to the Mexican-American

21   community in spirit, correct?

22       A.   Correct.

23       Q.   Right.

24       It's generally people who, who believe that

25   Mexican immigrant laborers might compete with them

1   for jobs, typically, are hostile to that proposition.

2   Yeah?

3       A.   It -- this is correct.   It's more complicated.

4           Of course there's another side to the story,

5   that there's an emerging immigrant right to movement.

6   There's an emerging analysis about what's the connection

7   between why Mexican immigrants leave Mexico, and why

8   they come to the United States, and that we're all,

9   actually, part of the same economic system, as opposed

10  to on, sort of, separate sides; when people need to go

11  back to their place.   It's all the same place.   It's all

12  the same economic system.

13      Q.   Turning to some other maybe drivers of

14  enforcement, you also wrote in Migra, you went down

15  to the archive in Mexico and you learned, uh, that

16  there was a Mexican Department of Migration that started

17  in, I believe, 1926, correct?

18      A.   That's correct.

19      Q.   And this is actually a bit of a surprise to

20  you at the time, if I'm not mistaken.   It was something

21  you didn't know about before -- other story -- and I

22  apologize.   You're not -- and I'm kind of rambling on --

23  but it was something that you didn't know prior to your

24  trip to Mexico, correct?

25      A.   Well, I went there because I'd seen in the

1    archive little hints that that might be the case.  And

2    I was persistent because I'd seen those things.

3         But, yes, that was relatively new to me.

4    Q.  All right.

5         And this Department of Mexican migration,

6    its focus was trying to prevent Mexican workers from

7    illegally crossing into the U.S., right?

8    A.  From crossing, period, largely, there was a

9    strong opposition.  For Mexican national reasons, you

10   know, concerns about how Mexican immigrants were treated

11   north of the border.  There were concerns by Mexican

12   employers, or U.S. employers in Mexico, about losing

13   access to labor.

14        Those are, sort of, the general politics of that

15   time period.

16   Q.  But if the U.S. Border Patrol can be understood

17   as serving a function to keep outsiders out, the Mexican

18   Department of Migration's function was to keep Mexicans

19   in, correct?

20   A.  I think this comes back to how we understand

21   the inside and the outside, right?

22        So you have like a -- also in Migra, Ernesto

23   Galarza, and others, who are really thinking about --

24   and you have to understand the importance of Mexico in

25   the rise of the United States economy in the late

1    19th and through the 20th century; that these are

2    conjoined initiatives, economies, and so there is no

3    inside/outside.  There is an increasingly integrated

4    space for a laborer.  And that critique is developing

5    and growing stronger across the 20th century.

6        Q.   All right.

7            But you did also write in <u>Migra</u>, did you not,

8    that Mexican officials, including the Department of --

9    the Mexican Department of Migration, they lobbied

10   the U.S. Department of State, the U.S. Immigration and

11   Nationalization Service, and the U.S. Border Patrol to

12   improve border patrol control this period, correct?

13       A.   That is correct.

14       Q.   And, to deport Mexican nationals who broke

15   U.S. and Mexican law by illegally entering, correct?

16       A.   Yeah.   They wanted to control the flow, as well,

17   of Mexican immigrant laborers into the United States.

18   And if we're talking about the 1940s, that's where the

19   Bracero program comes from, is this bi-, trilateral

20   set of agreements about controlling the flow of

21   migrants.

22       Q.   All right.

23            And so fair to say that, in part, border

24   enforcement decisions or control of migration across

25   the southern U.S. border at this time was also impacted

1    by foreign policy?

2         A.   Foreign policy, certainly, is a player in this.

3              And I also go to, you know, lengths in <u>Migra</u> to

4    talk about the power relationship between the United

5    States and Mexico; that Mexico is a junior partner in

6    this partnership, and that they're not dictating, by

7    any means, to the United States Government about how

8    this is going to go.  Rather, the United States

9    Government is receptive because it's aligned with

10   their political, cultural interests.

11        Q.   Although you also write in <u>Migra</u>, do you not,

12   that in 1943 -- you mentioned a little ago the Bracero

13   program, which is a program through which Mexican

14   immigrant laborers can receive legal status in the

15   U.S. to work, correct?

16        A.   Yeah.   They're short term contracts, usually

17   six months.

18        Q.   So is it not true that in 1943, the Mexican

19   Embassy in Washington D.C., warned the U.S. Department

20   of State that if control was not established over

21   illegal immigration into the U.S., that Mexico would

22   cut off the Bracero program?

23        A.   This is true.

24        Q.   Okay.

25              Now it's also true that in the early years of

```
 1    the -- well, actually, I beg your pardon.  Let me take

 2    a brief step back.

 3          Let's talk about the Bracero program for a

 4    moment, if we could --

 5                MS. GORMAN:  Your Honor, just to be

 6    clear, I tried as much as possible to streamline the

 7    presentation given our limitation and how, sort of,

 8    Professor Lytle Hernandez focused on the periods leading

 9    up to the periods of 1929.  So this is -- I mean, it's

10    up to Court whether to permit this line of inquiry, but

11    it is, certainly, beyond the scope of the direct.

12                MR. WALKINGSHAW:  With respect, Your Honor,

13    I believe there was commentary about enforcement

14    patterns following the passage of the 1929 laws act.

15    I think it's only fair that we inquire into some of the

16    other driving factors.  Obviously, racial animus has

17    been discussed in Professor Lytle Hernandez's testimony.

18    It's a complicated story.  I think the other factors

19    should -- are fairly discussed and are within the scope

20    of cross.

21                THE COURT:  Because Ms. Gorman's direct

22    examination did touch on enforcement, I'm going

23    to permit the government to explore the area of

24    enforcement.

25                Even if what was touched upon was brief, I
```

1    want, as I indicated earlier, to have a thorough record.

2    And I want to have the government be able to examine

3    the expert witness as well, not just with the scope

4    presented today, but with the scope of the content of

5    the Declaration that's been offered in support of the

6    motion.

7              So to the extent there's an objection, I

8    overrule the objection.

9              Mr. Walkingshaw, you want to repeat your

10   question?

11             MR. WALKINGSHAW:  Certainly.

12             Um -- might withdraw the question and start

13   anew, if that's all right, Your Honor.

14             THE COURT:  It is your question.  You may

15   rephrase if you would like or withdraw if you like.

16             MR. WALKINGSHAW:  Yeah.  I have a hard time

17   summing up what I said before.

18   BY MR. WALKINGSHAW:

19      Q.   Professor Lytle Hernandez, the Bracero program

20   that we discussed, started in 1942, correct?

21      A.   Right.

22      Q.   That was extended in 1951?

23      A.   Correct.

24      Q.   It ran until 1964, correct?

25      A.   Correct.

1     Q.   So the start of the Bracero program happened

2   roughly around the onset of World War II, correct?

3     A.   Yes.   Post-U.S. entry into the war.

4     Q.   Right.

5          And you wrote in <u>Migra</u> that this triggered

6   increased national security and geopolitical concerns,

7   given that the U.S. shared a 2000-mile border with

8   Mexico, correct?

9     A.   Correct.

10    Q.   And you wrote that the U.S. State Department put

11   pressure on the INS and Border Patrol to close the door

12   to undocumented migrants during this time, correct?

13    A.   Correct.

14    Q.   In part, because of the national security concern

15   presented by having a forced border during the world

16   war, correct?

17    A.   In part, yeah.

18    Q.   Yeah.

19    A.   Also, you know, to keep Mexico, you know, a solid

20   partner during this time period.

21    Q.   So, again, foreign policy concerns, in part,

22   correct?

23    A.   (No response.)

24    Q.   Now you also talked about how there's an

25   integrated system going on here, correct?

1    A.   The economy we're talking about?

2    Q.   Yes.  I apologize.  I suppose that's a bit

3  vague.

4        But the enforcement of a border control between

5  the U.S. and Mexico, that was also something in the

6  integrated system, incorporating institutions from the

7  United States, and institution from Mexico, correct?

8    A.   Yeah.  From the 1940s and '50s, you see

9  increasing integration in immigration control.

10   Q.   Right.  The U.S. Border Patrol and the Mexican

11  Department of Migration, they worked together during

12  this period.  Yes?

13   A.   Yes.  Uh-huh.

14   Q.   Okay.

15        Now, is it correct you wrote this in <u>Migra</u>

16  that: "By the late 1940s, one-third of all

17  apprehensions were of repeat offenders who had

18  previously been deported," correct?

19   A.   That's correct.

20   Q.   And some were repeat offenders who had been

21  apprehended and deported several times in a year,

22  correct?

23   A.   That's correct.

24   Q.   And others had been apprehended and deported

25  several times in a day, correct?

52

```
 1      A.   Correct.

 2      Q.   Is it correct in this period that the Border

 3   Patrol tried all different kinds of strategies to deter

 4   repeat offenders from returning?

 5      A.   Yes.  That's correct.

 6      Q.   All right.

 7           They tried detention?

 8      A.   (Nodding head affirmatively.)

 9           Yeah.

10      Q.   And you have to -- thank you.

11           Just for the benefit of the court reporter, if

12   you could respond orally -- although I am going to go

13   through a list, so I could understand why you started

14   nodding.

15           But, uh, they do bus lifts?

16      A.   Correct.

17      Q.   They did boat lifts?

18      A.   Yes.  All this was happening integration.

19      Q.   They erected fences?

20      A.   Correct.

21      Q.   And they even took unsanctioned actions, like

22   shaving repeat offenders' heads, correct?

23      A.   Yes.

24      Q.   Uh, but border patrol officers would still find

25   previously deported migrants, even after going through
```

1    some of these procedures, correct?

2       A.   That is correct.

3          I mean, all of this activity is happening, you

4    know, I would argue, uh, yes, within foreign relations,

5    with an (unintelligible) of foreign relations, with an

6    integrated economy, around labor concerns, concerns

7    about what's emerging as the Cold War.

8          Racial animus is also at play.  There is no way

9    in which we can understand the politics of head shaving

10   as something that would have been tolerable for other

11   than Mexican immigrants in this time period.  And the

12   involvement of the Mexican government does not mean

13   that rational animus is not at play.  Mexico has a long

14   and deep history of race and subrogation, especially for

15   indigenous folks.

16          So, the story of race transcends the border.

17      Q.   Thank you, Professor Hernandez.  I do appreciate

18   the analysis, although in the interest of time, with

19   respect, if you wouldn't mind answering my questions,

20   I think the analysis was put forth in your testimony.

21   And I know Ms. Gorman will be making these arguments

22   to the Court.

23          So just for purposes of today's proceeding, if

24   you wouldn't mind answering the questions that I put to

25   you, I think things will go a little faster -- although

1   I don't believe I have a ton more -- but can we agree

2   that that's fair?

3       A.   Well, I just want to be full in my answers, so --

4   everything is complicated, so yes/no is not always the

5   accurate answer.   So when I think that I need to give a

6   little bit more context, I would like to be able to do

7   that.

8       Q.   Okay.   Understood.

9            So there's another citation, and I believe it's

10  to your work from City of Inmates, in the motion.   It

11  refers to the same -- it, basically, immediately follows

12  the sentence we were discussing at the beginning of

13  cross-examination.

14           So, from 1929 to 1939, it says:   In each of these

15  years, individuals from Mexico comprise no fewer than

16  84 percent of those convicted, and often made up as many

17  as 99 percent of defendants for illegal, uh, for border

18  crossing crimes, correct?

19      A.   Correct.

20      Q.   Now, the majority of undocumented migrants in

21  this period crossing the Mexican border were Mexicans

22  at that time, correct?

23      A.   Certainly a substantial number.   I would also --

24  it's really important to understand the role that the

25  U.S. Border Patrol plays in identifying and arresting

1   people.  So this is why telling that law with the

2   (unintelligible) Border Patrol is really, really

3   significant, and why they came to focus on Mexican

4   immigrants.

5       So the 1924 Immigration Act, which dominates

6   immigration control between 1924 and to 1965, really,

7   there is a plethora of possibilities for immigration

8   law enforcement, right?  People likely to become public

9   charges.  People engaged in prostitution.  There's

10  lots of things that they could do.  But because of the

11  cultural and political dynamics of the establishment of

12  the Border Patrol, and who was hired as Border Patrol

13  officer, and where they worked, they made a set of,

14  sort of, granular decisions, at the local and regional

15  level, that shifted away from broad enforcement of the

16  immigration law, and all the possibilities, and targeted

17  their attention on Mexican immigrants.  This is the way

18  that they built power for themselves as immigration law

19  enforcement officers.

20      So, this is important because how you get from

21  a notion of all these different people crossing the

22  border -- people with trachoma who were kept out, people

23  likely to become public charges -- to just largely

24  Mexicans being delivered up as the undocumented, being

25  delivered up as the people who are arrested and

1    imprisoned, that happens in the -- in the sort of

2    vestibule of immigration law enforcement.  So, it's

3    really, really important to see that how you go from

4    law to law enforcement, to who gets imprisoned, happens

5    at that juncture.

6        Q.  Okay.  Thank you, Professor.

7            I do want to make sure that my question did get

8    answered.  The question is, yes, a substantial majority,

9    they were Mexicans, correct?

10       A.  Well, a substantial number.  Right?

11       Q.  Okay.

12       A.  So you're talking about what we don't know about

13   unauthorized immigrants.

14       Q.  Okay.

15       A.  There's -- certainly, we don't know the number,

16   so "majority" is tough.  "Substantial number," certainly

17   is true.

18       Q.  Okay.

19           Now, you were speaking a little bit ago about

20   enforcement priorities.  Isn't it correct, as you

21   wrote in Migra, that by the mid to late 1930s, the

22   U.S./Mexico border was not the epicenter of border

23   control activity, correct?

24       A.  Yeah, it wasn't as early as the 1920s.  That

25   increases over time.

1      Q.   And by the point of the mid/late 1930s, there

2   were more officers on the U.S./Canadian border, than in

3   the U.S./ Mexico border, correct?

4      A.   Yeah.   That border is longer.   So when the

5   border was started, there were even more officers or

6   allocations for the northern border.   Slowly, for the

7   vast reasons I was just discussing about, sort of,

8   border patrol force in the U.S./Mexico border region,

9   that shifts allocations to the southern border, and

10   that that really ampli -- ramps up during World War II.

11      Q.   Now, roughly, in this same period, I believe

12   in Migra, you cite that mid 1920s, "80 to 95 percent

13   of California's laborers were people of Mexican origin,"

14   correct?

15      A.   Of the working class, right, of --

16      Q.   The laborers -- I beg your pardon.   I didn't mean

17   to interrupt you.

18        But the laborers -- yeah, so the working class.

19   Laborers, roughly, to use equivalent terms?

20      A.   Well, I mean, laborers could be highly skilled

21   laborers.   It's a general term.   But, certainly, the

22   agricultural workforces, street workers, all of that.

23   Yes, Mexicans are a substantial portion of that.

24      Q.   And during this same period, I believe you wrote

25   that 80 to 98 percent of Texas' working class were

1  Mexican, correct?

2      A.  Of the low wage workforce, yes.

3      Q.  Right.

4          And, again -- I believe we discussed before -- a

5  substantial pull for these people, these working class

6  people, is increased economic opportunity, correct?

7      A.  Jobs.  Yes.

8      Q.  Exactly.

9          Now, I believe you also wrote in <u>Migra</u>, so you

10  would agree then, that at least in the 1930s, when

11  prosecution for entry crimes increased, the fines and

12  incarceration that were imposed, uh, diminished the

13  basic pecuniary function of labor immigration, correct?

14     A.  Yeah.

15     Q.  If you get fined, you lose your money, correct?

16     A.  If you get fined, you lose your money.  If you

17  go to prison, you can't work.

18     Q.  Right.  So criminal penalties served as

19  a deterrent to some folks seeking these labor

20  opportunities, correct?

21     A.  It served as a deterrent in its actual form, but

22  it also served as a mechanism of making Mexican laborers

23  more vulnerable.  Right?  Because of the way the law was

24  racially enforced, Mexicans were more vulnerable to

25  arrest.  And so it's a tool that agribusiness,

1    especially during this 1930s period, is using in

2    conjunction with border patrol officers, to make

3    sure that Mexican workers remain temporary, so-called,

4    quote, docile, um, and controlled.

5        Q.   Yeah.

6            You testified on direct about a social structure

7    that rose up.

8        A.   Juan Crow.

9        Q.   Yes.

10           And I believe you said it made these workers

11   more desirable for certain kind of employers, correct?

12       A.   Yeah.  It was a racialized form of social

13   hierarchy that's known in the American south as

14   Jim Crow, in the America southwest is Juan Crow --

15       Q.   Right?

16       A.   -- and that's what creates them as a marginalized

17   workforce.  Yes.

18       Q.   Right.

19           You said that the undocumented status of

20   these folks allows them to be subject to increased

21   control by their employers, correct?

22       A.   Well, there's the racialized system, right,

23   which is that Juan Crow.  And then undocumented status

24   accentuates that, and I would say that the threat of

25   imprisonment only deepens that marginalization.

1      Q.   Right.

2           I believe you testified in the past that, you

3      know, for folks who are undocumented, there's always the

4      threat, "We can just call the Border Patrol," correct?

5      A.   That's correct.

6      Q.   It's a threat that can be made against these

7      people?

8      A.   Correct.

9      Q.   And, in effect, it makes them more exploitable,

10     correct?

11     A.   Correct.

12     Q.   You can pay them lower wages, correct?

13     A.   Yeah.

14     Q.   You could submit them to, uh, working conditions

15     that wouldn't be accepted, or might even be illegal in

16     terms of standards put forth for people with status,

17     correct?

18     A.   Yeah.  So, there's status and non-status.  But,

19     again, we have to understand all this -- and Migra goes

20     into this in depth, and so does City of Inmates -- that

21     that's a racialized concept of who is undocumented by

22     this time period, and who gets policed, who that threat

23     is meaningful for, is a racialized situation and scheme.

24     Q.   But as you just said, Professor, isn't it correct

25     that undocumented status for some of these people

1   accentuates that threat?

2       A.   Undocumented status, certainly.  The fact,

3   though, is also that that status has deeper meaning

4   for people who are more vulnerable to the enforcement.

5       Q.   And folks who are undocumented are necessarily

6   more vulnerable to enforcement, are they not, Professor?

7       A.   Racialized workers who are the targets of

8   policing are the most vulnerable to enforcement per

9   immigration law.

10      Q.   With respect, Professor, the answer to my

11  question is yes; undocumented people are more vulnerable

12  to these kinds of enforcement?

13      A.   Only within a racialized context.

14      Q.   So you do not agree that, um, in a context such

15  as, uh -- Canadian workers, for example.  The Canadian

16  worker, without -- in the U.S. illegally, without any

17  kind of status, you do not agree -- and let's say for

18  purposes of the example, that this person was white.

19  The person is not more vulnerable than a similarly

20  situated Canadian white worker who has a visa?

21      A.   Uh, that is certainly the case.

22           In addition to that, their sense of vulnerability

23  is deeply impacted by the likelihood of them being

24  targeted for arrest, of them being brought to the

25  consequences of that status.

1       Q.   Okay.

2               MR. WALKINGSHAW:  I have no further

3    questions.

4               Thank you, Professor Lytle Hernandez, for

5    your testimony today.

6               I'll pass the witness.

7               THE COURT:  Ms. Gorman.

8               THE WITNESS:  You're welcome.

9                     **REDIRECT EXAMINATION**

10   BY MS. GORMAN:

11      Q.   Professor Lytle Hernandez, I think there were so

12   many important points to hit on and I want to use your

13   time as wisely as possible, but one of the interesting,

14   sort of, differences that the government brought up was

15   related to Canada.

16           So, can you talk a little bit about the

17   differences between the treatment of Canadians, both

18   legally, like, you know, in terms of visa overstaying

19   or regularizing status, and people south of the border.

20   So, generally, Mexican people or Latinos?

21      A.   Yeah.  So there's scholar historian named

22   Mae Ngai, who has written a considerable amount on

23   this.  And one of the things that she helps us to

24   see and to understand is the development of something

25   that was called the Pre-examination program that was

available, I believe starting in late -- in the 1920s,

that people who did not have regular status or proper

paperwork, for whatever reason, could get pre-examined

in the United States, go back -- go to Canada, and then

re-enter legally into the United States.

So this is a scheme that's only available in

Canada, which is sort of setup for people who are -- for

immigrants who are close to the Canadian border, have

access to the Canadian border.  And, you know, largely,

it was European immigrants that crossed through Canada

who had access to the Pre-examination program.

So that's one example of how regularization

was made available to, disproportionately, European

immigrants.

Q.   And what were the differences in terms of

Mexico for -- what would be the analogous situation

in Mexico that was or was not available to those

individuals?

A.   There was no pre-examination process that was

available in Mexico or through Mexico.  And again, as

I had mentioned earlier, by 1928, consulate officials

in Mexico were systematically denying visas to Mexican

workers in particular.

Q.   So -- which actually brings up an interesting

point.

1          Did Congress ever decide to criminalize visa

2    overstaying?

3         A.   I am unaware of any such move.

4         Q.   But, Canadians did have access to visas that

5    Mexicans did not?

6         A.   It was not -- the Pre-examination program did not

7    have these national limits to it.  But, the way in which

8    it's set up, because you have to return to Canada to

9    cross, it meant that it was more available to people

10   who crossed the Canadian border as opposed to people who

11   crossed the Mexican border.

12        Q.   And a few times I noted you tried to provide a

13   racial context to some of the prosecutor's questions,

14   and I want you to be able to elaborate on that.

15          How do you, as a historian, suss out racial

16   animus, when you have so many competing interests,

17   right?  You have economic interests and foreign policy.

18   So, how do you conceptualize race?  And then how do

19   you suss out racial animus when you're studying this

20   issue?

21        A.   You know, that's a good question.  I mean, of

22   course, the world is always complicated and there are

23   many dynamics of play in any congressional decision.

24   Why is that, you know, I, as a scholar of race and

25   immigration policing, think that immigration law and

1    immigration control are highly racialized?

2         First, the entire body of scholarship of

3    immigration law, I'm within the mainstream of that

4    scholarship that's discussing, um, the rise of the

5    1924 Act and heading into the 1929.

6         Also, let's -- can I read you a couple things

7    from the, sort of, pre-1929 period about --

8    Q.   Sure.

9    A.   -- this distinction, from their own words, not

10   mine?

11        We can talk about racial capitalism and how

12   racial formation and class are always bound together.

13   That the way that you extract (unintelligible) from

14   people is by dehumanizing and subjugating, so that,

15   you know, that extra portion of profit comes through

16   that racialization process.  But, let's take the words

17   of a people who were passing immigration law themselves.

18        So, for example, we know eugenics was a primary

19   science that was utilized as we're heading into the

20   1924 Act, and the efforts to include Mexicans in the

21   quota.  After the 1924 Act, you get a Society of

22   America, which Howard Johnson was the President of

23   in the mid 1920s, and it issues a series of reports.

24   I want to read from a couple of those reports.

25        Why?

1          Because they really hit on this issue of race

2     versus the economy.

3          So from a second report of the subcommittee on

4     Selected Immigration of the Eugenics Committee of the

5     United States of America, published by the Eugenics

6     Society of America, quote:  "Immigration Act of 1924,

7     established a new immigration policy.  It expressed

8     the conviction of the American people that immigration

9     is a long-time investment in family stocks, rather

10    than a short term investment in productive labor.

11    That is a question of future race character, and not

12    primarily an economic problem."

13         So, you know, this is the kind of thinking

14    that the eugenicists were deploying as they were coming

15    to develop the 1924 Act, the efforts to include Mexican

16    immigrants on the quota system.  And when that failed,

17    you have the development of the 1929 law.

18    Q.   So -- and when you talk about race and when you

19    talk about racial animus, how are you conceptualizing

20    race as opposed to nationhood?

21         So what is the -- so that was -- and that was the

22    second part of my question.

23         And I'm sorry.  I tend to ask compound questions

24    and that's my problem.

25    A.   Yeah.  I appreciate simple questions.  It's hard

1    to hold on to, like, multiple questions at a time.  So,

2    thank you for following up.

3         The concern, certainly during the 1920s, of

4    Mexican immigrants was not about a national concern.

5    The concern was about what was understood as non-white

6    immigrants coming from south of the U.S./Mexico border.

7         The way in which Mexicans were constructed as

8    racially undesirable, is that they were seen as being

9    majority indigenous, part black, mixed race; that they'd

10   be a threat to sort of the Nordic, particularly, of the

11   1924 legislation.

12        You know, James Davis, who was really, you know,

13   instrumental in the passage of the 1929 legislation.  He

14   was the Secretary of Labor and he worked very closely

15   with (unintelligible), I think the record is quite

16   clear was a ardent white supremacist.

17        James Davis commissioned a study in 1925 in

18   response to the 1924 Act, and he wrote -- or in that

19   study it's written, quote:  "In blood, the people of

20   the United States are mainly European and white.  In

21   blood, the people of Latin America and the West Indies

22   are mainly Asiatic.  And by that, they mean Indian or

23   African.  Mainly black or brown."

24        And it's that sort of notion about who is coming

25   from south of the border being, quote, unquote, the

1    sort of (unintelligible) Indian migration of history,

2    that makes Mexican immigrants seem racially unfit,

3    undesirable to the white population of the United

4    States.

5        Q.   And thank you.

6            You know, one thing I think I touched on, I

7    think, super briefly, was, um, there's a part of

8    history -- I will admit I knew nothing about before

9    this -- but sort of going into the 1920s, there were

10   certain, uh -- I think they were called the Juarez Riots

11   or the Bath Riots.

12           So there were -- there was this, sort of, system

13   at the border, sort of, going into the 1920s that, as I

14   understand it, people coming from south of the border

15   were subjected to, but north weren't.  And can you talk

16   a little bit more about that, or can you elaborate a

17   little bit more about that?

18       A.   Sure.

19           I mean, there's a scholar Alexandra Minna Stern,

20   who has written on this quite extensively on a the book

21   -- the book she has on Eugenics and Immigration, and

22   an article that she has on "Boundaries of Building and

23   Blood."  So, what happens is in 1917, U.S. Immigration

24   Service institutes a new process by which they're going

25   to quarantine and delouse all Mexican immigrants -- or

1    many Mexican immigrants crossing the U.S. and Mexico

2    border, that delousing consisted of, really, a kerosene

3    bath and a washing of the clothes, out of a fear that

4    they were going to bring Typhus fever into the United

5    States.  There was an uprising against this system, and

6    that's called the Juarez Riot, as you call it.  And,

7    yet, it continues through the 1920s, of the process of

8    sort of cleansing Mexican immigrants as they're entering

9    the United States.

10          People who had, sort of, border crossing cards

11   had to subject to these -- were subjected to these

12   weekly baths.  And people who were crossing to, you

13   know, go farther from the border were also subjected

14   on their way in.

15          And it's my understanding, uh, that, you know,

16   later on, some of the chemicals that were used in these

17   baths would become chemicals that were used, um, in the

18   genocidal campaigns in Nazi Germany.

19   Q.   And specifically the gas -- and I -- are you

20   referring to -- and I know I have it written down

21   somewhere -- but are you referring to the gas

22   specifically used in the gas chambers in Nazi Germany?

23   A.   I'm forgetting the title of the gas, but, yes.

24   Q.   Zyklon B.  Pardon me.  I had it written down

25   here somewhere.

1      So, is that what you're referring to is the gas

2  that was used in Nazi Germany?

3      A.   I am.   It just hurts so much to say that.

4          Uh, you know, Harry Laughlin, who was the

5  eugenics expert brought into Congress by Howard Johnson

6  in particular, uh, was heralded in Germany during the

7  1930s for the immigration laws and, um, studies.   And

8  there's a terribly close relationship between the two

9  regimes that developed.

10     Q.   All right.

11         And I notice you are -- I will give you a

12  moment because I, I didn't want to upset you with

13  that question.

14         But -- and so when we talk about the use of

15  this gas at the border, and the kerosene baths, um,

16  in addition, were individuals at the southern border

17  also required, including, you know, women and young

18  girls, to strip naked for inspection?

19     A.   That is correct.

20     Q.   And was anybody at the northern border, to your

21  understanding, ever subjected to this kind of, um,

22  treatment?

23     A.   No.

24         And, you know, the, the historical literature

25  is clear on this that about 99 percent of the people

 1   who came through Ellis Island were allowed passage into

 2   the United States, often with little more than, like,

 3   an eye exam for trachoma.  And what was happening to

 4   immigrants, mainly at the El Paso border, because that's

 5   the main passage point on the southern border, and at

 6   Angel Island in San Francisco, which is the main passage

 7   point for Asian immigrants, were subjected to far

 8   different procedures of immigration control than in

 9   El Paso.

10        As you say, the delousing baths and the

11   quarantine were particularly harmful, enraging,

12   unhealthy to the point that, you know, they invited

13   the riots of 1917.

14   Q.  I believe there was a 17-year-old girl that

15   incited those riots.  Are you familiar with the name

16   Carmelita Torres?

17   A.  I know the case lightly.

18   Q.  Well, then I won't make you go into it.

19             MS. GORMAN:  And Your Honor, I would pass,

20   um -- I guess, ultimately, before I let you go, is it

21   your ultimate conclusion that racial animus was a strong

22   motivating -- motivating force in the passage of illegal

23   re-entry in 1929?

24             THE WITNESS:  Yes.  It is my professional

25   opinion that racial animus was a motivating factor, a

1    significant motivating factor in the passage of the

2    Immigration Act of March 4th of 1929.

3                MS. GORMAN:  And is it your opinion that it

4    continues to have a desperate impact on Latino or Latinx

5    individuals?

6                THE WITNESS:  It is my professional opinion

7    that it was constructed to do just that, and that it

8    continues to have a dispersate impact.  Yes.

9                MS. GORMAN:  And are you aware of any

10   period, since 1929, when illegal re-entry has not been

11   on the books.

12               THE WITNESS:  I am not aware of any such

13   period.

14               MS. GORMAN:  Your Honor, I will pass the

15   witness.

16               MR. WALKINGSHAW:  Thank you.

17                      **RECROSS EXAMINATION**

18   BY MR. WALKINGSHAW:

19     Q.   Professor Hernandez, this will be as brief as I

20   can.

21          You testified on redirect that the opinion that

22   you just voiced is, I believe you used the phrase

23   "within the mainstream of immigration scholarship,"

24   is that correct?

25     A.   That racial animus was a driving factor in the

1    passage of immigration law, especially leading into

2    1924, and then the concerns, post-1924, around Mexican

3    immigration.  Yes.

4        Q.  So that opinion, you know, you testified is

5    within the mainstream of immigration scholarship,

6    correct?

7        A.  Yes.

8        Q.  And now you testified in a hearing in the

9    District of Oregon last week, correct?

10       A.  Correct.

11       Q.  At that hearing, uh, did you not say that, "in

12   the academy, you can always find differing opinions"?

13       A.  I, I don't recall saying that.  But, yes, I would

14   affirm that today.

15       Q.  It is true, correct?

16       A.  Of course.  Yes.

17       Q.  Yeah.

18           Then, briefly, we discussed, on redirect, some

19   differences between the enforcement at the Canadian

20   border and enforcement at the Mexican border.

21           Did Canada have anything remotely like the

22   Bracero program at any point in history?

23       A.  No.

24       Q.  Okay.  The Bracero program permitted -- I believe

25   you wrote in Migra -- two million Mexican laborers to

74

1   work illegally in the United States under the auspices

2   of the program, correct?

3       A.  Yes.  It also included West Indian laborers.

4   There's a strong sense of wanting to have, again,

5   non-white, racially marginalized populations included in

6   this workforce.  So, it wouldn't have been something

7   constituted for a majority white Canadian population.

8           The other distinction for the Canadian border

9   that's important is that under treaty rights, indigenous

10  folks, moving across the Canadian border, have free

11  passage.

12      Q.  All right.

13          And then just very briefly, I'd just like to make

14  sure I get some dates correctly.

15          I believe you said the Juarez Riot took place in

16  1917, is that correct?

17      A.  Uh-huh.

18      Q.  And the quotes that you wrote from the -- I'm

19  forgetting the term -- but the Eugenics Committee -- on

20  redirect, do you know the quotes I'm referring to?

21      A.  Yes.

22      Q.  Those are from 1920s, correct?

23      A.  Yes.  That's correct.

24      Q.  Okay.

25                  MR. WALKINGSHAW:  Nothing further --

```
 1                    THE WITNESS:  -- the 1924 Act.
 2                    MR. WALKINGSHAW:  Nothing further.  Thank
 3     you.
 4                    MS. GORMAN:    Your Honor --
 5                 FURTHER REDIRECT EXAMINATION
 6     BY MS. GORMAN:
 7        Q.   Professor Hernandez, and I'll be brief because I
 8     know I want to touch on this with Professor Gonzalez
 9     O'Brien too, but in terms of the Bracero program, was
10     there -- can you talk to me about race and exploitation
11     in terms of that program; or, is that beyond the scope
12     of your -- I don't want to put you in a position where
13     you're talking, you know, where I'm asking you to talk
14     beyond the scope of your, you know, your specialization
15     or expertise.  So, feel free to turn me down.
16        A.   No.   That's fine.   I think, as Mr. Walkingshaw
17     has indicated, my book Migra, I spent a considerable
18     amount of time on the Bracero program.
19             So, first of all, you know, as I think I had just
20     mentioned, the fact that the bilateral agreements that
21     become known as the Bracero program are only effectuated
22     between the United States and Mexico and West Indian
23     countries, is one indication that there was a desire
24     to find a -- not just close, but a certain type of
25     population to come in and do this temporary labor.
```

1   So, non-white populations were targeted for these

2   agreements, and that was Mexico and the West Indies

3   in particular.  And so I think that that's one of the

4   key indicators of the dynamics at play, that it's not

5   just labor, it's a racialized labor form that people

6   wanted to have through the Bracero program.

7           You also have, just through the implementation

8   of the program -- you know, especially in Texas, but

9   elsewhere -- this constant struggle over how Mexican

10  Braceros are going to be treated in the communities.

11  Are they going to be given access to restaurants?

12  Are they going to be given access to dances?  And

13  pretty consistently, uh, they are subject to, uh,

14  Juan Crow.  And that becomes a real sticking point

15  in the relationship, the bilateral relationship, to

16  the point that, you know, that Texas is largely kicked

17  out of the program.

18  Q.   In terms of -- and in terms of the Bracero

19  program, you have talked, sort of, briefly, about the,

20  I guess what we would call delousing or the gassing that

21  had happened at the border going into the 1920s.  But,

22  are you aware of the Braceros being -- and this would

23  be a different chemical.  It would be DDT -- but sort of

24  being subjected to very similar nude inspections, um,

25  sort of being gassed with DDT during that process,

1   when they were, uh, brought to American, I guess,

2   agricultural industries?

3       A.   Yes.   The Bracero workers were gassed

4   systematically with DDT, and there's, you know, many

5   photos and studies on that process.

6       Q.   And subjected, also, to these nude and invasive

7   inspections?

8       A.   That is correct.

9       Q.   And when -- you know one of the, I guess,

10  more arresting images I've come across in the Bracero

11  was, sort of, inspections by agricultural, I guess, land

12  owners or farm owners, uh -- but Braceros, when they

13  were brought in to be used as migrant labor force,

14  was there -- were they able to, sort of, be picked for,

15  I guess, physical fitness, or the ability to toil well,

16  by American agricultural interests?

17      A.   Um, well, so that's certainly true.   There have

18  long been a stereotype at play that Mexican workers, as

19  a race, right, were fit for agricultural labor because

20  they were, I think, believed and thought, you know,

21  shorter to the ground and ready for stoop labor.

22          So, there's sort of a racialized (unintelligible)

23  of people's appearance to do this kind of work.   And,

24  you know, it's part of the reason -- you know, one of

25  the little trowels that Braceros were given to work

1   with, which forced them to sort of bend over constantly,

2   really, literally, broke backs, and became a really

3   important issue that people organized around.

4        You know, a lot of the reasons they were

5   given those trowels was the stereotype that they, as

6   a racial group, um, were more stout and close to the

7   ground and sort of fit for this kind of labor, and so

8   they didn't need the accoutrement that others did.

9   Q.   So -- and in terms of the Braceros, I guess

10  what little protections were afforded to them on paper,

11  did they -- were they generally violated by industry?

12  A.   Oh, I mean, that's where Operation Wetback

13  comes from in 1954, is the persistent violation of

14  the Bracero contracts.  In many ways, that's a campaign

15  that is simultaneously anti-Mexican, and meant to bend

16  employers to comply.

17  Q.   In your general opinion, were Braceros an

18  exploited labor force and racialized?

19  A.   Absolutely.

20        MS. GORMAN:  Your Honor, I think at this

21  point I would pass the witness.  I am worried about

22  going into too much overlap with Dr. Gonzalez O'Brien.

23        And Professor Lytle Hernandez has been

24  very generous with her time already, so I'll pass

25  the witness.

```
 1                    THE COURT:  Mr. Walkingshaw, do you have any

 2    additional questions based on the re-redirect?

 3                    MR. WALKINGSHAW:  No, Your Honor.  Thank

 4    you.

 5                    THE COURT:  All right.  Thank you.

 6                    Thank you, Professor Lytle Hernandez, for

 7    your time here this morning.

 8                    THE WITNESS:  Thank you for having me.

 9                    THE COURT:  Let's take a brief recess before

10    we resume with the next expert witness.

11                    THE CLERK:  Yes, Your Honor.

12                    THE COURT:  We'll take about 15 minutes.

13                    MR. WALKINGSHAW:  Beg your pardon, Your

14    Honor, how long should we -- I might excuse myself from

15    the room.

16                    THE COURT:  We'll take a 15-minute recess.

17                    MR. WALKINGSHAW:  All right.  Thank you,

18    Your Honor.

19                    (Recess taken.)

20                    THE CLERK:  Court is back in session.

21                    THE COURT:  All right.  Ms. Gorman, let's

22    resume with the defense's next witness.

23                    MS. GORMAN:  Your Honor, we call Professor

24    Gonzalez O'Brien.

25    \\\
```

1

**BENJAMIN GONZALEZ O'BRIEN,**

2        called as a witness on behalf of the Defendant,
         was sworn and testified as follows:

3

4                THE CLERK:  Thank you.

5                Please state for the record your full name

6   and spell both your first name and your last names.

7                THE WITNESS:  Benjamin Gonzalez O'Brien.

8   Last names G-o-n-z-a-l-e-z; O, apostrophe, B-r-i-e-n.

9   First name, B-e-n-j-a-m-i-n.

10               MS. GORMAN:  May I, Your Honor?

11               THE COURT:  Yes.

12               MS. GORMAN:  Thank you.

13                   **DIRECT EXAMINATION**

14   BY MS. GORMAN:

15      Q.  Professor Gonzalez O'Brien, can you introduce

16   yourself to the Court, and explain a little bit about

17   your employment and your occupational background?

18      A.  Certainly.  I'm an Associate Professor of

19   Political Science at San Diego State University.  I'm

20   also the author of two books on U.S. immigration policy,

21   Handcuffs and Chain Link, Criminalizing the Undocumented

22   in America.  That came out in 2018, with the University

23   Virginia Press.  And also, Sanctuary Cities.  The

24   Policies of Refuge, that came out in 2019, with Oxford

25   University Press.

```
1          In addition to the two books that I have, uh,
2     I've also -- I'm also the author of a number of articles
3     that have been published in a range of journals.
4          Q.   Can you describe how you developed an expertise,
5     in particular in this area that we are talking about
6     today, in criminalization and migration?
7          A.   So my expertise is based on a reading of
8     committee reports, as well as congressional debate
9     over different pieces of immigration legislation,
10    including the 1929 Undesirable Aliens Act; the 1924
11    Johnson-Reed Act; the 1986 Immigration Reform and
12    Control Act; and the 1996 Illegal Immigration Reform
13    and Immigrant Responsibility Act.
14         I also do some quantitative work looking at
15    stereotypes of undocumented immigrants.  That was part
16    of my first book.  And also some quantitative work,
17    looking at things like crime rates in sanctuary and
18    non-sanctuary cities, which is part of that second.
19         Q.   And Professor, can you also talk about how, as
20    a political scientist, you sort of conceptualize or
21    understand history in your work.  Because I know there's
22    a distinction between the historian and a political
23    scientist, so I'm trying to, sort of, tease that out
24    because they're connected.
25         A.   Right.
```

1          So, you know, one of the connections that I draw

2     in my first book between the Undesirable Aliens Act

3     and the later Illegal Immigration Reform and Immigrant

4     Responsibility Act, is that -- is the influence of

5     initial decision -- policy-making decisions on future

6     choices, as well as, uh, how policy decisions at one

7     point in time, or policies themselves at one point

8     in time, can change how groups are characterized, can

9     change how groups are discussed; and how that, in

10    turn, influences future congressional debates, future

11    congressional decisions on policy in that area.

12    Q.  And is your work on these topics based on

13    principles and methodologies generally deemed reliable

14    in the field of political science?

15    A.  Yes.  Both of my books were peer reviewed by

16    both presses, and all of my articles, to date, have

17    been peer reviewed.  Sometimes multiple times.

18    Q.  And in your work, do you also -- do you

19    collaborate with other, sort of, notable academics on

20    these topics about immigration history and policy?

21    A.  Yeah.  I've collaborated with a number of other

22    academics at different institutions.  Uh, researchers

23    at the University of New Mexico; University of Oklahoma;

24    University of Washington, Tacoma; and then some work

25    in the past with, with a researcher at UCLA.

1    Q.   And I skipped over this, and I know you're a

2    professor, but just to be clear for the record, you

3    have a Ph.D in Political Science, is that correct?

4    A.   I do.   Not only a Ph.D, but also two master's

5    degrees.

6    Q.   Well, thank you.

7         MS. GORMAN:   And, Your Honor, I would ask

8    that the Court recognize Professor Gonzalez O'Brien as

9    an expert in political science, and particularly with

10   a focus on, um -- his words are going to be way better

11   than mine -- but on the intersection between criminal

12   law and immigration and policy, if -- unless Professor

13   Gonzalez O'Brien has a different characterization that

14   would be better.

15        THE WITNESS:   Um, I think the way that I

16   would characterize it would be between past policy

17   decisions and future policy choices when it comes to

18   law-making in Congress.

19        MS. GORMAN:   Your Honor -- and Your Honor, I

20   guess with that, would the Court --

21        THE WITNESS:   I see a wrinkled brow.

22        THE COURT:   I'm sorry.   So the request is

23   to recognize Professor Gonzalez O'Brien as an expert

24   in political science, with a focus on the intersection

25   between past policy decisions and its impact on future

```
 1   choices and debate when it comes to legislation?

 2               THE WITNESS:  If I may clarify, Your Honor.

 3               I think political science, with expertise

 4   in immigration policy, race, and public policy would

 5   probably be a more accurate characterization of my

 6   areas of expertise.

 7               THE COURT:  All right.

 8               Does the government have any objection?

 9               MR. WALKINGSHAW:  Not -- beg your pardon,

10   Your Honor.  I'm having some microphone difficulties.

11               Can you hear me?

12               THE COURT:  Yes.

13               THE WITNESS:  Yes.

14               MR. WALKINGSHAW:  Apologies.

15               No objection to the expertise framed as it

16   was in that last instance.

17               THE COURT:  So the request is for the Court

18   to recognize Professor Gonzalez O'Brien as an expert

19   in political science, with a particular expertise in

20   immigration policy, race, and public policy.

21               Is that correct?

22               MS. GORMAN:  That sounds right to me,

23   Your Honor.

24               THE COURT:  All right.  The request is

25   granted.
```

1           MR. WALKINGSHAW:  Um, yeah, I'm fine with

2    that, Your Honor.  Thank you.

3           THE COURT:  All right.  The request is

4    granted and the Court will so certify.

5    BY MS. GORMAN:

6       Q.  So, Professor Gonzalez O'Brien, I don't want

7    to be -- I'll try not to be duplicative, but -- and

8    I wouldn't fault you if you didn't -- but were you

9    present and were you able to listen to Professor Lytle

10   Hernandez's testimony that she just provided to the

11   Court?

12      A.  I was both present and over-caffeinated.

13      Q.  Great.  Me too.

14          So, Professor O'Brien, I guess I want to ask,

15   sort of, generally, you know, do you agree with,

16   uh, Professor Lytle Hernandez's characterizations,

17   particularly with reference to the historical and

18   legislative record that culminated in the 1929

19   Undesirable Aliens Act?

20      A.  I do.

21      Q.  And to the best of your knowledge, is 1939

22   the first criminalization of illegal re-entry in the

23   United States?

24      A.  1929, but --

25      Q.  Oh.  Sorry.  I don't know what I said.

1       So since 1929, has there ever been a time that

2   illegal re-entry was not on the books?

3       A.   No.

4       Q.   Okay.

5       So, Professor Gonzalez O'Brien, I wanted to try

6   to, as much as possible, provide a bridge between both

7   1929, and the events leading up to it, and 1952.  So I

8   want to start, I guess, so that I don't ask a million

9   questions in one question, would something that happened

10  after 1929 -- just to trace its, sort of, historical

11  origin -- but, is it your understanding that starting

12  at about the Great Depression era, there was what we

13  call, or what is called, sort of, the re-patronization

14  of Mexican people to Mexico and the United States during

15  the Great Depression?

16      A.   Yes.

17      Q.   Tell me what that is.

18      A.   So, the 1920s was a period of increasing

19  immigration restriction.  I don't want to retread

20  over a lot of the things that Dr. Lytle Hernandez has

21  already covered, but the passage of the Johnson-Reed,

22  the discussion over quotas being placed on Mexico in

23  the period between Johnson-Reed and the passage of the

24  Undesirable Aliens Act in 1929, and then in the period

25  following -- well, in the period -- in the same year as

1       the passage of the Undesirable Aliens Act, you also do

2       have the beginning of a program that's been referenced

3       as Mexican re-patronization, which was this push, as

4       the U.S. headed into the Great Depression, this push

5       to get Mexican immigrants to repatriate to Mexico.  And,

6       it was relatively successful.  The numbers vary in

7       terms of the number of immigrants -- or the number of

8       Mexicans -- let me clarify that -- the number of

9       Mexicans who left the United States, with, kind of,

10      the lowest estimates being around 400,000, and some of

11      the higher estimates being well over a million who

12      left for Mexico.  And some of the estimates of that

13      is, you know, that around 60 percent of those who

14      left -- who went back to the Mexico or went to Mexico

15      were, in fact, American citizens.

16           Now, there's a question of, well, why are

17      Mexican -- if they're American citizens, why are they

18      returning to Mexico?

19           And I think that part of the story here is that

20      this was a campaign that was meant to fuel voluntary

21      re-patronization.  But, that voluntary re-patronization

22      was, in some cases, driven by a sense of the threat of

23      deportation or the threat of additional penalties if

24      those individuals did not return to Mexico.  And in

25      particular, there was -- there were a number of raids

1    in Los Angeles.  And along with those raids, there was

2    publicity released announcing the raids in advance; that

3    there would be arrests; and that these raids were coming

4    to the area; and that, uh -- this idea that this would

5    create kind of a psychological push to get people to

6    leave for Mexico.

7           And the majority of the people who are questioned

8    during these raids are, uh, are Mexicans.  A raid in

9    the El Monte area on February 13th, questioned about

10   300 people.  Only 13 were arrested.  But, 12 of the 13

11   were Mexicans.

12          So you have this period of the Great Depression

13   where, in part, because of concerns about employment,

14   you have this push to force Mexicans out of the United

15   States and out of competition with American laborers.

16   And this runs, roughly, from 1929 to 1936.  And on the

17   heels of this, though, you have this, this change in

18   labor demands as the United States emerges from the

19   Great Depression.  And as this -- you have this change

20   in labor demands.  And as Dr. Lytle Hernandez has

21   already covered, you have the beginning of the Bracero

22   program.

23          The Bracero program, I don't want to retread

24   the ground that Dr. Lytle Hernandez covered, but what

25   I would like to talk about a little bit is the parallel

1    growth in the term of the undocumented population

2    and also the characterization of that population as

3    "wetbacks."  And that term "wetback" is one that is

4    racially derogatory, was recognized as being racially

5    derogatory at the time, and has roots that link back to

6    some of the discussions around both the quotas being

7    applied to Mexico, of discussions and debate of the

8    Undesirable Aliens Act.

9         And this term "wetback" is referenced in a number

10   of pieces of legislation at the time, including a Senate

11   Bill 1851 -- well, also known as the, uh, Act of March

12   20th, 1952, which is referenced in the Congressional

13   Record as the Wetback Bill.  And this was an empty

14   harboring Bill, but regularly referred to Mexicans as

15   wetbacks.

16        And the term with "wetback" comes from the idea

17   that individuals who are entering without inspection

18   have to do so at an area where there is no bridge

19   over the Rio Grande River and, therefore, they get wet

20   and, therefore, the term wetback.

21        But across the period of the 1940s and 1950s,

22   this term has -- is associated, and almost synonymous

23   with Mexicans.  And in addition to being synonymous with

24   Mexicans and racialized in much the same way, it also

25   has the attribution of a lot of the negative stereotypes

1    that were associated with Mexican immigrants in the

2    push, or quotas to be applied to immigration from Mexico

3    and south of the Rio Grande, as well as during debate

4    over the Undesirable Aliens Act.

5         So, I would like to talk a little bit about

6    that, unless you have -- unless you have any additional

7    questions or would like to redirect me.

8    Q.   One thing that struck me, because, you know, the

9    focus, I think, is on racial animus and the construction

10   of race, was -- I mean, one thing that you mentioned,

11   but sort of glossed over, was that during the Great

12   Depression, when you see this, I guess, competition

13   between, I guess, what's seen as American potential

14   employees and immigrant employees, this re-patronization

15   drive is not -- is targeting 60 percent of Mexican

16   Americans as in United States citizens, so how, sort

17   of, being Mexican becomes then associated with being in

18   competition with, quote, Americans, even though these

19   are Americans?

20   A.   Well, you know, Mexicans during this time -- and

21   Mexicans today, really, are, in the words of Mae Ngai,

22   the iconic illegal aliens.  So when you're making

23   this push for re-patronization, the idea is that a lot

24   of the -- you know, that anybody who is Mexican is also,

25   potentially, an illegal immigrant, or is someone who is

1    here competing with American workers for jobs and

2    working for lower wages, and a lot of that baggage

3    that goes hand-in-hand with that characterization of

4    the illegal work -- of the illegal immigrant.

5         And so the targeting during this period is

6    broadly aimed at Mexicans.  And, you know, most of

7    the -- most of the writing that I'd seen describing

8    some of those raids in L.A., the individuals who are

9    being questioned are individuals of Mexican descent.

10   And this is regardless of whether their American

11   citizens, or Mexican nationals who are here legally,

12   or illegal Mexican entrants.  They are being questioned

13   because they are being identified as, uh, potential --

14   of having potential illegality.  Illegality.  And

15   that is something that becomes attached to the, kind

16   of, racial identification of Americans under the

17   Undesirable Aliens Act, is this potential identification

18   of criminality, or this ascribing of a criminal identity

19   that is very much linked to a Mexican identity.

20        Now, there are distinctions that can be drawn,

21   right, between those who are here illegally or Mexican

22   Americans but, broadly speaking, if you are trying to

23   identify someone who could be an undocumented immigrant.

24   And we see this in some of the debates around Bills,

25   like, Arizona's SB-1070, and the question of if you are

1    saying that police officers can ask people who they

2    suspect of being an undocumented immigrant, they can

3    ask them for additional documentation.

4         Well, the problem is that that raises the

5    question of racial profiling because we know that in

6    this country, uh, being an illegal immigrant is also

7    seen as a racially -- it's seen as racially coded, as

8    being someone who is, uh -- appears to be a Latino.

9    Q.   So the term "wetback," even though it describes

10   people who have to cross via, uh, you know, non-ports

11   of entry, would apply to sort of, generally, to Latinos

12   or to Mexicans?

13   A.   Yeah, it would.  And there was a study, um,

14   titled the -- a 1951 study titled, "The Wetback In

15   the Lower Rio Grande Valley."  And in this study, what

16   the authors found is, and I quote:  "There are no

17   careful" -- "no careful distinctions are made between

18   illegal aliens and local citizens of Mexican descent.

19   They are lumped together as Mexicans.  And the

20   characteristics that are observed among the wetbacks

21   are, by extension, assigned to local people."  Again

22   saying that this term -- the illegality, this term

23   "wetback," and all the racial baggage that goes with

24   it, is ascribed broadly to anyone who could be seen as

25   being of Mexican descent.

1    Q.   So when you're talking about Mexican

2    re-patronization during the Great Depression -- I

3    didn't mean to cut you off, but then you had also sort

4    of transitioned and talked about the Bracero program.

5    And I think it's important, particularly, because these

6    are two events that sort of bridge 1929, and then the

7    codification in 1952.

8         So I didn't mean to cut you off, but following

9    this, I guess -- I want -- it's not re-patronization, I

10   guess, to the extent that 60 percent were U.S. citizens,

11   and I'll refer to it, for ease of reference, as

12   re-patronization.  But then can you sort of go back

13   to talking about what the Braceros program was, and,

14   sort of, the ways that it sort of changed the debate

15   around Mexicans and Mexican Americans and Latinos in

16   general?

17   A.   Sure.

18        One of the things that happens with the Bracero

19   program -- and Dr. Lytle Hernandez already covered some

20   of this in her testimony, so I won't restate of all of

21   it -- but one of the things that happens alongside the

22   Bracero program is this (unintelligible) undocumented

23   population.  And that occurs for a number of reasons.

24   That occurs, again, because of some of the things that

25   had to be endured by individuals who wanted to be

1    Braceros.  It also is linked to the -- there being

2    more demand for spots in the Bracero program than there

3    were actual spots available.  And, it also goes to the

4    process that Braceros had to pursue, as well as the

5    process that some of the employers had to pursue.  And

6    employers, particularly those in border regions and in

7    border areas, oftentimes saw it easier just to recruit

8    an undocumented immigrant, than go through the red tape

9    of the Bracero program.

10          And so alongside the growth of the Bracero

11   program and the implementation of the Bracero program,

12   you also have -- you also have an increase and a growth

13   in the size of the undocumented population, and the

14   number of the undocumented entrants that is occurring

15   alongside this, and is also, um, sometimes seen as a

16   consequence of the Bracero program itself; that this

17   is acting as a -- this is spurring undocumented

18   immigration in some ways.  Both because there is

19   greater discussion of, you know, there are jobs

20   available, but also because of some of the conditions

21   under the Bracero program, which -- you know, it's a

22   bilateral agreement -- although as Dr. Lytle Hernandez

23   points out, Mexico is a -- or a trilateral agreement.

24   Excuse me -- although Mexico was a junior partner in

25   this.  And many of the protections that were supposed

1  to be in place for Mexican workers simply weren't

2  there.

3       And you know, of -- in 1956, there were 1631

4  employers who violated the program in some way, only

5  50 of those were removed from the (unintelligible) of

6  having future access to Bracero workers.

7       So alongside this, kind of, legal employment

8  program, you have the growth of the undocumented

9  population, and you also have increasing discussion of

10  the quote, unquote, wetback problem.  And this harkens

11  back, in many ways, to -- the discussion of wetbacks

12  harkens back, in many ways, to the racialized discussion

13  of Mexicans in the period following the passage of

14  Johnson-Reed, so in the discussion of quotas, but also

15  in the debate around the Undesirable Aliens Act.

16       So during the debate around the Undesirable

17  Aliens Act -- there we go.  Sometimes these names for

18  legislation are tongue twisters, especially if you say

19  them multiple times -- but, John Box of Texas, noted

20  that they are badly infected with tuberculosis and other

21  diseases.  There are many paupers among them.  There

22  are many criminals.  They work for lower wages.  They

23  are as objectionable as immigrants when tried by the

24  tests applied to other aliens.

25            Representative Green of Florida noted that the

1  (unintelligible) examine the criminal records, you

2  will find that the percentage of criminals is largely

3  foreign.

4       These were all attributions of criminality that

5  we know oftentimes -- that we know go hand-in-hand with

6  notions of racial superiority and inferiority.  And this

7  was part a big part of the debate around eugenics during

8  this period of the 1920s.

9       And this idea about one of the reason -- one of

10  the things that was inherent in racial inferiority was,

11  kind of, feeble-mindedness, a lack of impulse control

12  and, therefore, a greater tendency towards criminal

13  behavior.

14       So, we see this in the debate around the

15  Undesirable Aliens Act in 1929.  And then moving forward

16  and talking about the wetback problem, a 1956 paper

17  references a joint study by the GI form in Texas and

18  the Texas Federation of Labor.  And the question was

19  to look at the problem of undocumented entry and the

20  problem of wetbacks.  And they said that you could

21  divide wetbacks into two different groups.  And again,

22  these have a lot racialized traits ascribed to them.

23       So, one group was a docile group of agricultural

24  workers, who have accepted good or bad treatment,

25  starvation wages, diarrhea and other sicknesses for

1    his children, and unsanitary living conditions.  These

2    were individuals who came here, who were brought here

3    to work.

4         But then there's also a distinction that you

5    made between those individuals and the Chucos, who

6    were portrayed as criminals, the marijuana peddlers,

7    the users -- and users, the falsifiers of identity

8    documents, the smugglers, the prostitutes, and the

9    homosexuals.

10        So, you have this attribution to the term

11   wetback.  Of these racialized traits, of criminality, of

12   submissiveness, that trace back both to the discussion

13   around eugenics in the 1920s, but also trace back to

14   the general discussions around racial identities that

15   we see in that early part of the 20th century.

16        In 1952, prior to the passage of the

17   McCarran-Walter Act, you have a Bill that is introduced

18   and passed on March 20th that is nicknamed the

19   Wetback Bill.  And this is a piece of anti-harboring

20   legislature where, throughout the debate, Mexican

21   undocumented entrants are regularly referenced as

22   wetbacks.  And Senator McFarland, during the debate

23   over the Act of March 20th, 1952, notes that Senate

24   Bill 1851, a Bill known as the Wetback Bill, was going

25   to be debated.  Initially, this legislation was aimed

1    strictly at Mexicans.  It referenced Mexicans.

2         Now this was struck from -- or this was

3    struck from the Bill because Senator Aiken of

4    Vermont, questioned whether you could discriminate,

5    constitutionally, against the aliens of one

6    particular nation.  And he also noted that while

7    he felt it needed to apply to all aliens, that he

8    knew of no instances of the illegal employment of

9    Canadians.  And that, certainly, this isn't common.

10        And, again, we have this dual construction of

11   the two borders.  The construction of one border as,

12   kind of, a racialized threat to the nation.  The

13   construction of Mexican immigrants in 1920.  But then

14   by the 1950s, undocumented entrance, or wetbacks, as

15   criminal threats to the nation.  But then, on the other

16   hand, this construction of Canadians as individuals who

17   could be assimilated, individuals, ho posed no threat.

18   And that goes back to early debates, immigration

19   restriction league noted early on in the 1920s, that

20   we didn't need to worry about Canadians because,

21   racially, they're the same as Americans, and quotas

22   really needed to be applied to Mexico and other

23   countries of North and South America, because these

24   were the, kind of, mongrelized people that we didn't

25   want diluting the, kind of, Anglo bloodline in the

     1    United States.
     2         And so the debate around wetbacks is -- also
     3    enters into the McCarran-Walter Act.  And with
     4    McCarran-Walter, you don't have a lot of debate around
     5    the recodification of 1326, right, that's initially
     6    passed in 19 -- that initially becomes part of U.S.
     7    law in 1929.  You don't have a lot of debate around
     8    1326 in McCarran-Walter.  But what you do have is
     9    that you do have this note that's entered in the
    10    support for 1326 by the Department of Justice, and
    11    it's a letter from the Deputy Attorney General,
    12    Peyton Ford.  And in this letter, he specifically
    13    notes that:  "Statutory clarification on the above
    14    points will aid in taking action against the conveyors
    15    and receivers of the wetback."
    16         So, again, you have the use of this racialized
    17    term to describe Mexican immigrants, even though you
    18    don't have debate around Mexican immigration in the
    19    McCarran-Walter Act itself, or during debate for the
    20    McCarran-Walter Act, in part, because you have this
    21    Bill that precedes it by two months, where much of
    22    the debate is how do we limit the number of Mexican
    23    immigrants and the trafficking of undocumented Mexican
    24    immigrants into the United States?  And that Bill
    25    also contained the Texas proviso, which gave workers

1    the kind of loophole of, you know, if you're employing

2    undocumented laborers, it doesn't constitute harboring.

3        Q.   Now, when we're talking about -- so we're

4    talking about the, sort of, Wetback Bill in the

5    context of the McCarran-Walter -- I know, that various

6    (unintelligible), sort of, commented on the lack of,

7    sort of, deep discussion about 1326.  Um, is that --

8    but still in the Walter -- the McCarran-Walter Bill,  do

9    you have the -- so it seems like you have the term in

10   this -- even in the Congressional Record, they're using

11   this, sort of, racial slur of "wetback."

12        Is that fair?

13       A.   That is fair.  Yes.

14       Q.   And then in this, sort of, the legislation -- the

15   Wetback Bill that passes, I guess three months earlier,

16   you have this exemption of employers from those who

17   are, quote, harboring aliens.

18        Is that a fair characterization?

19       A.   That is.

20       Q.   So can you talk about -- so these are, sort

21   of the, sort of historical -- so, I guess is it a

22   fair characterization to sort of encompass both

23   the historical link between 1929 and the 1952

24   codification.  Was there also reference in the

25   legislative history of an explicit desire to carry

1   forward the 1929 Act?  Of course, making it more

2   easy to, to, um, establish venue, as you had discussed

3   before?

4       A.   Right.  That was part of Peyton -- a part of

5   Peyton Ford's letter, that this needed -- that this

6   should be carried forward.  But, it didn't receive any

7   debate during the, kind of, longer debate over the

8   McCarran-Walter Act, which was largely dedicated to a

9   question of the, uh, the revision of the quota system,

10  and some of the issues inherent in the McCarran-Walter

11  Act itself, and some of the racialized aspects, right,

12  that didn't have to do with Mexican immigrants, but did

13  have to do with the assigning of quotas to the age of

14  specific triangle.

15      Q.   In terms of the, sort of the addition to the

16  1929 legislation, is it your understanding that 1326

17  was also expanded so that -- I guess, in their words,

18  "wetbacks could be prosecuted with venue in any

19  jurisdiction where they existed"?

20      A.   Right.

21      Q.   So that they would not be limited to having --

22  to the jurisdiction where they re-entered, but rather

23  any place that you are living or existing in the United

24  States who are then, at that moment, subject to criminal

25  prosecution wherever you're found?

1    A.  That's correct.  And, again, there was no -- you

2  know, there was no substantial debate, or there was

3  no debate over the problematic way in which the original

4  codification of 1326 occurred in 1929.  This received

5  no attention in 1952, despite the fact that you do have

6  a relatively robust debate around the problematic, uh,

7  implementation, and the problematic aspects of the

8  Johnson-Reed Act that's passed in 1924.  But, yet,

9  Mexican immigration receives almost no attention.

10        And, again, if you go back three months, Mexican

11  immigration is now talked about in terms of the -- in

12  terms of wetbacks.  Instead of talking about this in

13  the very overtly racialized terms of the Undesirable

14  Aliens Act in 1929, where you have discussions of

15  the, kind of, mongrel -- mongrelized blood of Mexicans,

16  but this changes to now you're talking about wetbacks.

17        So you're sidestepping a little bit about talking

18  about racial purity, but you're assigning those, and

19  you're ascribing those same traits now to these

20  individuals that you're characterizing as wetbacks,

21  individuals who are not distinguishable in any way,

22  shape, or form from individuals of Mexican origin, or

23  people who look as if they could be individuals of

24  Mexican origin.

25    Q.  Now we talk about the -- so, I guess, is it fair

1 to say that there was an understanding of the 1920s

2 history of the legislation when we're going forward in

3 1952?

4     A.   There was.  And there was an understanding

5 of the problematic attributions of criminality to

6 Mexican immigrants.  The Wickersham Commission, just

7 together in 1929 by Herbert Hoover, to study the

8 question of the impact that immigrations had on the

9 United States, had an entire volume of their final

10 report, which was released in 1931, on criminality in

11 the foreign born.  And a substantial number of pages

12 of that was dedicated to the question of Mexican

13 criminality.  And, you know, with the -- because these

14 attributions had been made, there was this idea that

15 there was something about certain national groups

16 or certain races that made them predisposed towards

17 criminal behavior.

18          And over, I think it's around -- it's well

19 over 100 pages is dedicated to the, kind of, Mexican

20 question.  And they didn't find any support for this

21 in 1931, right?  And they say, well, you know, in some

22 areas Mexican immigrants offend at a higher rate, and

23 in some areas they offend at a lower rate.  And some

24 specific studies, so the study of the State of Texas,

25 finds no relationship there.  And yet, by the time you

1    move forward to the 1950s, you still have these

2    attributions of criminality.  Now you're talking about

3    wetbacks instead of Mexicans, but as the term was

4    understood, this was a racialized term that applied

5    to all individuals who looked as if they could be of

6    Mexican descent.  And going back to that comment I

7    mentioned earlier in that 1951 study of the wetback

8    in the lower Rio Grande, that this was broadly an

9    attribution of all of these negative stereotypes that

10   were made to the wetback, to all individuals of Mexican

11   descent or nationality.

12       Q.   Is there any --

13            THE COURT:  I'm sorry.  Ms. Gorman --

14            MS. GORMAN:  Pardon me.

15            THE COURT:  -- if I may interject.

16            I'm trying to understand because

17   Dr. Gonzalez O'Brien just testified that there was an

18   understanding of the -- and I'm -- I hope I'm quoting

19   right -- the problematic criminalization on Mexican

20   immigrants when the statute 1326 was codified in 1952.

21            Is that a fair statement of what your

22   opinion is?

23            THE WITNESS:  Yes.  There was a governmental

24   commission report from 1931, that looked at the question

25   of Mexican criminality, and found no relationship to --

1    between Mexican nationality or race and criminal

2    behavior.

3                MS. GORMAN:  And just, Professor Gonzalez --

4                THE COURT:  No, but --

5                MS. GORMAN:  Oh.  Sorry.

6                THE COURT:  I'm sorry.  I'm still trying

7    to understand.

8                When you said there was a general

9    understanding of this -- the problem of criminalizing

10   Mexican immigrants, in the discussion -- well, from -- I

11   thought what you meant was when the statute was codified

12   in 1952, there was that general understanding of that

13   aspect.  And I -- and so if I'm wrong, let me know

14   if I'm wrong.  If I'm correct, then I want to know

15   what evidence is there to show that there was such an

16   understanding.

17               THE WITNESS:  Well, the evidence -- I

18   mean, the evidence is that you have, you know, a

19   governmental report released in 1931, and one that

20   wasn't, you know -- I would expect wouldn't be unknown

21   to members of Congress serving on the Immigration and

22   Naturalization Committee, or to members of Congress

23   more broadly.  I mean, it is the duty of Congress to

24   be aware of, especially relatively significant reports.

25   I mean, this was the second large-scale study after

```
 1    the Dillingham Commission in the earlier part of the
 2    20th century.  This was the second big examination of
 3    the impact of the immigration on the United States, as
 4    well as the first to specifically look at the question
 5    of immigrant criminality.
 6    BY MS. GORMAN:
 7       Q.  But to be clear, Professor Gonzalez -- and
 8    I think maybe -- and maybe I'm misunderstanding
 9    Chief Judge Du's question -- I think the question
10    went to was the association of criminality with
11    wetbacks, in spite of the fact that there was empirical
12    evidence of no criminality, or was it understood
13    that  it was problematic to associate wetbacks with
14    criminality?
15           And Chief Judge Du, am I understanding the
16    distinction correctly of your question?
17               THE COURT:  I think that -- well, based
18    on Professor Gonzalez O'Brien's answer, I think I
19    misunderstood his earlier testimony.  I think what
20    he meant to say is that by the time of the 1952
21    codification, there was a clear understanding there
22    was no connection between Mexican nationalities and
23    criminality.  And yet --
24               THE WITNESS:  Right.
25               THE COURT:  Right?  Is that -- so when you
```

1    said there was that general understanding, that's what

2    you were talking about?

3                    THE WITNESS:  Yes.  That's what I'm talking

4    about.

5                    And, you know, the, the point I'm trying to

6    make is despite the fact you have empirical evidence

7    that there is no association between these two things,

8    you have the continued referencing of criminality as

9    a reason for immigration restriction, either, as I

10   mentioned earlier, you know, through that study at

11   the GI form, but you also have individuals, like,

12   Senator Kilgore of West Virginia, who notes in debate

13   over the quote, unquote, Wetback Bill, that practically

14   every state in the Union has had the wetback problem.

15   Some of these people cannot meet the standards of

16   immigration.  They may be criminals because they are

17   wetbacks.  They can be kept in a state of peonage.

18                    So this link between the, kind of,

19   undocumented identity or the Mexican identity --

20   because, again, this was kind of understood as a

21   racialized identity at the time -- is still being

22   linked to criminality, despite the evidence, the

23   empirical evidence that there are no linkages between

24   these two things.

25                    THE COURT:  And Ms. Gorman, I think the

1  focus I would like for us to focus on is evidence of

2  the latter.

3           MS. GORMAN:  The latter?

4           Sorry.

5           THE COURT:  In other words --

6           MS. GORMAN:  What do you mean?

7           THE COURT:  I understand, Professor Gonzalez

8  O'Brien to testify that despite empirical evidence

9  that doesn't support this link, there continues to be,

10  I guess, a disregard for the empirical evidence,

11  when in -- at least surrounding the codification of

12  Section 1326.  So I'm looking for evidence of that

13  discussion, or lack thereof, which is, to me, the one

14  quintessential issue I have left in deciding the motion.

15  BY MS. GORMAN:

16   Q.  Professor Gonzalez O'Brien, then talk to me, I

17  guess, as a social scientist, about how you would suss

18  out racial animus and the codification of Section 19 --

19  or 1326.  I want to say 1926.

20           So how does a social scientists do that?

21   A.  Well, I think part of this is looking at,

22  you know, what were the justifications made for the

23  recodification of 1326 in 1952, but also going forward,

24  right?

25           I mean, the most recent codification of 1326 is

1    in 1996 under the Illegal Immigration Reform and

2    Immigrant Responsibility Act.  So if you are looking to

3    establish that racial animus is kind of a motivating

4    factor -- now I think we have relatively clear evidence

5    that this the case in 1929, right?  You know, we have,

6    we have these statements by members of the Immigration

7    and Naturalization Committee, and leading proponents of

8    this legislation, that part of the reason that you need

9    this is as a control on Mexican entry into the United

10   States because Mexicans are of a, kind of, mongrelized

11   bloodline.

12         But also in addition to these notions of racial

13   purity, you also have these attributions of certain

14   inherent traits that go hand-in-hand with Mexican

15   identity:  Criminality, the tendency towards peonage,

16   some mentions of illiteracy, of potentially being

17   disease carriers.  Now that carries forward in

18   discussions over future immigrations legislation.

19   You do see that reflected in discussions of the

20   Wetback Bill in 1952, preceding McCarran-Walter.  You

21   have a recognition that the term "wetback" is used to

22   reference these individuals who are seen of being as --

23   of inferior quality, of having criminalistic tendencies.

24   And, you see references -- you see the use of that

25   term -- a racially derogatory term -- in that letter

1   from Peyton Ford, the Deputy Attorney General, that

2   was entered into the Congressional Record.  And so you

3   have that present in 1952, even if the McCarran-Walter

4   Act itself does not contain discussion of Mexican

5   immigration to the United States, because that was

6   not the thrust of the McCarran-Walter Act, right?  That

7   was the thrust of the earlier Senate Bill 1851, or the

8   Wetback Bill.

9        But I think if you look at even debate over

10  the Illegal Immigration Reform and Immigrant

11  Responsibility Act, you still have these continued

12  attributions of criminality to illegal immigrants.

13  And by the time you get all the way up to 1996, it

14  is not just one governmental report by that point.  It

15  is two governmental reports:  The 1931 Wickersham

16  Commission and the 1994 U.S. Commission on Immigration

17  Reform, which preceded the passage of the Illegal

18  Immigration Reform and Immigrant Responsibility Act.

19  And despite that, you still have individuals, like

20  Lamar Smith, ranking member of the Judiciary Committee,

21  in debate over the Illegal Immigration Reform and

22  Responsibility Act, noting that illegal aliens are ten

23  times more likely than Americans, as a whole, to have

24  been convicted of a federal offense.  Think about the

25  cost, in pain and suffering, to the innocent victims

1    and families.

2         You have Representative Greg Laughlin of Texas

3    stating that because of the border fence, the rapes,

4    the robberies, the drug sales, the murders went down.

5         Spencer Abraham, in the Senate, noting that by

6    conservative estimates almost half-a-million felons

7    are living in this country illegally.  These aliens

8    have been convicted of murder, rape, drug trafficking,

9    potentially such crimes as espionage, sabotage, treason,

10   and a whole -- and a number of other serious crimes.

11        So, you have this continued attribution of

12   criminality to illegal immigrants, a racially coded

13   category.  And despite that, though, you have a raft

14   of evidence proving otherwise.  Evidence going back

15   to 1931, but evidence that grew in the periods following

16   that, and particularly across the 1990s and 2000s.

17        So, you have that U.S. Commission on Immigration

18   Reform report in 1994, that found that crime rates in

19   border cities were actually lower than crime rates --

20   than crime rates in cities in the interior.

21        Now, again, if you're making a -- if you're

22   arguing that undocumented immigrants are more

23   predisposed towards criminal behavior, then in those

24   border cities, which have a larger percentage of

25   undocumented immigrants, then -- or are likely to have a

1    larger percentage of undocumented immigrants -- then

2    you would expect crime rates to be higher.  And that's

3    not what you're finding.

4         A survey of all the literature to date, in 2000,

5    found no empirical support in any of the published

6    studies, either governmental or academic, for any

7    linkage between illegal immigration, immigration, and

8    criminal behavior.  And this is something -- and the

9    Cato Institute has put out a whole host of studies also

10   looking at this question, which similarly have found

11   no support for the idea that illegal immigrants are

12   more predisposed towards criminal behavior.  And, yet,

13   we continue to see this reference.  And we continue to

14   see this reference because it is linked to these notions

15   of otherness, of racial otherness.  And it is something

16   that is synonymous in many ways with the construction of

17   the illegal immigrant in the, kind of, American psyche

18   at this point.

19        And some public opinion work, I -- you know, I

20   did back for my first book, looked at agreement among

21   the American public with this -- with the statement

22   that illegal immigrants are more likely to be involved

23   in drugs and gangs -- with drugs and gangs, and over

24   45 percent agreed.  And so you have this attribution of

25   a racialized trait that we see begin in 1929 -- because

1  you really don't see a great deal of discussion of

2  this in Mexican criminality prior to that -- but you

3  see that carried forward.  You see it carried forward

4  into the discussion of wetbacks in 1952, and the

5  construction of the, uh, the stereotype of what a

6  wetback was.  And then you see that carried forward

7  into 1996, where now we're taking about illegal

8  immigrants.  But, all of these are just reconstructions

9  of the same term.

10     Q.  When we talk about racial animus as a motivating

11  factor in the recodification in 1952, I guess is it

12  fair to summarize it -- as a social scientist, one of

13  the ways you suss out racial animus is, you know, this

14  sort of awareness of the eugenist history of the

15  legislation being codified; but, in addition to that,

16  the sort of racial slurs and the historical context

17  around it, including the re-patronization of Mexican

18  Americans, and the use of the term "wetback" and

19  discussion of the wetback in not just McCarran-Walter,

20  but in the Wetback Bill that preceded it by three

21  months?  So you see the same, sort of, eugenics tropes

22  and language being used to characterize Mexicans or

23  undocumented immigrants in 1952, as you did in,

24  essentially, 1929?

25     A.  Right.  And, you know, policy-making doesn't

1    occur in a vacuum.  I mean, it doesn't occur without

2    the influence of the policies that came before it, and

3    especially policies in related areas.  And so the

4    influence not only of the past policy decisions, but

5    of, uh, thinking on race at that period in time, and

6    also of the kind of long-term construction of racial

7    categories, and racial categorization in this country.

8    You know, the construction of racial categories is a

9    project.  It doesn't just occur at one point in time

10   and then never change.  It does change over time.  And

11   the attributions sometimes change over time.

12         But, you see many of the same references back

13   to ascribed inherent traits in the discussion of

14   wetbacks in the 1950s, or the discussion of illegal

15   aliens in the 1990s, despite the fact that, again,

16   especially with the -- with the notion that they're

17   more inclined towards criminal behavior -- which has

18   been something that has long been used to argue for

19   immigration restriction in this country -- um, you don't

20   have support for it.  And it's something that even, you

21   know, after 1996, we continue to see the attribution

22   of criminal -- of criminal tendencies to undocumented

23   immigrants or Mexican immigrants, depending on who is

24   speaking at the time.  But, we continue to see this

25   attribution.  It's a racial attribution.  It was in

1    1929.  It was in the 1950s.  And, it continues to be

2    today because it is applied broadly.

3          As the 1951 report noted, people can't tell if

4    someone is undocumented or not.  So we can split hairs

5    over, well, we're just saying these are the undocumented

6    folks.  But that racial categorization is applied -- or

7    that negative categorization is applied to all people

8    who look as if they could be of that group that is

9    characterized as the kind of iconic undocumented

10   immigrant, and that is the Mexican.

11     Q.  One of the things that sort of struck me in

12   thinking of about it, is that Truman -- who, I guess,

13   I didn't conceptualize as, you know, necessarily, a

14   progressive in any sense -- but he actually veto'd

15   the McCarran-Walter Act.  And can you talk a little

16   bit about that?

17     A.  Well, the McCarran-Walter Act is sometimes

18   pointed to as a piece of richly progressive legislation.

19   And it wasn't.  Now it's true it removed racial

20   restrictions on immigration.  So prior to

21   McCarran-Walter, and under the Johnson-Reed Act,

22   individuals of Asian descent, because they could

23   not become American citizens, they also could not

24   immigrate.  McCarran-Walter removes those racial

25   restrictions, so now Asian immigrants can come to

1   the United States.  But, the quota that is assigned to

2   all the Asian Pacific Triangle is 2,000 quota spots,

3   2,000 visas.  And I believe that was roughly equivalent

4   to the number of visas given to a single country like

5   Sweden at the time, and was dwarfed by the number of

6   visas given to, say, the United -- to the UK during this

7   period.

8        So McCarran-Walter is viewed as -- is sometimes

9   characterized as racially progressive because it removes

10   these restrictions, but Truman's veto explicitly notes

11   that there -- that the McCarran-Walter Act, while it

12   had some good things going for it, also, uh, in the

13   words of Truman, from his letter to Congress, "would

14   perpetuate injustices of longstanding against many other

15   nations of the world..." -- and jumping forward a little

16   bit -- "...and intensify the repressive and inhumane

17   aspects of our immigrations procedures.  The price is

18   too high and, in good conscience, I can't agree to

19   pay it.

20        And there were also -- you know, there also were

21   a few times where the masks flipped a little bit off the

22   face of this is racially neutral, at least, legislation,

23   with Representative Wood of Georgia noting during the

24   debate on McCarran-Walter, that, "It seems to me the

25   question of racial origins, though i am not a follower

1    of Hitler, there is something to it.  We cannot tie a

2    stone around its neck and drop it in the middle of the

3    Atlantic, just because it worked to the contrary in

4    Germany.  The fact still remains that the peoples of

5    western Europe have made good American citizens.  I

6    believe that possibly statistics would show that the

7    western European races have made the best citizens in

8    America."

9         And McCarran-Walter continued to privilege

10   northern and western Europeans, over all others, in

11   terms of the quotas that were assigned based on either

12   national origin or race.

13    Q.  One of the things that you touched on in talking

14   about that was, sort of, the different treatment of

15   Mexican Americans or Latinos from immigrants from, let's

16   say, like, northern Europe or Nordic countries, and --

17   which sort of harkens back to some of the treatment that

18   we had talked about at the border, that were at the

19   southern border.  They weren't at the northern border.

20   So going into this time period, do you still see --

21   like, for the example, with the Bracero program, this

22   sort of -- the way that people are treated at the

23   southern border, being very different from the way that

24   people are being treated at the northern border?  So is

25   that still --

1       A.   You do still -- you do still see some

2   differences.   And I think Dr. Lytle Hernandez already

3   spoke to some of those.   But in terms of the admission

4   procedures for Braceros during this period, the need

5   for, you know, medical inspections, chest x-rays, other

6   things like that, because there continued to be, you

7   know, again, attributions that go back to the 1920s,

8   of -- you know, that Mexico was a dirty place, where

9   people lived in slums and were more predisposed towards

10  carrying illnesses.   So, you know, that does carry

11  forward.

12        And you do see some of that.   It's not as

13  pronounced, certainly, by the 1950s as what you see in

14  the 1920s.   But, the 1920s is very openly and explicitly

15  racialized and racist.   You get -- that gets a little

16  cleaned up, and some of the procedures are not quite as

17  invasive as what you were seeing in the period of the

18  1920s.   But, you continued -- you continue to see a

19  different treatment of the two borders.

20        And again, that ability for pre-examination in

21  Canada, in 1945, Mexicans are excluded from that.   So,

22  initially, there -- you know, there's this difficulty of

23  if you're Mexican and you can apply for pre-examination,

24  you still have to get up to Canada to go to one of

25  the -- to go to one of the consuls and get approved to

119

1    return back into the United States, as illegal entrant.

2    But after 1945 that is revised, and citizens of Mexico

3    are just excluded from that.  So they no longer can

4    even utilize what is extended to Canadians.  And the --

5    that that wouldn't end for Canadians until '61.

6        Q.   So one of the things that you had -- that

7    Professor Lytle Hernandez talked about also -- was the

8    sort of -- the difference between just straightup

9    exclusion, and then using Latinos and Mexican Americans

10   as the sort of temporary labor force that can be, um,

11   incarcerated or expelled at will, but could still be

12   utilized by American agriculture.

13        And one of the things we had talked about was,

14   in the Wetback Bill, was the sort of exemption of the

15   American employer from the -- essentially from harboring

16   an alien.  So, the employer was sort of cutout from this

17   because the employer still needed a, sort of, migrant

18   laborer.  But, is it your understanding also that an

19   illegal re-entry, let's say conviction, would also

20   cut off your path to that sort of permanency --

21        A.   Uh-huh.

22        Q.   -- that sort of creating roots, and sort of

23   funnel you in again to being this sort of temporary

24   source of racialized labor?

25        A.   Right.  And, you know, criminal convictions can

1  bar, you know, bar you from legal entry into the United

2  States.  And so the attachment of these, especially

3  felony convictions, was 1929.  Uh, to undocumented entry

4  means that, you know, in the period following 1929, and

5  if, you know, you cross back in after being deported,

6  then that, that makes it impossible for you to legally

7  immigrate at any point.

8        And there have always been exceptions, right?

9  You know, Dr. Lytle Hernandez talked about these kind

10  of push and pull factors.  But one thing that is -- one

11  exception that has traditionally been made in the,

12  in American immigration policy, has been an exception

13  for the responsibility of employers.  As I mentioned,

14  and as Dr. Lytle Hernandez mentioned, employers were

15  oftentimes knowingly employing undocumented immigrants.

16  Even during the period of the Bracero program, you had

17  employers who were still -- who are on record saying,

18  you know, it's still easier to go down to the southern

19  border and get workers, than it is to go through the,

20  kind of, red tape of all of this.

21        And the attempts to place some of the

22  responsibility on the shoulder of American employers

23  of undocumented immigrants have been either not present

24  at all in 1929, or relatively half-hazard in the years

25  following that.  I mean, there were employer sanctions

1   extended under the Immigration Reform and Control Act

2   of 1986, but those, those had so many loopholes, that

3   the fines were so low and the loopholes so big, that it

4   really didn't have much of a significant effect

5   on employers.

6         And also, of course, other things changed in

7   the 1980s and the 1990s in terms of forged documents and

8   other things like that.  But, you do have, you know --

9   the idea was that Mexicans were fine as long as they

10  came here only to work.  They were -- they were meant

11  to be a disposable labor force.  This is noted in the

12  1911 Dillingham Commission report, that:  "While

13  Mexicans are not easily assimilated, this is not of

14  great importance, as long as they return to their

15  native land in a short time."

16        And this was the point of the Bracero program,

17  right?  We'll bring them in.  We'll have them do the

18  labor that they're needed for, and then have it -- we

19  can make sure that they go back to Mexico.  The problem

20  with wetbacks is that there is no guarantee that they

21  go back to Mexico, right, because they are undocumented.

22  You don't know that they leave.  You don't have that

23  additional level of control over them.

24        And so there's a desire to preserve access to

25  this thing that American -- especially American cultural

1    interests say we need Mexican labor, right?  You have

2    cut off all these other potential spickets for labor

3    force, right?  You cut off access to Chinese labor.  You

4    cut off access to southern and eastern European labor.

5    And now what we have left are the Mexicans.  Or, as

6    Dr. Lytle Hernandez pointed out, or the blacks.  And

7    you don't want -- you know, you don't want the blacks

8    coming into Texas, so you say, well, we'll go with the

9    Mexicans.

10        And so they were viewed as disposable labor.  As

11   long as they returned, they didn't pose a racial threat

12   to the United States.  They didn't provoke those racial

13   anxieties.  It was when that control started slipping

14   during the period of 1950s, when you start to -- and

15   in the period leading up in 1929, right, when you have,

16   kind of, unfettered crossing between the United States

17   and Mexico, especially in terms of undocumented

18   entry.  But when you start to have the growth of the

19   undocumented population in the 1950s, this is when

20   you start to see the beginning of these, kind of, really

21   large-scale deportation actions, such as Operation

22   Wetback, and the discussion of the potential performance

23   of illegal immigrants in the United States.  And,

24   this idea that they are no longer that controllable

25   population.  Because part of what you want, right, out

123

1    of a racially inferior, but necessary labor force,

2    is you want to ensure that they, that they go back,

3    that they are here for as long as we need them.

4         And on the one hand, those temporary employment

5    programs worked for that.  And that is paired with this

6    idea -- you know, with the ability to designate them as

7    illegal and deport them when they are no longer needed,

8    or at least you try apply enough pressure to force them

9    to, kind of, self-deport, right?  Something that was

10   referenced by Mitt Romney in 2012, right?  This idea,

11   well, maybe if we just make this things bad enough,

12   all those illegal immigrants will just return to

13   Mexico.

14        And this harkens back, again, to the Mexican

15   re-patronization program.  And, again, is a

16   demonstration that none of these things occur in a

17   vacuum, without knowledge of what came before, right?

18   Lawmakers, in most cases, have some knowledge of the,

19   kind of, general arch of immigration policy --

20   especially if they're serving on some of these

21   committees.  Or, uh, I guess I shouldn't say that

22   they do.  If they don't, they should.

23   Q.  So I -- so you had talked about, a little bit

24   about, sort of, Operation Wetback, but I don't think --

25   I want to distinguish Operation Wetback from the

1  re-patronization of Mexicans that happened during the

2  Depression, and then the Braceros program.

3  And then talk a little bit about the exploitation

4  of migrant labor during the Braceros program, both by

5  Braceros and by undocumented immigrants.

6  That's three questions.

7  A.  Can you break that into pieces and chunks,

8  please?

9  I'll do my best to respond to that.

10  So, we didn't talk a lot about Operation Wetback.

11  I think Dr. Lytle Hernandez mentioned -- talked about

12  it a little bit.  But it was a -- you know, it was a

13  mass deportation program that was meant to address some

14  of these issues with the growth of the undocumented

15  population, and also supposed to be kind of a prod

16  to employers who were employing large number of

17  undocumenteds, that you need to kind of employ Braceros

18  and not undocumented immigrants.  But, the estimates are

19  that -- and it begins in 1954 -- the estimates are that

20  around 1.1 million people were deported under Operation

21  Wetback or returned -- although, again, you get into

22  kind of fuzzy numbers in some cases.  So I don't want to

23  be -- I will say that that number is -- that number is

24  probably not definitive, right?  It's an approximate.

25  But, it also utilizes -- again, to go back to this idea

1   of racial animus, it also utilizes a term that is,

2   you know, recognized as racially derogatory.  Again,

3   going back to that 1951 report that I cited earlier,

4   this idea that, you know, there was a recognition that

5   the term "wetback" carried all this baggage, and was

6   broadly applied to anybody of Mexican descent.

7          In addition, you know, there was a lot of

8   exploitation, both the Bracero program -- as Dr. Lytle

9   Hernandez pointed out, Mexico was a junior partner.

10  And in, in the 19 -- I think it was -- hold on.  Let me

11  find my -- let me look at my notes here.

12         In 1954, Mexico gave up its ability to

13  unilaterally blacklist employers who were exploiting

14  Mexican laborers.  So, in some cases, that exploitation

15  may take the form of a promised wage of $0.50 an hour,

16  and workers show up and, you know, they're told that

17  they're going to be paid $0.30 an hour; or, they're --

18  one of the things that was supposed to be provided for

19  Braceros was housing and, uh, some additional funds to,

20  kind of, feed themselves.  And in some cases, either the

21  housing was substandard, the food was not enough to

22  feed the number of people who were there, and so you

23  did have this exploitation of the program because there

24  just weren't a lot of consequences for violations of

25  the program.

1       You know, as I mentioned, in 1956, you have

2   1631 employers reported for violating the program,

3   and only 50 of them are removed.  So there's an

4   understanding of, like, what are you going to do?

5       Like, you went -- as a Bracero, you went through

6   this whole process to get this job, right, to improve

7   your life, or the life of your family, and now you're

8   here and they say, well, we're not going to pay you what

9   you were supposed to be guaranteed.  We're going to pay

10  you less than that.  If you don't like it, you can go

11  back to Mexico.  And so, you know, the mechanisms that

12  Braceros had at their -- you know, that they could use

13  to kind of leverage this agreement for their benefit,

14  uh, were more limited.

15      Now, were they as limited as they were for

16  undocumented immigrants?  Certainly not.  But, they

17  still were very limited.  And the legal status accorded

18  to them was based, in many ways, just on the need

19  for their labor, and not out of any desire to actually

20  protect them.

21  Q.  One thing I had learned, sort of, about the

22  Braceros that I didn't know before is, I guess, the

23  life of a Bracero was assigned $1,000 to his widow or

24  other family, but that it wasn't necessarily -- or I

25  guess -- or wasn't paid when a Bracero died on a farm

1   or a factory.

2       Do you know -- so, I guess, is it sort of your

3   general understanding that the protections that were

4   supposed to at least on paper be afforded to these

5   people coming from Mexico, just as a general matter,

6   were they actually protected in practice?

7   A.   I mean, I think there, you know, there is

8   variation there.  In some areas and with some employers,

9   perhaps the employers observed the terms of those

10  contracts more closely than other employers did.  But,

11  again, the ability for Braceros to take action -- I

12  mean, they could complain to the consulate.  They could

13  do things like that.  But, in many cases, you don't

14  see -- you don't see action taken on the part of the

15  government to ensure that employers are following the

16  terms of the contract.  And I think that's reflected

17  in that statistic, that this is just not being enforced

18  as much.

19      And so if you're an employer who, perhaps, is

20  shorting Braceros on wages, or providing unsafe or

21  substandard living conditions for them, you know,

22  their avenues to have that addressed are both uncertain

23  and relatively limited.

24          THE COURT:  All right.  Ms Gorman, I'm going

25  to interject.  I think that I should take a break to

1    allow everyone time to take a lunch break.

2              So, this is all very interesting.  As

3    someone who majored in history, I find it interesting.

4    But, I also don't want this to be out of control, in

5    the sense that it's not -- the hearing is not to have

6    a discussion or dissertation on just a general history.

7    When we return from the break, I would like to refocus

8    because earlier -- and I will have some follow-up

9    questions for Professor Gonzalez O'Brien after the

10   attorneys are finished, but just for my general thought,

11   earlier, Professor Gonzalez O'Brien began to talk about

12   the justification for the codification of Section 1326

13   in 1952, but then I didn't really get a clear answer, so

14   I would like to refocus on that issue.  And like I said,

15   I'll have some questions.  If you don't refocus, I'll

16   refocus you.

17             So let's take -- oh, did Ms. Gorman drop

18   off?

19             THE CLERK:  Yeah.

20             MS. GORMAN:  I'm here.

21             THE COURT:  We'll take our lunch break and

22   resume at -- let's resume at 1:30.

23             (Noon recess taken.)

24

25

1          Reno, Nevada, Tuesday, February, 2, 2021, 1:30 p.m.

2                            ---OoO---

3

4              THE CLERK:  Court is back in session.

5              THE COURT:  Ms. Gorman, are you ready to

6    resume?

7              MS. GORMAN:  I am, Your Honor.

8              May I resume?

9              THE COURT:  Yes.

10             MS. GORMAN:  Okay.

11                   **DIRECT EXAMINATION (resumed)**

12   BY MS. GORMAN:

13     Q.  So I guess to be more to the point, Professor

14   Gonzalez O'Brien, regarding the 1952 recodification,

15   is it your opinion, as a political scientist, that it

16   was motivated by racial animus?

17     A.  It is.

18     Q.  And can you tell me, as a social scientist, how

19   you reached that conclusion?  Looking at the historical

20   context and the legislative context?  Can you try to

21   summarize it?  And I know we've been through a lot of

22   it.  Sorry.

23     A.  Well, I think you have to look at a couple

24   things.  I think, first, you have to look at the context

25   in which, uh, Mexican immigration was being discussed at

1   that historical moment.  We talked about that a little

2   bit in regards to the Wetback Bill; also the reference

3   to wetbacks in that document by the Deputy Attorney

4   General.

5       So, I think it's important to understand it in

6   the context of that.  But it's, I think -- even though

7   it's recodified in 1952, I think the fact that there is

8   no debate on the prob -- the very overt problematic

9   aspects of its original codification in 1929, suggests

10  that there was nothing -- there was no problem seen

11  with the motivation for the original codification of

12  1326 in 1929.  Again, using language that was very

13  openly and explicitly racist, that made numerous

14  references to the necessity of preserving the kind of

15  purity of racial bloodlines in the United States, the

16  mongrelization of the Mexican or Latino bloodline.

17  So I think in understanding the recodification under

18  McCarran-Walter, it has to be done in the context both

19  of what came before it, but also what was occurring at

20  that historical moment, and at that moment in time.

21      And I think if you look at all of those things,

22  including the racial animus that was demonstrated in the

23  McCarran-Walter Act itself, in the continued assignment

24  of individuals of Asian descent to a kind of broad

25  category, and the assignment of national identities to

1    Europeans, which continued under McCarran-Walter, then I

2    think all of those things suggest that the decision to

3    pass this without debate, was largely driven by the same

4    things that drove the original codification of 1326;

5    and that was, in part, a desire to control access to

6    Mexican labor, and also a tendency to view Mexicans,

7    individuals from south of the Rio Grande, and at least

8    in the terms of the 1950s, the wetback, as a problematic

9    population.  And you don't see any significant debate

10   over -- you have a stretch between 1959 and 1952, where

11   you have 1326 in effect, and you don't see any debate

12   over that policy on its merits.

13        We've been doing this for over 20 years by that

14   point.  What are the merits of 1326?  Why should it

15   be recodified?  Is it serving the function it was

16   originally intended to serve -- even if we characterize

17   that as one of maintaining racial purity, but is it

18   serving the purpose that it is supposedly -- if we think

19   about it in race neutral terms, it is meant to serve

20   as a deterrent.  Is it just serving that deterrent

21   function?  You don't have a debate over that in 1952.

22        And, you, actually, don't have a debate over

23   that, really, in most of the either initial

24   codification -- or sorry -- the recodification in

25   '52, or the subsequent reenactments in legislation

1    going forward.

2         What is the purpose of this?  If it is racially

3    neutral, then does it serve its stated goals of acting

4    as a deterrent to undocumented immigration.

5             MS. GORMAN:  I don't know if the Court has

6    any follow-up questions as well -- and then I guess I --

7    and as part of that context if the, sort of, original

8    motivation is this compromise over eugenics, and having

9    a control over an exploitable labor force, was that

10   effective going forward when you talk about Mexican

11   re-patronization and the Bracero program, and the

12   utilization of those migrants as sort of a temporary

13   labor force?

14            THE WITNESS:  Yeah.  You know, one of the

15   points of the Undesirable Aliens Act was to create a

16   labor force in the United States that would serve

17   the interests of, um, usually southern agribusiness,

18   but the United States more broadly, but at the same

19   time have no permanence, be deportable, be controllable

20   and, therefore, offer a mechanism by which to preserve

21   the racial integrity of the United States, by ensuring

22   that these populations don't establish permanence, which

23   then can lead to (unintelligible) and other effects on

24   the racial purity of the nation.

25            MS. GORMAN:  Your Honor, I know if this

1    Court have any follow-up questions before I pass the

2    witness?

3              THE COURT:  Well, I'm going to let

4    Mr. Walkingshaw do his cross-examination.  And I'll

5    let you both exhaust your questions.  And if I find the

6    questions I have are not answered, I'll intervene.

7              Mr. Walkingshaw.

8              MR. WALKINGSHAW:  Thank you, Your Honor.

9                       **CROSS-EXAMINATION**

10   BY MR. WALKINGSHAW:

11       Q.  Good afternoon, Professor O'Brien.

12       A.  Good afternoon.

13       Q.  I was going to say good morning.

14            So, Professor Gonzalez O'Brien, I believe you

15   mentioned at the outset of your direct testimony

16   that you have a written a few books on the subject of

17   immigration, correct?

18       A.  Uh-huh.

19       Q.  One of them is called Handcuffs and Chain Link,

20   correct?

21       A.  Yes.

22       Q.  Is it fair to say that that work is based

23   off a dissertation that you wrote, I believe it was

24   copyrighted in 2014, for your Ph.D thesis at the

25   University of Washington?

1    A.   That's accurate.  It's an expanded version of

2    what was submitted for my dissertation.

3    Q.   Yeah.  But much of the text is the same, correct?

4    A.   There's, uh -- I mean, I don't know -- I don't

5    know the exact percentage of text that is -- that

6    mirrors exactly what was in my dissertation.  It went

7    through a couple peer -- it went through a period of

8    peer review with the University of Virginia Press before

9    going to publication, so there were changes and then

10   there were expansions to certain segments based on some

11   of the reviews from the individuals who were sent a copy

12   of the manuscript.

13   Q.   I would like to ask you some questions about

14   those documents --

15   A.   Okay.

16   Q.   -- if I could.  So --

17   A.   If I may of clarify, are you asking me, also,

18   questions about my dissertation, my memory of which

19   is now quite foggy, since I submitted my dissertation

20   in 2014, and have really only read this in the form

21   of the subsequent publication of it.  That would be

22   Handcuffs and Chain Link.  I don't know how accurately

23   I can speak to exactly what appears in my dissertation

24   from 2014.

25   Q.   Fair enough.  I'll try to frame it as things you

```
1    wrote in the book.
2          So in the introduction of the book, you did
3    write that:  "The 1929 Act" -- uh, which I -- I'll use
4    a shorthand -- I'm going to use some shorthand terms for
5    the benefit of the court reporter.  And I'll try to
6    speak slowly -- but I'm going to call the Undesirable
7    Aliens Act of 1929, "the '29 Act."
8          Fair?
9    A.   Sure.
10   Q.   Do you understand?
11   A.   Yes.
12   Q.   Okay.
13   A.   I get it.
14   Q.   And I'll try to define terms as I go.
15         But you wrote that:  "The 1929 Act was
16   attributable to a few things, including the success
17   of immigration restriction in 1924" --
18   A.   Uh-huh.
19   Q.   Correct?
20   A.   Correct.
21   Q.   "Hardening notions of sovereignty following
22   World War I," correct?
23   A.   Correct.
24   Q.   "And the Great Depression," correct?
25   A.   Correct -- well, the beginning of the Great
```

1    Depression, yeah.  The beginning of an economic

2    downturn.

3        Q.  And you wrote that:  "The Great Depression, like

4    most economic downturns, increased nativism," correct?

5        A.  Yeah.  You see an increase in nativism associated

6    with most economic downturns.

7        Q.  Right.

8            That "it helped drive perceptions of economic" --

9    "the Great Depression," rather, "helped drive

10   perceptions of economic threat from immigration,"

11   correct?

12       A.  Yeah.

13       Q.  All right.

14           And in your dissertation and your book -- I

15   believe they're both the same on this point --

16       A.  Yeah.

17       Q.  You, uh, you write that:  "The passage of the

18   1929 Act led to a 57-year period where there would be,

19   in your view, no congressional action on undocumented

20   immigration," correct?

21       A.  Very little.  I mean, I mention the Wetback Bill

22   in Handcuffs and Chain Link in passing, as a kind of,

23   uh, you know, expansion of some of the things.  But what

24   I'm talking about -- oh, sorry.  I'm talking too fast

25   again.

1          What I'm -- you know, what I mean by that 57-year

2     period is that you don't see a significant overhaul

3     of how we really approach immigration until the

4     immigration -- the Immigration Reform and Control Act

5     of 1986.  So, you don't see a significant overhaul of

6     how undocumented immigration specifically is addressed.

7          Now, that is not to say legal immigration is not

8     addressed in 1952 with McCarran-Walter, or 1965, with

9     Hart and Celler; nor that there isn't -- there aren't

10    other pieces of legislation that occur over the

11    course of this period.

12         But in terms of significant legislation and

13    legislation that constituted a significant overhaul

14    of how we address undocumented entry into this country,

15    the argument that I make is that 1929 and 1986 are

16    two of the big moments in U.S. immigration policy

17    in terms of undocumented immigration specifically.

18    Q.   And, uh --

19    A.   I do think I make that point both in my

20    dissertation and in my book.

21    Q.   I believe that's correct.

22         So, fair to say then, based on your answer

23    just now, you view the 1986 Immigration Control and

24    Reform Act as a major overhaul of how we approach

25    undocumented immigrations in this country?

1       A.   I mean, yeah, the Immigration and Control Act was

2   a significant piece of legislation.  I mean, I think

3   that is, uh, in -- to borrow from Dr. Lytle Hernandez --

4   I think that is in the mainstream of writing on U.S.

5   immigration policy.

6       Q.   All right.

7            And for the benefit of the court reporter,

8   I'm going to refer to that act as IRCA, which is a

9   pronunciation of I-R-C-A.  Is that a fair -- do you

10  understand that --

11      A.   That's fair.

12      Q.   Okay.

13      A.   I like the tongue twisters better.  But, it's

14  probably easier for the court reporter.

15      Q.   Right.

16           And to summarize the -- and correct me if

17  I'm wrong here, but the thesis -- or one of the thesis

18  of your dissertation and your book is that IRCA was

19  an opportunity to re-envision how we approach or

20  documented immigration in this country, correct?

21      A.   Certainly.  Yeah.

22      Q.   And you refer to it in both documents as what's

23  referred to as a "critical policy failure," correct?

24      A.   Yeah.

25      Q.   And what you mean by that, among other things,

1    is that it failed to reduce the overall undocumented

2    population in the U.S., correct?

3        A.   Uh-huh.   Yes.

4        Q.   Thank you.

5             And just for the benefit of the court reporter,

6    if you could -- I know you caught it eventually -- but

7    if you could respond with a "yes" as opposed to a

8    "uh-huh."

9        A.   Yes.

10       Q.   And I will try to speak slower.

11       A.   Yes.   I agree.

12       Q.   All right.

13            And then the sort of further thesis of both

14   your dissertation and your, and your book, is that

15   this critical policy failure led to a return to

16   the criminalization of immigration itself.   So,

17   criminalizing the immigrants --

18       A.   Uh-huh.

19       Q.   -- as embodied in the -- what I'll call IIRIRA,

20   but the 1996 Act, correct?

21       A.   Yes.

22       Q.   And, I'm sorry.   What's the full name of the Act

23   that I'm referring to?

24       A.   The Illegal Immigrations Reform and Immigrant

25   Responsibility Act.

1    Q.   Okay.  And I'll call that IIRIRA.

2    A.   Okay.  I didn't write it, so you can call it

3  whatever you want.

4    Q.   Fair enough.

5         Sorry.  Lots of terms here.  I'm trying to

6  cutdown on fingers typing?

7         And you referred to, in your direct testimony,

8  that's the last time that Congress really addressed

9  this issue as well, correct?

10   A.   Uh, as a point of clarification, that's the

11 last time a significant legislative package was passed

12 overhauling how undocumented immigration is addressed.

13 It certainly isn't the last time immigration is

14 addressed period, either legal immigration or illegal.

15 But, that's the last passage of a significant policy

16 that changes, kind of, the approach to undocumented

17 immigration, or addresses it in some manner.

18   Q.   Well, thank you for the clarification.

19        So as you discussed earlier, there were times

20 when Congress addressed legal immigration in this

21 intervening period, correct?

22   A.   Yes.

23   Q.   And as we've discussed, the 1952 Act is -- and

24 when I say "the 1952 Act," I'm referring to the

25 McCarran-Walter Act.  That's one of them, correct?

1    A.   Yeah.

2    Q.   That is the Act that passed -- I'm trying to

3    frame this in a way that we won't disagree about it --

4    but that's the Act that passed the, uh, 19 -- the 1326

5    provision that is in effect today, subject to further

6    amendment, correct?

7    A.   Right.   Correct.   The recodification of the -- of

8    the, uh, the Undesirable Aliens Act.

9    Q.   Okay.

10         And if you had written -- sorry.

11         You testified earlier that there is some

12   disagreement as to whether or not the McCarran-Walter

13   Bill was a progressive Bill, correct?

14   A.   Yeah.   I mean, I, I think in -- sometimes when

15   I've seen it referred to just in news stories and things

16   like that -- and some of the early encounters I had with

17   McCarran-Walter as a graduate student, if we want to go

18   all the way back to the yesteryears of my professional

19   experience, you know, the removal of racial restrictions

20   on immigration was seen as being a liberalization of the

21   immigration policy, right?   You were no longer saying

22   that you can't immigrate -- you can't come to this

23   country if you're Asian, right?   You cannot become a

24   citizen if you're Asian.   So, that did represent a

25   liberalization of immigration policy.   But, I think

1   that term is often stretched a little thin when

2   referencing McCarran-Walter, when you actually look

3   at the provisions of the Act itself.

4       Q.  All right.

5           So, fair to say you don't view it as progressive

6   though?

7       A.  I don't view it -- uh, I will say yes, but...  I

8   view the removal of racial restrictions as something

9   that is -- that was a good thing at that point in time.

10  I don't think, as a whole, that it is necessarily a --

11  or that it is a what I would call, or what I would label

12  as a progressive piece of legislation.

13          And when I say "progressive piece of

14  legislation," I want to clarify further that I'm

15  talking about this in terms of a racially progressive

16  piece of legislation.

17      Q.  All right.

18          Now, Mae Ngai -- Ngai, spelled N-g-a-i, for the

19  benefit of the court reporter -- writes in her book,

20  Impossible Subjects, about the McCarran-Walter Bill,

21  correct?

22      A.  She does.  Correct.

23      Q.  And you're familiar with her work, correct?

24      A.  Oh, I mean, if you've read my book, you know I

25  cite her frequently.

1    Q.   Yes.

2    A.   By the way, thank you for the royalty.

3         But, anyway, go ahead and continue.

4    Q.   You're very welcome.  I don't know what that

5    comes out to, but --

6    A.   Like, $0.75.

7    Q.   Fair enough.

8    A.   That would be a stick of gum these days.

9    Q.   Right.

10        And in addition, in the summary of anticipated

11   testimony that you provided for this hearing, you also

12   referenced Ngai's work, correct?

13   A.   That's true.  Yeah.

14   Q.   Is it correct that in her book, Ngai says

15   that:  "Preserving the national origins quota was not

16   the central motivation for the McCarran-Walter Bill"?

17   A.   Uh, I believe so.

18        I mean, if you want to read me that particular

19   passage, you're welcome too.  I don't know what page it

20   appears on.

21   Q.   Sure.

22   A.   I, I didn't have a chance to reread all of

23   Mae Ngai's 350-plus-page book before testimony this

24   morning or on the lunch break.  So, my apologies with

25   my unfamiliarity with that specific passage.

1      Q.   Yeah.   That's okay.

2           Do you have a copy handy?

3      A.   Right there.

4      Q.   All right.

5      A.   The good thing about working from your home

6      office, slash, bedroom.

7           Anyway, go ahead.

8      Q.   Does the phrase that I read to you appear on

9      page 237 of the book?

10     A.   Now I have to look old by taking off my glasses.

11     I'm almost ready for bifocals at this point.

12          Okay.   Yes.   What paragraph are you referencing?

13     Q.   Oh, boy.   Um --

14     A.   You didn't highlight it?

15     Q.   I really should have.

16          All right.   So, it's the first paragraph.

17     A.   Are you talking at the top of page 237?

18     Q.   Yeah.   It's the first -- it's not a full

19     paragraph, but it's the first paragraph.   If you go

20     four full lines up from the bottom, the sentence

21     beginning with the word --

22              COURT REPORTER:   Wait.   Beginning with the

23     word what?

24     BY MR.  WALKINGSHAW:

25     Q.   Does it say, "preserving the national origins

1   quota was not the central motivation for the Bill"?

2      A.   It does say that.

3      Q.   And does it continue, "maintaining the status quo

4   hardly required such major review and revision of the

5   code"?

6      A.   That's true.

7      Q.   And does it follow, "McCarran saw revision of

8   the nation's immigration laws as a tool in the United

9   States' urgent battle against communism"?

10     A.   That's accurate.   Yes.

11     Q.   Is it fair to say that the 1952 law received

12  political support for a variety of reasons?

13     A.   Yeah.

14     Q.   Earlier you referenced -- you were having

15  discussion as to whether or not the Bill was racially

16  progressive, and you referenced the elimination of the

17  bar on Asian immigration, correct?

18     A.   Uh, the elimination of the qualification under

19  Johnson-Reed, that the only people who could utilize

20  the quotas that were assigned to Asia, had to be people

21  who could become citizens of the United States, which

22  were not people of Asian descent at that point in time.

23     Q.   Right.

24          And Secretary of State, Dean Acheson supported

25  this Bill because it eliminated this provision, correct?

1    A.   Uh, to my knowledge.  Again, I haven't -- I --

2    you could reference that specific passage, if you'd

3    like.  I won't claim to know that off the top of my

4    head.

5    Q.   Okay.  It's on the following page, 238.

6    A.   Okay.

7    Q.   I promise we won't do much more of this.

8         So, the second full paragraph, second paragraph:

9    "Secretary of Dean Acheson..."

10    A.   Yep.

11    Q.   So that's where the sentence begins.

12    A.   I got it.

13    Q.   "Secretary of State, Dean Acheson, supported

14    the McCarran-Walter Act because its elimination of the

15    racial bar to citizenship, promises to resolve a, quote,

16    serious irritant of longstanding in the U.S./Japanese

17    relations," end quote.

18    A.   Yeah.

19    Q.   Would you agree with that?  Would you agree with

20    that statement?

21    A.   Would I agree with the statement, or would I

22    agree that that appears on page 238 of Mae Ngai's book?

23    Q.   Well, let's take them in turn.

24         Do you agree with the statement?

25    A.   I agree with the statement that that is why

1   that particular individual supported that piece of

2   legislation.

3      Q.   Okay.

4         Now, the McCarran-Walter Bill was preceded by --

5   you've mentioned in your prior testimony -- well, let me

6   back up and I'll withdraw the question and I'll try to

7   reframe it in a way that makes sense.

8         You've referenced in your prior testimony,

9   reports that have been compiled prior to the passage

10  of immigration laws, correct?

11     A.   Yes.  I have referenced a couple reports, as well

12  as, I think, a couple academic works from the period of

13  the 1950s.

14     Q.   And there was one done prior to the

15  McCarran-Walter Act, right, a report?

16     A.   I mean, there were lots of reports done.  Which

17  one are you referencing?  Are you talking about the, uh,

18  the Wetback in the Lower Rio Grande Valley?

19     Q.   No.  I believe there was a comprehensive report

20  that was about --

21     A.   Are you referencing the Wickersham Commission

22  report in 1931?

23     Q.   I'm referring to the Senate judiciary

24  Subcommittee report that ran about 900 pages.

25     A.   Of what year?

1    Q.   Well, I hate to break the book out again, but

2    it's back on page 237 -- I promise this is the last

3    one.

4    A.   Well, at least we're only going between two

5    pages here.

6    Q.   So back to the first paragraph --

7    A.   Yep.

8    Q.   -- following the sentence that says:  "McCarran,

9    a conservative and devout Catholic from Nevada, was

10   a dedicated anti-communist and, quote, warrior --"

11   A.   Uh-huh.

12   Q.   "-- but that 100-page report submitted by the

13   subcommittee, and the accompanying 200-page draft

14   omnibus Bill introduced by McCarran in 1950, and the

15   legislation that Congress ultimately passed in 1952,

16   have been considered most notable for their preservation

17   of the national origins support system."

18   A.   Okay.  Yeah.  It did preserve the national quota

19   system, although it changed the references point to the

20   census of 1920, I believe, instead of 1890, which was

21   the reference for Johnson-Reed.

22   Q.   So a few questions on that.

23        First, have you read that report that Ngai

24   references at page 237?

25   A.   I haven't read the 900-page report,

1    Q.   Okay?

2    A.   You know, if -- since you've read Handcuffs and

3    Chain Link, you know that I don't go into a great

4    amount of detail on McCarran-Walter, since it was, in

5    the history of undocumented immigration, uh, this

6    recodification in 1952 is something that is done very

7    much without debate, as we've covered in my testimony.

8    And so I did not read the 900-page report from the

9    Judiciary Committee.

10   Q.   Okay.

11        And the national origins quota system that that

12   sentence that we read referenced, that's no longer a

13   part of immigration law, correct?

14   A.   Uh, it is.  You don't get rid of national origins

15   quotas until 1965.

16   Q.   Right.  I'm sorry.  I mean, today, it's no longer

17   part of -- like you said, the national origins quota

18   system was eliminated in congressional legislation in

19   1965, correct?

20   A.   Yes.

21   Q.   Right.  So, today, if someone is trying to

22   immigrate to the U.S., they're not subject to any

23   quota with respect to their national origin, correct?

24   A.   They are not.

25   Q.   In fact, the 1965 Act included an explicitly

1    anti-discriminatory provision that banned consideration

2    of national origin, ancestry, or race, correct?

3        A.   That's true.   That doesn't mean there were

4    country level caps that were still imposed.   There was

5    a 20,000, uh -- 20,000 per year quota that was put on --

6    that was applied to Mexico in 1976.

7        Q.   All right.

8             I would like to shift perspective for a little

9    bit to IRCA, if we could.

10       A.   Okay.

11       Q.   Well, if you think it's --

12       A.   I love revisiting my first book, so --

13       Q.   Got it.

14            So, again, you view this as a significant shift

15   in the way that American law treated the, I guess what

16   we could call the problem of undocumented immigration?

17       A.   I mean, I think the way that I reference it in

18   my book is that I think this represented the potential

19   for a significant shift.   You did see the first amnesty

20   program that was part of the Immigration Reform and

21   Control Act -- or, sorry, IRCA -- in 1986.   And you did

22   see some shifts in language at this point in time.

23       Q.   Right.

24            With respect to the shifts in language, you wrote

25   that:  "The debate over IRCA differed significantly from

1    earlier debates on undocumented immigration in 1929,

2    right?

3        A.   That's correct.  I mean, we would -- you know,

4    we would hope that the debate on immigrations shifts

5    from one that is, uh, strictly talking about the racial

6    purity of the United States, to something different by

7    the 1980s.

8        Q.   And you reference in your book a floor statement

9    by Representative Fish as expressing -- well, you

10   believed "it was a feeling no doubt shared by many, that

11   IRCA represented an opportunity to address immigration

12   control in a way that was not driven by nativists or a

13   reaction to the (unintelligible)," correct?

14       A.   That's correct.

15       Q.   You say that, "The floor statements reflected a

16   significant shift from the way in which Mexican and

17   undocumented immigration was discussed in the 1924 and

18   the 1928 Acts," correct?

19       A.   That's correct.

20       Q.   I believe we've touched on this briefly, but

21   IRCA did fail to reduce the influx of undocumented

22   immigrants, correct?

23       A.   Correct.  You have the passage of an amnesty

24   program, and then you have the beginning of the surge in

25   undocumented immigration.  And I forget -- I don't have

152

1 the charts in front of me.  But you have a surge in

2 undocumented immigration around the early part of the

3 1990s, I believe.

4   Q.  Okay.

5   And I'll throw out some numbers here that I've

6 taken from your book.  Let me know if you disagree with

7 them.

8   After IRCA, the undocumented population dropped

9 from 3.2 million in 1986, to 1.9 million in 1988,

10 correct?

11   A.  Yes.  The size of -- the estimated size of the

12 undocumented population -- and I want to be careful

13 to clarify that language because by virtue of being

14 undocumented, it is also a population that can be

15 difficult to measure in terms of its full size.

16   Q.  Right.

17   A.  So those are the estimated size of the

18 undocumented populations as represented in my book,

19 yes.

20   Q.  And by 1990, the estimated undocumented

21 population had risen above three million, correct?

22   A.  That's correct.

23   Q.  And by 1996, the estimate had risen to five

24 million, correct?

25   A.  That's correct, based on whatever member -- or I

1    think, what really fancy chart that I have in there.

2        Q.   Right.

3            1996 was when IIRIRA, the I-I-R-I-R-A was

4    enacted, correct?

5        A.   Correct.

6        Q.   And you mention in your book a number of

7    motivating factors.  And I believe you reference a

8    scholar named Don Johnson who identified them, but

9    you refer to them in your book, correct?

10       A.   I think so.  I don't specifically remember

11   Don Johnston, but --

12       Q.   Okay.

13           So one of the things you mention is the failure

14   of IRCA to stem the illegal immigration --

15       A.   Right.

16       Q.   The other was the passage of NAFTA?

17       A.   Right.

18       Q.   And that's the North American Free Trade

19   Agreement?

20       A.   That's correct.

21       Q.   Which you write, "focused the public's attention

22   on immigration and its effect on the U.S. economy,"

23   correct?

24       A.   Correct.

25       Q.   You also reference the 1993 World Trade

1    Center bombing?

2        A.   I have no -- I have no recollection of

3    referencing that, but, um -- I don't know if you're

4    referencing my dissertation or my book, but I don't

5    recall that off the top of my head, and I don't

6    recall the context for referencing that off the

7    top of my head.

8        Q.   Okay.  You also --

9        A.   My apologies for not recalling it, but when

10   you -- you know, I have a little distance since that

11   was written.

12           But, anyway, go ahead.  Continue.

13       Q.   If I e-mailed you a copy of your dissertation

14   and pointed you to the page, would you be able to say

15   whether or not it was fairly characterized?

16       A.   If it appears in my book, I would be -- I think

17   it is more relevant to the testimony that I'm offering

18   today, since, again, my book went through the -- the

19   manuscript submitted as my dissertation went through

20   multiple rounds of peer review before being released as

21   my book; and, therefore, as a dissertation is not what

22   I can -- is not a publication, nor is it something that

23   I would consider a final version of my work.  That is,

24   essentially, a draft version.  That is a dissertation,

25   but it is not a publication.

1    Q.   Okay.

2         It's hard to e-mail it to you since there's a

3    digital copyright provision for the benefit of your

4    royalties.  Maybe we'll just move along.

5    A.   Well, I mean, I have my book, but I don't -- I

6    don't get any royalties from my dissertation --

7    although, you know, if you want to send me $0.75, I'll

8    take it.

9    Q.   Sure.

10        So you do have a copy of your book?

11   A.   Yeah.   Somewhere.

12   Q.   Okay.   So the phrase that I'm referring to does

13   appear in your book.

14   A.   Okay.

15   Q.   The sentence --

16   A.   Hold on one second.  Let me pull it up.

17   Q.   You have it --

18   A.   I also have a pdf of it.

19   Q.   Okay.

20   A.   So, uh -- and my apologies to -- my camera --

21   give me one second.  I just lost my monitor, so --

22             MS. GORMAN:  Personally, I'm losing a thread

23   because I don't know what people are referring to.   If

24   somebody could share a screen, or if Mr. Walkingshaw

25   could share his screen so I can -- I'm trying to --

156

1              MR. WALKINGSHAW:  I will try.  I have the

2    Kindle version of the Professor's book, which was cited

3    in the motion.  Let me see if I can find a way to share

4    my screen.

5              Can you Control F in your pdf?

6              Oh, dear, we lost his video.

7              THE WITNESS:  Yes.  Give me one second.

8    I'm trying to correct my video.  My monitor cut out.

9    I'm trying to do a quick fix on that, but I can still

10   hear you.  Hold on.

11             Okay.  What am I -- what page did you

12   reference?

13   BY MR. WALKINGSHAW:

14      Q.  So it's hard with the Kindle version because it

15   doesn't have pages, but if you can search within the

16   document for the phrase "the 1993 bombing."

17      A.  Let's see.

18      Q.  I'm afraid I'm unable to share my screen.

19      A.  And I'm down a monitor.

20          Um, yes, "the 1993 bombing of the World Trade

21   Center by" -- whoop.  Am I getting it back now?

22      Q.  Yes.

23      A.  Now it's over here.

24          Okay.  Let me just switch this over real quick,

25   and then I'm looking at the right screen.

```
 1              THE CLERK:  Mr. Walkingshaw, give it a try
 2    now to try and share your screen.
 3              MR. WALKINGSHAW:  All right.  One moment.
 4              THE WITNESS:  Okay.  I can read the passage
 5    if you'd like, since I have it right here.
 6              MR. WALKINGSHAW:  Sure.  That would be
 7    great.
 8              THE COURT:  Well, before you do that, I'm
 9    just trying to -- he's sharing the screen?
10              MR. WALKINGSHAW:  I'm sorry, Your Honor.  I
11    can take it down if it's preferable.
12              Did Your Honor have a question?
13              THE COURT:  I'm trying to understand this
14    line of questioning.  You're asking if Professor
15    Gonzalez O'Brien referenced the 1993 bombing of the
16    World Trade Center?
17              MR. WALKINGSHAW:  As a driving factor for
18    the passage of the 1996 IIRIRA Act.
19              THE COURT:  And I think that the answer
20    earlier was that he wasn't sure if he did.  And that's
21    what you were trying to demonstrate, is that it was
22    referenced?
23              MR. WALKINGSHAW:  Yes.  That he identified
24    it as one of the driving factors of the passage of
25    IIRIRA.
```

```
 1              THE WITNESS:  If I may offer a point of

 2   clarification.  I mean, all of this that is cited in

 3   that paragraph, both the North American Free Trade

 4   Agreement and the bombing of the World Trade Center,

 5   is talking about the environment at the time

 6   preceding the passage and the debate other the

 7   Illegal Immigration Reform and Immigrant Responsibility

 8   Act, or IIRIRA, or I-eera (phonetic), or however --

 9   whatever we're calling it right now.  So, I -- what

10   is your -- what is your question relating to that

11   particular passage?

12   BY MR. WALKINGSHAW:

13      Q.  So you have identified the World Trade Center

14   bombing as an event that made the passage of this Bill

15   more likely, correct?

16      A.  It was an event, at least the identification

17   of the individual, the suspect in that case as someone

18   who was believed to be an immigrant, did heighten public

19   fears around immigration, I think is the point that I'm

20   making there.

21      Q.  Okay.

22          And you also reference in your book -- I believe

23   you referenced this on direct -- a statement by John

24   Doolittle during the debates over IIRIRA, regarding a

25   drive-by shooting in his district where the perpetrator
```

159

 1     was an undocumented alien.  He served his sentence.

 2     And then he was back within one week after he was

 3     deported.

 4           Correct?

 5        A.  Correct -- well, I don't know that I referenced

 6     it that explicitly, but I did mention it in passing.

 7     Yes.

 8        Q.  Right.

 9           And I believe you also referenced a statement

10     by an Iowa legislator who referred to a stabbing by

11     a previously deported, undocumented immigrant at a

12     party, correct?

13        A.  Correct.

14        Q.  Okay.

15           I will try and cease sharing my screen at this

16     point.  I think we've more than --

17           Or, Peggie, have I stopped sharing my screen?

18              THE CLERK:  You have.

19              THE WITNESS:  You're good.

20              MR. WALKINGSHAW:  Okay.

21     BY MR. WALKINGSHAW:

22        Q.  You teach immigration and border politics,

23     correct?

24        A.  Uh, I have.  Yes.

25        Q.  Yeah.  And at Highline -- I'm sorry.  Is it

1    Highline College or University?

2       A.   It's Highline College.  It's a community college

3    in Washington, where I was before taking the job at

4    San Diego State.

5       Q.   You taught comparative government there, correct?

6       A.   Yeah.  I mean, at a community college, you teach

7    whatever classes they tell you to teach because there

8    are only four classes that are offered.

9       Q.   Gotcha.

10          And it's true --

11      A.   Actually, as a point of clarification, I did not

12   teach immigration and border policy at Highline.  I

13   taught a racial and ethnic politics class, I believe.

14   But I don't recall teaching an immigration and border

15   policy class.

16      Q.   Oh, I'm sorry.  I don't believe that I said at

17   Highline, but have you taught immigration and border

18   politics generally.

19      A.   Yes.  Yes.

20      Q.   Okay.

21          And at Highline you did teach comparative

22   government, even though it's, perhaps, one of only

23   four classes that they offer in political science?

24      A.   It is.  And if you're going to ask me questions

25   regarding comparative government, that is not one of

1    the areas of my expertise, so, uh -- I, I am happy to

2    say I taught that class, based on my limited expertise

3    in comparative government, but it is not one of my areas

4    of specialization.

5        Q.   Okay.

6             Do you know if other countries around the

7    world criminalize entry to their borders without

8    authorization?

9        A.   Some do.  There is a wide range of immigration

10   policies worldwide in regards to undocumented entry,

11   and there's a wide range of policies that are used by

12   countries to address it.  And I think, also, uh, to

13   give that question a little additional context, you also

14   have to look at not only the penalties for entry, but

15   the opportunities for normalization of status after

16   that, um, initial act of undocumented entry.  And some

17   countries do provide more opportunities to normalize

18   status than the United States does.  Although, again,

19   I'm not an expert in comparative government, nor is that

20   the area that I write in.

21       Q.   Right.

22            But, isn't it true that a substantial majority of

23   countries around the world criminalize entry into their

24   borders without authorization?

25       A.   Are you planning on citing a specific number?

1    Because I don't know what would -- I don't know that

2    I can say that a majority do, without looking at the

3    immigration policies of all of the individual countries

4    in the international system, and also then having a

5    debate around what you would identify as "criminalize

6    undocumented entry."

7        Q.   Okay.

8             So, fair to say you don't know then?

9        A.   I know that immigration policies from country

10   to country vary in how they treat undocumented entrants.

11       Q.   But, you don't know whether or not a majority

12   or minority of those policies include a criminal penalty

13   for entry into the country without authorization?

14       A.   I don't.  If you've quantified that, I would love

15   to see a chart.  I can use it in my classes.

16       Q.   I'm scared to do more screen sharing, and so

17   perhaps I'll just move on.

18             So, I think I only have a little more.  I would

19   like to ask you some questions about the term -- the

20   term "wetback."

21       A.   Uh-huh.

22       Q.   You discussed it in your direct testimony,

23   correct?

24       A.   That's correct.

25       Q.   And it's not the first time you've been asked to

1  provide expert testimony on the meaning of its -- on the

2  meaning of that term, correct?

3      A.  Uh, that's correct.

4      Q.  Right.

5          You've testified in a hearing last week in Oregon

6  on the same subject, correct?

7      A.  Yeah.  I testified -- I mean, you know, my

8  testimony was not just to define the term "wetback,"

9  but --

10     Q.  That's true.

11     A.  -- but I believe I did offer -- that testimony

12 was partial testimony that was then cut short.  So my

13 recollection of what exactly I discussed over the course

14 of that testimony is, um, is a wee bit foggy in terms

15 of where the stopping point was.

16     Q.  Okay.

17         This happened last Thursday, right?

18     A.  To my recollection, yes.

19     Q.  Right.

20         And I mean --

21     A.  I mean it's COVID time so, you know, everything

22 kind of ebbs and flows, and days of the week lose their

23 meaning.  But, yes, Thursday.

24     Q.  Sure.

25         And it was for a hearing on a motion very much

164

1  like this one, correct?

2      A.  That's correct.  Yeah.

3      Q.  I mean, can you think of any differences, aside

4  from the district and the defendant, from the two

5  motions that you're aware of?

6      A.  Not off the top -- I mean, I would have to look

7  at them side by side.

8      Q.  Right.

9      A.  I mean, I'm not going to pretend to have a

10  perfect recollection of both motions as were filed.

11      Q.  Sure.  But, you know, nothing major pops out

12  to you?

13      A.  They're similar motions based on my recollection

14  of the two.

15      Q.  Okay.

16      A.  Again, how similar they are and how -- in terms

17  of the actual text offered, I don't feel like I can

18  confidently say.

19      Q.  Okay.

20          You were asked at that hearing to discuss the

21  meaning of the term "wetback" as it was used in the

22  early 1950s, correct?

23      A.  Uh-huh.  Correct.

24      Q.  And in response, you stated, "The term was used

25  largely to denote anyone who had entered the United

1    States illegally," correct?

2        A.   Correct.

3        Q.   You stated that, "The term was used rather

4    broadly without any kind of national designation,"

5    correct?

6        A.   Correct.  Meaning, you know -- by which I meant

7    -- and I'm not sure if you're going to offer this

8    part of my testimony either, or if this was part of

9    my testimony -- but in terms of this being a designation

10   made solely to Mexicans versus anyone from, say,

11   Central America, who also crossed illegally, that

12   term would have been applicable to them as well.

13       Q.   All right.

14           And it refers, exclusively, to people in the

15   country without any documented status, correct?

16       A.   The term "wetback" does.  Yes.

17       Q.   Right.

18           And, again, the term originates from -- I believe

19   you covered that in your direct testimony.

20           Are you familiar with Cesar Chavez?

21       A.   No.  I've never heard of him before -- yeah.

22       Q.   Okay.

23           Uh, he was a Mexican-American labor organizer,

24   correct?

25       A.   Yes.

1        Yeah, and I already know where you're going with

2   this, but continue.

3   Q.   Okay.  Well, let's get there and then I think we

4   should -- ought to be done.

5        He was considered a civil rights hero for many

6   Mexican Americans, correct?

7   A.   Correct.

8   Q.   And in fact, in the 1950s and '60s and '70s,

9   isn't it true that Cesar Chavez, himself, referred to

10  undocumented strikebreakers who were in the country

11  illegally as wetbacks?

12  A.   That's true.

13  Q.   Okay.

14       And he wasn't referring to Mexicans in general,

15  was he?

16  A.   He was drawing a distinction between legal

17  Mexicans and illegal Mexicans.

18  Q.   Right.

19       You wouldn't say that Cesar Chavez bore a racial

20  animus against Latinx people, would you?

21  A.   I would not.

22  Q.   Okay.

23            MR. WALKINGSHAW:  Those are all the

24  questions I have at this time.

25            So, at this point, Your Honor, I'd pass

1   the witness.

2                    **REDIRECT EXAMINATION**

3   BY MS. GORMAN:

4       Q.  So, Professor, that covered a lot.  Most of which

5   I have not read.  But just to be -- to be very clear,

6   when you're referring to -- because I, likewise,

7   listened to your testimony last week in the District

8   of Oregon -- is it fair to say you testified for several

9   minutes and then time ran out?

10      A.  That seems accurate.  Again, I don't remember

11  the exact number of minutes, but I didn't testify for

12  very long.  I was having unfortunate audio issues, which

13  I've since addressed with this neat little thing right

14  here.

15      Q.  Is there a difference in the use of, of a racial

16  -- of what could be a racial slur for one group, and not

17  for another group?

18      A.  I think there is.

19      Q.  As in -- okay.

20      A.  I think to contextualize my answer to the

21  previous question about Cesar Chavez, and about, uh,

22  the positions of some Mexican Americans, more broadly,

23  in regards to the undocumented population or to

24  wetbacks, uh, Mexicans in the United States have

25  long had issues with their own status.  And so there

1    are some divisions that you see, both at the time that

2    was referenced earlier in regards to Cesar Chavez,

3    but I also think there are -- there continue to be

4    some division on this question -- or on the issue of

5    undocumented immigration because, as I mentioned,

6    with -- as I mentioned with that 1951 report on the

7    wetback in the Rio Grande Valley, this attribution of

8    inferiority and criminality to the wetback was seen by

9    Mexican Americans as something that was generalized

10   to them as well -- because it was generalized to them.

11   And again, that is what I mean by this is a racialized

12   term.   This is a term that was used to characterize

13   people who appeared as if they could be undocumented,

14   regardless of their actual legal status or citizenship.

15   And so there, there is some -- there is some necessary

16   nuance to that.

17       Q.   And is it true that when you talk about Operation

18   Wetback, that actually included both Mexicans who had

19   legally entered the country and Mexicans who had entered

20   without permission?

21       A.   That's correct.

22       Q.   And, you know, you were left with this sort of

23   question about Cesar Chavez, and you touches on, I

24   think, something very -- an important part of that

25   history, which we didn't go into too deeply, but is

```
 1    it your understanding since Cesar Chavez was very much

 2    a, uh, an advocate of worker's rights in general, humane

 3    treatment of workers?

 4         Is that fair?

 5    A.   Yes.

 6    Q.   And during periods in American history, were

 7    undocumented and Braceros actually used to break strikes

 8    by agricult -- by farm interests and farm owners?

 9    A.   That's correct.

10    Q.   And I want to make sure, if there's any

11    additional context that you wanted to add to that,

12    uh, you know, feel free to.  But those are just, sort

13    of, points that I noticed from the government's

14    cross-examination.

15         Was there anything further regarding that

16    terminology?

17    A.   Yeah.

18         So, uh -- so, you know, there -- again, there

19    were -- there has been, to a certain extent, this

20    playing off of the undocumented population and the

21    either legal Mexican population or Latino population,

22    and American citizens, and these tensions between

23    groups because, again, Mexican -- undocumented Mexicans

24    could be used as strikebreakers.  They were seen as

25    contributing to notions of racial inferiority of
```

1  Mexicans generally; essentially, of giving Mexican

2  Americans a bad name.  And so the context of

3  undocumented immigrants, and the context of the

4  term "wetback" and/or "illegal immigrant," has to be

5  understood through the lens of both how white America

6  interpreted those terms, but also how those were used

7  to categorize not just the immigrants, not just those

8  who were here without status, but to characterize an

9  entire group of people.  Because at the end of the

10  day, that was -- those were racial attributions.

11  There was no way for anybody to tell if somebody

12  was undocumented or legal or a citizen of the United

13  States.  And a lot of the activity on the part of

14  Mexican Americans, or legal Mexicans, and a lot of

15  the hostility toward some of the undocumented community,

16  was because there was a fear that that would be

17  generalized to the Mexican population as a whole, and

18  that would further lower the status of Latinos in the

19  United States as a group.

20     Q.  You know, another point that you had hat I

21  think was brought to your attention, was the use of

22  anecdotal testimony in congressional debates.  I

23  want you to comment further about the use of these

24  anecdotal -- of these anecdotes by lawmakers of violent

25  crimes committed by undocumented immigrants, to further

1  a general anti-immigrant agenda, and whether or not that

2  is intentioned with the empirical literature or not.

3      A.   Yeah.  So what you see sprinkled throughout the

4  congressional debate, you know -- and I go into this

5  quite a bit with the Illegal Immigration Reform and

6  Immigrant Responsibility Act, or IIRIRA, but what you

7  see is you see these instances, the use of the example

8  of the drive-by shooting, uh, these anecdotal instances

9  of criminality -- which this, again, you know, I'm not

10  downplaying the severities of that criminal behavior,

11  or the impact that that had either on the victims or

12  their families -- but that is essentially being used

13  in a way to characterize an entire population, when

14  the empirical support for immigrant criminality is

15  lacking, and when all contemporary examinations of

16  the criminality of illegal immigrants or undocumented

17  immigrants has found that undocumented immigrants

18  actually offend at lower rates than the native born

19  population.  And this is not something that was unknown,

20  even during the -- um, if I can pull this up for a

21  second, which I can't -- even during the debate of

22  McCarran-Walter, there was a correction on the part

23  of Representative Celler, when another member of

24  Congress -- and this is not specifically in reference

25  to Mexicans, but it is in reference to the kinds of

1    ideas that the foreign born are more inclined toward

2    criminality -- and Representative -- and Celler notes

3    that what you find, and what the FBI found -- and this

4    is in 1952 as well -- is the native born offend at

5    higher rates than the foreign born.  And this is

6    something that's been replicated over and over again

7    in multiple academic studies and, as I mentioned, in

8    numerous governmental publications and reports.  And,

9    yet, you continue to see it referenced.

10         You saw it referenced in the -- in the 1996, uh,

11   legislation during debate.  You also saw it referenced,

12   repeatedly, on the push on the part of President Trump

13   to crack down on sanctuary cities and things like this,

14   these references to tragedies; but, ultimately, to

15   anecdotal evidence of criminality on the part of the

16   undocumented population.

17         And, again, the criminality that we know tends

18   to be more, more generalized towards all people who look

19   like they could be undocumented immigrants because,

20   again, that term is a racialized one, and remains a

21   racialized one in this country.

22   Q.   The fact that -- I mean, there were the two,

23   sort of, notable examples, or several during that

24   administration, which I don't know if you're familiar

25   with, but one involved -- I think the first name of the

1    young woman might have been Mollie -- and her parents

2    came out and said don't use this tragedy to further a

3    racist agenda.

4         Do you recall, sort of that -- I understand this

5    post-dates this litigation, but --

6    A.   Right.  That was -- yeah, that was the murder

7    of Mollie Tibbetts in, I believe, in Iowa, by an

8    undocumented immigrant.  And this was picked up

9    as an example of the threat posed by undocumented

10   immigration, in much the same way that, Kathryn Steinle,

11   or Kate Steinle's death in San Francisco in 2015 was

12   used as an example of the threat posed by immigrant

13   criminality.  And this is something -- sorry.  I'm

14   moving my web cam.  I'm having -- there we go -- this

15   was something that you see referenced -- you see

16   referenced repeatedly in regards to both Mollie

17   Tibbetts, and Kathryn Steinle, but it was also something

18   that was part of Trump's general push in his campaign.

19   He brought the families of victims of undocumented

20   crime, he brought them on his campaign tour.  He had

21   them tell their story.

22        And, again, I am not saying these are not

23   tragedies, but this is -- the political reason for

24   this is it activates longstanding racial anxieties

25   in this country regarding nonwhite peoples, and

1    specifically Latinos.

2                THE COURT:  All right.  I forget --

3                THE WITNESS:  And at the same time --

4                THE COURT:  I'm sorry to interject.  I

5    forget what the original question was now and why we're

6    down this line of questioning.

7                Ms. Gorman, would you redirect.

8                MS. GORMAN:  Well, I think we can end it.

9    I think that the general point was -- that I was

10   at least attempting to conceptualize, was that

11   Mr. Walkingshaw had referenced this part of his

12   cross-examination, these anecdotal stories of violent

13   acts committed by undocumented immigrants, and to place

14   that in the context that those -- that these, sort of,

15   anecdotal pieces of evidence have sort of a long history

16   of being used to justify ultimately racists laws or

17   racist enforcement of laws, either facially neutral or

18   racially motivated laws.

19               THE COURT:  All right.  Do you have any more

20   in terms of your recross -- redirect, I mean?

21               MS. GORMAN:  I will mercifully say no,

22   other than, um -- yeah, I think I've -- I think we've

23   exhausted this.

24               And I guess just to be clear, there

25   was a lot of talk about IRCA, and I think -- and maybe

1   I misunderstood, but I guess it's my understanding, and

2   correct me if I'm wrong, but there was no amendment or

3   change to 1326 in IRCA, is that --

4                  THE WITNESS:  No, there was not.

5                  MS. GORMAN:  Okay.  So I think I

6   was confused by the testimony regarding IRCA

7   because -- okay.  That makes more sense then.

8        And, Your Honor, I don't know if this court had

9   additional questions or if we covered everything.

10                 THE COURT:  Mr. Walkingshaw, do you have

11  more?

12                 MR. WALKINGSHAW:  Your Honor, I don't

13  have any further questions, but I would ask the Court

14  for the opportunity to submit the transcript from

15  Professor Gonzalez O'Brien's testimony in the hearing

16  in Oregon on Thursday.  Obviously, it's only five days

17  ago, so that transcript hasn't been prepared yet.  But,

18  I think the Court should have the benefit of being able

19  to look at what Professor Gonzalez O'Brien said in that

20  proceeding because I believe there's some disagreement

21  between the parties as to what happened there.

22                 MS. GORMAN:  And Your Honor, just if it

23  might help, I know that his testimony is going to

24  continue tomorrow in that proceeding, so we may just

25  want to get the transcript as a whole.  And I'm happy

1    to looking into providing that too.

2            THE COURT:  I'll address the post-hearing

3    issue in a moment.  I have some follow up questions for

4    Professor Gonzalez O'Brien.  And I may be jumping around

5    just a little.

6            Going back to your testimony from before

7    the break, where you indicated there was justification

8    for the codification of Section 1326 in the 1952 Act,

9    I believe, I thought you testified that the

10   McCarran-Walter Act itself did not contain any

11   discussion of Mexican entry into the United States

12   because that was not part of that Bill, but there

13   was continued attributions of criminality to illegal

14   immigrants.  And as evidence of that, you referenced

15   the utilization of the term wetbacks to describe

16   undocumented immigrants as Mexicans.

17           Is that -- am I --

18           THE WITNESS: Correct.

19           THE COURT:  -- summarizing all that

20   correctly?

21           THE WITNESS:  Yeah.  Um, and, you know,

22   what I was referencing with the term "wetback," is if

23   you look at the debate over McCarran-Walter, at least

24   the debate that I've read over McCarran-Walter, uh, you

25   don't really see that come up.  That was a letter that

1    was -- that was put into the Congressional Record

2    in support of certain changes to the McCarran -- under

3    the McCarran-Walter, including some changes in language

4    to 1326.  And that was from Peyton Ford, the Deputy

5    Attorney General, on behalf of the DOJ.  And in that

6    document, the term "wetback" is referenced.

7               But, again, in the McCarran-Walter debate,

8    broadly, most of the conversation is about the national

9    origins quotas, and about legal immigration into the

10   United States.  And you actually don't see Mexicans

11   referenced in the, kind of, broad congressional debate,

12   outside of this kind of throw away reference -- or not

13   throw away -- to this reference in the AG's, the deputy

14   AG's letter.  But, my understanding and my read of

15   the congressional debate over McCarran-Walter is that

16   Mexicans just didn't come up.

17               MS. GORMAN:  Your Honor, just to be -- for

18   clarification, in terms of McCarran-Walter, Mexico was

19   among the countries, when we're talking about legal

20   immigration, that was discussed in McCarran-Walter.

21               I just want to make a distinction between

22   1326 and, sort of, the Western Hemisphere quota --

23               THE WITNESS:  Right.

24               MS. GORMAN:  -- generally.

25               So I don't know if that provides -- at

1    least, for me, that provided some clarification.  I

2    don't know if that (unintelligible).

3              So Mexico was part of the conversation in

4    McCarran-Walter in terms of just the overall sort of

5    quota and system.  But with respect to illegal, or

6    with respect to 1326, that was what was the minimally

7    discussed provision in McCarran-Walter.

8              Is that a fair characterization?

9              THE COURT:  I'm sorry.  Are you asking --

10             THE WITNESS:  Are you asking me?

11             THE COURT:  -- Professor Gonzalez O'Brien a

12   question now?

13             MS. GORMAN:  Yeah.

14             THE WITNESS:  Yeah.  And most of the

15   discussion under McCarran-Walter is about, uh, the --

16   you know, the re-constitution of the natural origins

17   quotas, Asian immigration, and some of the issues that

18   were taken with the designation of Asian ancestry,

19   as what determined your -- what quota you could apply

20   to --

21             THE COURT:  I do see that --

22             THE WITNESS:  (Unintelligible).

23             THE COURT:  I'm sorry.

24             I do see that as a different issue and

25   I'm not asking questions about that.  So, I understand

1    that context.

2              MS. GORMAN:  I just wanted to be sure that,

3    yeah, the testimony wasn't characterized that Mexico was

4    not discussed at all.  I think I just wanted to make

5    sure that that was clear.

6              THE COURT:  So then after the lunch break,

7    when you opined that the codification was motivated, in

8    part, by racial animus, you identified several reasons

9    for you reaching that conclusion.  And I believe you

10   testified that even though there was -- it was codified,

11   there was no debate on the -- and I'm quoting -- overt

12   problematic aspects of the original enactment of the

13   statute in 1929.  And also there was no debate over

14   the merits of the Act because it was in effect for -- I

15   don't want to do the math -- between 1929 and 1952.  For

16   a lengthy period of time --

17             THE WITNESS:  Correct.

18             THE COURT:  -- as to whether or not the

19   statute serves important policy.

20             So I guess my question is, all that may be

21   good, while it may be good to have, kind of, a policy

22   examination, I don't know that the absence of that

23   suggests any racial animus.  So my question for you

24   is if you're aware of other instances where Congress

25   re-codified a statute and did do so with robust debate

1    over what may have been overt problematic aspects of

2    the original enactment.

3              Do you have an example.

4              THE WITNESS:  Well, we see that debate with

5    the McCarran-Walter Act, I mean the debate over national

6    origins, and the kind of racial aspects of the, of

7    the limits placed on quotas for southern and eastern

8    Europeans.  You see that in 1965 with debate over the

9    Hart-Celler Act, and the elimination of national quotas,

10   and the acknowledgement that the national quota system

11   had been one that was very clearly and explicitly meant

12   to privilege certain groups based on perceptions of

13   superiority and inferiority, particularly -- you

14   know, especially with 1924.  But, also, you see the

15   continuation of that with the McCarran- Walter Act,

16   and the insertion of tables during committee testimony,

17   the insertion of tables showing that the largest quotas

18   will still go to northern and western Europeans.

19              So, I think you certainly see that debate.

20   And you see that debate in regards to the quotas that

21   were applicable to the age of specific triangle under

22   McCarran-Walter.  And so that debate occurs.  And I

23   think that's one of the -- you know, that's one of

24   the reasons that I'm willing to say that this is a

25   demonstration of racial -- of continued racial animus,

1    is that you're acknowledging in the debate over

2    the McCarran-Walter Act, members of Congress are

3    acknowledging that there are problematic racial aspects

4    to the 1924 Johnson-Reed Act, which comes five years

5    before the Undesirable Aliens Act, and yet they choose

6    to not only recodify the 1326, but to recodify it, uh,

7    without any examination.

8                    THE COURT:  Was there support for the

9    recodification or the codification of Section 1326?

10                    I guess I would charact -- is it correct

11   to characterize it as a codification?  Because 1326 as

12   a statute, Section 1326 was really codified in 1952,

13   right?

14                    So, my question is was there support for

15   that recodification of Section 1326 during the debate

16   in 1952?

17                    THE WITNESS:  I did not come across -- in

18   my reading of the debate over the McCarran- Walter Act,

19   I did not come across any specific references to

20   either the -- you know, regardless of whether we're

21   characterizing it as a codification or recodification

22   of 1326, it was just not debated, at least in what I

23   have, uh -- what I have come across, and based on my

24   reading of the Congressional Record.

25                    THE COURT:  So would it be fair to say it is

1  not clear that there was any particular groups

2  that supported or opposed the codification of

3  Section 1326 in 1952?

4        THE WITNESS:  There was no specific, uh --

5  there was no specific mention of it, again, outside of

6  some changes to the language that were suggested by

7  Peyton Ford in that letter.  Again, based on my reading

8  of the Congressional Record, there was no significant

9  debate over 1326.

10        MS. GORMAN:  Your Honor, may I ask a

11  follow-up question?

12        THE COURT:  You may when I'm finished.

13        Hang on.

14        Are you familiar with the ways in which

15  Section -- the statute changed, from 1929 to 1952, in

16  terms of the criminalization of re-entry?

17        THE WITNESS:  The language was changed a

18  little to allow for people who were apprehended outside

19  of -- I believe.  I would have to refer to the specific

20  language again -- but I believe that people who were

21  apprehended outside of instances of the Act of the area

22  that they had initially entered, illegally entered.  And

23  this was largely aimed at immigrants that had preceded

24  into the interior of the United States and were -- to

25  ease prosecutions of those individuals because, um, I

1    think as something that was mentioned in earlier

2    testimony, visa overstays and things like that had not

3    been criminalized in the same manner that the Act of

4    undocumented entry has been criminalized, and so the

5    language to that has been adjusted.  But, you know,

6    I'm -- based on my recollection of reading both

7    1929  and the final codification in 1929, and the

8    recodification then of 1326, as well as the 1326 as

9    it exists today, the differences are not wildly

10   significant in the, in the changes in language.

11          But, again, I would have to say that, uh,

12   with complete confidence, I would actually have to

13   refer to those statutes.

14          THE COURT:  That's why I asked if you're

15   familiar because I didn't compare the statute.  That

16   was a foundational question as to your familiarity,

17   and it sounds like you're not entirely -- you may be

18   familiar, but you're not -- you don't entirely recall

19   the difference between the two.  And I think that's

20   fair.

21          Ms. Gorman, do you have follow-up questions?

22   I don't have any further questions for Professor

23   Gonzalez O'Brien.  Do you have any?

24          MS. GORMAN:  I do.

25          So, Professor Gonzalez O'Brien, you have

1    made -- you know, I want to be clear when we say, in

2    terms of what it means to debate something, versus

3    what it means to explicitly choose to carry something

4    forward.

5            So, is it your understanding that

6    explicitly, in 1952, there was an affirmative decision

7    made by that legislative body, to carry forward the

8    1952 Act of illegal re-entry?

9            THE WITNESS:  Yes.  I mean, they chose to,

10   you know, to codify or recodify what had been passed in

11   1929.  And that was part of the legislation, and members

12   of Congress are responsible for knowing what is in the

13   Bills that they're voting on.

14           MS. GORMAN:  So is there also -- and

15   you had gotten some questions from chief Judge Du

16   regarding -- and I'll refer to it as the "found-in

17   language."  So to the extent that this Bill was --

18   there was a decision to carry it forward, was there --

19   then there was this adoption of the found-in language

20   at the suggestion of the Deputy Attorney General?

21           Is that fair?

22           THE WITNESS:  That's fair.

23           MS. GORMAN:  And that adoption was

24   explicitly to make it easier to enforce the 1929 law,

25   by allowing prosecution of immigrants wherever they

1   were found, even if you couldn't establish where they

2   crossed.

3            Is that your understanding?

4            THE WITNESS:  That's correct.  That's my

5   understanding.  Yes.

6            MS. GORMAN:  And so I just want to be

7   very clear that the -- you know, the Congressional

8   Record, at least in Walter -- in McCarran-Walter, is

9   not silent on the point of illegal re-entry.

10           And then to just sort of reiterate that

11  one of the contexts of this sort of lack of, I guess,

12  robust debate, stands in contrast to robust debates

13  about other aspects of legal immigration.

14           Is that fair?

15           THE WITNESS:  That's fair.  And other

16  racialized aspects of immigration.

17           MS. GORMAN:  And part of the legislative

18  background also is the Wetback Bill that occurred two

19  months earlier.

20           Is that fair?

21           THE WITNESS:  That is fair.

22           MS. GORMAN:  And the Wetback Bill explicitly

23  carved out from the harboring of aliens employers?

24           THE WITNESS:  That is correct.

25           MS. GORMAN:  And that tension between

1    employers and the utilization of south of the border

2    migrants was the same sort of tension that we see

3    animating that debate in 1929.

4              Is that fair?

5              THE WITNESS:  That's fair.

6              THE COURT:  Ms. Gorman, have you concluded

7    your follow-up questions?

8              MS. GORMAN:  I think so, Your Honor.

9              THE COURT:  Mr. Walkingshaw, do you have

10   any follow-up questions based on the questions I

11   asked and the additional questions that Ms. Gorman

12   asked?

13             MR. WALKINGSHAW:  No, Your Honor.

14   Thank you.

15             THE COURT:  All right.

16             In terms of post-hearing briefs, let me

17   first address the question that Mr. Walkingshaw asked

18   about submitting Professor Gonzalez O'Brien's -- the

19   transcript of his testimony in a hearing, I assume

20   before the District of Oregon, on a similar motion to

21   dismiss a Section 1326 Count.

22             I don't want testimony for the sake of

23   testimony.  So if you believe that Professor Gonzalez

24   O'Brien testified -- that the testimony somehow is

25   pertinent to his testimony today in terms of what's

 1    offered, or in terms of credibility or inconsistency,

 2    I'll allow it.  So, you can file it in your post-hearing

 3    briefs, submit the transcript, and point out what I

 4    should focus on.  I don't want the testimony to be the

 5    same testimony that I've heard already in this case.

 6              MR. WALKINGSHAW:  (Nodding head

 7    affirmatively.)

 8              THE COURT:  I would assume that much of --

 9    there will be much overlap because the issue is the

10    same.  Not that it's not very interesting, but I don't

11    need the records to be redundant.  So that's -- so to

12    the extent that you find that the testimony offered in

13    the other case will be somehow relevant for -- on the

14    issues raised or pertinent to determine credibility, I

15    will permit it.

16              And so if you need additional time because

17    Professor Gonzalez O'Brien is expected to testify

18    again on Thursday, then I will set the deadline for

19    post-hearing briefs to be submitted, and then I'm

20    going to close the briefing period so I can make a

21    decision on the motion.

22              So how much time do the parties think you

23    need to submit post-hearing briefs?

24              MR. WALKINGSHAW:  Uh, well -- I'm sorry --

25    if Ms. Gorman --

1          THE COURT:  That's all right.

2   Mr. Walkingshaw, you can go ahead and tell me since

3   you were the one that asked for post-hearing briefs.

4          MR. WALKINGSHAW:  Thank you, Your Honor.

5          So we can order -- I do believe that

6   having the transcript from this hearing is important

7   to properly focus and present the issues.  We can order

8   that on an expedited basis and I believe that will take

9   one week to arrive.  Although, I don't know if Kathy is

10  in the room, she might be able to tell me otherwise.

11  But, I do think we will need a one week delay for

12  purposes of receiving that transcript.

13         I will order the Oregon transcript as soon

14  as possible.  I assume it won't take any longer.

15         If Ms. Gorman -- I don't plan on submitting

16  anything on testimony going forward in the Oregon

17  hearing, but if Ms. Gorman would like to that, I

18  believe -- and perhaps Professor Gonzalez O'Brien

19  can correct -- can let us know as far as scheduling,

20  but I believe that's scheduled to resume tomorrow.  But,

21  what I would suggest is build in a week to receive the

22  transcripts, and then perhaps three weeks to write

23  them?

24         THE COURT:  I'm sorry.  Three weeks to

25  what?

 1                  MR. WALKINGSHAW:  To write the briefs.  So,

 2      perhaps, a month from now?

 3                  MS. GORMAN:  I guess I want to be clear,

 4      Your Honor, in terms of Professor -- I would have to

 5      contact the District of Oregon, but I would assume

 6      that Your Honor would want the complete testimony of

 7      Professor O'Brien because I know he only testified for

 8      a few minutes.  And I don't know if that will change

 9      the timeline from the District of Oregon.  So, I

10      can check in with them too.

11                  But I guess in terms of post-hearing

12      briefing, I want to know what areas this court would

13      like us to brief, I guess.

14                  THE COURT:  I'll tell you that it's the same

15      area I've been struggling with, so I'll tell you what

16      they are.  And then Mr. Walkingshaw seems to think that

17      he would want the opportunity to offer any additional

18      arguments based on what's been presented so far and I'll

19      let him do that.

20                  So, let me talk about timing.  I'll talk

21      about the page limit.  And I'll tell you the issues.

22                  You want a 30-day deadline?  I may not

23      remember what I've heard already, so --

24                  MR. WALKINGSHAW:  I'm open to other ideas,

25      Your Honor.  That seemed like it would be -- to review

1    the transcript and then put forth the argument, that

2    seemed appropriate.  But, I'm certainly open to if the

3    Court has other ideas in mind, I don't mean to preclude

4    the Court from suggesting an alternate schedule.

5              THE COURT:  All right.  I'm going to give

6    you until February 23rd to submit the post-hearing

7    briefs.  So, both hearing briefs will be due the same

8    day.

9              The issue that's important for me is still

10   the issue of one of the questions I posed previously

11   at the hearing before; and that is, whether or not

12   the absence of any repudiation of the history that

13   led to the adoption of the statute in 1929 should be

14   construed as the defendant meeting his burden of

15   demonstrating that the codification in 1952 was

16   motivated by racial animus.

17             So that's a broad question, but I think it's

18   more nuance because I think it's important to focus on

19   the difference between the 1930 -- the 1929 version of

20   the statute, and the 1952 version of the statute.  And

21   you can argue it either way.  If there was not much,

22   as Ms. Gorman argued, there's not much changed to the

23   statute, other than adding a remedy that's more

24   punitive, then it would be easier for the defendant

25   to argue that the lack of any rejection of the prior

1    history is indicia of racial animus; or, you can argue

2    the opposite.  So I see the parties, both sides, can

3    argue either way.

4            What I'm looking for is, I guess, case

5    law that would support your position, and so far I

6    haven't seen any case law that supports either position,

7    unfortunately.  So that's why it's still the same issue

8    I've been struggling with from reading the initial set

9    of briefs, even after the hearing, and through today.

10           I don't know that you will be able to shed

11   more light on that, but it's and issue I would like you

12   to think about it in terms of the post-hearing brief

13   that you wanted to submit.

14           There may be one more.  Let me look at my

15   notes on the issues.

16           Oh.  And I reiterate that to the extent

17   that the transcript of any of the experts who testified

18   today, to the extent they have testified in other

19   proceedings, I don't want the transcript just to be

20   informed that they've testified.  It will be only

21   relevant if it's relevant for my purposes.

22           MS. GORMAN:  Your Honor, I would just ask,

23   in terms of the District of Oregon transcript, since I

24   presume it's regarding Professor O'Brien -- or Gonzalez

25   O'Brien, that we have the complete transcripts.  And I

192

1    just want to make sure that I can get those.

2            THE COURT:  Well, if you're not able to get

3    those, I don't want that to hold up my decision in this

4    case.  So the deadline is what it is already, which is

5    February 23rd.

6            All right.  Any other questions that you

7    have before I conclude the hearing?

8            (No response.)

9            THE COURT: So to summarize, post-hearing

10   briefs will be due on February 23rd -- oh, did I address

11   the page limit?

12           THE CLERK:  You didn't.

13           THE COURT:  I did?

14           MR. WALKINGSHAW:  No, Your Honor.

15           THE COURT:  I haven't?

16           MR. WALKINGSHAW:  I don't believe so, but

17   I might have missed it.  Peggie thinks you didn't.

18           THE COURT:  I would like to say 10 pages per

19   side as a limit because there's been exhaustive briefing

20   already.  I think 10 pages is fair.  If you, uh -- but

21   I'll accept comments if you think you need more than

22   10 pages.

23           MR. WALKINGSHAW:  Your Honor, I certainly

24   appreciate that a lot of ink has been spilled on this

25   case, not only the motion, the response, the reply,

```
 1    the supplements.  Uh, I can certainly try and keep it --
 2    I mean, and I'll let Ms. Gorman speak for herself -- I
 3    could certainly try to keep it at 10 pages.  My only
 4    worry is that -- and I think the Court -- and I think
 5    everyone appreciates this.  I mean, this is an important
 6    issue.  I think -- you know, this is, uh -- and it's
 7    a complex issue.  So, uh, I don't know.  I would maybe
 8    ask for 12?  But I don't want -- I don't want to overly
 9    negotiate the -- you know, and if Ms. Gorman thinks 10
10    is fine, I can curve my voracity to the extent possible.
11              MS. GORMAN:  Mess with the margins.
12              THE COURT:  In a way, I kind of invited a
13    debate -- or a request for more because I had said that
14    I would be open to suggestions.
15              I'm going to give you up to 15 pages.  I
16    would say the parties' briefs were about 30 pages, and
17    a lot of it relates to issues that I'm no longer
18    concerned about.  So, certainly, I think you could
19    do it in five, if not 10 pages, but I'm going to give
20    you up to 15.
21              MR. WALKINGSHAW:  Okay.
22              THE COURT:  That way, you're not reducing
23    the margin or making the font so small that you're
24    violating Local Rules and I can't read it.
25              All right.  15-page limit.
```

194

1            MR. WALKINGSHAW:  Actually, Your Honor, and

2    since you bring it up, I just do have a brief question

3    or just a point of clarification, if I could.

4            So I am taking the presumption that the

5    Court put on the record at the prior hearing, that the

6    Court is inclined to employ the Arlington Heights

7    framework.  I'll certainly answer the question the

8    Court asked.  I just want to make sure that I'm being

9    clear for the record that, you know, we've preserved

10   our positions as to the stan -- I'm happy to answer

11   the question.  I think it's, uh -- you know, that's the

12   brief I'm going to write.  I just don't want to be

13   construed as waiving any of our prior positions by

14   addressing those issues, if that makes sense.

15           And perhaps I'm being overly concerned here.

16   But since we're moving to post-hearing briefing, I just

17   want to make sure that those issues, you know, will be

18   ruled on in some form or other, if that's -- I won't

19   include the, you know, O'Brien, the deference stuff in

20   the new brief.  But, I just don't want to be construed

21   as waiving any of that by leaving it out of the new

22   brief, if that makes sense.

23           THE COURT:  You're inviting me to limit more

24   pages here because the nature -- so let's be clear for

25   the record.  Whatever arguments that both sides have

1 already raised in the prior briefs, they're are deemed

2 to be part of the record. I am not construing that you

3 waive any of the arguments by not addressing them in the

4 post-hearing briefs. I granted post-hearing briefs,

5 primarily, because, Mr. Walkingshaw, you asked for it.

6 And because you asked for it, I wanted you to have the

7 full opportunity to brief the issue that I'm focusing

8 on, that I just indicated.

9          If you want to, you can also focus on

10 another issue that the government raised in the response

11 that was briefly addressed in the reply; and that is,

12 that whether if -- assuming that the defendant met his

13 burden under Arlington Heights, the burden then shifts

14 to the government, and the question whether the

15 government met its burden.

16          So, you can briefly address that issue

17 as well, if you want. But not addressing issues you

18 have already addressed, will not be construed as you

19 waiving, unless you specifically conceded an issue,

20 which you did, with respect to the passage of the 1929

21 statute.

22          MR. WALKINGSHAW: Thank you, Your Honor.

23 I appreciate that. And I think that's entirely

24 correct.

25          The COURT: All right.

1          Thank you everyone.  I'm going to conclude

2    the hearing then.

3

4          (Court Adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              -oOo-

2

3          I certify that the foregoing is a correct
           transcript from the record of proceedings
4          in the above-entitled matter.

5

           \s\ Kathryn M. French          February 5, 2021
6          _____    _____

7          KATHRYN M. FRENCH, RPR, CCR              DATE
           Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2

3   <u>**DEFENDANT'S WITNESSES:**</u>                           <u>**PAGE:**</u>

4

    1) **KELLY LYTLE HERNANDEZ**
5

        Direct Examination By Ms. Gorman         18
6        Cross-examination By Mr. Walkingshaw     37
         Redirect Examination by Ms. Gorman       62
7        Recross-Examination By Mr. Walkingshaw   72
         Further Redirect Examination By Ms. Gorman  75
8

9   2) **BENJAMIN GONZALEZ O'BRIEN**

10        Direct Examination By Ms. Gorman         80
         Cross-examination By Mr. Walkingshaw    133
11        Redirect Examination by Ms. Gorman      167

12

13

14

15

16

17

18

19

20

21

22

23

24

25