# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00018-RMR

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.  OSCAR DURON-DELUNA,
        a/k/a Oscar Duron,
        a/k/a Oscar de Luna,
        a/k/a Carlos Carbajal,
        a/k/a Eduardo Diaz,
        a/k/a Tomas Duron-De Luna,
        a/k/a Oscar Duron Munos,
        a/k/a Saul Muranda,
        a/k/a Juan Gonzalez-Solis,

        Defendant.

---

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

---

The United States of America, by and through Cole Finegan, United States Attorney for the District of Colorado, and Albert Buchman, Assistant United States Attorney, respectfully submits this Response to Defendant's Motion to Dismiss the Indictment ("Defendant's Motion"). ECF No. 25.

The Court should deny Defendant's Motion. Congress has plenary power over immigration affairs, and its decisions are subject to a highly deferential standard of review. The illegal reentry law easily passes that standard. Moreover, Defendant's Motion fails to account for the fact that the "governing statutory framework" of United States' immigration law comes from 1952, not the 1920s. While Defendant attempts to stain the 1952 act with 1929 Congressional findings, his attempts fail

1

under the weight of the evidence presented below. Defendant's Motion can and should be denied on the filings.

## I.   <u>FACTUAL BACKGROUND</u>

Defendant is a native and citizen of Mexico without claim to lawful immigration status in the United States. Defendant has been removed from the United States to Mexico three times, most recently on April 14, 2021.  Defendant did not seek or obtain permission to return lawfully to the United States. In other words, Defendant did not obtain the express consent of the proper legal authority to reapply for admission to the United States. Nonetheless, he returned. Immigration officials encountered Defendant on September 6, 2021, following an arrest in Adams County, Colorado.

With respect to his criminal history, Defendant sustained the following felony convictions prior to his last removal:

(1)   On October 9, 2017, Defendant was convicted in the United States District Court, District of Colorado, for the offense of Illegal Reentry, in violation of 8 U.S.C. § 1326 (a) & (b)(1), a felony, for which he was sentenced to a term of 12 months of imprisonment and three years of supervised release.

(2)   On June 5, 2017, Defendant  was convicted in the District Court of Colorado, Jefferson County, for the offenses of: Aggravated Motor Vehicle Theft in the First Degree Less Than $20K, in violation of C.R.S. § 18-4-409 (2), (3)(a), a class 5 felony; Gathering Identity Information by Deception, in violation of C.R.S. § 18-5-904, a class 5 felony; Criminal Mischief Under $300, in violation of C.R.S. § 18-4-501(1), (4) (a), a class 3 misdemeanor; Throwing Missiles at Vehicles, in violation of C.R.S. § 18-9-116(1), a class 1 petty offense ; and Resisting Arrest, in violation of C.R.S.

§ 18-8-103, a class 2 misdemeanor. For these offenses Defendant was sentenced to overall to four years in the Colorado Department of Corrections.

(3)   On April 13, 2017, Defendant was convicted in the Colorado District Court, Denver County, for the offense of Forgery-Public Record/Filed with Public Office, in violation of C.R.S. § 18-5-102(1)(d), a class 5 felony, for which he was sentenced to four years community corrections to be served concurrent with two other cases.

(4)   On April 13, 2017, Defendant was convicted in the Colorado District Court, Denver County, for the offense of Criminal Possession of a Financial Device- 2+ Devices, in violation of C.R.S. § 18-5-903(1), (2)(b), a class 6 felony, for which he was sentenced to four years community corrections to be served concurrent with two other cases.

(5)   On March 7, 2016, Defendant was convicted in the Colorado District Court, Douglas County, for the offense of Aggravated Motor Vehicle Theft $20,000 or Less, in violation of C.R.S. § 18-4-409(2), (3)(a), a class 5 felony, for which he was sentenced to four years of probation and 40 hours of community corrections. On May 7, 2017, Defendant's probation was revoked, and he was re-sentenced to serve three years community corrections to be served concurrent to three other cases.

(6)   On September 25, 2014, Defendant was convicted in the United States District Court, District of Colorado, for the offense of Illegal Reentry of Previously Removed Alien Following a Felony Conviction, in violation of 8 U.S.C. § 1326(a) and (b)(1), a felony, for which he was sentenced to a term of six months imprisonment.

(7)   On November 3, 2010, Defendant was convicted in the Colorado District Court, Adams County, for the offense of Theft, $20,000 or More, in violation of C.R.S. § 18-4-401(1), (2)(d), a class 3 felony, for which he was sentenced to a term of four years of probation, which was eventually

transferred to the Colorado Department of Corrections for a prison term of six-years to be served concurrent to other cases.

(8)   On August 20, 2007, Defendant was convicted in the Colorado District Court, Denver County, Colorado, for the offense of First-Degree Tampering, in violation of C.R.S. § 18-4-505, a class 1 misdemeanor, for which he was sentenced to a term of two years of probation. On July 1, 2008, Defendant probation was revoked, and he was re-sentenced to 30 days jail and two years of probation. This sentence to be served concurrently with one other case.

(9)   On August 22, 2007, Defendant was convicted in the Colorado District Court, Denver County, for the offense of Criminal Impersonation to Gain a Benefit, in violation of C.R.S. § 18-5-113(1)(e), a class 6 felony, for which he was sentenced to 18 months of probation. On July 1, 2008, Defendant's probation was revoked, and he was re-sentenced to 30 days jail and two years of probation. This sentence to be served concurrently with one other case.

Defendant was indicted on January 6, 2022, on a single count of illegal reentry of a removed alien in violation of 8 U.S.C. § 1326 (a), (b)(1). ECF No. 1. On March 7, 2022, Defendant filed the instant motion to dismiss. *Id.* No. 25. The United States now responds.

## II.   <u>UNITED STATES' RESPONSE TO MOTION TO DISMISS THE INDICTMENT</u>

### A.  Statutory Background.

For almost a century, federal law has made it a crime for a noncitizen previously ordered removed from the United States to reenter without proper authorization. Neither then nor now has the statutory language distinguished among noncitizens by their race or ethnicity, instead imposing criminal penalties on "any alien." 8 U.S.C. § 1326.

With the Immigration Act of 1917, Congress passed legislation requiring the deportation of aliens who entered the United States "at any time or place other than as designated by immigration

officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. There was no penalty other than repeated deportation for reentering after deportation. Accordingly, to enhance the deterrent value of the deportation laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years' imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018.[1] The Senate Report from the Committee on Immigration outlined the purpose of the law:

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The report then set out the parameters of the proposed illegal reentry crime and stated, "It is believed that such a statute would be of material aid in enforcing our immigration laws." *Id.*

Charged at that time with enforcing the country's immigration laws, the Secretary of the Department of Labor agreed. In a letter made part of the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws." The Secretary continued,

> It is academic that no prohibitive law can successfully be enforced without a deterrent penalty. The fact that possible deportation is not a sufficient deterrent to discourage

---

[1] The law stated, "[I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment."

> those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions . . . . Aside from the sexual immoral and members of the anarchistic and similar cases there is nothing in the immigration laws which penalizes aliens for reentering the United States unlawfully after they have been deported at considerable expense to the Government. The enactment of a law imposing a penalty is recommended.

*Id.*

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction). In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1, *et seq.*), Congress passed another crime for reentry of a deported alien. The law stated,

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his re-embarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229 (8 U.S.C. § 1326).

Over the years, Congress has updated Section 1326 multiple times, always to increase its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to Section 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181. Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110

Stat. 1214 (among other things, limiting collateral attacks on deportation orders in Section 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and  deported," and inserting "denied admission, excluded, deported, or removed"). Congress's continual strengthening of Section 1326's deterrent value "suggests a crystallizing vision on Congress's part of the need for stern punishment in this milieu." *United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir. 2007); *see also United States v. Shill*, 740 F.3d 1347, 1352 & n.5 (9th Cir. 2014).

**B.  Rational basis review.**

The ultimate purpose of Defendant's Motion is to convince the Court to find that the crime of illegal reentry served a discriminatory purpose at its inception and, therefore, the Court should declare the modern version, codified at 8 U.S.C. § 1326, to be  unconstitutional as it violates equal protection. ECF No. 25, p. 3. Such a declaration would necessitate the dismissal of his indictment. *Id.*

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws.  *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017). As such, while not actually containing an equal protection clause itself, the Fifth Amendment still mandates all laws passed by Congress must not violate the principle of equal protection. An equal protection violation need not appear on the face of the statute; rather, a litigant may show the challenged law was enacted with "an invidious discriminatory purpose [which] may often be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 241-42 (1976),

It has repeatedly been affirmed that judicial inquiry into immigration legislation is very limited, given that "over no conceivable subject is the legislative power of Congress more complete

than it is over the admission of aliens." *Fiallo v. Bell,* 430 U.S. 787, 792 (1977) (quotation omitted).

Indeed, when exercising its plenary powers in matters of immigration and naturalization, *i.e.,* exclusion and deportation, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 80 (1976). Recently the Supreme Court has reaffirmed the limited role of judicial review, as it pertains to immigration law.

> For more than a century, [the Supreme Court] has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'. . . . Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'

*Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (quoting *Fiallo*, 430 U.S. at 792; *Matthews v. Diaz*, 436 U.S. at 81).  Most critically, and largely in part to the unique prerogative just detailed, the standard of review for an equal protection claim challenging an immigration law has already been determined: when "Congress exercises these powers to legislate with regard to aliens, the proper standard of judicial review is rational-basis review." *Soskin v. Reinertson*, 353 F.3d 1242, 1255 (10th Cir. 2004); *Trump*, 138 S. Ct. at 2419 (A "deferential standard of review" applies in the immigration context.); *Appiah v. INS*, 202 F.3d 704, 710 (4th Cir. 2000) ("[J]udicial review over federal immigration legislation has always been limited."). Here, since Defendant is challenging the constitutionality of a decade's old immigration law, precedent dictates that the Court should decide the matter with a rational basis review.

The rational basis test is deferential. It simply requires courts to determine whether the classification in question is, at a minimum, rationally related to a legitimate governmental purpose. *Younger v. Colorado State Bd. of L. Examiners*, 625 F.2d 372, 376 (10th Cir. 1980); *see also Jurado-Gutierrez v. Greene*, 190 F.3d 1135, 1152 (10th Cir. 1999), as amended on denial of reh'g (Nov. 29,

1999) (The distinction between "deportable" and "excludable" is subject to rational basis review. The government's legitimate interest in expeditiously removing criminal aliens was rationally related to the means.).

The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id*. Instead, the "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it[.]" *Id*.

In the instant matter, the Court only need decide whether Section 1326 is rationally related to a legitimate government interest. The government has an interest in ensuring compliance with deportation orders and promoting respect for this country's legal immigration process. This interest is achieved by deterring illegal reentry into the United States. The relationship between that interest and Section 1326, which provides sanctions for repeated violations of United States immigration law**,** is axiomatic. It is obvious that Section 1326 rationally relates to that interest by sanctioning those who disregard a previous deportation order.

This analysis is not just the United States' proffering a legal position in the instant matter, it is long held and widely accepted. To be sure, the government's interest is over a century old. The Supreme Court recognized as much, at least as far back as 1893, with the following proclamation: "[t]he right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, [is] essential to its safety, its independence, and its welfare[.]" *Fong v. United States*, 149 U.S. 698, 711 (1893). The right of a sovereign to criminally sanction those illegally within its borders is of a similar vintage. *See Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("[I]t

9

would be plainly competent for Congress to declare the act of an alien remaining unlawfully within the United States to be an offense punishable by fine or imprisonment.").

As detailed above, and as common sense informs, the government has a legitimate interest in deterring illegal reentry. There is a clear rational relationship between that interest and Section 1326 which provides sanctions for, and therefore actual deterrence of, repeated violations of the United States' immigration laws. *See e.g.*, *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."); *United States v. Henry*,111 F.3d 111, 114 (11th Cir. 1997) ("Section 1326 is not based upon any common law crime but is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." (citation omitted)); *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994) ("[T]here is a strong societal interest in controlling immigration and in effectively policing our borders. This interest is furthered by enhancing punishment against persons who illegally enter the country after having previously committed aggravated felonies.").

Applying rational-basis review will not render criminal immigration laws free from constitutional equal protection constraints and license Congress to enact racially discriminatory statutes as *Carrillo-Lopez* fumes. *See* Section II(c)(3), *infra* (discussing *United States v. Carrillo-Lopez,* 2021 WL 3667330 (D. Nev Aug. 18, 2021)). Other courts have similarly suggested that, under the rational-basis standard, courts would be "unable to review a criminal law that, on its face, targets a particular racial group," such as a law that "explicitly prescribed harsher penalties for immigrants of Latin American descent." *United States v. Rios-Montano*, 2020 WL 7226441 at *2 (S.D. Cal. Dec. 8, 2020) (reviewing same equal-protection claim for the illegal entry statute); *see*

10

*also United States v. Wence*, 2021 WL 2463567 at *2, 3 (D.V.I. June 16, 2021) (expressing concern that deferring to Congress's plenary immigration powers would permit the "carte blanche" enactment of racially discriminatory statutes and render Congress "immune" from judicial scrutiny). Those concerns are unfounded.

Criminal laws are not exempt from rational basis review, nor do other Constitutional concerns such as the due process afforded in criminal cases, *per se* demand higher scrutiny. The Supreme Court has upheld Congress's plenary immigration authority even when the law or policy at issue conflicted with other constitutional rights, and even in the criminal context. *United States v. Flores-Montano*, 541 U.S. 149 (2004) (a defendant's Fourth Amendment rights give way to Congress's sovereign right to permit the executive branch to conduct warrantless searches and seizures at the border); *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972) (First Amendment rights do not outweigh Congress's plenary immigration power or the executive's exercise of that power as delegated. No precedential case has applied *Arlington Heights* to a federal criminal statute.

Rational basis review does not give Congress carte blanche to pass discriminatory statutes that are immune from judicial review. Rational basis review may be deferential, but it is not nothing—and it is the same level of review applied to *any* allegedly discriminatory act or policy that does not involve a suspect class or a fundamental right (notwithstanding intermediate scrutiny, not at issue here). Undocumented non-citizens are not a suspect class, *Plyler v. Doe*, 457 U.S. 202, 223 (1982), and entering the United States illegally after deportation is not a fundamental right. *See, e.g., Castillo-Felix v. Immigr. & Naturalization Serv.*, 601 F.2d 459, 467 (9th Cir. 1979) ("the right of a permanent resident alien to remain in this country has never been held to be the type of 'fundamental right' which would subject classification touching on it to strict judicial scrutiny"). Even rational basis review can invalidate an immigration law that "rested on an irrational prejudice" or contained

distinctions for reasons "inexplicable by anything but animus." *Hawaii*, 138 S. Ct. at 2320.

Based on conclusive precedent and the undeniable enumerated power over nationalization and immigration granted to Congress by the Constitution, it is apparent that Section 1326 satisfies rational basis review. It is also important to reiterate that under rational basis review the government has no obligation to produce evidence to sustain the rationality of the challenged law. And therefore no evidentiary hearing is needed. *See Heller*, 509 U.S. at 320. To the contrary, the burden to negate "every conceivable basis" that supports the rationality is on the challenger of the law. *Id*. Here Defendant has failed to even attempt such a showing.

Instead, Defendant takes an alternative approach, blatantly ignoring Congress's plenary immigration powers to avoid the inevitable failure under the rational basis test and attempts to apply the Supreme Court's ruling in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to claim Section 1326 is unconstitutional. *See* ECF No. 25 (no mention of rational basis test). The United States takes the position that the proper standard of review for an equal protection challenge against Section 1326 is the rationale basis test, and for the aforementioned reasons, that test has been satisfied. For the sake of thoroughness, the United States will address Defendant's *Arlington Heights* argument, demonstrating that his position is without merit.

### C. *Arlington Heights.*

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). And third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*, 429 U.S. at 265–68.

Defendant challenges Section 1326 only under the third rationale, focusing on *Arlington*

12

*Heights*. In that case, the Supreme Court held that "[w]hen there is a proof that a discriminatory purpose" motivated a legislature to pass a law, a court should subject that law to heightened scrutiny. *Id.* at 265-66. To determine whether a discriminatory purpose motivated a legislature to pass a law, a court examines numerous factors, including but not limited to, the law's impact, its historical background, "[t]he specific sequence of events leading up to the challenged decision," the legislature's substantive departures from the normal lawmaking process, and legislative or administrative history. *Id.* at 266-68. If the law's challenger produces evidence that a discriminatory purpose motivated a law's passage, then the burden shifts to the government to prove that the legislature would have passed the law "even had the impermissible purpose not been considered." *Id.* at 270 n.21.

*Arlington Heights* involved a rezoning request to accommodate the placement of low-income housing which is hardly applicable here. *Id.* at 254-255. Indeed, Defendant can cite only one case finding *Arlington Heights* to be applicable to any immigration laws passed by Congress. ECF No. 25, p. 3-4. Attached here is government's Exhibit 2, a list of cases across the country where defendants have filed the same or a similar Motion to Dismiss Indictment, on the same grounds as in this case. All courts, including district courts in the 10th Circuit, have denied the motion, save one court. *See United States v. Ramirez-Aleman*, 2022 WL 1271139, at *3 (S.D. Cal. April 27, 2022) (as of the date of the order, "Only one court has found the argument persuasive . . . *Carrillo-Lopez*."); *see* Ex. 2 (list of United States district courts denying the claim). That lone court, the District Court (Hon. Du, J.) in the District of Nevada, granted such a motion and is relied upon extensively in Defendant's arguments: *United States v. Carrillo-Lopez*, 555 F. Supp.3d (D. Nev. 2021), which is currently on

appeal to the Ninth Circuit, Case No. 21-10233.[2] *See* ECF No. 25, p. 3.

The expansive *Arlington Heights* inquiry is antithetical to the long-standing principle that, regarding congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. That does not comport with the plenary power given to Congress over immigration policy that must be crafted by statute and the narrow judicial review over such policymaking.

That aside, Defendant's argument is that a close examination of the political context underlying the criminalization of illegal reentry in 1929 reveals a disturbing truth: that racism and eugenics were not only a 'motivating factor' in the legislature's passage of [the Undesirable Aliens Act of 1929], they were a primary factor (quoting *Arlington Heights*, 429 U.S. at 265). *See* ECF No. 25, p. 12-23. For evidence, Defendant does not do a deep dive into the Congressional record to provide a full picture of the complicated nature of immigration legislation; instead, he provides cherry picked comments of randomly selected Congressmen from the 1920's. *See id.*

Ultimately, Defendant relies heavily on racially problematic quotes from several Congressmen to establish the primary motivation for the Undesirable Aliens Act of 1929 was racism and eugenics. *See id*. This selective history does not explain why Congress passed the Immigration and Nationality Act of 1952 ("INA"), the law that replaced the Undesirable Aliens Act of 1929, and the law that Defendant is accused of violating. *See* Pub. L. No. 82-414, 66 Stat. 229 (codified as

---

[2]        The government's opening brief in that appeal is attached here to as Exhibit 1.

amended at 8 U.S.C. § 1326). To challenge the relevant law, the one that still exists, Defendant must provide evidence that a discriminatory purpose motivated Congress to pass the INA in 1952.[3] His arguments in this regard are not persuasive.

Instead of evidence concerning the formulation of the actual law at issue as required for any *Arlington Heights* assessment, Defendant merely cites several cases which apply the holding of *Arlington Heights*. Defendant briefly discusses a few cases in which the holding of *Arlington Heights* was applied to find that certain state laws and actions were unconstitutional. The first among them is *Hunter v. Underwood*, 471 U.S. 222 (1985). In *Hunter*, the Supreme Court considered whether a section of the Alabama State Constitution, which disenfranchised persons convicted of certain enumerated crimes, as well as "crimes of moral turpitude," violated the Equal Protection Clause because its original purpose was to primarily disenfranchise blacks. *Id.* at 223-24. This dastardly purpose was undeniable, as even the appellants did not dispute that the "zeal for white supremacy ran rampant" at the 1901 Alabama Constitutional Convention. *Id.* at 229. Moreover, the president of the convention announced in his opening remarks some of the goals of the convention; "what is it that

---

[3]    *See McClesky v. Kemp*, 481 U.S. 279, 298 n.20 (1987) ("[T]he 'historical background of the decision is one evidentiary source' for proof of intentional discrimination . . . . But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value . . . . Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent." (citations omitted)); *see also Abbot v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. '[P]ast discrimination cannot, in the manner of original sin, condemn government action that is not itself unlawful.'" (alteration in original) (quoting *City of Mobile v. Bolden*, 466 U.S. 55, 74 (1980)); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 215-16 (1983) (refusing to presume that California enacted one law "for the same purposes" as other laws with "a common heritage" because "these other states laws are not before the Court . . . and their pedigree do not taint other parts of the" law at issue).

we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State." *Id.* (quoting 1 Official Proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901 to September 3rd, 1901, p. 8 (1940)).

The Supreme Court found that the appellant's own explanation effectively conceded both that "discrimination against blacks, as well as against poor whites, was a motivating factor for the provision and that § 182 certainly would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation." *Id.* at 231. The key to *Hunter* is that it was conceded up front that there were original racist motivations when the provision was enacted as well as current discriminatory outcomes. The appellant's ill-fated strategy of trying to convince the Court that the motivation to disenfranchise poor whites should mitigate the primary purpose to disenfranchise blacks, was foolhardy. *See id.* at 230. This is in stark contrast to the instant matter, in which there is no such concession of racist animus as a primary factor in the formation of immigration enforcement laws. There has been no evidence presented of inappropriate motivations concerning Section 1326, the proper statute.

A single federal district court judge has found that *Arlington Heights* applies to Section 1326, *United States v. Carrillo-Lopez,* 2021 WL 3667330 (D. Nev. Aug. 18, 2021). In a lengthy opinion the *Carrillo-Lopez* Court ruled that "a prior version of a statute [1929 law] known to be motivated by racial animus may be considered as infecting its present iteration [1952 law] if it was not, in fact, substantially altered" which the court found it was not. *Id.* at *10. The court held in keeping with *Arlington Heights* and *Hunter*, that Section 1326 disparately impacted racial groups. Judge Du is the sole outlier in the jurisprudence quickly arising from this one motion. *See* Ex. 2.

Chief Judge Brimmer denied the Motion to Dismiss the Indictment in *United States v. Sanchez-Felix*, District of Colorado Case No. 21-cr-00310-PAB, ECF No. 33, holding, without an

evidentiary hearing, that *Arlington Heights* applied but that the Motion failed to show that that the historical background was a product of an invidious motive.[4] Judge Martinez, in his ruling on the same issue and without an evidentiary hearing, also denied the motion, *United States v. Sifuentes Felix*, District of Colorado Case No. 21-cr-337-WJM, 5.[5] Similarly, Judge Arguello, in her ruling on this issue and also without an evidentiary hearing, denied the motion, agreeing with Judge Brimmer's and Judge Martinez' reasoning. *United States v. Gamez-Reyes*, 21-cr-00123-CMA, ECF No. 22.

Judge Moore, in his ruling on this issue, (after an evidentiary hearing at which Dr. Kang testified), agreed with the government that the rational basis review applied, and denied the motion to dismiss, *United States v. Quintanilla-Dominguez,* 21-cr-406-RM, ECF No. 29, stating:

> What has been provided is not enough to invalidate a facially neutral statute that was passed by Congress, and has been, frankly, in the law for some changes and amendments and modifications, for decades, and that all of that should be overturned on the basis of the skimpy [sic] and the evidence that's before me and the invitation to draw inferences from it.

Page 8 of Transcript of Court's Ruling attached hereto as government's Exhibit 3.

### 1.   Immigration and Nationality Act of 1952 ("INA").

As briefly discussed above, Defendant's challenge to Section 1326 focuses more on the legislative motives of the 1929 Congress than the law that Congress passed in 1952 and repeatedly

---

[4]   This order is now on appeal at Tenth Circuit Court of Appeals No. 22-1199.

[5]   The Court held: "The Court is not persuaded that Defendant has carried his burden of showing that Section 1326 was enacted, or later modified, with discriminatory intent. *See id*. (citing *United States v. Gallegos-Aparicio*, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020) (noting specifically the legislative history of the 1990 amendment which was void of evidence of discriminatory intent). Specifically, in the Motion, Defendant merely refers the Court to *Carrillo-Lopez*, which as noted above found Section 1326 unconstitutional, and encourages the Court to 'adopt the factual findings of *Carrillo-Lopez* . . . regarding the 1952 reenactment.' (ECF No. 18, p. 18.)  Defendant does not analyze any portion of *Carrillo-Lopez*, nor does he specifically identify what evidence before that court is also before this Court which should persuade the undersigned to wholesale adopt *Carrillo-Lopez*'s 'outlier' analysis." District of Colorado Case No. 21-cr-337-WJM, ECF No. 23, p. 5-6.

amended, that is, Section 1326. *See* ECF No. 25, p. 12-34. It must be reiterated that Defendant is challenging the constitutionality of a repealed law. *Arlington Heights* directs the courts to look at the motivation behind the official action being challenged. *Id*. at 265-67 (describing intent analysis in terms of "the challenged decision"). The challenged decision in this case is the decision to criminalize the conduct Defendant is charged with committing, illegal entry. Any hypothetical constitutional harm suffered by Defendant stems from that charge, not the different law enacted in 1929. This means that the Court must seek to discern the intent of the Congress that enacted Section 1326 specifically, rather than the intent of previous Congresses.

Defendant relies on *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) to argue that the Court should consider the 1926 enactment. *See* ECF No. 25, p. 27-28. In that case, the Supreme Court held that Louisiana's and Oregon's laws allowing non-unanimous jury convictions violated the Sixth Amendment. While the Court, and even the States, acknowledged that race was a motivating factor in the adoption of their respective non-unanimity rules, neither that reality nor *Arlington Heights*[6] were the reason for the decision. *Id.* at 1394. The holding was that the Sixth Amendment right to jury trial, as incorporated against the States by way of the Fourteen Amendment, requires a unanimous verdict to convict a defendant of a serious offense, no matter when or why a law that allowed non-unanimity was enacted. *Id.* at 1397. The opinion made clear that previous interpretation and precedent allowing nonunanimous jury felony convictions were simply incorrect. *Id*. at 1397-1408.[7] As such, *Ramos* does very little to support Defendant's contention.

---

[6]     *Arlington Heights* is not mentioned once in the opinion and *Ramos* did not "bring an equal protection challenge." *Id.* at 1410 (Sotomayor, J., concurring).
[7]     The decision abrogated *Apodaca v. Oregon*, 406 U.S. 404 (1972) and *Johnson v. Louisiana*, 406 U.S. 356 (1972).

Defendant similarly relies on *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2257 (2020) and *United States v. Rizo-Rizo*, 16 F.4th 1292 (9th Cir. 2021). *See* ECF No. 25, pp. 25-28. The first case was concerned with the Free Exercise Clause of the First Amendment in which the Supreme Court applied strict scrutiny because Montana's law prohibiting families from using state-sponsored scholarships at religious schools discriminated based on religious status. 140 S. Ct. at 2263 n. 5.  The second was concerned with *mens rea* for 8 U.S.C. § 1325 in the context of its history as a regulatory crime. 16 F.4th at 1296-1298. Those cases are distinguished from the present matter because neither had anything to do with race or *Arlington Heights* and did not address any alleged violations of the Equal Protection Clause.

The United States does agree that *Ramos*, *Rizo-Rizo*, and *Espinoza* support the broad contention that subsequent enactments of a statute do not erase its historical context. But the three cases did not involve equal protection challenges and certainly did not hold that the discriminatory motivations of a previous legislature are determinative of the outcome of an *Arlington Heights* analysis, the subject of which is a law enacted by a subsequent legislature. Defendant assumes and acts as though they do, *see* ECF No. 25, p. 25-28, and that is one of the reasons his motion is a failure. It is not unreasonable to propose that the legislative history of past enactments may be probative of the motivations of the legislators who enacted the current law. However, the Court should not automatically impute these past motivations to the current law and forgo analysis of the enacting legislature, as specifically required by *Arlington Heights*. *Cf.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) ("[W]e have never suggested that past discrimination flips the evidentiary burden [of the intent test] on its head."). The Court therefore must consider whether Defendant has shown that Congress's 1952 enactment of Section 1326 was motivated, at least in part, by a discriminatory purpose.  Defendant has failed in his attempt to make such a showing.

Neither *Espinosa*, *Rizo-Rizo*, *or Ramos*, nor any other case or reason articulated by Defendant, justifies retreating, for the first time, from the well-settled principle that Congressional immigration policies are unsuited for "prob[ing] and test[ing]" by the courts. *See Fiallo*, 430 U.S. at 799. *Arlington Heights* itself also does not justify so—the case involved a local rezoning request to accommodate the placement of low-income housing, a far cry from a federal Congressional immigration law.

Defendant cites the high percentage of illegal-reentry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. *See* ECF No. 25, p. 10-11. It is not. Those numbers are a product of geography, not discrimination. For instance, in FY19, Border Patrol had 859,501 total encounters. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of those encounters (851,508) occurred on the southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019. Those numbers are neither surprising nor illuminating of Congress' motives in the 1920s. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity, including those from a country sharing nearly 2,000 miles of border with the United States—virtually any such law could be challenged on that ground. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (finding disparate impact of DACA rescission for Latinos from Mexico—totaling 78 percent of DACA recipients—did not establish plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds") (citation omitted); *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no

constitutional concern.").[8]

Even if the Court agrees with Defendant has met his burden and applies the heightened scrutiny of *Arlington Heights*, the challenge to Section 1326 would still fail.  Under the *Arlington Heights* framework, a law survives a constitutional challenge if the government can prove that Congress would have passed the law, here the INA,[9] even if Congress had not considered "the impermissible purpose." *Id.* at 270 n.21.

This means the United States simply has to offer a legitimate reason that would rationally justify Section 1326. That reason is that our nation has a sovereign right to protect its borders and control the influx of those attempting to cross over those borders. Enacting laws to prevent an unmitigated influx of foreign nationals and contraband is necessary to protect the citizens of the United States. The federal government has an interest in ensuring compliance with federal law, deportation orders and promoting respect for the country's legal immigration process. Deterring illegal reentry into the United States helps protect these interests and rights. These are all rational reasons why 8 U.S.C. § 1326 is law and would still be the law regardless of any impermissible purposes that can be concocted by academics.

---

[8]     The proximity of a very large population of Hispanics to the Southern Border, as well the political and financial realities unique to Central America, explain the disproportionate number of Hispanics charged with violating § 1326. The statistics Defendant cites for disparate impact are a feature of Mexico's proximity to the United States, the history of Mexican employment patterns, and other socio-political and economic factors that drive migration from Mexico to the United States, not discrimination. That alone is enough to reject Defendant's *Arlington Heights* analysis.

[9]     Defendant's belief that the United States would have to show that the Undesirable Aliens Act of 1929 would have been passed by Congress had the impermissible purpose not been considered is mistaken.  The actual question before the Court would be whether the United States had proven that Congress would have passed the INA, the law that Defendant allegedly violated, had Congress not considered the alleged discriminatory purpose.

### 2.   Enactment of the Immigration and Nationality Act of 1952

As noted above, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) ("In 1952, Congress replaced this disparate statutory scheme with the [INA], which remains the governing statutory framework."). Through the INA of 1952, "Congress substantially revised the immigration laws[.]" *City & Cty. of San Francisco v. United States Citizenship & Immigration Servs.*, 944 F.3d 773, 795 (9th Cir. 2019).

Section 1326 also expanded the class of non-citizens eligible for prosecution to include those excluded as well as deported. *Compare* Pub. L. No. 70-1018, (1929) *to* Pub. L. No. 82-414, § 276, 66 Stat. 163 (1952) (codified at 8 U.S.C. § 1326). More than forty years later an amendment further expanded the class of potential defendants to add those who "ha[ve] departed the United States while under an order of exclusion, deportation or removal is outstanding." *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 324, 110 Stat. 3009 (1996).

Since 1952, Congress has also overhauled the INA several times. First, in 1965, Congress redefined immigration law through an express anti-discriminatory lens by passing the Immigration and Nationality Act of 1965. *See* Pub. L. No. 89-236, 79 Stat. 911 (Oct. 3, 1965); *Immigration in Two Acts*, Bipartisan Policy Center, at 3 (Nov. 2015), *available at* https://bipartisanpolicy.org /download/?file=/wp-content/uploads/2019/03/BPC-Immigration-Legislation-Brief.pdf (explaining the Act resulted from social and civil rights movements that expressed dissatisfaction with an immigration system "that many felt was outdated at best and discriminatory and racist atworst") ("Immigration in Two Acts");  Although the 1965 Act did not amend Section 1326, it did create a statutory ban on discrimination based on "race, sex, nationality, [or]place of birth" in the immigration

setting. Pub. L. No. 89-236, 66 stat 175, § 911 (1965) (codified at 8 U.S.C. § 1152(a)(1)(A)); *See Novando-Ceballos*, 554 F. Supp.3d 1114, at *5 (D.N.M. 2021); *Gutierrez-Barba*, 2021 WL 2138801, at *4 (D. Ariz. May 25, 2021).

In 1990, Congress again overhauled the INA by passing the IMMACT. IMMACT instituted significant reforms that remain largely intact. *Immigration in Two Acts*, at 6. It resulted from long-circling recommendations that considered both the importance of legal immigration and the problem of illegal immigration. *Id.* The chairman of the Select Commission on Immigration and Refugee Policy, which issued the report on which IMMACT was largely based, explained:

> We recommend closing the back door to undocumented, illegal migration, opening the front door a little to accommodate legal migration in the interests of this country, defining our immigration goals clearly and providing a structure to implement them effectively, and setting forth procedures that will lead to fair and efficient adjudication and administration of U.S. immigration laws.

*Id.* Just four years earlier, in 1986, Congress had attempted to deal with the "back door" through the Immigration Reform and Control Act ("IRCA") by granting amnesty to illegal non-citizens in the United States. *Id.* IMMACT, on the other hand, focused more on legal immigration, increasing the number of immigrant visas, creating a new non-immigrant work program, and creating a new Temporary Protected Status program to assist non-citizens in the United States who had fled El Salvador's civil war. *Id.* One of IMMACT's goals was to promote diversity in immigration, and it met this goal by creating a new "diversity visa." *Id.* at 7, 9. At the same time, IMMACT updated and strengthened enforcement measures. *Id.* at 11. This included Section 1326; Congress reconsidered it and decided to increase the fine provision. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. In the context of equal protection claims, courts have found that IMMACT was an "about face away from the racist trope that accompanied the enactment of the 1929 immigration law." *United States v. Gallegos-Aparicio*, 2020 WL 7318124 at *3 (S.D. Cal. Dec.

11, 2020); *see also Rios-Montano*, 2020 WL 7226441 at *5 (noting that the 1990 Act enjoyed support from Bruce Morrison, Nancy Pelosi, Kika de la Garza, Bill Richardson, Edward Roybal, Esteban Torres, the Mexican American LegalDefense and Education Fund, and the American Civil Liberties Union).

### 3. Defendant has not established that Congress was motivated by racial animus in passing and amending Section 1326.

To prove motive, Defendant suggests this court to adopt *Carrillo-Lopez*. *See* ECF No. 25, p. 8-9. But *Carrillo-Lopez* was wrong on the law and the facts. Every other court to consider motive disagrees with *Carrillo-Lopez*. *See* Ex. 2. This Court should not fall prey to *Carrillo-Lopez*'s errors.

The foundation of *Carrillo-Lopez's* ruling is its finding that the 1929 Act was motivated by racial animus. 555 F. Supp.3d at 1007-1008. It then found that the 1952 Congress and subsequent amending Congresses were racially motivated because, in *Carrillo-Lopez's* view, they silently carried forward the 1929 Act without repudiating the original racial taint. *Id.* at 1009-1017. The court also inferred from five other factors that the 1952 Act was racially motivated, and that subsequent amending Congresses continued to carry forward this taint. *Id.* at 1011-1017. None of these reasons hold up.

#### i.    *Congressional silence is not evidence of animus.*

*Carrillo-Lopez* found that the absence of Congressional debate on Section 1326, when "compared to robust Congressional debate" about the INA's national origins quotas, supported an inference "that discriminatory intent was a motivating factor in" Section 1326's enactment.[11] *Id.* at 1011. The court believed the inference was warranted for either of two reasons: Congress "ignored the express nativist intent behind the [1929] Act" or, if it was aware of that intent, bypassed the "opportunity to either adopt its racial animus or refute its improper motivation and clarify a

[permissible] purpose for the statute." *Id.* at 1012. This argument suffers from at least two fatal flaws.[12]

First, it contravenes the Supreme Court's warning against "[d]rawing meaning from [Congressional] silence." *Kimbrough v. United States*, 552 U.S. 85, 103 (2007); *United States v. Wells*, 519 U.S. 482, 495–96 (1997) ("We thus have at most legislative silence on the crucial statutory language, and we have frequently cautioned that it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law") (internal quotation marks, citation, and alternation omitted); *Zuber v. Allen*, 396 U.S. 168, 185 (1969) ("Where, as in the case before us, there is no indication that a subsequent Congress has addressed itself to the particular problem, we are unpersuaded that silence is tantamount to acquiescence, let alone the approval discerned by the dissent."). *Carrillo-Lopez*'s promotion of congressional silence to a dispositive level is simply at odds with well-established principles of statutory interpretation. *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1747 (2020).

---

[11]     Notably, Mexico and other Western Hemisphere countries were not subject to the national-origin quotas in the INA or a predecessor 1924 law.

[12]     At least two because the court also overlooked an obvious explanation for Congress's silence: that Section 1326 was an uncontroversial and widely supported provision of the INA, as discussed below. And, moreover, the finding that the 1929 Act was motivated by racial animus in the first place fell prey to improper and incorrect motive-probing.

Moreover, it repeats the error that the Supreme Court corrected in *Abbott v. Perez*, 138 S. Ct. 2305 (2018). There, the Court reaffirmed that discriminatory purpose must be shown as to the actual law being challenged, not just a predecessor; the legislature that enacted the successor statute is generally afforded a presumption of good faith; a finding of past discrimination does not "flip[] the evidentiary burden" to the government to prove that the successor statute is free from animus, *id.* at 2324–25; and a successor legislature does not have a "duty to expiate its predecessor's bad intent," *id.* at 2325; *see id.* at 2326 n.18. Circuit courts have roundly upheld this mandate. *NAACP v. Raymond*, 981 F.3d at 298; *I.L. v. Alabama*, 739 F.3d 1273, 1288 (11th Cir. 2014); *Hayden v. Paterson*, 594 F.3d 150, 165-166 (2nd Cir. 2010); *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998). By holding against the 1952 Congress its failure to engage with the history of the 1929 Act, the *Carrillo-Lopez* district court ran afoul of *Abbott*. And as in *Abbott*, that aspect of the court's rationale "cannot be dismissed as stray comments," *Abbott*, 138 S. Ct at 2325, because it pervaded the court's analysis. *See Carrillo-Lopez*, 555 F. Supp.3d at 1010 (1952 law "did not cleanse Section 1326 of its racist origins") Aside from *Carrillo-Lopez*, no court considering this equal protection claim has adopted the "silence" theory. *See* Ex. 2.

*Carrillo-Lopez's* attempt to distinguish *Abbott* is unavailing. The court suggested that *Abbott* turned "on the legislature's active response and engagement with the prior challenged statute," 555 F. Supp.3d at 1017-1018, and read it "to require that the reenacting legislature make some substantive change before known racial animus is cleansed," *id.* at 1021. But *Abbott* does not say that; and no court has read it that way. *Abbott* was a state redistricting case, but the presumption of good faith has been applied in other contexts. *See e.g.*, *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 318–19 (1978) (university admissions policy); *NAACP v. Raymond*, 981 F.3d at 303 (voter ID law).

Moreover, the basis for the presumption—"that a court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus"—is even truer in the federal immigration law context. *Abbott*, 138 S. Ct. at 2324; *see also Miller v. Johnson*, 515 U.S.900, 915–16 (1995).

In addition, the Court in *Abbott* could look to the 2013 legislature's "response" only because allegations of discriminatory intent had been aired in legal challenges to the original 2011plan brought in multiple federal courts. *See* 138 S. Ct. at 2315–17 (describing challenges in Texas and D.C.). It is unrealistic to expect an "active response," by contrast, in cases where the legislaturehas no notice of allegations that a law it is revisiting was motivated by racial animus. As the en banc Eleventh Circuit has explained, demanding legislative engagement with a law's history in such cases "establishes an insurmountable burden" because it is "unlikely that the present day legislators would be aware of the past discrimination" that supposedly taints the law. *Johnson v. Florida*, 405 F.3d 1214, 1225 n.21 (11th Cir. 2005). That concern is directly implicated here, where *Carrillo-Lopez* identified no evidence that the 1952 Congress—which had experienced a 96% turnover since 1929[13]—was even aware of the alleged taint to the 1929 Act.

Even taking as true *Carrillo-Lopez's* interpretation that an earlier law must be "substantially altered" before a presumption of good faith applies under *Abbott*, Section 1326 satisfies that criterion because the 1952 Congress changed the law governing illegal reentry in at least three material ways. First, Congress repealed multiple penalty provisions and enacted a single penalty scheme for all illegal reentrants.

---

[13]    *Compare* Congress Profiles, 70th Congress (1927-1929), available at https://history.house.gov/Congressional-Overview/Profiles/70th/, *with* Congress Profiles, 82ndCongress (1951-1953), available at https://history.house.gov/Congressional-Overview/Profiles/82nd/.

Second, Congress added the "found in" clause now in Section 1326(a), creating a "substantive offense[]" that is "distinct" from the two grounds for liability (entry and attempted entry) in the 1929 Act. *Carrillo-Lopez* itself recognized elsewhere in its opinion that the addition of the found-in clause made a "substantive change" to existing lawby "expand[ing] the government's authority to enforce the" reentry prohibition. 555 F. Supp.3d at 1014. Third, the statute expanded the class of non-citizens eligible for prosecution to include those previously excluded as well as deported. Those alterations qualify as substantive changes under any reasonable understanding of that term.[14]

Defendant's silence rationale fails for another reason. There is, in fact, an obvious, non-speculative reason why Congress hardly debated Section 1326 in the buildup to the INA's passage—it was uncontroversial. *See United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of June 27, 1952, but [sections] 1325 and 1326 were not among the debated sections."). The provision was not debated because everyone agreed that it was an appropriate measure, not because Congress wanted to carry forward the alleged racial animus of a prior Congress.

Even vocal opponents of the national origin quotas supported the illegal-reentry provision. On March 12, 1952, a group of 13 Senators led by Herbert Lehman and Hubert Humphrey introduced S. 2842 ("the Humphrey-Lehman bill"), an alternative Act which included more liberal

---

[14]    Amendments to Section 1326 after 1952 were also substantive. For example, the Omnibus Consolidated Appropriations Act of 1996 expanded the statute's criminal reach to a new group: those who had departed the United States while an order of exclusion, deportation, or removal is outstanding. The Antiterrorism and Effective Death Penalty Act of 1996 created a statutory collateral attack framework—providing a new statutory defense against prosecution.

national-origin provisions. Humphrey and Lehman were among the most outspoken critics of the INA's national origin provisions, criticizing them as xenophobic and based on a theory of racial superiority. *See* 98 Cong. Rec. 5169 (May 14, 1952) (Lehman criticizing the national origin provision as stemming from "a discredited theory of racial superiority."); 98 Cong. Rec.5170–71 (May 14, 1952) (Humphrey similar); 98 Cong. Rec. 5768 (May 22, 1952) (Lehman criticizing quotas as "recogniz[ing] the people of the so-called Nordic strain" but "turn[ing] [a] thumb[] down on people from southern or eastern Europe."); 98 Cong.Rec. 5803 (May 22, 1952) (Lehman criticizing bill and contrasting its "philosophy" with S. 2842). Yet the Humphrey-Lehman bill contained its own illegal-reentry provision, which is a word-for-word copy of the law later passed and codified as Section 1326. *See* S. 2842 (1952). If the 1952 Congress's silence establishes acquiescence to the racist baggage of the past when the two leading critics of the quotas included the same illegal-reentry provision in their own bill, then Humphrey and Lehman were silent carriers of the racism allegedly baked into the statute. That is illogical and shows why the silence-as-acceptance theory swims in treacherous waters.

This adoption-by-silence theory does not square with the law or the historical record. Congress did not debate the illegal-reentry provision because both the majority and the minority agreed it should be passed. This makes sense. Criminalizing illegal reentry is a neutral, commonsense policy that the majority of countries around the world have adopted. *Criminalization of Illegal Reentry Around the World*, Library of Congress (August 2019). The historical record refutes *Carrillo-Lopez*'s alternative theory into Congress's silence. *Cf.*, *Helvering v. Hallock*, 309 U.S. 106, 119–20 (1940) ("To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities.").[15]

### ii. President Truman's veto is irrelevant to Congress's intent.

President Truman's decision to veto the INA in 1952, and Congress's decision to override

that veto, is not further evidence that Congress passed Section 1326 out of racial animus as suggested by Defendant. Neither the law nor the facts support such a contention.

*Carrillo-Lopez* noted Truman's view that the INA perpetuated a "discriminatory policy" of the past and his remarks urging Congress to "reexamin[e]" the approach taken in that act. 555 F. Supp.3d at 1012-1013.; Message from the President of the United States Returning Without Approval the Bill (H.R. 5678) to Revise the Laws Relating to Immigration and Nationality and for Other Purposes (June 25, 1952). And the court found that "Congress' failure to heed President Truman's" message, "while simultaneously making the INA, and particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor." *Carrillo-Lopez*, 555 F. Supp.3d at 1013.

Truman's veto statement, however, "does little to advance [Carrillo's] argument." *Machic-Xiap*, 552 F. Supp.3d 1055, 1075 (D. Ore. 2021). *Carrillo-Lopez*'s reliance on it violates the rule against placing undue weight on an opponent's comments. In fact, as noted by one court, the handful of senators who expressed problematic rhetoric during debate preceding the override of President Truman's veto all voted against the veto override, "rendering whatever discriminatory purpose those eleven may have held inapplicable to the Act's passage." *Wence*, 2021 WL 2463567, at *7–8.

---

[15]     Moreover, even assuming *Carrillo-Lopez*'s adoption-by-silence theory made conceptual sense,because it relies on the views of only a handful of legislators from 1929, the theory would equally allow the 1952 Congress to silently adopt the "pure" or "neutral" motives of the hundreds of otherlegislators who voted for the law. If Congress can silently appropriate the allegedly bad motives of a few lawmakers, it could seemingly—and more easily—adopt the majority view instead of the minority.

Finally, the statement says "nothing about what President Truman thought about Section 1326 specifically." *Machic-Xiap*, 552 F.Supp.3d at 1075. Thus, Congress's decision to override his veto *necessarily* had nothing to do with Congress's view on Section 1326.

### iii.   *Defendant misapprehends Deputy Attorney General Ford's letter.*

Defendant infers racial animus from a 1951 letter by Deputy Attorney General Peyton Ford. ECF No. 25, p. 46-47; 25-16 (Ex. P).   In doing so, he makes basic mistakes of historical fact. Defendant argues the Ford letter is indicative of Congress's racial animus because Congress supposedly followed its recommendation to add the "found in" clause to Section 1326; that clause made the statute more punitive; and the recommendation came in a letter that, in addressing another part of the INA, referred to Mexicans as "wetbacks."  ECF No. 25, p. 46-47.

Defendant misunderstands the sequence and significance of the relevant events. Even accepting the premise that the "found in" clause made the illegal-reentry statute more "punitive" (and that such an effect is itself suggestive of animus), Ford did not propose the relevant language. He wrote in "response" to the Senate Committee's request for the Justice Department's views on a draft bill that *already contained* the "found in" clause. *Id.* No. 25-16, at 1 (Ex. P: Statement of Peyton Ford, Deputy Attorney General (May 14, 1951)); *see* S. 716, § 276, 82nd Cong., 1st Sess.(Jan. 29, 1951). Defendant errs in stating that "the one and only change" between the 1929 Act and Section 1326 "was based on [Ford's] request alone," and imputing to Congress animus inferred from Ford's use of the term "wetback" in a part of the letter that was not even addressing Section 1326.  ECF No. 25, p. 46; *see also Carrillo-Lopez*, 555 F. Supp.3d at 1022, at 1017 ("The 1952 Congress incorporated the advice of supporters of the bill who used racial epithets in official documents[.]"), at 1015 ("The only significant alteration between the unlawful reentry provision in the Act of 1929 and Section 1326 was this one, recommended by Ford.").

This Defendant's reliance on the Ford letter also fails because Ford was not a relevant decisionmaker. His views are therefore not probative of Congress's intent. *See Arlington Heights*, 429 U.S. at 268 (statements by members of the decision-making body are relevant); *see also Machic-Xiap*, 552 F. Supp.3d at 1076 ("Because Ford was not a member of Congress, however, his use of the epithet is limited evidence of Congress's purpose in enacting § 1326."). Finally, Ford did not actually *use* the derogatory term "wetback." He quoted an earlier report from the President's Commission on Migratory Labor, Migratory Labor in American Agriculture, which itself used the term—the same President whose equality-minded veto of the INA *Carrillo-Lopez* found evinced Congress's animus. *See Carrillo-Lopez*, 555 F. Supp.3d at 1012-1013. But even if Ford had endorsed the term as a racial epithet, "[t]he bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis." *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1292 (7th Cir. 1977). Ford's letter simply does not support any proposition that a desire to strengthen the law necessarily stems from an improper racial motive.

Defendant also infers racial animus from Congress's enactment of a bill colloquially known as the "Wetback Bill." *See* ECF No. 25, p. 36-39. This reasoning is also flawed. Defendant and really anyone's reaction to the term "wetback" is understandable, as it is a universally acknowledged odious racial epithet. However, the historical record does not support the finding that racial animus in passing Section 1326 can be inferred from Congressmen's use of the term in 1950s debate. At most, it shows that the word has a complex history that carried a particularized non-racial meaning in the context of the Congressional immigration debate over illegal migrant labor. The historical background and legislative history—two evidentiary sources considered under *Arlington Heights*—bear this out.

#### iv.    *Historical background of Section 1326.*

The *Arlington Heights* analysis directs the court to consider context. The 82nd Congress considered the immigration laws in a careful, deliberate and comprehensive way. The sequence of events in passing Section 1326 followed standard protocol, and there is no evidence of departure from the normal procedures.

The historical background shows Congress was motivated not by racial animus but by legitimate goals of protecting national security, improving the employment conditions of American and foreign workers, maintaining positive foreign relations, improving public health, and deterring recidivist breaches of the country's sovereign borders while promoting compliance with court and government orders. By the early 1950s, illegal labor migration had dramatically increased, touching on all of these issues. *See* Special Message to Congress on the Employment of Agricultural Workers from Mexico (July 13, 1951) ("Special Message"); Hearings Before the Committee on Appropriations, United States Senate, Eighty-Second Congress, First Session, on H.R. 5215 ("Hearings") *Machic-Xiap*, 552 F. Supp.3d at 1068-1069. Even President Truman recognized the scale of the problem. Testimony of INS Commissioner A.R. Mackey during a 1952 appropriations committee hearing shows the growing issue of illegal reentry: "[t]he best we could do with our skeleton force was to put them back across the river. They would reenter and, of course, be apprehended."

Congress sought to address these issues through immigration reform. But because of the complicated nature of immigration policy, U.S. immigration law-making often "decouple[s]" immigration issues. *See* ECF No. 25-2 (Ex. B: Declaration of Prof. Benjamin Gonzalez-O'Brien). This dynamic is unmistakably apparent in the early 1950s. Congress passed the 1952 INA just months after enacting separate bills to authorize the Mexican agricultural worker program, Pub. L. No. 82-78,

65 Stat. 119 (1951), to criminalize the harboring of illegal aliens and equip the INS with enhanced enforcement authority, Pub. L. No. 82-283, 66 Stat. 26 (1952), and to provide an increase in appropriations for border enforcement activities, Pub. L. No. 82-375, 66 Stat. 103 (1952). These laws are necessarily interconnected and provide context to passage of the 1952 Act. For example, President Truman approved the agricultural workers bill on the express assurance by Congressional leaders that supplemental legislation and appropriations would be passed to address the "influx" of illegal Mexican laborers and to give INS sufficient authority and resources to step up their enforcement activities.

The so-called "Wetback Bill" from which *Carrillo-Lopez* drew racial bias was an "anti-harboring" measure that targeted those involved in transporting and facilitating non-citizens' unlawful entry into the United States. *See* Pub. L. No. 82-283, 66 Stat. 26 (Mar. 20, 1952); *Carrillo-Lopez*, 555 F. Supp.3d at 1015. Its title "An Act to assist in preventing aliens from entering or remaining in the United States," codified as amended at 8 U.S.C. § 1324(a); 98 Cong. Rec. 791 (Feb 5, 1952). It was meant to overcome a deficiency in the prior harboring law arising from a Supreme Court decision that found the prior statute lacked a penalty provision. *Herrera v. United States*, 208 F.2d 215, 216 (9th Cir.1954) (noting the anti-harboring law was passed to overcome *United States v. Evans*, 333 U.S. 483 (1948) and to strengthen the law generally regarding illegal entrants). It was passed on an emergency basis, at the behest of President Truman, to secure extension of an existing migratory-labor agreement with Mexico. *See* 98 Cong. Rec. 791, 795 (Feb. 5, 1952).[16] The bill was "non-controversial." *Id.* at 791–92 (statements of Sen. O'Mahoney, Sen. McFarland). It was a product of "long conferences between the State Department, the executive department, the farm labor-management groups . . . and a [ ] legislative council." *Id.* at 792 (statement of Sen. Magnuson).

Its purpose was to address "one aspect" of a "very difficult and complex" problem, with the omnibus immigration bill under separate consideration to comprehensively address the immigration framework. *Id.* (statements of Sen. Humphrey, Sen. Kilgore).

Congressmen had varying reasons to support it—none racially animated. Some agreed that the bill should include a penalty for employing illegal non-citizens. 98 Cong. Rec. 793–94 (Feb 5,1952). Several agreed that the bill was aimed at those "who exploit these illegals." 98 Cong. Rec. 1347 (Feb 25, 1952) (statement of Representative Celler); *see also id*. at 1346 (statement of Representative Walter) ("[I]t is absolutely essential if we are to adequately deal with these racketeers who are concealing aliens by the hundreds all over the United States. That is the crowd we are trying to do something about We are thinking about the professional gangster"). To Representative Graham, "[t]his bill is perfectly simple. It is to apply to all our borders and applies against every type of person who has the intent of concealing or harboring aliens." 98 Cong. Rec. 1350 (Feb. 25, 1952).

---

[16]    The Bracero Program was a series of laws and bi-lateral agreements between the U.S. and Mexico addressing the issue of migratory labor. On the same day the "Wetback Bill" was introduced, President Truman addressed Congress as to the need for new anti-harboring legislation. Two months later, President Truman approved House Joint Resolution 311, which made interim appropriations for the Department of Labor to begin bringing Mexican laborers to the United States "in conformity with the recently concluded agreement between this Government and the Republic of Mexico." Statement by the President Upon Signing Bill Relating to the Employment of Mexican Agricultural Workers (August 16, 1951). The United States' agreement with Mexico, however, expired within six months and renegotiation was contingent on certain congressional action. As such, President Truman hoped Congress would "give expeditious consideration" to the proposals set forth in his July 13, 1951, message.

Contrary to *Carrillo-Lopez*'s factual finding, the law did not punish laborers. It did have a controversial proviso that exempted employers from liability for the bare act of hiring a non- citizen. 98 Cong. Rec. 794 (Feb. 5, 1952). But it did not punish only "the laborers themselves" or "criminaliz[e] Mexican immigrant laborers." *Carrillo-Lopez*, 555 F. Supp.3d at 1015-1016. In fact, Congress considered and rejected language that would have criminalized only the harboring and transportation of Mexican non-citizens, to the exclusion of other non-citizens. 98 Cong. Rec. 799 (Feb 5, 1952).

In any event, *Carrillo-Lopez*'s dissatisfaction that the law did not punish employers is overreach. *See* 555 F. Supp3d at 1015-1016. Congress's decision to exempt employers was a legislative judgment—indeed, the product of compromise—whose validity is not contingent on *Carrillo-Lopez*'s perception of its efficacy. "[I]t is well settled that the legislature may choose to attack a problem one step at a time,"*United States v. Richards*, 737 F.2d 1307, 1310 (4th Cir. 1984), which is exactly how Congress proceeded when it ultimately criminalized the employment of illegal non-citizens in the Immigration and Control Act of 1986. *See* H.R. No. 101-723(i) at 46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649, 5650; 8 U.S.C. § 1324a. Moreover, the bill still penalized employers who induced non-citizens to cross the border for employment purposes. *See* 98 Cong. Rec. 793– 94 (Feb 5, 1952).

The racial animus of the whole Congress in passing Section 1326 cannot be inferred from Congress's continued use of national quotas, as Defendant urges. *See* ECF No. 25, p. 39-46. By 1952, the Displaced Persons Act of 1948, Pub. L.No. 80-774, 62 Stat. 1009, and amendments in 1950, Pub. L. No. 81-555, 64 Stat. 219, and 1951,Pub. L. No. 82-60, 65 Stat. 96, had begun to dilute the racial effect of the quota system that is at the heart of defendant's racial animus argument. In his Statement by the President Upon Signing Bill Amending the Displaced Persons Act in June 16, 1950, President

Truman praised the expansion of refugee eligibility, including from countries with otherwise low quotas). The focus of the 1952 INA was not the national origin aspect of the quotas, but the creation of a new visa-preference system based on occupation and family. The INA "was Congress's response to a massive nine-hundred-page report that identified problems with current U.S. immigration policy and laid out recommendations for how to best address them." *Machic-Xiap*, 552 F. Supp.3d at 1069.

The historical background reflects Congress's careful, deliberate and comprehensive approach to achieving immigration reform that would address the prevalent, legitimate issues of the time. As *Machic-Xiap* aptly concluded, the INA "followed a comprehensive review of the entire panoply of the nation's immigration laws." 552 F. Supp.3d at 1076. There was nothing substantively irregular about it. *Id.*

### v.    *Legislative history.*

The legislative history reflects the same: there are no explicit statements of racially discriminatory motivation in the 1952 Act. Instead, Defendant assigns racial motivation to the fact that certain aspects of the prior law continued forward without, in his view, adequate redressing of the racial history. *See* ECF No. 25, p. 23-34. But this assignment of racial animus is legally impermissible: it is not the government's burden to prove the affirmative purging of a prior taint. *Abbott*, 138 S. Ct. at 2324. Defendant must prove racial animus, and the good faith of the Congress must be presumed. *Id.*

*Carrillo-Lopez* points to the word "wetback" in debate on the immigration bills at that time, 555 F. Supp.3d at 1015-1016, but the appearance of the term does not support the inference of racial animus. The use of the term is absolutely a racial epithet, but the many courts that have looked at this specific issue have not found it was used as a generally racialized term against all Latinx.

Rather, it carried a specific meaning pertaining to illegal entrants in the context of debate about the Mexican contract labor program and the accompanying problem that migrants were circumventing those contracts through illegal entry, and employers were hiring them. In fact, legislators often expressly defined the term "wetback" in this circumscribed way or qualified it with the preceding phrase "so-called." 97 Cong. Rec. 7255 (June 27, 1951) (statement of Sen. Celler) ("[a] wetback is one who is in this country illegally"); 97 Cong. Rec. 4515 (April 30, 1951) (statement of Sen. Ellender) ("[t]he wetback swims the river. He comes in illegally, whereas the others come in under contract"); 97 Cong. Rec. 7148 (June 26, 1951) (statement of Rep. Cooley) ("Many of these so-called wetbacks have been exploited by selfish landlords").

President Truman used the term too—despite being lauded by Defendant for his sensitivity to discrimination when vetoing the INA. So too did civil rights stalwarts Representative Celler and Senator Chavez. *See, e.g.,* above and  97 Cong. Rec. 7154–55.

The broader legislative history shows Congressional intent to eliminate racial bias. Senator McCarran, Senate sponsor and chief proponent of the 1952 Act, stated that the law "does not contain one iota of racial or religious discrimination." Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration 1924-1965*, 192 (2020). Representative Walter, House sponsor and chief proponent of the bill, stated "[t]he equality of all races, the final repeal of all racial discrimination now contained in our immigration and naturalization laws, as well as the repeal of all discrimination based on sex, nationality, etc., are the basic features of my bill." 98 Cong. Rec. 2283 (March 13, 1952) *See also Wence*, 2021 WL 2463567 at *7–8 (citing statements by Representative Judd touting that the INA would no longer outlaw "millions of people" simply because of "the color or pigment of their skin.")

The appearance of the term "wetback" in the legislative history and historical record, jarring

though it is to see, was used for a circumscribed purpose and by civil rights and immigration advocates alike; it does not support the inference that racial animus motivated Congress in passing the law.

### vi.   *Congressional awareness of disparate impact is insufficient.*

*Carrillo-Lopez* concluded that Congress's decision to expand the illegal-reentry bar, "despite its knowledge of the disparate impact of the provision on Mexican and Latinx people, is some evidence that racial animus was a motivating factor" in Section 1326's passage. *Carrillo- Lopez*, 555 F. Supp.3d at 1016, and adopted by Defendant, *see* ECF No. 25, p. 31. That conclusion lacks merit, for three reasons.

First, as explained above, the type of disproportionate impact visible in an immigration-related measure such as Section 1326 does not give rise to the same inference of discriminatory intent as in other settings. *See Wence*, 2021 WL 2463567, at *10. Second, the district court's statement that Congress knew that the 1929 Act had disproportionately affected Latinx people is unsupported. The *Carrillo-Lopez* court relied on data from the 1930s supplied by Carrillo's expert, but without any evidence that those statistics were available to or shared with the 1952 Congress. 555 F. Supp.3d at 1016. The court's only other source—a passage in the Senate report describing the difficulties of obtaining convictions in the "Mexican border area," *id.*—addresses "illegal entry and alien-smuggling" prosecutions, not the illegal *reentries* covered by Section 1326. Report of the Committee on the Judiciary Pursuant to S. Rex. 137 (April 20, 1950). That report makes no express reference to the race or national origin of those who were prosecuted under the 1929 Act. *See* ECF No. 25-16 (Ex. P., Ford Letter, noting that "[m]any European aliens are specifying Mexico or Canada as the country to which they wish to be deported" and that, if their requests were granted, "reentry from such territory in an illegal manner is easily possible"). Third, even assuming that the 1952 Congress was aware that the existing reentry prohibition produced a

disparate impact, awareness is not enough. The Supreme Court's decision in *Feeney* requires proof that Congress acted *because of* Section 1326's adverse effect on Mexican and Latinx defendants, not simply that the effect was known or foreseeable. *Feeney*, 442 U.S. at 279; *see Wayte v. United States*, 470 U.S. 598, 610 (1985); *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464 (1979) ("[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation.").

Finally, given that Congress has repeatedly amended Section 1326—and all in the face of this continuing disparate impact—one would have to assume (adopting *Carrillo-Lopez*'s logic) that those amendments are also "evidence of continued racial animus" when there is simply no support for that assumption. *See* ECF No. 25, p. 47-65 (Defendant's Motion, making that argument).

### vii.    *Strengthening a law is not evidence of animus.*

Finally, Defendant asserts that increasing a statute's deterrent value is evidence of animus, while citing no case law for this novel proposition. *See id.* Indeed, courts generally treat the act of repeatedly strengthening a law as evidence of "a crystallizing vision on Congress's part of the need for stern punishment[.]" *United States v. Shill*, 740 F.3d 1347, 1352 n.5 (9th Cir. 2014) (noting Congress's repeated revisitation of the Mann Act to toughen penalties for the crimes therein) (citing *United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir. 2007)) (same). Congress's decision to impose strict penalties for certain conduct across the board is not evidence of an equal-protection violation.

Moreover, contrary to Defendant's binary framework, where strengthening a law necessarily implies racial animus, Congress has increased Section 1326's deterrent value while simultaneously eschewing forms of racial discrimination. IMMACT, where Congress amended Section 1326 to authorize greater fines, but also more than doubled the then-existing cap on immigration, created the TPS program and granted status to citizens of El Salvador, and created a

diversity visa program, is just one example. It would be anomalous that a Congress purportedly under the silent spell of white supremacy and anti-Hispanic animus included these provisions in the 1990 Act. "Is it really possible that the same Congress that was deeply concerned about racial justice when looking at [immigration visa provisions] suddenly became racist when contemplating [Section 1326]? That is a heavy lift. A more basic explanation exists for what Congress did, . . . . The government has a powerful interest in [deterring illegal migration]." *United States v. Blewett*, 746 F.3d 647, 659 (6th Cir. 2013) (en banc) (discussing the Fair Sentencing Act's decision not to make retroactive fixes to the crack cocaine sentencing provisions). The same is true for the 1952 Act in the first place.

That Congress has viewed Section 1326 as an important tool to further its immigration policies, in the absence of any discriminatory motive, is plainly demonstrated by the 1990 Act. Yet, according to Defendant, these amendments do nothing but continue the proliferation of racism allegedly baked into the statute. This conclusion is at odds with the historical record.

### viii.   Congress would have enacted Section 1326 absent discriminatory intent.

Defendant has not shown discriminatory intent. His *Arlington Heights* claim fails. But even if he had, the historical record establishes that Congress would have enacted Section 1326 absent racial animus. Contrary to Defendant's flawed reading, the best evidence that Section 1326 is valid is that Congress has repeatedly amended the law for well-documented legitimate purposes. *Hayden v. Paterson* makes clear that it is not the effect of the amendment of laws with potentially troubling histories that matters, it is the consideration that the process of amendment necessarily entails. 594 F.3d at 167.

First, it is obvious from the historical record that nondiscriminatory objectives motivated the passage of Section 1326 in 1952 and its later amendments. Support for border enforcement is driven by a desire to protect American citizens from economic competition, by a need to maintain

national security, and by a need to maintain foreign relations with international allies, including Mexico, which has historically opposed illegal migration from Mexico to the United States. Moreover, the fact that workers without immigration status are subject to exploitation creates concerns about working conditions for both the migrants themselves and others competing with them economically.  It is manifest that Congress passed the INA in part to protect American workers and the interests of those working legally in the United States.

In cases such as this, where valid non-invidious purposes motivating a law "cannot be missed," discriminatory motive cannot be the but-for cause of the law's passage, absent some direct evidence of discriminatory intent on the part of the passing legislature. *See, e.g.*, *Feeney*, 442 U.S. at 275; *Hayden v. Paterson*, 594 F.3d at 167-68 (upholding felon disenfranchisement law given the "obvious alternative explanation" for its passage).

Defendant points to no evidence of racial animus in the amending Congresses. *Carrillo-Lopez* does not find any; rather it doubles-down on the silence-as-acquiescence theory and ignores evidence to the contrary. 555 F. Supp.3d at 1011-1012. The obvious valid reasons for enacting the illegal reentry statute, along with Congress's continued repassage of Section 1326 without animus, conclusively demonstrates that the law would have—and has—passed without discriminatory intent. Even setting aside Defendant's failure to meet his initial burden under *Arlington Heights*, Defendant's attack on the law fails.

### III.    AN EVIDENTIARY HEARING IS NOT WARRANTED

Finally, Defendant requests an evidentiary hearing. His entire claim rests on *Arlington Heights*. As detailed above, his claim fails for many reasons besides *Arlington Heights'* inapplicability to this case. Therefore, there is no reason to hold an evidentiary hearing. *See, e.g., United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (evidentiary hearing not required where the materials provided to the court "show as a matter of law that [the defendant]was not entitled to relief"). The government could only find three courts that have granted an evidentiary hearing when presented with this exact same argument: *Carrillo-Lopez*, 555 F.Supp.3d 996; *United States v. Machic-Xiap*, 552 F. Supp.3d 1055; and Judge Moore in *Quintanilla-Dominguez.*

The facts presented by Defendant in his motion essentially resolve the matter in favor of the United States. An evidentiary hearing is unnecessary if the claim can be resolved on the record. *Torres v. Mullin,* 317 F.3d 1145, 1161 (10th Cir. 2003). The Court has already been presented with enough information regarding what the college professors offered by Defendant, *see* ECF No. 25, p. 3-4, thought about the 1920's. There is no need to consider irrelevant material once again.[10]

### IV.    CONCLUSION

Defendant's motion should be denied because: (1) immigration laws are subject to a highly deferential standard of review. Section 1326 bears an undeniably rational relationship to the government's legitimate interest in enforcing its immigration laws, thereby, satisfying rational-

---

[10] As already pointed out, Defendant's Motion is not novel. Indeed, district courts across the Circuits have squarely rejected the defendant's argument. *See e.g., United States v. Palacios Arias*, No. 3:20-cr-62-JAG, ECF No. 37, p. 6 n.7 (E.D. Va. Oct. 13, 2020) ("Even assuming, however, that the Court can consider the discriminatory purpose that the defendant alleges motivated Congress to pass the Undesirable Aliens Act of 1929, this evidence has only marginal relevance to the defendant's challenge to the INA, passed by Congress twenty-three years later."). *See* Ex. 2 for a list of courts that have addressed this issue without an evidentiary hearing (excepting the courts as previously noted).

basis review; (2) in the highly deferential context of immigration legislation, courts should be hesitant to probe the alleged motives of those who passed the challenged law; (3) even if the Court deemed it necessary to apply *Arlington Heights*, Defendant's challenge to Section 1326 would nonetheless fail because it focuses entirely on the legislative motives of the 1929 Congress, not the Congress that actually passed, or repeatedly amended 8 U.S.C. § 1326; and (4) the United States has several legitimate purposes to enact and enforce illegal reentry laws and the theory that Section 1326 would not have been enacted but for racist ideology is unfounded. Section 1326 is constitutional under rational basis review, the standard applicable to an equal protection challenge to a law that regulates the removal of noncitizens; it does not violate equal protection under the *Arlington Heights* standard; and Section 1326's impact on Latinx defendants does not give rise to an inference of discriminatory intent.

For the reasons and authorities stated above, the United States respectfully requests that this Court deny Defendant's Motion to Dismiss the Indictment on its face, finding no need to hold an evidentiary hearing.

Dated this 27th day of June, 2022.

Respectfully submitted,

COLE FINEGAN
United States Attorney


*s/ Albert Buchman*
ALBERT BUCHMAN
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: al.buchman@usdoj.gov

Attorney for the United States

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 27th, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

By: *s/Stephanie Price*
STEPHANIE PRICE
LEGAL ASSISTANT