IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 22-cr-00018-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

OSCAR DURON-DE LUNA,

      Defendant.

---

**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO THE
MOTION TO DISMISS TH INDICTMENT**

---

In *Arlington Heights*, the Supreme Court set out the two showings necessary to establish a race-based equal protection challenge: (1) the legislature that enacted the law was motivated in part by racial animus, and (2) the law disparately impacts one race. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Mr. Duron-De Luna made that showing by setting out the sordid history behind the unlawful reentry statute, which is enforced almost exclusively against Mexicans and Latin Americans. The government does not meaningfully contest that the 1929 Undesirable Aliens Act (which first criminalized reentry) was motivated by racial animus, or that almost all 8 U.S.C. § 1326 prosecutions are against Mexicans and Latin Americans. Instead, the government attempts to divert the Court's attention from the statute's racist history in three ways.

***First,*** the government argues the Court should not concern itself with the motivations behind criminal immigration laws. In the government's view, because § 1326 relates to immigration, the Court should apply a lesser standard of review that would require courts to uphold

a domestic criminal immigration law no matter how obvious and odious the racial animus behind the law.

   **Second,** if the Court does look to the motivations behind the unlawful reentry statute, the government argues the Court must start at 1952 — when Congress shifted the statute from one section of the criminal code to another (§ 1326). According to the government, that shift within the code wiped the historical slate clean, and the Court therefore cannot consider the racist history of the 1929 Undesirable Aliens Act while examining § 1326.

   **Third,** if the Court does determine that racial animus was a motivating factor in enacting the statute, the government argues it doesn't matter because later Congresses cured the law by amending it.

   Each of these arguments is easily dispatched. First, courts are not forbidden from assessing whether a domestic criminal law is racially motivated. To the contrary, the courts' role in our system of government is precisely to determine whether laws enacted by legislatures offend the Constitution. Second, moving a statute from one section of the code to another does not erase its history, and, regardless, the 1952 Congress recodified the unlawful reentry statute not just in spite of the 1929 Congress' racism but also due to its own racial animus. Third, the Congresses that amended § 1326 did not cure the law of racial animus. As set out by Dr. S. Deborah Kang, a professor specializing in immigration history, those Congresses were themselves acting with racial animus.

   Because Congress acted with racial animus when it criminalized reentry, and because almost all prosecutions under § 1326 are against Mexicans and Latin Americans, Mr. Duron-De Luna asks the Court to join the Honorable Miranda M. Du in finding that § 1326 violates the Fifth

Amendment's equal protection guarantee. *See U.S. v. Carrillo-Lopez*, __F.Supp.3d__, 2021 WL 3667330 (D. Nev. Aug. 8, 2021).

## I.      CONGRESS CANNOT SHIELD RACIST LAWS FROM JUDICIAL SCRUTINY

In its response, the government asks the Court to jettison the traditional equal-protection analysis and instead apply a deferential rational basis review. Doc. # 28, p.7. Why? Because the government claims § 1326 — a domestic criminal statute authorizing up to 20 years of incarceration — is an immigration provision, so different rules apply. *Id.* at p.8. Those different rules apply because immigration is terrain left to the political branches, leaving § 1326 largely immune from judicial control. *Id.* In effect, the government tries to change the rules because it cannot defend § 1326 under the appropriate *Arlington Heights* framework.

### A.      Courts assess race- and ethnicity-based equal protection claims under *Arlington Heights*.

Trial courts routinely apply *Arlington Heights* to race- and ethnicity-based equal protection claims. *See e.g., California v. U.S. Dep't of Homeland Sec.*, 476 F.Supp.3d 994, 1018–23 (N.D. Cal. 2020); *Cook Cty., Illinois v. Wolf*, 461 F.Supp.3d 779, 789 (N.D. Ill. 2020); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325 (D. Md. 2018); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393,412 (D. Mass. 2018). Recently, a district court noted that, even in the civil immigration context, "[s]everal recent district court opinions have also applied the *Arlington Heights* framework to evaluate whether the federal government acted with discriminatory purpose despite a facially neutral action." *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp.3d 994, 1023 (N.D. Cal. 2020).

These district courts are correctly following the lead of the Ninth Circuit and the Supreme Court. Twice in the past three years, the Ninth Circuit has applied *Arlington Heights* in high-profile civil immigration cases. In *Ramos v. Wolf*, the Ninth Circuit applied *Arlington Heights* in an equal-

protection challenge to the government's termination of the Temporary Protected Status program. 975 F.3d 872, 896 (9th Cir. 2020). And in *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, the Ninth Circuit applied *Arlington Heights* in an equal-protection challenge to the government's rescission of the Deferred Action for Childhood Arrivals (DACA) program. 908 F.3d 476, 518–20 (9th Cir. 2018). The Supreme Court then heard the DACA case, and at least five Justices agreed *Arlington Heights* applied, although they rejected the plaintiffs' claim on the facts. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915–16 (2020); *Id.* at 1917–18 (Sotomayor, J.).

If *Arlington Heights* applies to civil claims of race- and ethnicity-based discrimination, it certainly applies in the criminal context. This is consistent with basic separation of powers principles: Congress makes the laws, and courts determine whether those laws pass constitutional muster. There is no reason the rules should be any different just because a criminal law touches on immigration. "A challenged law does not receive minimal scrutiny merely because it is related to immigration." *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018).

**B.     The government's attempts to push the Court away from *Arlington Heights'* higher level of scrutiny fall short.**

In arguing for deferential rational basis review, the government cites to a number of civil cases that are easily distinguishable. For example, the government cites to *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), for the proposition that rational basis review "applies in the immigration context." Doc. #28, p. 8. The government fails to appreciate that President Trump's "Muslim ban" (at issue in that case) was a civil matter addressing the entry of individuals from outside the country.

4

That is not the case here. Mr. Duron-De Luna's challenge is to a criminal statute employed to incarcerate members of our community – people who are already in the United States – for up to two decades. When one's liberty is on the line, the full panoply of constitutional protections applies. *E.g. Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). As the Supreme Court has held, constitutional protections are afforded to noncitizens even under civil immigration laws where the government seeks to "punish[] by deprivation of liberty and property." *Wong Wing v. U.S.*, 163 U.S. 228, 237 (1896); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent") (citations omitted). When Congress imposes criminal sanctions, we have departed the terrain left to political branches and any hands-off review of legislation necessarily ends.

While the government correctly notes that some district courts have bought its argument for rational-basis review, courts that have actually engaged with the issue have rightly been unpersuaded. *See* e.g., *Carrillo-Lopez*, 2021 WL 3667330 at *1–3 (applying *Arlington Heights* after being "unpersuaded that a criminal law enacted by Congress is free from constitutional equal protection constraints, even if the offense relates to immigration"); *U.S. v. Machic-Xiap*, ___F. Supp. 3d___, 2021 WL 3362738 at *9–10 (D. Or. Aug. 3, 2021) at *9–10 ("Freedom from imprisonment … lies at the heart of the liberty that the Fifth Amendment's Due Process Clause protects. The government's assertion that the Court has little role in policing the Fifth Amendment's boundaries in a case where the defendant faces risk of imprisonment is without merit."); *see also U.S. v. Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *2 (S.D. Cal. 2020) (applying *Arlington Heights* to a constitutional challenge to 8 U.S.C. §1325).

Indeed, recently, Chief Judge Brimmer rejected the government's identical argument it makes here. The government argued that § 1326 is "a provision of the Immigration and Nationality Act …, legislation concerning aliens and is, therefore, subject to rational basis review." *U.S., v. Sanchez-Felix*, No. 21-CR-00310-PAB, 2021 WL 6125407, at *2 (D. Colo. Dec. 28, 2021) (citation and punctuation omitted). Evaluating relevant cases, Chief Judge Brimmer found that there is a "distinction between non-citizens present in the United States and those outside the borders, *see Zadvydas*, 533 U.S. at 693; *Mathews*, 426 U.S. at 77." *Sanchez-Felix*, 2021 WL 6125407, at *3. As a result,

> the government [was] mistaken that § 1326 should be reviewed under the rational basis standard. Because § 1326 applies to "aliens who are already in the United States, [the government] cannot entirely rely on [Congress'] plenary power doctrine to uphold the [statute]." *California*, 476 F. Supp. 3d at 1021; *see also United States v. Zepeda*, 2021 WL 4998418, at *2 (C.D. Cal. Jan. 5, 2021). Rather, the Court finds, the nature of defendant's claim and his presence within the United States weigh in favor of applying *Arlington Heights* to his challenge.

*Sanchez-Felix*, 2021 WL 6125407, at *3; *see also United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I. June 16, 2021) ("the Court can find no support for the proposition that criminal laws enacted by Congress, even when they are enacted in furtherance of Congress's broad immigration power, are otherwise immune from Constitutional review, particularly that they are immune from upholding a right so fundamental as the equal protection of this nation's laws.").

### C.   It cannot be that racist laws must stand so long as they touch on immigration.

The government's argument for rational-basis review is wrong on the law, and it fundamentally misconstrues Mr. Duron-De Luna's situation as a defendant facing domestic criminal charges. This is a routine criminal case. When the government sought to prosecute Mr. Duron-De Luna, it took the case before a grand jury. The magistrate arraigned Mr. Duron-De Luna and informed him of his rights — to remain silent, to be represented by counsel, to be tried

by a jury of his peers. At no point has there been any indication Mr. Duron-De Luna's criminal proceedings differ because his alleged crime has some connection to this country's immigration laws.

Nor could there be. Just like any other individual facing criminal charges, Mr. Duron-De Luna has the right to challenge the law he is alleged to have violated — and to have a court assess whether the law impermissibly discriminates on the basis of race. This is especially the case when that law is employed almost exclusively against one race. If Mr. Duron-De Luna and others in his situation were barred from challenging such a law, Congress would have carte blanche to pass any law it wanted — no matter how obviously racist — so long as the law itself was couched in neutral terms and somehow touched on immigration. The government disagrees and insists it is permitted to prosecute Mr. Duron-De Luna (and potentially send him to prison for years) without the Court so much as considering whether § 1326 was passed specifically to target Mexicans and Latin Americans.

This cannot be. It cannot be that courts are barred from analyzing whether a law violates the Constitution on the basis of race — the most suspect category, *see Loving v. Virginia*, 388 U.S. 1, 11 (1967) ("the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to the most rigid scrutiny") — simply because the law has some connection to immigration. The "sensitive inquiry" demanded by *Arlington Heights* provides a necessary bulwark against precisely such unconstitutional discrimination. 429 U.S. at 266.

## II. CONGRESS ACTED WITH DISCRIMINATORY INTENT WHEN IT CRIMINALIZED REENTRY

In its response, the government does not meaningfully contest the overwhelming evidence showing the 1929 Congress acted with a discriminatory purpose when it criminalized reentry under

the Undesirable Aliens Act. *See* Doc. #28, p.14. The government has explicitly conceded this point in separate proceedings. *See Carrillo-Lopez*, 2021 WL 3667330 at *7. Indeed, many courts across the country have similarly found "the legislative history bears out Congress's racist motivations in enacting the [Undesirable Aliens Act of 1929]". *United States v. Novondo-Ceballos*, No. 2:21-CR-383 RB, 2021 WL 3570229, at *1 (D. N.M. Aug. 12, 2021); *see also Sanchez-Felix*, 2021 WL 6125407, at *5 (citing *Machic-Xiap*, 2021 WL 3362738 at *11 – 13 and *Wence*, 2021 WL 2463567, at *6). There is no question that anti-Mexican and Latin American animus motivated Congress' passage of the Undesirable Aliens Act and its criminalization of reentry. As such, Mr. Duron-De Luna has established discriminatory intent.

### A.    By shifting the statute to a new location in the criminal code, Congress did not erase its discriminatory intent.

Despite characterizing the Undesirable Aliens Act's unlawful reentry provision as the "first version" of § 1326,[1] the government now insists this concededly racist "first version" has no bearing on the almost-identical law recodified at § 1326 in 1952. The government argues legislative intent does not carry over from the Undesirable Aliens Act to the version now in force, § 1326. Doc. #28, p.18. This is contrary to the Supreme Court's instruction that "in construing [a statute] we may refer to the *purpose* and scope of the act from which it was derived." *United States v. Mason*, 218 U.S. 517, 525 (1910) (emphasis added); *see also United States v. Ryder*, 110 U.S. 729, 740 (1884) ("[i]t will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed"); *United States v. Nishiie*, 996 F.3d 1013, 1026 (9th Cir. 2021) ("codification does not alter congressional meaning evident from prior history").

---

[1] Exhibit A (United States Attorneys' Bulletin, dated July 2017) at 1.

The government cites *Abbott v. Perez*, 138 S. Ct. 2305 (2018), to argue "the Court should not automatically impute the[] past motivations [in passing the Undesirable Aliens Act] to the current law and forgo analysis of the enacting legislature." Doc. #28, p.19. However, the government fails to acknowledge that *Abbott* itself confirms that the original legislature's intent is relevant to determining the reenacting legislature's intent, "to the extent that [it] naturally give[s] rise to — or tend[s] to refute—inferences regarding" such intent. 138 S. Ct. at 2327. In *Abbott*, the Supreme Court made clear that the law in question withstood an *Arlington Heights* challenge only because the reenacting legislature had not "carried forward the effects of any discriminatory intent on the part of the" legislature that had initially enacted a racist law. *Id.* at 2325. The Court distinguished *Hunter v. Underwood*, 471 U.S. 222 (1985), where "amendments [to a racist law] did not alter the intent" of the law — and the law was therefore unconstitutional. *Abbott*, 138 S. Ct. at 2325. And the Court upheld the law in question only because the reenacting legislature had engaged with the racism behind the original law and passed a new law explicitly created to "fix the problems identified." 138 S. Ct. at 2329.

Here, the 1952 Congress didn't engage with the 1929 law's racist history at all. It simply shifted the unlawful reentry statute to a different section of the U.S. Code as part of the McCarran-Walter Act's (the Immigration and Nationality Act of 1952 ("INA")) consolidation of immigration laws, tweaking the language to make it easier to prosecute that crime.

Recent Ninth Circuit case law demonstrates the error of the government's view. In *United States v. Rizo-Rizo*, 16 F.4th 1292 (9th Cir. 2021), the Ninth Circuit looked to the Undesirable Aliens Act of 1929 when assessing 8 U.S.C. § 1325, which criminalizes entry (as opposed to reentry). The Ninth Circuit found it important that "the precursor statutes to both § 1325(a) and § 1326(a), which bear substantially similar language to the modern statutes, were enacted together

in 1929 as part of" the Undesirable Aliens Act. *Id*. at 1298. Why? Because "when statutes are enacted shortly after one another and address the same subject and use similar language, that demonstrates Congress's intent that they have the same meaning." *Id*. That is, the Ninth Circuit explicitly tied § 1326 to its "precursor statute," the Undesirable Aliens Act, finding it was "Congress's intent that they have the same meaning." *Id*. It is therefore appropriate for this Court to construe § 1326 by referring to its precursor statute, the Undesirable Aliens Act's unlawful reentry provision, and to find discriminatory intent.

At a minimum, consideration of the discriminatory intent behind the Undesirable Aliens Act's unlawful reentry provision is a relevant consideration when evaluating the discriminatory intent behind § 1326. *Machic-Xiap*, 2021 WL 3362738, at *11–13; *Wence*, 2021 WL 2463567, at *5 (citing *Rogers v. Lodge*, 458 U.S. 613, 624–25 (1982) (considering past laws intended to disenfranchise Black people as evidence of intent that at-large election system was adopted with discriminatory purpose); *see also Hunter*, 471 U.S. at 229 ("[T]he Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks."). Similarly, Judge Du was correct to find that "a prior version of a statute known to be motivated by racial animus may be considered as infecting its present iteration if it was not, in fact, substantially altered." *Carrillo-Lopez*, 2021 WL 3667330 at *10.

**B.    Dr. Kang's evidence confirms the 1952 Congress acted with a discriminatory purpose when it recodified the unlawful reentry statute.**

Because racial animus motivated the 1929 Congress to criminalize reentry under the Undesirable Aliens Act, and because the 1952 Congress simply recodified that law at § 1326 without engaging with its discriminatory intent, there is no need for the Court to assess the McCarran-Walter Act under *Arlington Heights*. The 1952 Congress' recodification of the Undesirable Aliens Act's unlawful reentry statute — without debate on (and with full knowledge

of) the statute's discriminatory intent and disparate impact — establishes the discriminatory intent needed under *Arlington Heights*.

However, should the Court assess the McCarran-Walter Act, the record (particularly as buttressed by Dr. Kang's evidence) demonstrates, by at least a preponderance of the evidence, that racial animus was a motivating factor in the 1952 Congress' recodification of the unlawful reentry statute at § 1326. Such an assessment would require "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including (1) the "historical background of the decision," (2) the "specific sequence of events leading to the challenged decision," (3) the "legislative or administrative history," and (4) any "[d]epartures from normal procedural sequence." *Arlington Heights*, 429 U.S. at 265–68. While Mr. Duron-De Luna presented evidence relating to the racial animus of the passage of INA in his Motion to Dismiss the Indictment, Doc. #25, out of an abundance of caution, Mr. Duron-De Luna presents an analysis of the McCarren-Walter Act based on Dr. Kang's evidence.[2]

### 1. *The first factor (the law's historical background) shows a discriminatory purpose.*

Three particular areas of § 1326's historical background establish its discriminatory purpose. First, the racial animus underpinning the Undesirable Aliens Act of 1929, which informed the 1952 Congress' recodification of the unlawful reentry provision. Second, the anti-Mexican racism that continued from 1929 to 1952, most notably the "repatriation drives" of the Great

---

[2] Dr. Kang's affidavit was attached to the Motion to Dismiss. DE 18-14. An updated version of Dr. Kang's affidavit is attached here to as Exhibit B. Any reference to Dr. Kang's affidavit relates to the updated version attached hereto. Additionally, Benjamin Gonzalez O'Brien, M.A., Ph.D., a professor of political science at San Diego State University, has provided additional evidence relating to the racial animus that infected the Undesirable Aliens Act of 1929 through the enactment of the INA. His declaration is attached hereto as Exhibit C.

Depression and the subsequent Bracero Program.[3] Third, the 1952 Congress' debate and passage of the "Wetback Bill," which included regular use of the racial slur "wetback," just two months before its passage of the McCarran-Walter Act.

The government does not contest the racial animus underpinning the Undesirable Aliens Act, the anti-Mexican racism that continued through 1952, or the repeated use of the racial slur "wetback" by members of Congress just two months before they recodified the unlawful reentry statute at § 1326. Doc. #28, pp.32-33.

To the extent the Court questions whether the historical background leading up to Congress' passage of the McCarran-Walter Act demonstrates racial animus, Dr. Kang addresses that issue thoroughly. As Dr. Kang explains, Senator McCarran was a racist and anti-Semite who drafted provisions barring European Jews' admission to the U.S. in the 1940s. *See* Exhibit B at 18–19 n. 54.[4] He described the threat of immigration as one of the United States being "overrun, perverted, contaminated, or destroyed." *See* Exhibit D. He also worked to ensure the continued vitality of the compromise struck in the Undesirable Aliens Act: granting Anglo business owners access to cheap Mexican and Latin American labor (by weakening border protection and continuing the exemption of Latin America from the national quota system) while ensuring Mexicans and Latin Americans could not become permanent members of the community (through

---

[3] Dr. Kang's updated affidavit provides substantial additional evidence on the Bracero Program, a particularly dark chapter in this country's history. Exhibit B at 6–12. Dr. Kang concludes that "the immigration enforcement policies of the Bracero era powerfully reinforced longstanding racist notions that Mexican migrants deserved admission into the United States not as prospective citizens but instead as a cheap, exploitable, and deportable force." *Id.* at 11.

[4] *See also* the June 19, 2020 letter from Senators Jacky Rosen and Catherine Cortez Masto and Representatives Steven Horsford, Dina Titus and Susie Lee to the Governor of Nevada, Steve Sisola, Nevada Senate Majority Leader Nicole Cannizzaro, and Nevada Assembly Speaker Jason Frierson, describing Senator McCarran's "dark legacy of virulent racism, anti-Semitism, and xenophobia," describing him as "a man who advocated bigotry," and requesting that his statue be removed from the National Statuary Hall Collection. Attached here to as Exhibit D.

various means, including the expanded criminalization of reentry). *See* Exhibit B at 18 – 19. Even the State Department agrees Senator McCarran was motivated to secure passage of the McCarran-Walter Act by concern "that unassimilated aliens could threaten the foundations of American life."[5] As Dr. Kang summarizes it:

> [A]nti-Mexican animus informed the passage of the 1929 Undesirable Aliens Act and its 1952 revision. Racist conceptions of Mexican immigrants as exploitable and deportable farm workers led to the passage of laws that facilitated the labor management needs of southwestern agribusiness. In times of prosperity, agricultural labor programs, such as the Bracero Program, welcomed Mexicans to the United States; in moments of economic crisis, however, laws such as the Undesirable Aliens Act and Sections 275 and 276 of Public Law 414 [§ 1325 and § 1326, the unlawful entry and reentry statutes] could be used to deter prospective arrivals. In short, the 1929 and 1952 criminal penalties for undocumented re-entry reinforced the precarious status of Mexican workers in the US and reflected the racist notion that Mexican migrants were unfit for citizenship.

Exhibit B at 99. Dr. Kang's evidence is consistent with — and builds on — the historical background set out in Mr. Duron-De Luna's motion. It establishes beyond any doubt that the historical background of the McCarran-Walter Act supports a finding that racial animus motivated the 1952 Congress to recodify the unlawful reentry statute at § 1326.

**2. *The second factor (events leading up to the law) shows a discriminatory purpose.***

Two events leading up to the recodification of the unlawful reentry statute at § 1326 were Congress' passage of the "Wetback Bill" two months earlier, and Deputy Attorney General Peyton Ford's use of the racial slur "wetback" in a letter to the Judiciary Committee regarding the unlawful reentry statute evidence a discriminatory purpose.[6] The government does not dispute that "wetback" is a racial slur and was understood as such in 1952, but argues Ford's use of the epithet

---

[5] U.S. Dep't of State, Office of the Historian, *The Immigration and Nationality Act of 1952 (The McCarran-Walter Act)*, https://bit.ly/32d4Y6B.
[6] Statement of Peyton Ford, Deputy Attorney General, May 14, 1951, attached hereto as Exhibit H.

"is limited evidence of Congress's purpose in enacting § 1326" because Ford was not a member of Congress.[7]

Deputy Attorney General Ford was not some fringe figure shooting off a letter to his representative. He was the second-highest-ranking Department of Justice official and was providing "the views of the Department of Justice." Exhibit H at 6 ("This change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act."). Based on his request alone, the 1952 Congress expanded the unlawful reentry statute so that venue would lie wherever a reentering immigrant was found. But for this expansion, the government would have no grounds to prosecute Mr. Duron-De Luna in this district.

Mr. Duron-De Luna maintains the open racism of the man speaking for the Department of Justice is significant. Regardless, Dr. Kang has pointed to instances of Senator McCarran (the man behind the 1952 recodification of the unlawful reentry statute) using the racial slur "wetback." He did so repeatedly, including in Senate committee hearings in 1951 and 1953.[8]

---

[7] While government counsel does not argue "wetback" was ever an appropriate way to refer to Mexicans in this case, elsewhere, her colleagues at the Department of Justice have taken a different tack. In the Opening Brief of its appeal in *Carrillo-Lopez*, the government argues that this highly offensive term was, in the early 1950s, "often used to refer to an undocumented worker from Mexico" and the term has come to be "understood as a 'racial epithet'" only as a result of "linguistic norms chang[ing] over time." *U.S. v. Carrillo-Lopez*, Ninth Circuit Case No. 21-10233, Dkt. Ent. 5 at 48, attached hereto as Exhibit E. The government offers no support for this argument other than its assertion that many people used the term "wetback" in the early 1950s. *Id*. at 48–49. It is not difficult to think of other racial slurs that were once common in this country that were offensive then and remain so now. Common usage in no way suggests the term "wetback" was anything but a racial slur in the early 1950s. As Professor Gonzalez-O'Brien testified in *Carrillo-Lopez*, the "term 'wetback' is one that is racially derogatory [and] was recognized as being racially derogatory at the time."

[8] *See* Exhibit B at 17–18; Hearings before the Subcommittee of the Committee on Appropriations, U.S. Senate, March 25, 1953, at 245–46, attached hereto as Exhibit F; Hearings before the

Even were the Court to agree with the government that Ford's use of the term "wetback" is limited evidence of racial animus because Ford was not a member of Congress, that argument does not carry over to Senator McCarran. Not only was Senator McCarran a member of Congress, he was the driving force behind the McCarran-Walter Act. His open anti-Mexican and Latin American racism is significant evidence of the racial animus that motivated the codification of the unlawful reentry statute at § 1326.

### 3. *The third factor (legislative history) shows a discriminatory purpose.*

The scarcity of legislative history regarding § 1326 does not disqualify Mr. Duron-De Luna's argument. Rather, Dr. Kang shows that Congress' relative silence around the recodification of the unlawful reentry statute cannot be read as suggesting an absence of racial animus. Exhibit B at 19. To the contrary, opponents of § 1326 knew that arguing against the racism underlying that provision would be ineffective because Senator McCarran "regularly wielded his authority to delay and block the passage of any liberal immigration reforms." *Id*.

As Dr. Kang establishes, "[t]hose congressmen who were most likely to attack the racist premises of the nation's immigration laws admitted that such a challenge would fail due to the pervasive racism among their fellow members in Congress and the institutional advantage wielded by the nativists and segregationists." Exhibit B at 23. Or, as Representative Emanuel Celler of New York put it, "I knew that a really liberal immigration bill … had no more chance of being enacted this session than could a bit of butter remain intact on a hot stove." *See id* at 20.

While there was little discussion of the 1952 recodification of the unlawful reentry statute at § 1326, Congress' one change to the law was telling.[9] That one change was to expand the law

---

Subcommittee of the Committee on Appropriations, U.S. Senate, March 8, 1951, at 124, attached hereto as Exhibit "G.

[9] In addition to this change to the unlawful reentry statute, Congress lessened the penalty for unlawful entry (recodified at 8 U.S.C. § 1325) from a felony to a misdemeanor, specifically to

to cover those "found in" the United States, thereby massively extending the scope of the 1929 law. *See* Exhibit B at 21. This change served no purpose other than to make it easier to prosecute the Mexicans and Latin Americans who Congress knew were disparately impacted by the racially motivated law. This legislative history demonstrates that racial animus was a motivating factor in Congress' recodification of the unlawful reentry statute at § 1326.

**4.  *The fourth factor (deviations from procedural norms) shows a discriminatory purpose.***

Examining whether the legislature departed from "normal procedures or substantive conclusions" requires courts to consider any procedural irregularities leading up to the enactment of a law, as well as any illogical or counter-intuitive conclusions in the decision-making process. Here, there were five such departures. First, Congress passed the "Wetback Bill" just two months before enacting § 1326; second, Congress expanded the unlawful reentry statute based on a letter using a racial slur; third, Congress passed § 1326 with little debate despite knowing of its disparate impact on Mexicans and Latin Americans; fourth, Congress obstructed efforts at effective border enforcement; and fifth, Congress rejected INS' proposal for employer penalties to deter unlawful immigration.

Congress passed the "Wetback Bill" just two months before enacting § 1326

Congress' passage of the "Wetback Bill" (two months prior to recodifying the unlawful reentry statute) represents an illogical and counter-intuitive irregularity leading up to the enactment of § 1326. This is because of the incongruity between the stated intent of the "Wetback Bill" and Congress' actual intent, as demonstrated by the language of the statute. While the Bill's stated aim

---

avoid the need to present the case to a grand jury and to deprive defendants of a jury trial. INS pursued this revision because grand juries "typically shared the sentiments of southwestern agribusiness regarding Mexican farm workers and, as a result, often refused to indict." *See* Exhibit B at 22. Over 90% of immigration crimes were "no-billed" in El Paso, Texas, in the late 1940s. *See id*. at 22, n.69.

was to prevent "aliens from entering or remaining in the United States illegally," the law worked to shield employers from prosecution ("for the purposes of this section, employment … shall not constitute harboring").[10] It was obvious then as now that the lure of employment was the primary reason Mexicans were coming to the United States unlawfully. For many reasons, employers are vastly more responsive to deterrence than impoverished immigrants, and the most effective means of deterring "aliens from entering or remaining in the United States illegally" is therefore to punish employers who hire such immigrants. The import here is that the 1952 Congress, despite its avowed interest in limiting unlawful immigration, was in fact furthering the racist compromise introduced by the 1929 Congress: preserving American industry's access to cheap and exploitable Mexican labor while punishing those who provided that labor. As Judge Du found in *Carrillo-Lopez*, the 1952 Congress' "criminalization of Mexican immigrant laborers while shielding employers evidences the racially discriminatory motives and intent of the same Congress who enacted Section 1326 only two months later." *Id*. at *15.

<u>Congress expanded the unlawful reentry statute based on a letter using a racial slur</u>

The 1952 Congress' decision to expand the reach of the unlawful reentry statute based on a letter from the Deputy Attorney General that referred to Mexicans as "wetbacks" is procedurally irregular and evidences racial animus. As Judge Du found in *Carrillo-Lopez*, this sequence of events demonstrates that "[t]he 1952 Congress' silence does not evince a neutral viewpoint but worked to expand the enforceability of an admittedly racist law." *Id.* at *14.

<u>Congress passed § 1326 with little debate despite knowing of its disparate impact on Mexicans</u>

The 1952 Congress' lack of debate regarding § 1326, when Congress knew of the law's disparate impact on Mexicans and when other provisions of the INA were discussed and debated

---

[10] Pub. L. No. 82-283, 66 Stat. 26 (1952).

at length, is an irregularity demonstrating Congress' discriminatory intent. This is particularly the case given that the 1952 Congress expanded the grounds for deportation, restricted discretionary relief from deportation, and expanded the scope of the unlawful reentry provision. As Professor Gonzalez O'Brien testified, the lack of discussion of the unlawful reentry provision of the INA suggests an acceptance of its racist history. The 1952 Congress had full knowledge of the unlawful reentry statute's disparate impact, as Mexicans comprised up to 99% of the tens of thousands of individuals prosecuted and convicted in the years following the law's passage.[11] Despite having every opportunity to examine the unlawful reentry provision's history and clarify it was recodifying that provision for a legitimate, non-discriminatory purpose, the 1952 Congress ignored the express racism behind the original statute and its disparate impact on Mexicans. As Judge Du found in *Carrillo-Lopez*, "[w]hen considered in comparison with the express debate over other racially problematic predecessor statutes, Congress' silence here weighs in favor or establishing" the 1952 Congress was motivated by racial animus—particularly given "its decision to expand the grounds for deportation and carceral punishment, despite its knowledge of the disparate impact of this provision on Mexican and Latinx people." *Id.* at *11, 15.

Congress obstructed efforts at effective border enforcement

As Dr. Kang sets out, "congressional conservatives, particularly southern and western Democrats, played a key role in weakening or blocking immigration enforcement bills." Exhibit B at 15. While leaders of the Immigration and Naturalization Service (INS) repeatedly asked the Appropriations Committee (of which Senator McCarran was a member) for funds to hire more Border Patrol agents and to construct more processing facilities to control the number of unlawful entries, Senator McCarran "worked to remove obstacles to the undocumented crossings of

---

[11] *See also* S. Rep. No. 1515, Apr. 20, 1950, at 654–56. Attached hereto as Exhibit I.

Mexican workers" and "routinely supported reductions in funding for border enforcement operations." *Id.* at 17. Senator McCarran's support of INS budget cuts "defended a widespread system of labor exploitation premised upon racist notions of Mexican migrants as expendable farmworkers." *Id*. Senator McCarran justified a denial of an INS appropriations request by explaining southwestern growers' "desire for these wetbacks" took precedence over the agency's enforcement needs. *Id*. at 18; Exhibit F at 245.[12]

<u>Congress rejected INS' proposal for employer penalties to deter unlawful immigration</u>

As Dr. Kang establishes, INS proposed such sanctions, and the Truman administration published that recommendation in a 1951 report explaining that (as Dr. Kang summarizes it) "American growers created the conditions that drew undocumented workers to the United States in the first place" — and that it was those American growers "rather than the migrants themselves, [who] bear the principal responsibility for the so-called crisis on the border." Exhibit B at 14. But, "[a]s in the 1920s, racist conceptions of Mexican migrants as the ideal agricultural workforce led congressional conservatives to ... reject efficacious employer penalty proposals." *Id.* at 13.[13]

These irregularities demonstrate that it was racial animus—not a race-neutral desire to prevent unlawful immigration—that motivated Congress' recodification of the unlawful reentry statute at § 1326. If Congress' true aim was preventing unlawful immigration, it was illogical and counter-intuitive for it to cut the border enforcement budget and to refuse to sanction employers who hired undocumented immigrants.

* * *

---

[12] See Exhibit B at 18; Exhibit F at 245.

[13] These efforts were led by Senator Allen Ellender of Louisiana, the son of Louisiana plantation owners, a lifelong segregationist and civil rights opponent, and an ally of agribusiness. *See* Exhibit B at 15–16.

Based on the record before the Court in *Carrillo-Lopez* , Judge Du was correct to find "the totality of the evidence shows that the same factors motivating the passage of [the unlawful reentry statute] in 1929 were present in 1952" — meaning, "racial animus was at least one motivating factor behind the enactment of Section 1326." 2021 WL 3667330 at *10, 16. Dr. Kang's additional evidence only underscores that point.

## III. CONGRESS' LATER AMENDMENTS DID NOT CLEANSE THE LAW OF RACIAL ANIMUS

In its response, the government intimates Congress' amendments to § 1326 provide evidence that Congress would have criminalized unlawful reentry regardless of any racially discriminatory motivation from the 1920s. Doc. #28, p.21. In doing so, the government seeks to avoid any "burden … to demonstrate that the law would have been enacted without" the motivating factor of racial discrimination. *Hunter*, 471 U.S. at 228. But subsequent amendments have no bearing on the one relevant question: whether the Congress that ***enacted*** (not amended) the unlawful reentry statute would have done so absent racial animus.

The government's argument misses the distinction between enacting a bill and amending a bill already on the books. Even were the Court to determine that the actions of an amending Congress could theoretically demonstrate the intent behind a law it did not enact, there is no such evidence here. None of the amendments to § 1326 involved Congress reconsidering the decision to criminalize reentry. Quite the opposite. The amendments expanded the pool of individuals who could be punished, stiffened penalties, and limited collateral attacks on removal orders — all ensuring more Mexicans would be incarcerated for more time. As Judge Du found, the amendments "do not reflect any change of Congressional intent, policy, or reasoning, but merely work to increase Section 1326's deterrent value." *Carrillo-Lopez*, 2021 WL 3667330 at *23. The Supreme Court has agreed, noting (with respect to the 1988 amendment) the legislative history

"speaks about, and only about, the creation of new penalties." *Almendarez-Torres v. U.S.*, 523 U.S. 224, 234 (1998). At no point since 1929 has Congress debated unlawful reentry or given any indication it would have criminalized reentry had that law not already been on the books.

Finally, even were the Court to determine one or more of the amending Congresses would have criminalized reentry, none would have done so without the motivating factor of racial discrimination. Dr. Kang thoroughly refutes that claim by developing the record for each of the five amendments, which are contained in (1) the Anti-Drug Abuse Act of 1988; (2) the Immigration Act of 1990; (3) the Violent Crime Control and Law Enforcement Act of 1994 ("VCCLEA"); (4) the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"); and (5) the Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). As Dr. Kang details, these amendments were authored by elected officials from Florida (Senator Lawton Chiles, Senator Bob Graham, and Representative Bill McCollum) working in close conjunction with the Federation for American Immigration Reform ("FAIR") — an anti-immigrant hate group, as designated by the Southern Poverty Law Center — in response to a perceived crisis that the nation had lost control of its borders. Exhibit B at 25.[14] While shifting societal norms made the overt racism of earlier decades unacceptable and the legislative history is therefore less rife with racial slurs, Dr. Kang demonstrates that each amendment to § 1326 was "enacted with a discriminatory purpose." Exhibit B at 1.

### A.      Anti-Drug Abuse Act of 1988.

The Anti-Drug Abuse Act was a legislative centerpiece of President Reagan's War on Drugs. *See* Exhibit B at 44, n.155. The Act took an extraordinarily punitive approach to drug crimes by establishing severe mandatory minimum sentences for drug offenses, expanding the

---

[14]   Southern Poverty Law Center, *Federation for American Immigration Reform*, https://bit.ly/3qgZike.

death penalty for drug crimes, permitting public housing authorities to evict tenants, and revoking public benefits such as student loans. *Id*.

Senator Chiles of Florida, who coordinated with FAIR, was responsible for drafting the immigration provisions of the Anti-Drug Abuse Act. Exhibit B at 38. Those provisions introduced the concept of an "aggravated felony," curtailed the procedural rights of noncitizens, and amended § 1326 to add subsection (b), which enhanced penalties for "criminal aliens" — up to five years imprisonment for those with a prior felony conviction, and up to 15 years imprisonment for those with a prior "aggravated felony" conviction.[15]

Senator Chiles previously expressed concern that "[i]f we do not regain control of our borders ... I think that within ten years, we will not recognize the United States as the United States we see today." *See* Exhibit B at 43. He criticized the Supreme Court for "allowing the alien to have all the constitutional rights of a citizen." *Id*. And he co-sponsored legislation that aimed to reduce the admissions of refugees, rescind "special rights" afforded to undocumented immigrants, and allow the U.S. military to enforce immigration laws "beyond the territorial limits of the United States." *Id*. at 39–41. With the Anti-Drug Abuse Act, Senator Chiles drew immigrants into the ambit of the War on Drugs by establishing new criminal penalties for noncitizens convicted of drug offenses and engaging the INS in the work of drug control. *See* Exhibit B at 44, n. 155. Senator Chiles's focus on the threat of "criminal aliens" came despite the fact that, per the General Accounting Office, there was no objective basis for the belief that "alien involvement in crime is a serious problem." *See* Exhibit B at 46–47.

An ACLU Associate Director testified before the Senate that Senator Chiles' proposals "misperceive the problem" and "may be counterproductive in terms of our immigration policy

---

[15] *See* Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988).

objectives," noting in particular that "the problem presented by the failure to deport 'illegal alien felons' " was down to "INS' inability to adequately identify and apprehend persons subject to deportation" — and would not be helped by amending § 1326. *See* Exhibit B at 46 – 47.[16] Representative Shirley Chisholm of New York, the chair of the Congressional Black Caucus' task force on refugees, argued, "We cannot hope to retain the respect and admiration of the world if our immigration and refugee policies are discriminatory on the basis of ... skin color." Exhibit B at 41–42. Despite this criticism, the Act passed, "creat[ing] the foundation for the ensuing amendments to the criminal penalty provisions of the nation's immigration laws." *Id*. at 50.

### B.    Immigration Act of 1990

The Immigration Act of 1990 amended § 1326 by authorizing greater fines,[17] and the legislative history for this amendment is "very thin." Exhibit B at 51. Senator Bob Graham of Florida sponsored the amendment, and Dr. Kang notes that Senator Graham "like the drafters of the [Anti-Drug Abuse Act], worked to yoke the nation's immigration agencies in the work of criminal law enforcement, particularly to make use of these agencies' broad legal authority to detain and expel unwanted migrants in the war on drugs."

### C.    Violent Crime Control and Law Enforcement Act of 1994

In 1994, Congress passed the VCCLEA, a bill recognized as a "major driver of mass incarceration" of both citizens and noncitizens. *See* Exhibit B at 80. The VCCLEA included an amendment to § 1326 increasing penalties and including those with misdemeanor convictions in the heightened penalty category.[18]

---

[16] Statement of Wade J. Henderson before the Subcommittee on Immigration and Refugee Affairs of the Committee on the Judiciary, U.S. Senate, April 14, 1988, at 38–40, 43. Attached hereto as Exhibit J.

[17] *See* Pub. L. 101-649, title V § 543(b)(3), 104 Stat. 5059 (Nov. 29, 1990).

[18] Specifically, the VCCLEA increased the imprisonment time for those with a prior felony conviction from up to 5 years to up to 10 years, and for those with a prior aggravated felony

As Dr. Kang sets out, Congress passed the VCCLEA at a time when this country was experiencing "the virulent xenophobia that emerged as a result of an economic recession ... and increases in both the legal and undocumented immigrant population." Exhibit B at 66. Opinion polls showed the highest level of hostility toward immigrants "since the heyday of nativism in the 1920s." *See id.* at 67. As The New York Times put it, "Americans have felt freer to voice a rude inhospitality that at other times they might have considered racist or at least xenophobic." *See Id.* at 67. Right-wing intellectuals published best-sellers promoting white supremacism and nativism, while arguing Mexican immigrants — unlike European immigrants — were incapable of assimilation. *See id.* at 67–68. Patrick Buchanan (the presidential candidate and political commentator) revived the eugenicist notion of "race suicide," warning that white Americans would become a minority given Mexican birth rates. *See id.* at 68.[19] Capturing the popular mood, the headline on an April 1990 cover of Time magazine depicted an image of an American flag composed of black, brown, and yellow stripes — and asked, "What will the U.S. be like when whites are no longer the majority?" *See id.* at 66–67.

It was against this backdrop that Senator Harry Reid of Nevada proposed an amendment to § 1326 that would have barred any noncitizen from "challeng[ing] the validity of the deportation

---

conviction from up to 15 years to up to 20 years; included persons with "three or more misdemeanors involving drugs, crimes against the person, or both" in the group with the penalty of up to 10 years imprisonment; and broadened the definition of 'deportation' to include "any agreement in which an alien stipulates to deportation during a criminal trial under either Federal or State law." *See* Pub. L. 103-322, title XIII § 130001(b), 108 Stat. 2023 (Sept. 13, 1994).

[19] The idea of "race suicide" has more recently been cast as the "Great Replacement Theory." According to the Anti-Defamation League, over half of the extremist murders committed in the U.S. over the past decade were carried out by people espousing such white supremacist ideologies. *See* John Eligon, *The El Paso Screed, and the Racist Doctrine Behind It*, N.Y. TIMES (Aug. 7, 2019), https://nyti.ms/3p49FZ9.

order." *See* Exhibit B at 78 – 79.[20] Senator Reid's proposed amendment would have also revoked birthright citizenship for children born to undocumented immigrants. *See* Exhibit B at 79. Senator Reid later apologized for his proposed amendment, calling it "the biggest mistake I ever made," and blaming interest groups that had "convinced us that the thing to do would be to close the borders between Mexico and the United States; in effect, stop people from coming across our borders to the United States." *See id*. at 79.

Senator Reid's proposed bar on challenging the validity of removal orders in § 1326 prosecutions did not become part of the VCCLEA, although a later amendment — discussed below — would restrict such challenges. The amendment to § 1326 that did pass was authored by Representative Bill McCollum of Florida. Representing a deeply conservative and predominantly white district in central Florida, Representative McCollum dedicated his career to the reconfiguration of this country's criminal and immigration laws. Exhibit B at 54.[21] His legislative agenda "reflected an aversion towards Latin American migrants," and his "sustained attack on Latin American migration led many observers to criticize his immigration policy proposals for their racially discriminatory impacts and the racist ideas that informed them." *Id*. at 56. He co-sponsored and endorsed measures drafted by FAIR, and he spoke at a FAIR-sponsored congressional briefing. *See id*. at 57 – 58. He sought to end challenges to deportation orders, to

---

[20] This was six years after the Supreme Court had held that, if § 1326 "envisions that a court may impose a criminal penalty for reentry after any deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, the statute does not comport with the constitutional requirement of due process." *United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987).

[21] In criminal law, Representative McCollum sought to limit habeas appeals in capital cases, end the exclusionary rule, abolish parole, pass three-strikes laws with mandatory life sentences, and increase the incarceration of children. Exhibit B at 55. As Representative McCollum said on the House floor, "[T]hese violent youthful offenders, young people 12, 13, 14, 15 years of age. We need to take those very violent criminals, whatever age they are off the streets, lock them up and throw away the key." *Id*.

curtail the rights of asylum seekers (he claimed up to half of the entire population of Mexico would come to the United States if allowed), and to enhance penalties for unlawful entry and reentry. *See id*. at 55–56, 58. He co-sponsored resolutions to amend the Constitution to deny birthright citizenship to the children of undocumented immigrants and to make English the official language of the United States. *See id*. at 58, 60.

### D.    Antiterrorism and Effective Death Penalty Act of 1996

Because Representative McCollum believed the VCCLEA had "not gone far enough," he introduced a bill to limit collateral attacks on removal orders in § 1326 prosecutions. *See* Exhibit B at 83. Two other amendments to § 1326 were authored by Representative Mark Foley of North Carolina, who had previously introduced a constitutional amendment to deny birthright citizenship to the children of undocumented immigrants. Exhibit B at 60, 84.[22] All of those amendments became part of AEDPA, which was passed into law in 1996.[23]

It's important to understand AEDPA in its historical context. In October 1994 — one month before the midterm elections — President Clinton faced pressure to take further action against border crossings and launched Operation Gatekeeper. Exhibit B at 81. This operation placed hundreds of federal officers on the border as a "visible show of force," with the predictable result that migrants altered their routes and attempted dangerous journeys through the inhospitable desert, transforming the Arizona borderlands into a "killing field." *See id*. at 81.

Despite President Clinton's efforts, the Republicans took control of the House in January 1995. FAIR was elated and began promoting its immigration agenda aggressively. Exhibit B at 90.

---

[22] These amendments established penalties for individuals who reenter after being excluded under § 1225(c) and mandated incarceration for individuals who reenter after being deported by judicial order. *See* 8 U.S.C. §§ 1326(b)(3), (c).

[23] *See* Pub. L. 104-132, title IV §§ 401(c), 438(b), 441(a), 110 Stat. 1267-68, 1276, 1279 (Apr. 24, 1996).

As the head of FAIR put it, "We expected to see the tightening up of the whole deportation process, eliminating needless appeals, presumption in favor of detention, curtailing of asylum, and summary exclusion at the border." *See id*. at 90.

FAIR got what it expected. In June 1995, Speaker Newt Gingrich's Task Force on Immigration Reform proposed dramatic increases in "resources to prosecute deported felons who illegally re-enter" — along with streamlined deportation proceedings, mandatory prosecution of certain noncitizens, an end to birthright citizenship for the children of undocumented immigrants, and the denial of public benefits (including public education) to undocumented immigrants. Exhibit B at 82, n. 312.

When Congress took up debate on AEDPA, "both Democrats and Republicans strove to win the votes of [the] anti-immigrant electorate in anticipation of the 1996 elections." Exhibit B at 87. Representative Gerald Solomon of New York made racist complaints about the number of children born to undocumented immigrants. *See id*. at 87. Representative Lamar Smith of Texas urged passage of the bill by stressing that it would cut down on challenges to deportation orders. *See id*. at 84. And Representative McCollum explained the amendment to § 1326 would limit challenges to predicate removal orders. *See id*.

Congress passed AEDPA, and President Clinton signed it into law. Along with the aforementioned amendments to § 1326, AEDPA expanded the offenses considered aggravated felonies, eliminated long-term residency as a defense to deportation, expanded the pool of undocumented immigrants who could be deported expeditiously, and authorized wiretap authority for immigrant-smuggling investigations. Exhibit B at 83–84.

Three years later, even Representative McCollum would concede AEDPA "went too far." *See* Exhibit B at 89. As he put it, "We are a just and fair nation and must strike a just and fair

balance in our immigration laws." *See id*. Representative McCollum gave two examples of noncitizens treated unfairly by the law. Tellingly, neither were Mexican: one was Bob, a Scotsman deported for a dated crime; the other was Robert A. Broley, the son of the Republican Party treasurer in Orange County, Florida, who was convicted on felony fraud charges and deported to Canada. *See id*. at 90, n. 338.

### E.    Illegal Immigration Reform and Immigrant Responsibility Act of 1996

Later in 1996, Representative Lamar Smith of Texas (a member of FAIR's National Advisory Board) introduced IIRIRA, also known as "The Mexican Exclusionary Act." *See* Exhibit B at 82, n. 310, 91. Representative Smith argued "there exists an inchoate sense among the American people that our culture is changed by immigration"— and promised IIRIRA would correct laws that viewed "immigration as a form of 'civil right' that is owed to an unspecified portion of the world's population without regard to objective criteria of selection based in the national interest." *See id*. at 91. It was widely understood that Cordelia Strom, formerly of the Immigration Reform Law Institute (FAIR's litigation arm), drafted the bill for Representative Smith. *Id*. at 90–91. In fact, many considered that "Lamar Smith, in effect, turned the congressional immigration subcommittee over to FAIR." *See id*. at 91.

IIRIRA amended § 1326 by broadening its scope to include those removed (as opposed to deported), and authorizing up to 10 years imprisonment for noncitizens who reenter after being removed while on parole, supervised release, or probation for a nonviolent offense.[24] In addition to these amendments, IIRIRA eliminated family reunification visas for siblings and adult children, capped humanitarian admissions, limited asylum claims, expanded the definition of an aggravated felony, and expedited the removal of so-called "criminal aliens." Exhibit B at 92.

---

[24] *See* Pub. L. 104-208, div. C title III §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324(a), 324(b); 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996).

Opponents of IIRIRA drew attention to the racial animus underlying the bill. Representative Xavier Becerra of California (now the Secretary of Health and Human Services) wondered why the bill targeted border-crossers, considering the majority of undocumented persons in the United States were visa overstays. *See* Exhibit B at 93. Representative Jerrold Nadler of New York argued the bill's "mindless cruelty" and its "good old-fashioned Xenophobia" had "nothing to do with legitimate protection of our borders." *See id*. at 92. But, as Dr. Kang notes, "the pressure to appear tough on undocumented immigration was particularly acute given that 1996 was an election year," and the bill was passed into law. *Id*. at 94 – 95.

IIRIRA had its intended effect. Following its passage, deportations from the United States jumped precipitously — massively increasing the pool of individuals who could be charged with violations of § 1326 should they return.[25] It is no coincidence that criminal immigration proceedings then jumped tenfold. *See* Exhibit B at 96.

* * *

Judge Du was correct to hold that § 1326's amendments "never substantively altered the original provision," "did not change the operation of Section 1326," and "do not reflect any change of Congressional intent, policy, or reasoning, but merely work to increase Section 1326's deterrent value." *Carrillo-Lopez*, 2021 WL 3667330 at *23. These amendments are irrelevant to the analysis of whether the unlawful reentry statute violates equal protection.

Regardless, it's clear § 1326's amendments "demonstrate that lawmakers made no effort to examine and acknowledge the legacy of racism that informed the passage of" the Undesirable

---

[25] In 1994, there were just over 50,000 removals. In just two years, that number had more than doubled. By 2019 (the latest year with records), there were nearly 360,000 removals. Dep't of Homeland Sec., Aliens Removed or Returned: Fiscal Years 1892 to 2019 (2009), https://bit.ly/3Eb0Sci.

Aliens Act of 1929 and its recodification as § 1326 — and that they in fact perpetuated the "racism that informed the passage of these earlier laws." Exhibit B at 50. As Dr. Kang concludes, each amendment was "enacted with a discriminatory purpose." *Id*. at 1. These amendments in no way cleansed § 1326 of its racial animus.

## IV. SECTION 1326 DISPARATELY IMPACTS MEXICANS AND LATIN AMERICANS

Having established discriminatory intent, Mr. Duron-De Luna must show disparate impact to make out an equal protection violation. *See Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). The government misunderstands what such a disparate impact showing entails. *See* DE 22:16 (arguing the numbers are a product of geography, not discrimination); *Machic-Xiap*, 2021 WL 3362738, at *11 ("The Government misdescribes disparate impact. That an innocent explanation may exist for the disparity does not eliminate the disparity."); *Wence*, 2021 WL 2463567, at *9 ("The Government's interpretation of disparate impact would seem to require a party challenging a law under the *Arlington Heights* intent test to show not only that a law had a discriminatory purpose, but also that it was discriminatorily applied."). Under *Arlington Heights*, the disparate-impact inquiry is separate and distinct from that of discriminatory intent. For the disparate impact inquiry, the question is simply a matter of numbers: whether the law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (cleaned up); *Sanchez-Felix*, 2021 WL 6125407, at *4 ("The Court finds that defendant has shown that the illegal reentry statute disparately impacts Mexican and Latin American defendants because, between 2013 and 2019, over 98% of defendants in illegal reentry cases were Hispanic.").[26]

---

[26] That question concerns the law's impact in the current day. *See Hunter*, 471 U.S. at 233 (finding disparate impact because the law "continues to this day" to have such an effect).

This distinction matters because it shapes the inquiry. While the assessment of discriminatory intent involves parsing legislative history, the disparate impact inquiry is purely mathematical. Courts look to the numbers without any need to search for an explanation behind disparities. The sole question here is, does § 1326 disparately impact Mexicans and Latin Americans? The answer is clear: yes, it does. *See Sanchez-Felix*, 2021 WL 6125407, at *4. The government does not dispute that, from the enactment of the Undesirable Aliens Act up to today, 85 to 99 percent of unlawful reentry prosecutions have been brought against Mexicans and Latin Americans. The *Machic-Xiap* court described this as "strong evidence" of disparate impact. 2021 WL 3362738 at *10. And, as Judge Du noted, "[t]hese numbers are in line with other successful *Arlington Heights* challenges." *Carrillo-Lopez*, 2021 WL 3667330 at *6. Mr. Duron-De Luna has made the necessary showing. *See Sanchez-Felix*, 2021 WL 6125407, at *4.

The government's response is confused. While the government appears to appreciate that disparate impact and discriminatory intent are separate inquiries, Doc. #28, p.20, it conflates them. For example, the government characterizes Mr. Duron-De Luna's motion as "cit[ing] the high percentage of illegal-reentry prosecutions of Mexican and [Latin American] defendants as proof of disparate impact ***and discrimination***," and argues the disparate impact is not caused by racial animus. *Id*. (emphasis added). To be clear, Mr. Duron-De Luna's arguments concerning disparate impact have nothing to do with discrimination or racial animus.

The government's confusion carries over to its misreading of *Regents*, 140 S. Ct. 1891. There, the Supreme Court found that a showing of disparate impact alone (i.e., without a separate showing of discriminatory intent) does not make out an equal protection claim. Chief Judge Brimmer summarized this finding and followed it. *Sanchez-Felix*, 2021 WL 6125407, at *5. As did Judge Du. *Carrillo-Lopez*, 2021 WL 3667330 at *6.

Having confused the issue, the government attempts to explain away the overwhelming evidence of disparate impact as "a feature of geography, not discrimination." Doc. #28, p.20. But the disparate impact analysis is not concerned with the reason for the disparity. The *Machic-Xiap* court correctly summarized the government's error in rejecting the same argument: "The Government misdescribes disparate impact. That an innocent explanation may exist for the disparity does not eliminate the disparity." 2021 WL 3362738 at *11.

To make a showing of disparate impact, Mr. Duron-De Luna only needs to show that § 1326 "bears more heavily" on Mexicans and Latin Americans. He has done that.

## V.   REQUEST FOR AN EVIDENTIARY HEARING

Chief Judge Brimmer held that "[a] hearing must be held only if the moving papers allege facts with sufficient definiteness, clarity and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved." *Sanchez-Felix*, 2021 WL 6125407, at *8. Mr. Duron-De Luna has made a "*prima facie* case" of both (1) the racial animus underlying – and animating – the enactment of the Undesirable Aliens Act of 1929, the INA, and the INA's subsequent reenactments/amendments, and (2) those laws have disparate impact on Mexican and Latin American defendants. That is all that is required to prove a violation of the Fifth Amendment's equal protection guarantee. *See Arlington Heights*, 429 U.S. at 265–268. Accordingly, "the burden [now] shifts to the government to show that 'the same [governmental] decision would have resulted even had the impermissible purpose not been considered.'" *Sanchez-Felix*, 2021 WL 6125407, at *8 (quoting *Arlington Heights*, 429 U.S. at 270 n.21).

To rebut the government's unfounded claim that § 1326 and its amendments were free of racial animus, Mr. Duron-De Luna intends to present the testimony of Dr. Kang[27] and Dr. Gonzalez

---

[27] Dr. Kang's  curriculum vitae is attached hereto as Exhibit K.

O'Brien.[28] While Dr. Kang's affidavit and Dr. Gonzalez O'Brien's declaration are thorough and convincing, Mr. Duron-De Luna respectfully asks this Court to set an evidentiary hearing so Dr. Kang and Dr. Gonzalez O'Brien may provide oral testimony in support of their writings. This would allow Dr. Kang and Dr. Gonzalez O'Brien to supplement their writings as necessary and answer questions from this Court.

## VI.    CONCLUSION

With this history, it's unsurprising the government asks this Court not to look behind the curtain. But the Constitution demands that courts examine statutes for discriminatory intent and disparate impact in order to ensure equal protection under the law. Like the district courts in Nevada, Oregon, and Washington have already done, this Court should hold an evidentiary hearing. Thereafter, the Court should grant Mr. Duron-De Luna's motion to dismiss.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


*/s/ Matthew K. Belcher*
MATTHEW K. BELCHER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Matthew_Belcher@fd.org
Attorney for Defendant

---

[28] Dr. Gonzalez O'Brien's curriculum vitae is attached hereto as Exhibit L.

## CERTIFICATE OF SERVICE

I certify that on July 1, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Albert C. Buchman, Assistant U.S. Attorney
Email: Al.Buchman@usdoj.gov

Brian Dunn, Assistant U.S. Attorney
Email: Brian.Dunn@usdoj.gov

and I will serve the document or paper to the following non-CM/ECF participant in the manner indicated:

Oscar Duron-De Luna (via mail)

*/s/ Matthew K. Belcher*
MATTHEW K. BELCHER
Assistant Federal Public Defender
Office of the Federal Public Defender