***United States v. Duron-De Luna***

United States District Court
District of Colorado

Case No. 22-cr-00018-RMR

---

**Exhibit A**

U.S. Attorneys' Bulletin



# Prosecuting Illegal Reentry Cases Where Evidentiary Documents Are Missing or Incomplete: Everything You Never Wanted to Know About A-Files and Removal Documents and Were Not Afraid Not to Ask

*Louie Uhl*
*Assistant United States Attorney*
*District of Arizona*

## I. Introduction—Illegal Reentry of Removed Alien

The first version of Title 8 United States Code (U.S.C.) § 1326, Reentry of Removed Alien, was codified by the seventy-first Congress on March 4, 1929.[1] Over time, the rate of prosecutions under the statute fluctuated. However, prosecutions over the last several decades have spiked dramatically, "from 690 cases in 1992 to 19,463 in 2012."[2] The five southern border districts[193] have predictably seen the highest volume of Illegal Reentry prosecutions. In 2016, the District of Arizona saw the highest number of Illegal Reentry prosecutions, followed by the District of New Mexico, the Southern and Western Districts of Texas, and the Southern District of California.[4] However, even in a non-border district like the District of Oregon, nearly one of six federal prosecutions in 2014 was for Illegal Reentry.[5]

### A. Illegal Reentry Elements

Illegal Reentry prosecutions rely heavily upon documentary evidence and tend to be relatively simple. The statute consists of the following elements: that the defendant: (1) "is an alien"; (2) "had [previously] been removed"; (3) "was subsequently found in the United States"; and (4) "did not have the Attorney General's permission to reapply for admission."[6] Illegal Reentry cases can be prosecuted under three theories: "'enter,' ['found in,' and] 'attempt to enter,'" the latter of which encompasses the

[1] Act of Mar. 4, 1929, Pub. L. No 70-1018, ch. 690, § 2, 45 Stat 1551 (codified at 8 U.S.C. § 180 (1929 sup. III)) (repealed 1952).
[2] Michael T. Light, et al., *The Rise of Federal Immigration Crimes*, PEW RES. CTR.: HISP. TRENDS (Mar. 18, 2014).
[3] The Southern District of California and the District of Arizona are in the Ninth Circuit; the District of New Mexico is in the Tenth Circuit, and the Western and Southern Districts of Texas are in the Fifth Circuit. While Illegal Reentry cases are obviously tried nation-wide, the border Districts predictably see the highest volume.
[4] *See* Barbara Hollingsworth, *Criminal Prosecutios for Illegal Entry Up 7.7% in 2016*, CNSNEWS.COM (Aug. 10, 2016, 10:41 AM).
[5] *See* Andrew Clevenger, *Illegal Reentry Prosecutions Increase*, THE BULLETIN (Sept. 4, 2014).
[6] United States v. Parga-Rosas, 238 F.3d 1209, 1211 (9th Cir. 2001).

additional element of an overt act toward the goal of reentry.[7] Because so many Illegal Reentry cases occur in bulk in the southern border districts and are relatively simple to prove, the overwhelming majority are resolved by a plea of guilty. By one 2014 estimate, "in cases where Illegal Reentry was the lead charge, [99.8%] of those convicted pled guilty, [waiving their right] to trial."[8]

## B. Common Illegal Reentry Issues

Illegal Reentry prosecutions can present challenges. Perhaps, the most common hurdle arises when a defendant moves to dismiss the indictment and argues that it is based upon a defective removal order.[9] Such motions, enmeshed as they are in the byzantine world of immigration law, can become quite complex and involved. Other issues tend to relate to either proof of the defendant's alienage (an element that can become mired in the equally complex area of derived citizenship) or proof of the defendant's intent to actually enter the United States (an issue generally arising when an alien is encountered at or just near the border). Aside from these defenses or substantive issues, a far more mundane but equally challenging obstacle can arise—when documents integral to the successful prosecution of Illegal Reentry cases are lost or missing. This article is meant to provide insight, guidance, and strategy for a prosecutor facing this challenge. Prosecuting Illegal Reentry cases is not particularly glamorous. Doing so when key documents are missing or lost can prove a slog. A working knowledge of the removal process is instrumental to successfully prosecute an Illegal Reentry case where important documents are lost or missing. Stitching together evidence can be a down and dirty, squint-eyed, sleeves rolled-up, nuts-and-bolts look under the hood of the process of removing hundreds of thousands of illegal aliens from the United States a year. The Immigration and Customs Enforcement (ICE) alone removed a total of 240,255 aliens in Fiscal Year 2016.[10]

## C. Creation and Organization of the Department of Homeland Security (DHS)

First, a cursory explanation of some of the different government agencies and organizations referenced in this article is in order. Upon the post-9/11 shock to the United States' internal defense system, the 107th Congress created the Department of Homeland Security (DHS) with the passage of the Homeland Security Act on November 25, 2002.[11] The fledgling agency commenced operations on March 1, 2003.[12]

Subordinate agencies of DHS include Customs and Border Protection (CBP), which, in turn, is the parent agency of the United States Border Patrol (USBP) (which patrols the border and the interior of the United States adjacent to the border) and the Office of Field Operations (OFO) (which operates the ports of entry along the nation's borders and at international airports). Also falling under the DHS umbrella is the United States Customs and Immigration Service (USCIS), which essentially shoulders the same responsibilities, functions, and duties of the former Immigration and Naturalization Service (INS), dissolved in the wake of the post-9/11 restructuring. Another subordinate organization is ICE. ICE is further divided into different components, including Enforcement and Removal Operations (ERO). "ERO's mission is to identify[,] arrest[,] and remove aliens who present a danger to national security or

---

[7] United States v. Pacheco-Medina, 212 F.3d 1162, 1165 (9th Cir. 2000) (citing United States v. Hernandez, 189 F.3d 785, 789 (9th Cir. 1999); and citing United States v. Santana-Castellano, 74 F.3d 593, 597 (5th Cir. 1996); also citing United States v. Rodriguez, 26 F.3d 4, 8 (1st Cir. 1994)).
[8] TRAC Immigration, *Despite Rise in Felony Charges, Most Immigration Convictions Remain Misdemeanors*, TRAC (June 26, 2014).
[9] *See* 8 U.S.C. § 1326(d)(3) (2012).
[10] *FY 2016 ICE Immigration Removals*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT (last visited July 17, 2017).
[11] Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (codified as amended in scattered sections of 5, 6, 18, 44, and 49 U.S.C.).
[12] *Creation of the Department of Homeland Security*, DEP'T HOMELAND SECURITY (Sept. 24, 2015).

are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of our immigration laws and our border control efforts."[13] A sub-unit of ERO is the ICE Air Operations (IAO), which "provid[es] air transportation services to ERO's [twenty-four] field offices[] to facilitate the movement of aliens within the United States and the removal of aliens to destinations worldwide."[14]

### D. Databases and Forms

Several DHS agencies use their own databases. Border Patrol uses the E3 database, OFO uses Sigma, and ICE uses Eagle. However, these systems provide access to the same information, and are a trove of information, warehousing such documents as the G-166 (Report of Investigation), the I-44 (Report of Apprehension or Seizure), and the I-213 (Record of Deportable Alien). These forms, in turn, can help piece together missing parts of an alien's immigration chronology. Any alien encountered by DHS officials will be identified in a G-166, even if that alien was never criminally prosecuted or even arrested (for example, the identity of a smuggled alien can be included as part of a G-166 created for the smuggler). The I-44 details DHS seizures of contraband and the identity of aliens arrested in conjunction with those seizures, even if the seizure led to no prosecutions or even arrests. For Illegal Reentry prosecutions, many case agents, combing through these databases, learn that an alien was previously encountered—even if not arrested—by Border Patrol agents while the alien was smuggling aliens or contraband. Details gleaned from these documents may also help identify the agent or officer who witnessed or verified the defendant's removal—information which, under the right circumstances, may be admissible as proof of the defendant's lack of mistake or his modus operandi under Federal Rule of Evidence 404(b). There is more on that below.[15]

## II. Alien Files (A-Files)

Proof of all elements comprising Illegal Reentry (except the alien's entry, for reasons discussed below) heavily rely upon the evidence compiled in the defendant's Alien File (A-File). A-Files are individual files identified by the subject's Alien Registration Number (A-Number). "An A-Number is a unique personal identifier assigned to a non-citizen."[16] Trying an Illegal Reentry case without these A-File documents requires at least a general understanding of the process of A-File construction, transportation, and maintenance. Assistant United States Attorneys (AUSA) in high-volume Illegal Reentry districts are more familiar with A-Files than they would ever have dreamed while in law school. Upon the filing of an Illegal Reentry complaint, the archive seems to magically appear from the case agent, wholly intact and ready for use, like the morning newspaper on a driveway at dawn. But even prosecutors who juggle a heavy Illegal Reentry caseload generally have little reason or opportunity to know much about the creation, storage, and maintenance of these files that are so integral to the successful resolution of their Illegal Reentry caseload.

### A. Purpose, Creation, and Maintenance of A-Files

Every alien encountered by DHS (or its predecessor agencies) is issued an A-Number. An alien's A-Number is a unique personal identifier assigned to that alien only, and is affixed to the alien's A-File. A-Files hold a historical wealth of data, including visas, photographs, applications, affidavits, correspondence, and more.[17] Indeed, A-Files for older aliens with significant immigration and criminal histories in the United States chronicle literally entire decades of their lives. Because Illegal Reentry

[13] *ICE Air Operations*, U.S. Immigr. & Customs Enforcement (last visited June 20, 2017).
[14] *Id.*
[15] Fed. R. Evid. 404(b).
[16] *A-Files Numbered Below 8 Million*, U.S. Citizenship & Immigr. Services (last updated Feb. 9, 2016).
[17] *About A-Files*, U.S. Citizenship & Immigr. Services (last updated Feb. 9, 2016).

prosecutions are so reliant upon this archived evidence, an A-File is crucial for successful Illegal Reentry prosecutions. But what options are available to a prosecutor when a defendant's A-File is lost or missing? Or (more commonly) when the file is available but lacks vital documents?

While the process of ordering A-Files may differ within the various sub-units of DHS, generally, USCIS creates blank files with pre-designated A-Numbers and bar codes and disburses them as needed to DHS facilities (such as Border Patrol Stations, Ports of Entry, and ICE field offices). Agents handle these blank A-Files with extreme care. Border Patrol stations store blank A-Files along with the station's firearms and ammunition in their locked station armories, indicating the files' important and sensitive nature. DHS personnel create an alien's A-File upon that alien's first encounter with immigration officials. For example, Border Patrol agents who are assigned to screening recently arrested aliens, and who find that an alien has no previous immigration contacts in the United States, will retrieve a blank A-File from the armory and begin the process of creating that alien's A-File. Thus, while all aliens are issued A-Numbers and A-Files, more accurately, all A-Numbers and A-Files are subsequently issued aliens. When the arresting agency that created or last possessed the A-File no longer needs it, it is transported to National Records Center (NRC), which is the main storage facility for archived A-Files.

Upon the decision to criminally prosecute a recently arrested alien, the alien's A-File is ordered from NRC. The prosecutions unit for a Border Patrol Sector will normally designate an agent or a Mission Support Specialist as a Responsible Party Code (RPC), whose duties include ordering A-Files from File Control Offices (FCOs). Every FCO is able to transfer files between RPCs. Once a case agent receives and possesses the A-File, the agent can scour it for relevant documents. Processing agents or officers will also prepare the requisite documents related to the alien's instant arrest, such as the verification or witnessing document to be completed at the time of the alien's future removal and the FD-249 (fingerprint card) from the instant arrest. Generally, documents relating to the instant arrest (or ensuing prosecution) will be affixed to the left side of the A-File. However, as with all routine administrative and clerical functions, this procedure is not scrupulously followed.

### B. Temporary Files (T-Files)

Upon the arrest of an alien, agents create Temporary Files (T-Files), which contain the current event's paperwork (including the field addenda of arresting agents, the reports of processing agents, record checks, and removal documents to be completed and served in the future). This is standard operating procedure for Border Patrol prosecutions units because Border Patrol nearly always arrests aliens at or near their point of entry along the border, and have no reason to have a recently arrested alien's A-File in their custody. The A-File for an alien just arrested, if one already exists, will be stored at NRC, as explained above. The alien's removal document will be transported with the T-File to the port of entry of the alien's pending removal. Upon the signing and execution of the relevant documents, the T-File will then be sent back to the processing station until a future request for transfer. From there, NRC staff in Missouri logs each T-File into the National File Tracking System (NFTS) and monitors its physical location on a national level. When the A-File and T-File cross paths, either with ICE or at a Border Patrol prosecutions unit when the A-File is requested from NFTS, the current case agent receives the T-File and merges its contents with the A-File. Therefore, if a removal document (particularly a very recent removal) cannot be found, it very well could still be in the T-File.

## III. Pursuing Alternate Courses of Action When the A-File or Removal Documents Are Unavailable

Imagine now that the complaint for an Illegal Reentry case has been initialed and filed, and it looks to be a relatively simple matter. But the case agent delivers grim tidings to the prosecuting AUSA: the defendant's A-File is unavailable. It is either lost or missing, or more commonly, the defendant's removal document is not part of the A-File. USCIS designates different definitions for "lost" and

"missing." "Lost" A-Files are those destroyed, not received after transit, or not verifiably under government control. "Missing" A-Files cannot be located but are presumed to be within government control.[18] These are distinctions without differences for our purposes. A lost or missing A-File is unavailable for prosecution and leads the prosecuting AUSA to important decisions: whether to pursue alternate charges or to pursue the illegal reentry charge, and if so, how to go about piecing together the case.

Prosecuting an Illegal Reentry case without an A-File or removal documents can prove extremely time-consuming and difficult. Therefore, depending upon the severity, length, and context of an alien's criminal and immigration history, the prosecutor may search for alternate charging options. Such decisions are situationally dependent upon the alien's criminal and immigration history, the circumstances of the alien's arrest or encounter with local authorities or DHS officials, and the prosecuting office's contacts and relationships with local law enforcement and local county or district attorneys.

## A. State or Local Charges

State or local charges may provide a tidy resolution. An alien in possession of fraudulent documents (especially documents issued by the state of the alien's arrest, such as a driver's license or state-issued identification) can face stiff penalties under local or state law. For example, in Arizona, forgery is a Class 4 felony with the possibility of 2.5 years in prison. If the alien was encountered by local law enforcement while engaged in other illegal activity (such as DUI, domestic violence, burglary, etc.,) the local district or county attorney's office can dispose of the matter. In such cases, local criminal charges may be the easiest resolution and will also allow DHS to obtain a fresh removal of the alien and begin reconstructing the alien's A-File.

## B. Illegal Entry

Should a state or local prosecution prove unavailable, prosecution under 8 U.S.C. § 1325 may be an option, although one with limitations.[19] Like its Illegal Reentry counterpart, the first version of the Illegal Entry statute was enacted by Congress on March 4, 1929.[20] Importantly, Illegal Entry, unlike its Illegal Reentry counterpart, is not a "continuing offense," meaning that the five-year statute of limitation begins to toll upon the defendant's entry, regardless of whether the government has reason to know of that entry.[21] For this reason, Illegal Entry is almost exclusively applied to aliens encountered within border districts at or immediately near or after entry. Proving the entry of an alien encountered far into the interior of the United States is, for practical purposes, exceedingly difficult.

Relying upon Illegal Entry can prove a weak balm when the defendant's criminal history is rife with felony convictions or past illegal reentry convictions (a very common occurrence). The relatively nominal cap of six months of imprisonment may fail to reflect the seriousness of the defendant's immigration or criminal histories.[22] Nevertheless, depending upon the circumstances, a charge of Illegal Entry may be the only way to salvage criminal prosecution of a defendant whose A-File or removal

---

[18] USUC Memorandum HQREC160/8 P, Feb. 27, 2017.
[19] 8 U.S.C. § 1325 (2012).
[20] Act of March 4, 1929, Pub. L. No 70-1018, ch. 690, § 2, 45 Stat 1551 (codified at 8 U.S.C. § 180 (1929 sup. III)).
[21] *See* United States v. Rincon-Jimenez, 595 F.2d 1192, 1194 (9th Cir. 1979).
[22] A first conviction under Illegal Entry is a petty offense punishable by six months' imprisonment, while a subsequent Illegal Entry charge can be prosecuted as a Class E felony with the sentence of imprisonment increasing to two years. 8 U.S.C. § 1325(a) (2012). Because a removal is not a necessary element of an Illegal Entry prosecution and most aliens amenable to the charge are encountered at or near the border, a felony Illegal Entry prosecution for a qualifying alien can prove the best solution when the defendant's A-File, or removal documents, are missing or lost.

documents are lost or missing.

### C. Alternate Federal Charges to Illegal Entry and Illegal Reentry

Several other federal statutes can roughly apply to the same conduct giving rise to an Illegal Reentry prosecution. Aliens attempting to obtain entry by false or misleading statements or documents often falsely claim U.S. citizenship or lawful permanent resident alien status, allowing for a justifiable prosecution under 18 U.S.C. § 911, Citizen of the United States (for aliens falsely claiming U.S. citizenship),[23] or 18 U.S.C. § 1001, Statements of entries generally (for those falsely claiming lawful permanent resident alien status).[24] An alien attempting entry at a port of entry and providing a false or fraudulent document may be amenable to a wide array of charges. Title 18 U.S.C. § 1546, Fraud and misuse of visas, permits, and other documents, applies to the fraudulent use of several immigration-related documents and visas.[25] Title 18 U.S.C. § 1543, Forgery or false use of passport, criminalizes the use of a false, mutilated, counterfeited or altered passport.[26] Prosecutors can use 18 U.S.C. § 1544, Misuse of passport, to prosecute an alien who presents a passport issued to another person or who uses a passport in violation of the terms of that passport.[27] Title 18 U.S.C. § 1028A[28] or 1028[29] can be used to prosecute an alien's presentation of any false document. If accurately reflecting the defendant's criminal conduct, prosecutors can use any of the above charges in lieu of an Illegal Reentry prosecution of an alien whose A-File or removal documents are lost or missing.

### D. No Prosecution

Finally, if it is determined that the above options are not available or not worth pursuing, the last remaining option is to simply forego criminal prosecution of any kind and allow DHS to obtain a fresh removal and create a new A-File for the alien.

## IV. Determining Whether the Prosecution of Illegal Reentry Without an A-File or Removal Document Is Warranted

What if none of the above options are available, but it is still determined that an Illegal Reentry prosecution is worth pursuing? For example, an alien's criminal history may consist of several aggravated felonies or crimes of violence. Perhaps an alien has several Illegal Entry and Reentry convictions, or the instant offense also constitutes a supervised release violation. To determine if conviction is worth the requisite expenditure of resources, the defendant's United States Sentencing Guidelines (U.S.S.G.) sentence should be calculated based upon the defendant's criminal history and where in the U.S.S.G. the defendant falls.

Armed with all of the relevant facts, the justification for going forward with the prosecution, and a realistic estimate of the time and resources needed to go forward, the prosecuting AUSA should confer with supervisors before deciding to prosecute an Illegal Reentry conviction without an A-File or removal documents. No real "check list" exists for this process (the checklist for an Illegal Reentry prosecution comes, of course, from the A-File itself). Once the decision to prosecute without an A-File or removal documents is made, this must be communicated to defense counsel, and it should be assumed that trial will commence at the earliest date possible. Therefore, there is little time to waste.

---

23 18 U.S.C. § 911 (2012).
24 *Id.* § 1001.
25 *Id.* § 1546.
26 *Id.* § 1543.
27 *Id.* § 1544.
28 *Id.* § 1028A.
29 *Id.* § 1028.

### A. Alien's Criminal History

Determining whether to continue with prosecution of an Illegal Reentry without an A-File or a removal document begins with the defendant's criminal history. Over time, AUSAs in high-volume Illegal Reentry districts recognize patterns in the criminal histories of Illegal Reentry defendants by studying, comparing, and contrasting countless pretrial service reports. Recognizing these patterns is vital in determining whether and how to prosecute an alien whose A-File or removal documents are lost or missing.

For example, some illegal aliens have held and lost lawfully admitted permanent resident status, yet continue to illegally reenter the country. Others never held such status, but grew up in the United States and are unwilling to leave their former life behind. Some illegal aliens are fifty years of age (or even older) and are late middle-aged drifters with a criminal history spanning states and decades; yet upon closer notice, this criminal history consists of relatively minor infractions, most of which have long gone stale. Others are young men in Criminal History Category IV (or even higher) due to amassing a condensed history of misdemeanor convictions within a ten-year span. Some aliens' criminal histories are limited to only one conviction, but that conviction could be an aggravated felony with truly horrifying underlying facts and a lengthy sentence of imprisonment. Still other aliens may have serious and troubling convictions in their past, but these convictions may have gone stale and no longer count for criminal history points, placing them in the lower rungs of the U.S.S.G., and perhaps pointing against what may be a time-consuming prosecution. These nuances are vital in determining whether and how to proceed with an Illegal Reenty prosecution when faced with an unavailable A-File or removal documents.

### B. Alien's Immigration History

A complete knowledge of an alien's immigration history is necessary in determining what strategy to employ when an alien's A-File or removal documents are lost or missing. A pretrial service report does not contain all of a defendant's removals, immigration hearings, or voluntary returns or departures. But, matching the pretrial report with information located in DHS databases can reveal an alien's immigration history, which can be as unique as her criminal history. Some aliens have been removed only once. That removal could be several years old, or it could be so recent (sometimes mere days prior to the alien's instant arrest and, in more than one case, the very same day of the instant arrest) that it has yet to be entered into DHS's internal databases. Other aliens have been removed on multiple occasions. Others have been granted Voluntary Returns (VRs) on multiple occasions. Proving the lone removal of an alien that occurred several years prior to the alien's instant arrest will pose a serious (and perhaps intractable) obstacle if the removal document is lost or missing. The more recent the removal, the easier it is to piece together if the removal document is unavailable.

## V. Proving the Elements of Illegal Reentry Without the A-File or Removal Documents

### A. Reentry

Proving the element of reentry should pose the least hurdles because its proof does not rely upon the A-File. If not arrested at or near the border, an illegal alien is likely to be encountered by ICE ERO officers in a local jail or prison or subsequent to an arrest by local law enforcement in the interior of the country. Agents who arrested aliens in border districts at or near their points of entry (almost always a port of entry or by Border Patrol agents) must be prepared to testify as to the circumstances of the defendant's encounter and arrest. Issues of intent, constant surveillance, and official restraint regarding the alien's entry may arise, but these factors are not generally independent of information in the defendant's A-File and are outside the realm of this discussion.

## B. Alienage

Proving alienage should be relatively simple as well. Any admissions made to officers or agents regarding alienage are usually admissible at trial via the interviewing officials. To supplement such admissions (or if the alien did not provide them), determine if the alien appeared at immigration court. If so, the tapes of all immigration hearings, as well as the order of the alien's removal, must be ordered from the Executive Office of Immigration Review (EOIR). Upon receipt, the tapes should be officially transcribed for use at trial. The transcript will almost certainly contain an alien's admission to the IJ that he is not a U.S. citizen and an affirmation of the alien's country of citizenship.

If the alien has been subject to an Expedited Removal (ER), the case agent should search all relevant databases for the Forms I-860 (Notice of Intent to Expedited Remove) and I-867A and B, for these forms should contain a sworn admission as to the alien's country of citizenship as well as other incriminating admissions. These databases are a trove of information, warehousing such documents as the G-166 (Report of Investigation), the I-44 (Report of Apprehension or Seizure), and the I-213 (Record of Deportable Alien). An alien encountered by DHS may be identified in a G-166 even if that alien was never criminally prosecuted or even arrested (for example, a smuggled alien). The I-44 details DHS seizures of contraband, as well as the identity of aliens arrested in conjunction with those seizures, even if the seizure led to no prosecutions or arrests. Many Illegal Reentry case agents combing through their agencies' databases find that a current Illegal Reentry defendant has previously been encountered by Border Patrol agents who caught the defendant smuggling aliens or narcotics, even if the alien was never arrested.

If the defendant has been previously convicted of Illegal Entry or Illegal Reentry (or any other federal statute concerning alienage), the prosecutor can order certified copies of the conviction documents from the district court of conviction. The case agent who ordered the original documents can admit properly redacted and sanitized copies into evidence at trial. Finally, the case agent or officer can also order a certified birth certificate. Better yet, the agent can obtain an apostilled birth certificate from the Department of State:

> An apostille is a certificate issued by a designated authority in a country where the Hague Convention Abolishing the Requirement for Legalization of Foreign Public Documents, Apostille Convention, is in force. . . . Apostilles authenticate the seals and signatures of officials on public documents such as birth certificates, notarials, court orders, or any other document issued by a public authority, so that they can be recognized in foreign countries that are parties to the Convention.[30]

## C. No Permission to Reenter

No permission to reenter, too, should be easily disposed of because it does not depend upon the availability of the defendant's A-File. The case agent or officer simply conducts a complete examination of all relevant databases to determine if the alien has received permission to reenter the United States from the Attorney General of the United States or the Secretary of the Department of Homeland Security. The case agent then testifies as to these findings at trial.

## D. Removal

Without a removal document, proving a defendant's removal beyond a reasonable doubt becomes the most problematic aspect of an Illegal Reentry prosecution. There are two types of removal documents: the form I-205 (Warrant of Removal) and the form I-296 (Verification of Removal). Both have been held as routine, non-testimonial documents not prepared in anticipation of criminal litigation and, thus,

[30] Notarial and Authentication (Apostille), Travel.State.Gov (last visited June 20, 2017).

admissible at trial.[31] Normally, of course, the removal document is in the alien's A-File, and the case agent simply transports it to the nearest USCIS office to obtain a certified copy. Although the removal officer or agent who signed and witnessed or verified the alien's removal document usually testifies at trial, the prosecutor can admit the USCIS-certified removal document through the case agent because the original is maintained in the A-File. But if the removal document is missing or lost, alternate means of proof for that removal must be found.

Here begins the reconstruction of an alien's removal. An alien's apprehension by DHS triggers the creation of an "event" in the subordinate agency's specific database. This event contains the alien's biographical information, fingerprint, and photograph. Databases can be searched to match prior Alien Numbers and Federal Bureau of Investigation (FBI) numbers. After an event is created and all biographical information is captured and input, a system called Enforce Alien Removal Module (EARM) is used by DHS to investigate an alien's immigration history. EARM is a master database containing all of an alien's documented encounters with DHS. It contains narratives of prior apprehensions, and most importantly, it usually provides information of where and when an alien was ordered removed, when the alien was actually removed, and which agency and port of entry were involved in the alien's removal. ERO updates and closes out removals in EARM. All DHS agents, officers, and civilian support staff authorized to enter information into EARM possess an identifying number, referred to as a hash ID, which is associated with each entry that employee inputs into EARM. For all of the useful information EARM contains, it does not include, unfortunately, the name of the agent or officer who witnessed an alien's removal from the United States and signed the relevant I-205 or I-296.

United States Visitor and Immigrant Status Indicator Technology (U.S. Visits) is another of the many databases used by CBP and can be helpful in the prosecution of an alien without an A-File or removal documents. U.S. Visits collects and compiles biometric data of all known contacts between an alien and immigration officials. While U.S. Visits, like EARM, cannot identify a removal agent or officer, the database will identify the DHS official who encountered an alien during each of that alien's encounters with immigration officials. Information compiled from U.S. Visits, therefore, can be instrumental for several reasons.

First, locating the immigration official via U.S. Visits who most recently encountered the alien allows the prosecution team to contact and question that official, who may recall details of the alien's subsequent removal or could suggest another official who might know more. Second, illegal aliens, like the rest of us, tend to be creatures of habit. Some have amassed multiple entries in the same approximate area or via the same smuggling routes. Prior to the mid-2000s, illegal aliens encountered by USBP agents in high-volume alien-trafficking sectors and who lacked a serious criminal history were simply granted what is called a Voluntary Return (VR).[32] Evidence of encounters leading to VRs can be of use in an

---

[31] Both the Form I-205 and I-296 have been held admissible by the Ninth Circuit Court of Appeals—the I-205 in *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1075 (9th Cir. 2005) and the I-296 in *United States v. Lopez*, 747 F.3d 1141, 1148 (9th Cir. 2014), *opinion amended and superseded on denial of reh'g*, 762 F.3d 852 (9th Cir. 2014). This latter case poses an interesting wrinkle much more common than missing removal documents—illegible or unidentifiable signatures on removal documents. *Id.* at 1144. The I-296 is one page and contains two officer signatures: that of the agent taking the alien's fingerprints and that of the agent witnessing the defendant's removal. *See id.* However, both signatures on the I-296 at issue were illegible, and the prosecution did not call either DHS official to testify. *Id.* In commentary, the Court noted the weakness of the government's proof of the removal element. *Id.* at 1154 n.7. The lesson is clear: although a removal document can be admitted into evidence though the case agent, it is much better practice—when at all possible—to admit the removal document via the DHS official who actually verified and signed it. This will preclude any confusion regarding the removal process in the jurors' minds and prevent the defense from successfully creating an issue where none should exist.

[32] A Voluntary Return is not to be confused or conflated with a Voluntary Departure (VD), a form of relief which can only be granted by an Immigration Judge.

Illegal Reentry prosecution.

A VR is not a removal and cannot be used to prove the removal element of an Illegal Reentry prosecution; also, it should not be confused with an ER. Only citizens of Mexico can be granted a VR. A VR is accomplished by a simple entering of the alien's biometrics (including fingerprints) into relevant DHS databases (i.e., U.S. Visits), followed by a quick turn-about to Mexico. During the late 1990s until the middle of the last decade, VRs were common. The immigration courts were overloaded, and because the criminal and immigration histories of aliens eligible for a VR were relatively minor, immigration detention was highly unlikely; these aliens' immigration court dates could be years away. If not for VRs, these aliens would have simply been served with a Form I-862 (Notice to Appear before an Immigration Judge) and released. Predictably, very few of these released aliens appear for their hearings; in 2012 alone, ICE searched for more than 469,000 aliens who had missed their immigration court dates.[33] VRs were a practical tool for Border Patrol agents struggling to manage the high volume of illegal aliens during the late 1990s and the earlier years of this century.

Because VRs practically offer little effect, several illegal aliens currently in their thirties or older, whose only consequence for several years was a VR, have compiled several of them. Evidence of the encounters preceding VRs can be useful for prosecution purposes. Under the right circumstances, prosecutors may be able to introduce evidence of these encounters under Federal Rule of Evidence 404(b),[34] especially if EARM confirms that the alien's most recent removal occurred via a port of entry in roughly the same area as the alien's VR and the instant encounter with immigration officials. Prosecutors must identify the encountering agent or officer for each encounter preceding a VR, and the agent or officer must be available to testify at trial. As a practical matter, the mass practice of granting VRs to illegal aliens abated between 2004 and 2007 after the introduction of Expedited Removals to the entire border.[35]

The Form I-216 (Record of Persons and Property Transfer) can be another important tool in piecing together an alien's removal. This form is essentially a manifest of aliens transported to any number of the approximately forty-eight ports of entry along the border between the United States and Mexico[36] and ports of entry in international airports. Unlike the other "I" forms discussed above, the I-216 is not usually included in an alien's A-File.[37] Rather, it is simply a log of aliens to be transported from a detention center, Border Patrol station, or some other DHS facility, to the port of entry of an alien's ultimate removal. DHS facilities differ in their practice of maintaining I-216s. Locating I-216s more than three years old can prove exceedingly difficult. But because an I-216 is normally signed in the regular course of business by the officers or agents who both approved the transport of the alien and received the alien for removal, the I-216 can be admitted into evidence at trial under Fed. R. Evid. 803(6) under the business record exception to the Hearsay Rule.[38] However, I-216s contain information totally irrelevant to the alien being tried, including the names of all aliens to be transported, sensitive information

[33] Christina London & Bridget Naso, *ICE: Many Immigrants Skip Court Hearings*, NBC: SAN DIEGO (July 2, 2014).
[34] FED. R. EVID. 404(b).
[35] Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 amended section235(b) of the Immigration and Nationality Act (INA), introducing the practice of allowing immigration officials to remove qualifying aliens from the United States in lieu of simply serving them NTAs. Omnibus Consolidated Appropriateions Act, 110 Stat. 3009 (1996) (codified as amended). Via a systematic expansion of the program, by 2004, any alien encountered by immigration officials within 14 days and 100 miles of entry was amenable to ER, thus negating the logic of granting VRs.
[36] MPI Staff, *The U.S.-Mexico Border*, MPI (June 1, 2006).
[37] Thus, the Form I-216 cannot simply be copied and certified by USCIS and admitted into evidence by the case agent, even if the A-File is available. However, in some instances, the form is actually included in the A-File, in which case a certified copy of the document is admissible through the case agent as the custodian of the file.
[38] FED. R. EVID. 803(6).

regarding each alien, and in some instances, the various criminal convictions of all aliens listed on the document. Thus, the document must be heavily redacted before admission into evidence.

An I-216 can be instrumental; however, it cannot be used as a substitute for an actual removal document. Its relevance is two-fold. First, if properly admitted into evidence, it can reinforce the already existing evidence of an alien's removal—edging closer to the "beyond a reasonable doubt" burden of proof. Second, it can greatly assist the prosecution team's quest to identify and locate the removal agent or officer. The transport agents or officers may personally know their counterpart who removed the alien in question, or they may have kept internal notes that can assist in identifying them. An alien's removal date and port (obtained from EARM) and information from the I-216 can sometimes be matched with internal time and attendance records of a particular port to determine exactly which DHS officials were conducting removals on any given day.

Title 8 Section 1326 provides that an alien who "has departed the United States while an order of exclusion, deportation, or removal is outstanding" can be charged with Illegal Reentry.[39] However, this is rare and generally concerns cases in which the defendant is a citizen from a country which does not accept its criminal aliens for repatriation (most notably—at least until recently—Cuba). Because proof of the alien's departure is a necessary element, such cases almost exclusively occur in districts along the northern and southern borders. If the alien does not admit to having departed the United States, then circumstantial evidence must prove a departure, which is why such cases generally only occur when the alien is encountered at or near the border.

# VI. Air Removal

Due to the size of Mexico's population and its vast border with the United States, the majority of removable aliens have hailed from that country.[40] However, the proportion of removed Mexican aliens has steadily decreased with the influx of Central Americans in recent years. From 2013 to 2014, "ICE removals of Mexican nationals decreased from [66% to 56%] of total . . . removals."[41] All non-Mexican removable aliens (except for Canadian citizens, who are generally removed via the land ports of entry along the border between the United States and Canada) are removed via air to their countries of origin.[42]

## A. Mexican Interior Repatriation Program (MIRP)

At various times, ICE has conducted removals of Mexican citizens via air as well. One such program was the Mexican Interior Repatriation Program (MIRP).[43] First initiated in the Yuma and Tucson Border Patrol sectors (encompassing the entire state of Arizona and a small sliver of the easternmost portion of the Southern District of California) in 2004 during the brutally hot summer months, MIRP was a removal program conducted for Mexican nationals without criminal records.[44] MIRP was designed both to protect aliens from the scorching Sonoran desert heat during peak summer months and to disrupt traditional smuggling patterns by flying Mexican aliens to Mexico City.[45] Upon the aliens' arrival, the

[39] 8 U.S.C. § 1326(a)(1) (2012).

[40] *FY 2016 ICE Immigration Removals*, U.S. IMMIGR. & CUSTOMS ENFORCEMENT (last visited July 17, 2017).

[41] DEP'T OF HOMELAND SEC., U.S. IMMIGRATION & CUSTOMS ENF'T, ICE ENFORCEMENT & REMOVAL OPERATIONS REP. 4 (2014).

[42] A handful of nations refuse to accept the repatriation of their citizens. Such refusal is, of course, a highly sensitive diplomatic issue, one well outside of the focus of this article. *See* Leo Hohmann, *23 Countries Refuse to Take Back Criminal Aliens*, WORLD NET DAILY (Mar. 18, 2017).

[43] *See* Press Release, Nat'l Immigration Forum, Analyzing Border Enforcement Operations: Interior Repatriation Programs (Sept. 22, 2012).

[44] *See id.*

[45] *Id.*

Mexican government would then provide transportation to their cities and towns of origin.[46]

Proving the removal of an alien removed via air when a removal document is missing can be easier than doing so for an alien removed via a land port of entry. Air removals leave a greater administrative and documentary footprint, allowing a prosecution team to piece together more admissible evidence of a defendant's removal. Then, it becomes a matter of identifying and locating the agent or officer who either transported the alien to the airport in the United States or who was actually on the airplane with the alien to her home country. Generally, EROs transporting aliens to be removed by air accompany the alien to the airport of the alien's scheduled removal. However, EROs may accompany an alien with a particularly violent criminal history to an airport in the alien's home country. Flight itineraries can often be retrieved from the defendant's A-File, but a lost or missing A-File is of no use.

### B. Form G-391

If an alien has been removed within the previous three years, the Form G-391 may be of use in piecing together his removal. The G-391 is used for every alien transfer via land or air. A detainee cannot be removed from any DHS facility, including Field Office detention areas, without a Form G-391. All G-391s are signed by supervisors, retained for at least three years, and filed in order by month. A G-391's usefulness derives from its identification of the DHS officers either witnessing an alien's departure or escorting the alien to the alien's final destination. This form contains the name of the detainee, the place to be escorted, the purpose of the trip, and any other information necessary to carry out the movement.

## VII. Conclusion

Prosecuting the offense of Illegal Reentry without an A-File or removal documents can prove difficult, time-consuming, and challenging, and it requires knowledge of DHS; its organizational structure and databases; how the agency arrests, processes, transports, and removes aliens; and how it constructs, maintains, and transports A-Files and T-Files. Such knowledge reveals the importance of the daily operations carried out by DHS officials, usually unseen by AUSAs, and that the lion's share of work necessary to secure successful Illegal Reentry prosecutions has already been done by the DHS officials across the country and world, who strive to enforce the immigration laws of the United States.

**ABOUT THE AUTHOR**



❏ **Louie Uhl** is an Assistant United States Attorney in the Phoenix Division of the District of Arizona where he has worked in the Yuma Office since August 2008. He is also a Lieutenant Colonel in the United States Marine Corps Reserve (USMCR).

[46] News Release, U.S. Immigration & Customs Enf't, U.S. and Mexico Resume Interior Repatriation Initiative (Nov. 11, 2013).