*United States v. Duron-De Luna*

United States District Court
District of Colorado

Case No. 22-cr-00018-RMR

## Exhibit C

Declaration of Professor Benjamin Gonzalez O'Brien



# Declaration of Professor Benjamin Gonzalez O'Brien Regarding Racial Animus and USC 1326

December 30, 2021

I have been asked to make a declaration regarding the racial animus present in the initial codification of USC 1326 in 1929, as well as its subsequent reenactment in 1952. I am an associate professor of Political Science at San Diego State University and have written two books on U.S. immigration policy, *Handcuffs and Chain Link: Criminalizing the Undocumented in America* (University of Virginia Press) and *Sanctuary Cities: The Politics of Refuge* (Oxford University Press). Both of my books, as well a a number of my peer-reviewed journal articles address immigration in the United States, with a specific focus on undocumented entry. My first book, *Handcuffs and Chain Link* examined the importance of the 1929 *Undesirable Aliens Act* for the treatment of undocumented entry and how this act both reflected existing eugenicist beliefs regarding immigration from Mexico and Central America, but also shaped how undocumented immigrants were perceived in the decades to come.

USC 1326 was first codified in 1929 under a bill dubbed the *Undesirable Aliens Act*. This legislation, signed into law on March 4th, 1929, for the first time attached criminal penalties to the act of illegal entry (this would later become USC 1325) and reentry (USC 1326). The initial act of illegal entry was from this point forward a misdemeanor, punishable by imprisonment for one year, a $1000 fine, or both. Reentry after deportation, which would be re-enacted as USC 1326 in 1952, was henceforth a felony, punishable by a two year sentence, a $1000 fine or both.

The Undesirable Aliens Act was the culmination of a long push for restrictions on immigration from Mexico and Central America that had begun in the 1920s as the number of Mexican immigrants to the United States grew. Immigration from south of the Rio Grande river would become a target for white supremacists and eugenicists during this period, after immigration restrictionists realized a number of victories in late-nineteenth and early-twentieth centuries. The first big win for restrictionists in Congress had come in 1882, with the passage of the Chinese Exclusion Act, the first piece of immigration legislation prohibiting immigration based on race. This was followed by the implementation

1

of a literacy test in 1917, which was meant to weed out undesirable European immigrants, primarily from the Southern and Eastern parts of Europe, as well as the creation of an Asiatic barred zone that same year. The Chinese Exclusion Act and Asiatic barred zone of 1917 would reduce Asian immigration to a trickle, and were largely based on narratives of racial threat from those of Asian descent.

Restrictionists did not just want to see limits on Asian immigration though. There was also a desire to see immigration on the part of undesirable European groups reduced. Southern and Eastern Europeans, as well as the Irish, were often portrayed as being of a "whiteness of a different color", to borrow Matthew Frye Jacobson's phrase. [1] Groups like the Immigration Restriction League had long pushed for limits on "new" immigrant groups from Europe, who were seen as being of a lower racial stock than immigrants from the "old" countries, primarily Northern and Western Europeans. In 1907 the Dillingham Commission was formed with the purpose of examining the impact of the new waves of immigrants on the United States. The commission was made up of three members from the House, three from the Senate, with another three appointed by then-President Theodore Roosevelt. William Dillingham, senator from Vermont, served as chair. Henry Cabot Lodge, a member of the commission, was a known and outspoken eugenicist who believed that a whole range of traits were inherited or carried in the blood, which made the immigration of those from lower racial stocks a threat to the nation. Theodore Roosevelt also endorsed the pseudo-science of eugenics, which would become increasing popular in the early 20th century.

In 1911 the Dillingham Commission released its report, which spanned 42 volumes. The commission found that "new" immigrant groups from places like Serbia and Italy posed a burden to the United States across a number of different dimensions, including a greater propensity to criminal behavior, which the commission dedicated an entire volume to. Mexican immigration, which would not begin to surge until 1910 and the beginning of the Mexican Revolution, was largely ignored by the commission, though they did note that Mexican immigrants could become an issue in the future. In volume 36, the commission noted that, "Mexican immigrants are providing a fairly acceptable supply of labor...While the Mexicans are not easily assimilated, this is not of very great importance as long as most of them return to their native land after a short time." This highlights a basic tension that would become the basis for immigration policy throughout the 20th century, the need for Mexican labor and perceived racial threat posed by Mexican permanence in the United States.

After the release of the Dillingham Commission's report, eugenics would provide additional "scientific" evidence to grant greater legitimacy and urgency to immigration restriction in the first two decades of the 20th century. In 1910, the Eugenics Records Office, a research institute for the study of human heredity, was formed by Charles Davenport.

---

[1] Jacobson, Matthew Frye. Whiteness of a Different Color. Harvard University Press, 1999.

Harry Laughlin was appointed superintendent of the ERO and would emerge as a central figure in the push for immigration restriction in the United States, becoming assistant director under Davenport in 1921. Laughlin would offer expert testimony to Congress on a number of occasions, frequently before the House's Committee on Immigration and Naturalization, which was chaired by Albert Johnson of Washington, one of the key architects of the Johnson-Reed Act and the national origins quota system it would create, and one of Congress' most outspoken supporters of eugenics.

Laughlin would offer testimony before the House committee from April 16-17, 1920 titled, "The Biological Aspect of Immigration" where he would make a case for the use of immigration restriction to protect the racial purity of the United States. This was important because as Laughlin argued, "The character of the nation is determined primarily by its racial qualities; that is, by the hereditary physical, mental, and moral or temperamental traits of its people." At the conclusion of his testimony he was appointed the expert eugenics expert of the committee and a request was made for further studies into immigration and the racial stock of immigrants. The testimony of Laughlin, the Dillingham Commission report, and the influence of eugenicists like Albert Johnson in Congress would lead to the passage of the Johnson-Reed Act in 1924. This represented a huge victory for immigration restrictionists and eugenicists, who had long been advocating for curbs on Southern and Eastern European immigration. It created a national origins quota system for Europe based on two percent of the population present as of the Census of 1890, which was deliberately chosen to privilege Northern and Western European immigration. Additionally, Johnson-Reed created a system of racial quotas for those outside of Europe, with both Africa and Asia subject to a pan-ethnic regional quota, both of which were less than the quota of many European nations. In the case of Asian immigrants, Johnson-Reed also prohibited the immigration of any who could not naturalize, which Asian immigrants could not, meaning they could not even draw upon the regional quota for the Asia-Pacific region.

While Mexican immigration had largely been ignored in the Dillingham Commission report, it began to receive attention during the debate over the Johnson-Reed Act. Specifically, some members of Congress found it problematic that Mexico would not be subject to a quota under the act. Representative Patrick O'Sullivan of Connecticut argued, "I do not know what standard is used to measure desirability, but I do know the average Italian is much superior to the average Mexican as a full-blooded Airedale is to a mongrel. Yet this bill will permit every Mexican in Mexico to enter the United States, and the same bill would limit the number of Italians to 3,912." In the Senate, Senator Matthew Neely of West Virginia proclaimed, "On the basis of merit Mexico is the last country in the world to which we should grant special favor or extend a peculiar privilege...It is high time for us to realize that this is our country, and that it is our duty to defend it against all enemies. It is our duty to defend it not only against enemies in arms, but against the millions of physically, mentally,and morally inferior men and women scattered over Europe, Asia, Africa, Mexico, and the islands of the sea, who, as prospective immigrants, are awaiting the opportunity to rush our shore." Despite the

racial animosity displayed toward Mexican immigrants in the debate over Johnson-Reed, Mexico was not included in the quotas. This was due to resistance on the part of agribusiness, who wanted to maintain access to Mexican laborers. Rep. John Box of Texas, a long-time opponent of Mexican immigration and proponent of quotas for Mexico, explicitly noted that the inclusion of Mexico in Johnson-Reed's quotas could potentially lead to the entire bill being killed due to opposition from business interests.[2]

After the passage of Johnson-Reed in 1924, eugenicists and restrictionists like Rep. Box began to push for national quotas to be applied to Mexico. Box would introduce a number of bills to do just this beginning in 1926, despite the continued opposition from agricultural and business interests. Faced with the drive to restrict access to Mexican labor, some groups threatened that, "...if we are deprived of this source of labor we must immediately bring negroes from the southern states or Porto Rico."[3] Those who wanted Mexican immigration restricted leaned heavily on eugenics in making their argument, with Rep. Robert Green of Florida proclaiming that, "Another reason why the quota should apply to any country south of the Rio Grande is because their population in the main is composed of a mixture of blood of White, Indian, and Negro. This makes this blood a very great penalty upon the society which assimilates it."[4] Similarly, Box would argue that the purpose of the nation's immigration laws was to prevent, "...the lowering of the ideals and the average of our citizenship," before specifically singling out the "Mexican peon" as a threat to the racial purity and cohesion of the nation.[5]

The language used by members of Congress in many ways echoed the Congressional testimony given by Harry Laughlin of the Eugenics Record office. In 1922 Laughlin testified before the House Committee on Immigration and Naturalization in a hearing titled, "Analysis of America's Melting Pot". Laughlin presented a number of statistics to the House committee that were meant to demonstrate the threat posed to the racial stock of America by various immigrant groups. While Congress itself was more interested during this time in Southern and Eastern Europeans, Laughlin noted that Mexican immigrants were ranked fourth in all types of social inadequacy, which included criminality, feeblemindedness, insanity, propensity to disease or illness, and physical disabilities. He noted that these traits were carried in the blood or "germ plasm" and that, "We in this country have been so so imbued with the idea of democracy, or the equality of all men, that we have left out of consideration of blood or natural inborn hereditary mental and moral differences. No man who breeds pedigreed plants and animals can afford to neglect this thing..."[6] In 1928, the year immediately preceding the passage of the Undesirable Aliens Act, Laughlin would once again be called

---

[2] 65th Congressional Record, 6478
[3] U.S. Senate, Hearings before the Committee on Immigration, 1928
[4] 69th Congressional Record, 2462
[5] 69th Congressional Record, 2818
[6] Analysis of America's Melting Pot, Hearings before the Committee on Immigration and Naturalization, House of Representatives, 67th Congress

to testify before Congress, this time in a hearing titled, "The Eugenical Aspect of Deportation". Laughlin pointed out that, "...deportation is the last line of defense against the contamination of American family stocks by alien hereditary degeneracy."[7] He would later point out that, "Immigration can be made to improve the quality of the American people, but if the present standard is not raised and rigidly enforced, and if the aliens of degenerate or inferior stock who are found within our borders, especially those who will become the parents of future Americans, are not deported, then, depending on the number of such cases, immigration will tend to work not toward the improvement but toward the degeneration of the American people." Albert Johnson was the chair of the Committee on Immigration and Naturalization and both John Box and Robert Green were members at the time of Laughlin's testimony and Johnson in 1930 would ask that Laughlin be made an immigration agent. Eugenicists, both inside and outside Congress, increasingly saw Mexican immigration as a racial threat to the nation and the language of men like Laughlin would be drawn on heavily in arguing for quotas to be applied to Mexico, though this would fail to gain traction time and again in the period following Johnson-Reed.

Instead, other approaches would be used to try and limit the number of Mexican nationals entering the United States. The Border Patrol was formed in 1924 and Mexican immigrants were subjected to a number of unpleasant procedures for legal entry in the hope that this would serve to limit Mexican immigration via administrative means. A head tax was imposed on entry in the post-WWI period, and those entering from the southern border were also subjected to humiliating and degrading nude inspections and delousing baths, often using caustic chemicals, and their clothes fumigated with zyklon-B. These same procedures were not applied to the northern border, since Canadian immigrants were not seen as potential vectors for disease, which was explicitly linked by eugenicists during this period to race.[8]

None of this served to sufficiently limit Mexican immigration though and thus in 1929 a compromise was struck with agribusiness. Instead of a quota on Mexico, Senator Coleman Livingstone Blease of South Carolina introduced Senate Bill 5094, which would be nicknamed the "Undesirable Aliens Act". Instead of a quota on Mexico, this bill criminalized undocumented entry (1325) and reentry (1326), making the former a misdemeanor and the latter a felony. Blease himself was an outspoken White supremacist and someone who had defended lynch mobs are necessary for liberty, and who supported a constitutional amendment prohibiting miscegenation. He was also a staunch restrictionist, stating in 1930, "So far as I am concerned, I believe in keeping the doors shut against all immigration, in keeping them all out..."[9] The debate around the Undesirable Aliens Act would be driven by eugenicist narratives of racial inferiority

---

[7]The Eugenical Aspects of Deportation: Hearings Before the Committee on Immigration and Naturalization, House of Representatives, Seventieth Congress

[8]Stern, Alexandra Minna. "Buildings, boundaries, and blood: Medicalization and nation-building on the US-Mexico border, 1910-1930." Hispanic American Historical Review 79.1 (1999): 41-81.

[9]72 Cong. Rec. 7512-13

and threat, something which Rep. John J. O'Connor of NY noted was inherent in the bill itself. He pointed out that, "I fear there is a spirit pervading our country today reflected in these immigration bills that is a menace to the country - a spirit of intolerance and bigotry not only to religions but to races."[10] The report on the Undesirable Aliens Act by the House Committee on Immigration and Naturalization included a letter expressing opposition from the ACLU to the criminalization of undocumented entry, though this was ignored.

Eugenicist narratives were common in the debate over the *Undesirable Aliens Act* in the House, led by men like Robert Green and John Box. Green argued that criminals in the United States were largely foreign-born, while Box would go further, unleashing a tirade steeped in eugenics to justify the bill. "They are badly infected with tuberculosis and other diseases; there are many paupers among them; there are many criminals...they are objectionable as immigrants when tried by the tests applied to other aliens." while Rep. Roy Fitzgerald of Ohio charged that Mexican immigrants were, "poisoning the American citizen."[11] The Undesirable Aliens Act would be passed with little opposition in either house of Congress and become law on March 4th, 1929, representing the first codification of what would become USC 1326.

While the law technically applied to undocumented entry from the northern OR southern borders, there was little mention of the Canadian border during the debate over the *Undesirable Aliens Act*. Indeed, even groups like the Immigration Restriction League had noted that because Canadians were of similar racial stock, no quotas were necessary.[12] The omission of any real discussion of illegal entry from Canada from debate on the Undesirable Aliens Act made the racial animus behind the law clear, as would the later loopholes that would be created for illegal entrants from Canada.

Nineteen twenty-nine would also mark the beginning of a program of Mexican repatriation that would last seven years until 1936. Mexican reparation was a combination of federal, state, and local programs meant to encourage Mexicans in the United States to "voluntarily" return to Mexico. Mexican nationals were threatened with forcible deportation and raids were announced in advance, with arrests highly publicized to increase fear in Mexican communities. In the El Monte area of Los Angeles, approximately 300 people, largely if not exclusively members of Latinx communities, were questioned and asked to provide proof of legal entry.[13] As with the Undesirable Aliens Act, Mexican repatriation was exclusively focused on Mexicans, legal and illegal, citizen and immigrant, and would result in an estimated two million Mexicans being "repatriated". Not all of those who were returned to Mexico were immigrants though, and in 2005 California passed the "Apology Act for the 1930s Mexican Repatriation Act" which

---

[10] 70th Congressional Record, 3526
[11] 70th Congressional Record, 3620
[12] Ngai, Mae M. Impossible Subjects: Illegal Aliens and the Making of Modern America. Princeton University Press, 2014.
[13] Hoffman, Abraham."Stimulus to repatriation: The 1931 federal deportation drive and the Los Angeles Mexican community." Pacific Historical Review 42.2 (1973): 205-219.

formally acknowledged that, "These raids targeted persons of Mexican ancestry, with authorities and others indiscriminately characterizing these persons as 'illegal aliens' even when they were United States citizens or permanent legal residents." Furthermore, of those who were forced to return to Mexico, the Apology Act estimates that 60% were American citizens. This was likely deliberate, as one of the problems with immigrants from "undesirable" races was their ability to have children who would become American citizens by virtue of the Fourteenth Amendment, with eugenicists like C.M. Goethe, a California businessman who corresponded with Harry Laughlin, noting in 1933 that, "It is this high birthrate that makes Mexican peon immigration such a menace. Peons multiply like rabbits...". While there was a continued push for quotas on Mexican immigration, continued resistance from business-interests made this impossible to achieve, especially in the face of renewed demands for Mexican labor as the country emerged from the Great Depression.

In 1942 a new chapter would open in the relationship between the United States and laborers from Mexico in the form of an agreement between the two countries, the bracero program. This set up a process for bringing Mexican labor into the United States, which many industries were even more dependent on after the U.S. entered WWII in Dec. of 1941. Under the bracero program, applicants would pay a fee, go through inspection, and then be contracted to an employer who was supposed to provided a guaranteed wage, housing, and funds for meals and general subsistence. Braceros could work for a period of six months after which they had to return to Mexico, unless their visa was renewed. This was meant to supply a stream of cheap, disposable labor for American companies and, importantly, laborers that would return to Mexico. While there were supposed to be some minimum guarantees for braceros in terms of wages and living accommodations, Mexico was a junior partner in the agreement, in 1954 dropping its ability to unilaterally blacklist employers who were in violation of the terms of the bracero contract. In 1956, only 50 of more than 1500 employers who were in violation of the terms of the program were removed.[14] Yet the bracero program also helped to exacerbate undocumented entry, as there was both more demand than there were available spots, as well as a far larger number of immigrants who wanted to enter the US to work. Some employers also preferred undocumented labor, as it was easier to access, especially for those in border regions, involved less red tape, and was often cheaper since the employer did not have to guarantee a wage or minimum standards for accommodations.

In the 1940s and 1950s, as the explicit eugenics of the 1920s and 1930s became less socially acceptable, the language around Mexican immigrants shifted, with braceros largely portrayed as a non-threatening disposable labor force, while undocumented immigrants were labeled "wetbacks" for their method of entry across the Rio Grande river. Mexican labor was always seen as invaluable and unthreatening as long as there were guarantees that those individuals would return to Mexico when their labor was no longer needed. The "wetback" on the other hand, was not guaranteed

---

[14]Ngai, 2004

to return and were seen as a threat to the racial purity of the country. While the eugenicist language of the Johnson-Reed or Undesirable Aliens Acts was no longer present to the same extent, the same attributions used to characterize Mexican immigrants in earlier decades were now attached to the figure of the "wetback". This allowed for charges of racism to be circumvented, while still using the same racialized traits to describe a population that had entered without inspection. One study divided the "wetback" into two groups, one a set of docile agricultural workers who accepted, "...good or bad treatment, starvation wages, diarrhea and other sickness for his children...and unsanitary living conditions," while a second group, the "pachucos" were criminals, drug dealers, smugglers, prostitutes, and homosexuals.[15] These attributions of criminality, illness, and deviant behavior were based on race, not legal status, with a 1951 study of Mexican immigrants noting that, "...no careful distinctions are made between illegal aliens and local citizens of Mexican descent. They are lumped together as Mexicans and the characteristics that are observed among the wetbacks are by extension assigned to the local people."[16]

In 1952, just three months before the passage of the McCarran-Walter Act, Senate bill 1851 was introduced and nicknamed the "Wetback Bill". This was anti-harboring legislation that attached criminal penalties to the sheltering or transport of undocumented immigrants, but in the Congressional debate over the bill, the continued animus toward Mexican immigrants, as well as the racial attributions attached to the figure of the Mexican immigrant were made clear. As with past legislation, the Wetback Bill primarily targeted those from the southern border, and initially applied exclusively to Mexican immigrants, before some in Congress questioned whether this raised issues of constitutionality. Senator George Aiken of Vermont questioning whether Congress could, "discriminate constitutionally against the aliens of one particular nation," before noting that while it should apply to all illegal entrants, he knew, "...of no instances of illegal employment of Canadians."[17] During debate, Senator Harley Kilgore of WV used language to describe the "wetback" population that largely mirrored earlier eugenicist reflections on Mexican immigration. He argued that, "Practically every State in the Union has the wetback problem. Some of these people cannot meet the standards of immigration. They may be criminals."[18] The argument of eugenicists and members of Congress that Mexican immigrants had a greater propensity for criminal behavior had long served as a justification for restriction and example of the threat this group posed, despite the fact that this had been refuted by a report from the National Commission on Law Observance and Enforcement, also known as the Wickersham Commission, in 1931. The commission had been formed by President Herbert Hoover in 1929 because of growing concerns about crime in the United States, but unlike the Dillingham Commission was not made up of members of Congress but a number of experts from various fields such as law, criminology, and the social sciences. Because of the longstanding attribution of criminality

---

[15] Idar, Ed and Andrew C. McLellan. What Price Wetbacks. Austin, Texas State Federation of Labor (AFL) (1953).
[16] Saunders, Lyle and Olen Leonard. The Wetback in the Lower Rio Grande Valley of Texas. University of Texas - Austin (1951).
[17] 98th Congressional Record, 799
[18] 98th Congressional Record, 793

to the foreign-born, the Wickersham Commission dedicated an entire volume of their report to immigration and crime. Mexican immigration was specifically examined, with the Wickersham Commission finding no support that Mexican immigrants were more inclined to criminality. The commission found that higher incarceration rates in some areas among the Mexican immigrant population were often due in part to ignorance of Prohibition laws, as well as racial profiling on the part of local law enforcement. In one passage, the report notes that, "It was frequently observed that peace officers shared the prejudices toward Mexicans of other members of the community in which they live...The effect of this is to doubtless increase arrests of Mexicans relative to arrests of native-born Americans, quite independent of criminality."[19] While the figure of the "wetback" was characterized as a threat to the country, employers, as with past legislation, were provided a carve out as employment would not constitute harboring. It must also be noted that while Mexican undocumented immigrants were characterized as "wetbacks", a derogatory term that carried all the racial baggage of the earlier period of eugenics, undocumented entrants from the northern border could still apply for pre-examination, which was available until 1961.

The passage of McCarran-Walter Act on June 27, 1952, which reenacted USC 1326, represented a reform of existing immigration laws in some ways, but also maintained much of the racial animus present in the earlier Johnson-Reed Act. The national origins quotas of Johnson-Reed were increasingly seen as problematic in the wake of WWII and the Holocaust, and as counter to US interests as the Cold War began. While the McCarran-Walter Act did remove racial prohibitions on naturalization and immigration, it did little to change the racial quotas of Johnson-Reed. The Asia-Pacific region still received only a small number of quota spots when compared to European nations, and McCarran-Walter also required those of Asian ancestry, regardless of citizenship, to draw on the regional quota. During the debate some even lamented the end of eugenics as a result of the horrors of Nazi Germany, with Rep. John Wood of Idaho noting that, "It seems to me the question of racial-origins, though I am not a follower of Hitler, there is something to it. We cannot tie a stone around its neck and drop it into the middle of the Atlantic just because it worked to the contrary in Germany. The fact still remains that the peoples of Western Europe have made good American citizens...I believe that possibly statistics would show that the Western European races have made the best citizens in America."[20] Truman would veto the legislation because of its discriminatory aspects, in his letter to Congress stating that while he approved of the removal of racial restrictions on naturalization and immigration, "... now this most desirable provision comes before me embedded in a mass of legislation which would perpetuate injustices of long standing against many other nations of the world, hamper the efforts we are making to rally the men of East and West alike to the cause of freedom, and intensify the repressive and inhumane aspects of our immigration procedures. The price is too high, and in good conscience I cannot agree to pay it."[21] While the bill would pass over the veto of the president,

---

[19] National Commission on Law Observance and Enforcement, Report on Crime and the Foreign-born, Government Printing Office (1931)
[20] 98th Congressional Record, 4314
[21] Truman, Harry. Veto of Bill to Revise the Laws Relating to Immigration, Nationalization, and Nationality. June 25th, 1952

the racially discriminatory nature of its immigration quotas of the bill was at least discussed.

This was not the case with USC 1326, which was reenacted with no debate or discussion of the racial animus underlying its initial codification in 1929. This animus was still on display though, with the regular references during the 98th Congress to "wetbacks" and continued attribution of racialized traits to Mexican immigrants, though now this cloaked by referencing their legal status. The only real reference to 1326 in the debate around McCarran-Walter's reenactment was in the form of a letter from Attorney General Peyton Ford, who wanted the term "found in" to be added to make prosecutions easier since the original codification suggested that the reentry point needed to be established in order to determine the proper venue for prosecutions. This letter included a reference to the "wetback", a term Pat McCarran himself used in discussing Mexican immigrants and the potential inclusion of provisions the Wetback Bill in the new omnibus legislation. He noted that, "We changed the language a little to meet the wetback situation, which applies to the southern section of the country."[22] Pat McCarran himself was a known racist and anti-Semite with members of Congress from Nevada in 2020 sending a letter to the state legislature and governor asking that Las Vega's airport, McCarran International, be renamed and that the former senator's statue be removed from the National Statuary Hall in DC. Clark County, the site of McCarran International, agreed in 2021 to change the name of the airport to Harry Reid International.[23]

The racial animus toward Latin American immigrants was also demonstrated by the policy of pre-examination that was applied to the northern border and based on an agreement with the Canadian government. In 1935, those who had entered the United States illegally could apply for "pre-examination" while in the United States. Initially meant for those for whom deportation would cause a hardship, such as undocumented entrants with an American spouse or children, individuals would apply and be cleared for legal entry while in the US, then have to voluntarily depart to Canada, where they then could be issued a visa at the nearest American consul.[24] Immigrants from Mexico were explicitly excluded from this program in 1945 and even prior to this it was never applied equally. As it was an agreement between the US and Canadian governments, even if Mexican immigrants were allowed to apply, they would still have to travel to Canada in order to normalize their status. Thus, deportation and the penalties for undocumented entry/reentry were never just about how an immigrant entered the United States, but also their race. In the case of those who had entered the US illegally from Canada, largely European or of European descent, a path was provided to normalize their status. Between 1935 and 1959, approximately 58,000 pre-examination requests were made and

---

[22] 98th Congressional Record, 5320
[23] https://www.reviewjournal.com/news/politics-and-government/clark-county/clark-county-backs-mccarran-name-change-to-harry-reid-international-airport-2281859/
[24] Ngai, Mae M. Impossible Subjects: Illegal Aliens and the Making of Modern America. Princeton University Press, 2014.

most were also granted[25], with more than 4000 immigrants allowed to normalize their status in both 1943 and 1944[26], the years preceding the exclusion of Mexican nationals. On the other hand, between 1929 and 1939 approximately 44,000 Mexican immigrants were charged under the *Undesirable Aliens Act* for illegal entry.[27] Thus, while some undocumented immigrants from Canada were provided a means of relief and path to normalizing their status, this was not extended to those from the southern border, primarily Mexican and Central Americans.

Immigrants entering the United States without a visa from Canada were also discussed in far different terms than their Mexican counterparts, despite their violation being the same. During a discussion of pre-examination in 1938, the following example was provided by Rep. Samuel Dickstein of New York for why this procedure was necessary, "Suppose you were an American citizen and married an Irish girl not here lawfully. Your wife would have to go back 3,000 miles in order to return to you, as, according to the language of this bill, the Department of Labor could not give your wife a preexamination. I say to all those who believe in restriction that that is not restriction. It is nonsense and brutality. It is unjust[28]." The courtesy of this kind of consideration was not extended to non-White immigrants, who were regularly deported despite the lives they built in the United States, not to mention charged under USC 1326 if they reentered.

It was also acknowledged that this procedure allowed for the skirting of the criminal penalties that had been attached to undocumented entry in 1929. During a debate on pre-examination in 1938, Rep. Malcolm Tarver of Georgia noted that, "I am saying simply that the Labor Department ought to observe the law, and that if the law should be changed in order to take care of any proportion of these aliens on this list, who ought not to be deported notwithstanding they are lawfully subject to deportation, then that is a question which should present itself to this House and the Senate...Why? Because section 137 (h) of title VIII, United States Code, provides that where an alien who has obtained unlawful entry to this country is deported that alien not only cannot return, but if he returns he is subject to imprisonment in the United States penitentiary for not exceeding 5 years. So if the Department of Labor carries out the law and deports aliens unlawfully here, aliens who are subject to deportation, not only cannot obtain legal readmission but if they do reenter the country without lawful authority they will be violating the law and subject to imprisonment in the penitentiary.[29]" Thus, it was clear that the policy of pre-examination was in conflict with section 137, which would be reenacted as USC 1326, yet it continued until 1959. Senator Robert Reynolds, returning to a discussion of pre-examination in 1940, would characterize it as, "an inducement to aliens to enter illegally in the hope of availing

---

[25]Ibid.
[26]Congressional Record, March 14th, 1945, 2222
[27]Hernández, Kelly Lytle. City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771–1965. UNC Press Books, 2017.
[28]Congressional Record, Feb. 17th, 1938, 2146
[29]Congressional Record, Feb. 18th, 1938 2176

themselves of this nullification pie.[30]"

By the 1950s it was also acknowledged that there was a growing problem on the northern border with undocumented entrants from Canada. In 1951, Rep. Emanuel Cellar of New York, pointed out that there was a "distressing" number of illegal immigrants entering through the northern border[31] and in 1953, Senator Herbert Lehman cited INS Commissioner Benjamin Habberton as stating there was little screening of European immigrants in Canada, and that "border-jumping" was on the upswing.[32] Despite this, pre-examination remained in place but largely available only to European immigrants or those of European descent. The reenactment of USC 1326 in the McCarran-Walter Act, when paired with the loophole for the northern border, demonstrates that the criminal penalties attached to reentry were meant to specifically penalize Mexican, or Latin American, undocumented immigrants, whose hardships were never taken into consideration in the same way as their white counterparts who entered surreptitiously from Canada.

While USC 1326 received scant attention during the debate over the McCarran-Walter Act, the repeated use of the term "wetback" to describe Mexican immigrants and the racialized aspect of this designation demonstrate that racial animus toward Mexicans, and Latinx individuals more broadly, continued to be present during its reenactment. The historical record clearly demonstrates that Mexican nationals, as well as those from Central America, were the regular targets of racially-motivated legislation. USC 1326 was never intended as racially-neutral policy, but was instead about controlling immigration from one border, and by one group of people, in particular. Entrants from the northern border were, through pre-examination, differentiated from those from the southern border. Members of Congress, and even restrictionist groups like the Immigration Restriction League, made it clear that undocumented entry from the north was not seen as a problem because those immigrants were like "us". They were white and thus they could be assimilated, while those crossing the southern border were criminalized and characterized as "wetbacks". USC 1326 has never been subject to a debate of its origins and the racial animus present in either its initial enactment in '29 or reenactment in '52, nor its actual merit as a policy. Despite its long history, it has never been shown to be an effective deterrent to illegal entry or reentry, but it has destroyed innumerable lives over this period. Congress and President Truman chose to address the racially-motivated aspects of national origins quotas, particularly the racial quota for the Asia-Pacific region, in 1952 even if these were ultimately preserved, but did not extend the same courtesy to Mexican or Central American immigrants who continue to make up the largest percentage of sentenced federal offenders for immigration violations, demonstrating the continued disparate impact of the nation's immigration laws.

---

[30] Congressional Record, July 8th, 1940, 9275
[31] Congressional Record, June 26th, 1951, 7155
[32] Congressional Record, March 3rd, 1954 2562