*United States v. Duron-De Luna*

United States District Court
District of Colorado

Case No. 22-cr-00018-RMR

---

### Exhibit G

Hearings before the Subcommittee of the Committee on Appropriations
U.S. Senate
June 30, 1952



-cr-00018-RMR   Document 31-7   Filed 07/01/22   USDC Colorado   Pa
20-cr-00134-RMP   ECF No. 78-7   filed 12/22/21   PageID.962   Page

# DEPARTMENTS OF STATE, JUSTICE, COMMERCE
## AND THE JUDICIARY    991  -2
### APPROPRIATIONS FOR 1952

# HEARINGS

BEFORE THE

## SUBCOMMITTEE OF THE
## COMMITTEE ON APPROPRIATIONS
## UNITED STATES SENATE

### EIGHTY-SECOND CONGRESS

FIRST SESSION

MAKING APPROPRIATIONS FOR THE DEPARTMENTS
OF STATE, JUSTICE, COMMERCE, AND THE
JUDICIARY FOR THE FISCAL YEAR
ENDING JUNE 30, 1952

---

### PART 1

(Pages 1–1181)
Same Index for Parts 1 and 2

---

Printed for the use of the Committee on Appropriations



UNITED STATES
GOVERNMENT PRINTING OFFICE
80513                  WASHINGTON : 1951

# DEPARTMENTS OF STATE, JUSTICE, COMMERCE, AND THE JUDICIARY APPROPRIATIONS FOR 1952

### THURSDAY, MARCH 8, 1951

UNITED STATES SENATE,
SUBCOMMITTEE OF THE COMMITTEE ON APPROPRIATIONS,
*Washington, D. C.*

The subcommittee met, pursuant to recess, at 10 a. m., in room F–89, the Capitol, Hon. Pat McCarran (chairman of the subcommittee) presiding.

Present: Senators McCarran, McKellar, and Ellender.

## DEPARTMENT OF JUSTICE

### IMMIGRATION AND NATURALIZATION SERVICE

## STATEMENTS OF A. R. MACKEY, ACTING COMMISSIONER, IMMIGRATION AND NATURALIZATION SERVICE; PAUL WININGS, GENERAL COUNSEL; EDWARD LOUGHRAN, ASSISTANT COMMISSIONER; WILLARD KELLY, ASSISTANT COMMISSIONER; AND DALE FRANCIS, BUDGET OFFICER

#### INCREASE IN ALIEN DEPORTATION

Senator McCARRAN. We will continue with the Immigration and Naturalization Service.

Mr. MACKEY. Mr. Chairman, I will proceed with my statement, if you please, sir.

Senator McCARRAN. All right.

Mr. MACKEY. There has been a progressive increase over the last several years in the total number of aliens expelled from the United States. Last year a peak of 579,105 was reached, which was almost double the previous year and which is 50 times the number expelled from this country only 10 years ago. While it is impossible to do so, and we have not given formal deportation hearings in a majority of these cases, it was necessary, in connection with the apprehension of each of these aliens, to question them at considerable length to determine their immigration status and to ascertain whether or not they might be permitted to depart in lieu of formal deportation.

#### ALIENS INVOLVED IN SUBVERSIVE CHARGES

As usual, because of long-drawn-out litigation and inability to obtain travel documents, the number of subversives deported from the United States last fiscal year was very small in comparison with

the total number expelled. Warrants of deportation based on subversive charges are now outstanding against 117 aliens. Of these, 106 have been outstanding for more than 6 months.

Warrant hearings based on subversive charges are now pending in 212 cases.

There are now at liberty under bond 154 aliens pending determination of their deportability on subversive grounds.

Senator McCARRAN. Let me interrupt you there, Mr. Mackey. This matter comes to us continuously in the Judiciary Committee, and for that reason I am very much interested in it. We handled in the Judiciary Committee suspension of deportation cases to the extent of—if my recollection is correct—about 7,000 last year. Those suspensions come to us by reason of the fact that they are first granted by the Department of Justice; and then, under the law, they must come to the Congress if the suspension is longer than 6 months. They come to the Judiciary Committee, and we have to work on each individual case as a case in itself.

You are now dwelling on some of that subject matter, and you seem to have but few deportations.

Mr. MACKEY. I am not dealing with the suspension procedure at this point, Mr. Chairman. I will reach that in my statement.

Senator McCARRAN. To continue, my study of the subject indicates that there have been but few real deportations.

Mr. MACKEY. I think we can explain that, Senator.

### DEPORTATION OF MEXICANS

Senator McCARRAN. Except when you get down to the Mexican boundary. Of course, you have all kinds of deportations there and removals from the territory of the United States. But that is a come-and-go proposition. In other words, there is a flood of people who come across the boundary. They are called wet-backs, and they come across legally or illegally during the various harvest seasons. Then they go back, and so you have this come-and-go drifting there.

Mr. MACKEY. That is right, sir.

### DEPORTATION OF EUROPEANS

Senator McCARRAN. Aside from that, I am speaking largely of European deportations, of which there have been very few.

Mr. MACKEY. Mr. Chairman, may I give you the present picture concerning all classes?

Senator McCARRAN. Yes.

Mr. MACKEY. Pending determination of deportability are 9 subversives; 378 criminal, narcotic, and immoral cases; 114 stowaways and smuggled aliens; 297 other cases—and among those, Senator, are cases where it appears the alien may be eligible for suspension of deportation. The total of all classes in detention at this time is 798.

Senator McCARRAN. Those are in detention?

Mr. MACKEY. Yes, in detention.

Senator McCARRAN. But that does not cover those not in detention?

### ALIENS RELEASED UNDER BOND

Mr. MACKEY. I am getting to that, sir.

Released under bond, there are 154 subversives; 422 criminal, narcotic, and immorals; 197 stowaways and smuggled aliens; other classes, including those that may be eligible to suspension, 4,439; making a total of 5,212. They are under bond.

Senator ELLENDER. How does a stowaway happen to get a bond?

Mr. MACKEY. Some of these stowaways entered illegally a year or more ago. They have been here for some time. We don't release them; the courts will release them on writs.

Senator McCARRAN. How many cases have you, Mr. Mackey, if you can state the number, pending on writs now?

Mr. MACKEY. I will refer that question to Mr. Winings.

Mr. WININGS. I am sorry, Senator, but I don't think we can give you that figure at the moment. You know how it varies from day to day.

Senator McCARRAN. All right, let me ask you a few more questions on this subject. When you catch up with some fellow and his attorney gets a writ for him, do you handle that in court or does the Department of Justice?

Mr. WININGS. The United States attorney in the local area where he is being detained handles it.

Senator McCARRAN. Which is our Department of Justice?

Mr. WININGS. It is a part of our Department of Justice.

Senator McCARRAN. I forgot that for the moment; that is right. So, the United States attorney in the district in which the alien's attorney obtains the writ takes care of the matter for the Government?

Mr. WININGS. That is right, sir.

Senator McCARRAN. Can you give me just a general idea of how many of those cases you have from day to day, approximately? Do they run into the hundreds?

Mr. WININGS. I shouldn't want to say that from day to day they run into the hundreds, but there are always 25 pending in the courts.

Senator McCARRAN. Are they principally in New York?

Mr. WININGS. Some of them have been here for a long time.

Senator McCARRAN. I say, are they principally in New York?

Mr. WININGS. Of course, the larger number are in New York for obvious reasons. That is the largest port of entry, and it is the center of the alien population, perhaps, of the United States.

Senator McCARRAN. They are largely on the eastern seaboard; would you put it that way?

Mr. WININGS. Sir?

Senator McCARRAN. The eastern seaboard has the greatest number of those cases?

Mr. WININGS. That is right; and then, naturally, of course, there are many on the western seaboard.

Senator McCARRAN. All right; I just wanted to see how much of the time of the Service and the time of the Department of Justice is taken up with court procedure in these deportation cases. From what I gathered, it seemed to be quite a lot.

Mr. WININGS. May I add a word?

Senator McCARRAN. Yes.

Mr. WININGS. In that connection, you may be interested to know that although the United States attorneys do represent the Government, as properly they should, of course, our own officers at the local ports cooperate very closely with them, because we are active in a very special field, and it has been found very helpful if our men cooperate very closely with them in the preparation of cases.

Senator McCARRAN. I have some cases in mind that have come to my attention in the Judiciary Committee in which it appears that when the writ is finally denied by the court they go to the circuit court of appeals and, indeed, even go as high as the Supreme Court.

Mr. WININGS. Oh, yes, as often as they can. There it seems to be largely a question these days of whether they have the money to go that far.

Senator McCARRAN. Are there not agencies or organizations that furnish money for that very purpose?

Mr. WININGS. We have every reason to know that that is so; yes, sir, and more particularly in certain types of cases.

Senator McCARRAN. Will you go into that off the record.

(Off-the-record discussion.)

### AUTHORITY TO DETAIN ALIENS

Mr. MACKEY. Following the off-the-record discussion, I would like to say that under section 20 of the Immigration Act of 1917, as amended by section 23 of the Internal Security Act of 1950, the Attorney General has the power to detain aliens pending a determination of their deportability. Under that authority we took into custody 50 of the most active alien members of the Communist Party in the United States. They all sued out writs of habeas corpus.

Those writs were dismissed and the alien remanded to custody in seven cases. Writs were dismissed and the alien released by a court pending appeal in one case. Writs were withdrawn and the alien deported in one case. Writs were sustained and the alien ordered released on bond in 37 cases.

Senator McCARRAN. Now, what does that mean, "released on bond," when the writ was dismissed?

Mr. MACKEY. The writ was sustained, sir, and the alien was ordered released on bond. I am sorry if I said "dismissed."

Senator McCARRAN. I believe I am wrong there.

Under what authority did they release them on bond when they sustained the writ?

Mr. MACKEY. They sustained the petition, but only on the sole question of the right to bail, Senator.

There are writs pending with the alien released on bond pending decision in four cases.

Senator McCARRAN. One of the last classifications that you mentioned is the Harry Bridges case, where the circuit court of appeals held that he was entitled to bond although convicted.

Mr. MACKEY. That was a criminal case.

Senator McCARRAN. That was a straight conviction proposition.

Mr. MACKEY. Sir, that was a criminal case as distinguished from these deportation proceedings.

STATE, JUSTICE, COMMERCE, JUDICIARY APPROPRIATIONS, 1952   **127**

### ALIENS IN DETENTION

Now, Mr. Chairman, we have in detention where the warrants of deportation have been outstanding for 6 months or less, 2 subversives, 185 criminal, narcotic, and immorals, 17 stowaways and smuggled aliens, and 249 other classes, among which are those who might be entitled to suspension, making a total of 453.

Of that class we have released on bond 7 subversives, 42 criminal, narcotic and immorals, 15 stowaways and smuggled aliens, and 466, among which are those that might be entitled to suspension, making a total of 530.

Of that class on conditional parole, we have 2 subversives, 8 criminal, narcotic and immorals, 2 stowaways and smuggled aliens, and 172 others, among which may be those entitled to suspension, making a total of 184.

In other words, we have 1,167 aliens as to whom warrants of deportation have been outstanding for 6 months or less, some of them being in detention, others being released under bond, and others on conditional parole.

Senator McCARRAN. Is there a way to clean up that mess and get those who are in detention out of here?

Mr. MACKEY. Yes, sir. We are working on that.

Senator McCARRAN. They ought to be out of here. We are feeding them and housing them and everything else.

Mr. MACKEY. We are, sir. It is a question of getting the travel documents for them. As you know, under the Internal Security Act, the alien has the right to specify the country to whic'. he wishes to be deported.

Now, referring to the totals of all groups specified here, we have in detention 13 subversives, 776 criminal, narcotic and immorals, 133 stowaways and smuggled aliens, and 623 others, among whom there may be some who may eligible to suspension. That makes a grand total of 1,545 in detention.

Now, released under bond we have 161 subversives, 464 criminal, narcotic and immorals, 212 stowaways and smuggled aliens, and 4,905 others, among whom there may be some entitled to suspension. That makes a grand total of 5,742.

Paroled or under parole supervision, we have 149 subversives, 1,710 criminal, narcotic and immorals, 127 stowaways and smuggled aliens, and 26,933 others, among whom may be those who are entitled to suspension. That makes a grand total of 28,919.

Now, under warrants of arrest unserved as yet, we have 6 subversives, 76 criminal, narcotic and immorals, 30 stowaways and smuggled aliens, and 3,425 others. That makes a grand total of 3,537.

The totals of the groups specified are 329 subversives, 3,026 criminal, narcotic and immorals, 502 stowaways and smuggled aliens, and 35,886 others, making a grand total of 39,743.

### NATIONALITY OF MOST ALIENS IN DEPORTATION CASES

Senator ELLENDER. Are you able to tell from what country the majority of these people come?

Mr. MACKEY. I don't have that right now, but we will be able to tell you.

2-cr-00018-RMR   Document 31-7   Filed 07/01/22   USDC Colorado   Pag
:20-cr-00134-RMP   ECF No. 78-7   filed 12/22/21   PageID.968   Page

128      STATE, JUSTICE, COMMERCE, JUDICIARY APPROPRIATIONS, 1952

Senator McCARRAN. Can you get that for us?

Mr. MACKEY. Yes, sir.

(The information requested is as follows:)

Of the 30,743 outstanding cases approximately 25 percent involve Mexican nationals and approximately 10 percent involve nationals of iron curtain countries.

Of the remainder the predominant nationalities are Canada, West Indies, Central and South America, Great Britain, Italy, France, Greece, Sweden, China, and India.

### ALIENS DEPORTED UNDER INTERNAL SECURITY ACT OF 1950

Mr. MACKEY. In the category of those deported since the passage of the Internal Security Act of 1950, we have 18 subversives, which includes aliens actually and physically deported by us and aliens who themselves left under orders of deportation. To repeat, we have in that group 18 subversives deported, 616 criminal, narcotic, and immorals, 105 stowaways and smuggled aliens, and 2,640 others. That makes a grand total of 3,379 deported since the passage of the Internal Security Act of 1950.

Senator McCARRAN. Has the Internal Security Act accelerated the deportations?

Mr. MACKEY. It has, sir. Mr. Kelly, who is Assistant Commissioner, Enforcement Division, will comment on that.

Mr. KELLY. I would like to say that because of the actions of the courts in these subversive cases, it has not particularly accelerated deportations. After the act was passed about six that we had under orders of deportation, because of the passage of the act, we feel, did leave the United States, people we had been trying to get rid of for a long time. But when others went to the courts and the courts upheld them in so many cases as to their right to bail, why, we began slackening off on getting rid of our subversives.

However, as to other classes, such as stowaways, smuggled aliens—I am talking about classes other than Mexicans now—whom we have, as a matter of policy, been holding in detention, and as to which cases the courts have seemed to distinguish the matter of the right to bail as between a man who is admitted legally and who has been here for many years, we have accelerated deportation in those cases, because the evidence is there, and they are becoming discouraged about trying to drag out all of these administrative proceedings and going through all of this litigation in the courts. So as to other classes we may say that it has accelerated deportations.

### MEXICAN CASES

Senator ELLENDER. Mr. Kelly, would you be able to give us percentagewise the number of those people just mentioned by Mr. Mackey, the thirty some-odd-thousands, who are Mexicans? Are there any Mexicans in there?

Mr. KELLY. Yes, sir. I suppose—and I am just making a very rough estimate—that there may be as many as 10,000 Mexicans, potential suspension cases, whom we cannot move until we get a chance to adjudicate their applications for suspension.

## DEPORTABILITY OF STOWAWAYS

Senator ELLENDER. Mr. Mackey, if you arrest a person who you know is a stowaway and identify the ship on which he was brought in, what is your recourse there? Can you make the ship take him back?

Mr. MACKEY. Yes, sir. He is deportable. If we apprehend him within 5 years of entry, he is deportable at the expense of the steamship that brought him in.

(Off-the-record discussion.)

Senator McCARRAN. I wish to announce some very sad news. Senator Chapman, who was in an automobile accident, I am advised by the clerk has passed away.

Mr. MACKEY. Following our comments off the record, may I say that I should like to do some additional talking off the record here at the proper points, if I may.

Senator McCARRAN. All right.

Mr. MACKEY. I have very capable assistants who could carry on, but I am so interested in this matter that I would like to go ahead with this.

Senator McCARRAN. All right.

### SUBVERSIVE CASES

Mr. MACKEY. Warrant hearings based on subversive charges are now pending in 212 cases. There are now at liberty under bond 154 aliens pending determination of their deportability on subversive grounds. Nine such cases are presently in detention. Forty-three such cases are at large on conditional parole. In this connection, following the enactment of the Internal Security Act of 1950, the Service directed its field officers to take into custody all those aliens under warrants of arrest who were active and prominent functionaries in the Communist party. Fifty were taken into custody. The courts directed the release of 39 on bond and 2 departed voluntarily in lieu of deportation, and 9 are still in detention.

It was contemplated that with the deportation of the 50 active and prominent member cases, we would proceed immediately with the apprehension of the remaining subversive but less active aliens numbering perhaps double or more the active functionaries first taken into custody under the Internal Security Act. While appeals to these decisions of the courts releasing 39 aliens are being taken, further action along these lines will be in accordance with the final decisions. Pending a conclusion of current litigation, we are proceeding under those provisions of the Internal Security Act relating to supervision under parole and bond. During the last fiscal year 11,357 aliens were placed on parole as compared with 8,111 the year before. Under the provisions of the Internal Security Act of 1950, it is estimated that the total number of aliens under parole will reach 15,000.

Senator McCARRAN. Let me interrupt you there for a question. Now, these on parole that you have mentioned—8,000, is that right?

Mr. MACKEY. 11,357.

Senator McCARRAN. Is their identity made known to the FBI?

Mr. MACKEY. We work very closely with the FBI; yes, sir.

Senator McCARRAN. So the FBI knows of these parolees?

Mr. MACKEY. We have perfect coordination, Senator.

Senator McCARRAN. I see. Go ahead.

Mr. MACKEY. These are under conditional parole, which requires them to make known their whereabouts, their activities, and so forth.

### IMMIGRATION BORDER PATROL ACTIVITY

The Immigration Border Patrol is "our first line of defense" against the illegal entry of aliens into the United States. Last fiscal year ending June 30, 1950, the force patrolled more than 10,000,000 miles, examined more than 2,000,000 conveyances, and questioned more than 7,000,000 persons. These operations resulted in apprehension of 469,-581 deportable aliens—over six times the number 5 years ago. The growing problem is indicated by the volume of apprehensions by the border patrol during recent years as follows:

In the fiscal year 1945, there were 70,639 apprehensions by the border partol. In 1946 there were 100,785. In 1947, there were 194,054. In 1948 there were 193,852. In 1949 there were 289,402. And in 1950 there were 469,581.

### MEXICAN CASES

The illegal entry of Mexicans has reached such proportions that it is now comparable to an invasion. Standard border patrol operating procedure is to conduct line operations at the critical border points determined largely by transportation facilities and the nature of the terrain and to throw a line of back-up units across the principal avenues of travel away from the border—to screen travel from that area and apprehend illegal aliens and to search for them in the area between the border and the line established by the back-up units. Both lines of operations, the one along the international boundary and the other across the avenues of travel away from the border, are manned so thinly that many aliens inevitably succeed in their efforts to enter illegally and to reach interior destinations in the United States.

The constant apprehension and expulsion of Mexican aliens who have entered illegally has become so burdensome that the Border Patrol is almost powerless to cope with the threat of dangerous types of aliens using this avenue to filter into the United States.

Senator ELLENDER. Let me ask you a question right there, if I may. Many of these who come in from Mexico are not Mexicans; is that not right?

Mr. MACKEY. I want to talk about that in a moment, Senator.

### ALIEN SMUGGLING

The tide of illegal entry from Mexico should be halted. It makes a farce of the immigration laws in that area. It constitutes a ready avenue for European alien smuggling.

A problem as of now and for the future is ability of the border patrol force to meet the actual and potential alien smuggling situation. Smuggling is on the increase. The numbers apprehended in recent years are as follows:

In the fiscal year 1944, 116 smugglers were apprehended. In the fiscal year 1945, there were 136. In 1946 there were 220. In 1947 there were 277. In 1948 there were 412. In 1949 there were 635. And in 1950 there were 713.

Here again we are apprehensive that the true meaning of these increasing numbers is a growing disregard for our laws because of an understaffed arm of enforcement.

The movement of aliens into Canada from Europe continues and there are strong indications that it will continue at an accelerated pace. Many of the aliens who are coming into Canada do so with the desire and intention to reach this country as soon as possible, legally or illegally.

Senator McCARRAN. That has been especially true, as the record before our committee shows, amongst the displaced persons. They have come into Canada with no intention of remaining there. They have been selected by Canada in Europe and brought over at Canadian expense, in most instances, and they have then come across our border.

Mr. MACKEY. May I proceed, sir?

Senator McCARRAN. Yes.

Mr. MACKEY. Organized rings of smugglers are operating in various sections of the United States in concert with smugglers abroad. The smuggling of aliens has been accomplished along the Canadian border, along the Mexican border, along the Gulf coast and along the east coast of the United States. All indications point to an anticipated increase in the number of attempted smuggling operations.

World conditions being as they are, many persons in countries with small quotas are risking detection, imprisonment, and deportation by trying to steal their way into the United States. During the period from July 1, 1948, until November 1, 1950, a total of 1413 alien stowaways were found on board vessels. One hundred seventy-five of this number were found during the period from July 1 to October 31, 1950. The bulk of these alien stowaways were found at the ports of New York, Philadelphia, Baltimore, Norfolk, and New Orleans.

Early last fiscal year a border-patrol unit was stationed in New York for the purpose of searching and guarding vessels suspected of carrying stowaways and to patrol the water front and harbor. Each of those cars is radio-equipped. In the final 7 months of last fiscal year the New York patrol unit apprehended 757 deportable aliens, including 77 stowaways and four smugglers. We have found that the most effective way to cope with this problem is to meet each suspect ship immediately on arrival and search the ship from stem to stern. Within the last month we have authorized border-patrol units for Philadelphia, Baltimore, and Norfolk to provide the protection needed at these ports—even at the expense of moving men from the land boundary where they can ill be spared from the task of preventing illegal entry across the border.

### INVESTIGATIONS

There is hardly a phase of the enforcement and adjudicative operations of the Immigration and Naturalization Service that does not require that an investigation be conducted at some stage in the proceedings. The growing security consciousness in this country adds

**132**   STATE, JUSTICE, COMMERCE, JUDICIARY APPROPRIATIONS, 1952

to the importance of investigations required in all avenues of Immigration and Naturalization Service activity.

During the past year, the investigations program of the Service placed special emphasis upon the problems peculiar to the times, such as subversive aliens, smugglers, and related activities.

During the fiscal year 1950 the force completed 238,064 investigations of all types. There were 38,462 pending at the close of June 1950. Of those completed 1,872 were based solely on subversive charges and 1,882 of those pending involved subversive charges. This was an increase of 32 percent over the cases based solely on subversive charges the prior fiscal year.

Unlawful activity flows through devious channels encompassing smugglers, stowaways, forgery, and falsification of documents, corruption of public officials, and the like. The Immigration and Naturalization Service has taken active steps to cope with the smuggling of aliens into the United States. Last fiscal year 1,489 investigations of smuggling activities were completed. Seven hundred and thirteen smugglers were apprehended, an increase of 12 percent over the prior year. Also, during 1950 there were apprehended 243 persons after having effected illegal entry as stowaways. Widespread and closely coordinated investigative work is required to break these cases.

### NATURALIZATION INVESTIGATIONS

Last fiscal year the force completed 1,279 investigations involving possible cancellation of naturalization, an increase of 15.7 percent over the prior fiscal year. Also, last fiscal year 1,244 investigations were initiated in cases of naturalized citizens suspected of engaging in subversive or proscribed activity—1,170 such cases were pending at the close of the year.

Last fiscal year 15,004 cases involving suspension of deportation were investigated, an increase of 9 percent over the prior year. There were submitted to Congress with recommendation for the granting of permanent status in suspension cases 4,452 cases, as compared with 4,302 in 1949 and 3,160 in 1948. Since the passage of the act of June 28, 1940, authorizing suspension of deportation, 32,358 names have been submitted to Congress for approval, or an average of 3,236 a year.

### LEGISLATION FOR RELIEF OF INDIVIDUALS

There has been a large increase in the number of private bills introduced for the relief of individuals subject to deportation. During the Eighty-first Congress, 2,738 private bills of this type were introduced as compared with 1,141 during the Eightieth Congress. The Service is required to conduct thorough investigations into the subjects of these bills in order that appropriate reports may be submitted to the Congress. The field force was called upon to conduct 1,810 such investigations last year.

### OTHER INVESTIGATIONS

Other investigational accomplishments last fiscal year were 107,500 cases contemplating warrants of arrest under general immigration laws, 36,164 cases involving visitors, students, transits or treaty mer-

chants who had remained longer than the temporary periods for which admitted or had violated the conditions under which temporarily admitted; 2,532 applicants for adjustment of status under the terms of section 4 of the Displaced Persons Act of 1948, as amended; 9,823 cases involving violation of the Alien Registration Act; 2,035 cases involving parole of deportable aliens; 7,539 petitioners for naturalization; and some 50,000 cases involving other miscellaneous subjects such as contract labor, applicants for registry, irregular practice of attorneys, personnel, and so forth.

Judging by all the objective criteria available, the outlook for the approaching fiscal year points convincingly to a substantial increase in the number of investigations which will be required in all fields of Service responsibility. The following are the highlights of this anticipated activity.

It is safe to predict, I believe, that there will be an increase in the number of aliens investigated for possible deportability or excludability on subversive grounds, and in the number of naturalized citizens investigated for possible cancellation on like grounds. This prediction is predicated on the following current factors:

### INTERNAL SECURITY

Recent developments, both at home and abroad, have made the public at large more security conscious than ever before. Activity and remarks which have heretofore passed unnoticed by the average citizen have now acquired significance and aroused suspicion. Members of the public have lost their prior apathy and do not hesitate to report items they consider questionable. As a result, there is already noted an increase in the number of complaints, both signed and anonymous, received from members of the public concerning aliens and naturalized citizens whose loyalty they suspect. Each complaint received requires consideration.

Intensified concentration by other agencies on internal-security problems has resulted in an increase in the amount of information being made available concerning aliens and naturalized citizens. The number of reports of derogatory information received by this Service from other agencies is constantly on the increase.

Undercover informants hitherto unavailable are gradually being disclosed, thereby placing their hitherto unobtainable information at the disposal of this Service. Persons who have up to now, for reasons of personal convenience, refused to divulge relevant information are now yielding under the impact of current events. Closer liaison with agencies of friendly governments, plus the march of world events, has resulted in opening up new sources of information.

Apart from the number of formal organizations being made the subject of investigation, the number of national groups requiring closer scrutiny is increasing as the result of the world situation. Thus, for example, the dramatic turn of events in the Orient has placed numerous orientals in a position where they must elect between the Communists and the democratic forces. Forced to take a stand, many of the Chinese and Koreans in this country have indicated by their actions and associations that their sympathies are with the Communists. Thus, the recent developments abroad have required that we focus more sharply on entire national groups and scrutinize all individuals

in those groups with much greater care than heretofore. As the international situation develops, additional groups will logically come under the microscope.

Recent legislation, particularly the Internal Security Act of 1950, has set up additional legal grounds for exclusion, deportation, denial of citizenship, and denaturalization. Additional investigations are required to determine whether persons, heretofore unaffected by the prior legislation, are now subject to Service action.

The increased tension abroad has aggravated the demand for illegal entry on the part of aliens unable to effect legal entry. This is true not only with respect to aliens seeking to enter the United States direct from Europe or the Orient, but also with respect to aliens who have recently made their way into countries of the Western Hemisphere. Canada, Mexico, Cuba, and other of our good neighbors have recently experienced a large influx of European aliens, numbering in the hundreds of thousands. While many of these are settled in good faith, it is obvious that many others regard their present location merely as a way-station or stepping-off place for entry into the United States when the opportunity presents itself. Recent experience with aliens smuggled into the United States after lawful admission into Canada indicates clearly that the immigration into Canada was engineered by smugglers as part of a carefully planned border-jumping project. While some of the smuggling gangs have been exposed and broken up, it is obvious that the huge number of recently arrived European aliens in Western Hemisphere countries forms a profitable reservoir from which smugglers will continue to draw.

Senator ELLENDER. From that statement, are we to judge that aliens can more easily come into Canada than into the United States? Is there not some way by which Canada can look into that, and can we not get their cooperation?

Mr. MACKEY. Yes, sir; we do have their cooperation. Of course, that is through the Secretary of State who deals with the Canadian authorities. We do have the full cooperation of the Canadian authorities.

### ILLEGAL TRAVEL DOCUMENTS

The use of counterfeit and altered travel documents as a means of effecting illegal entry gives every indication of being on the increase. The increasing tension in the Orient has aggravated the desire of numerous Chinese to get to the United States by hook or crook. Within the past few months, a gang trafficking in forged travel documents has been unmasked. Current investigation indicates that the operations of this gang were much more widespread than was originally suspected. How far the ramifications extended, and what other groups will be exposed, is a matter dependent on the investigation which is still current. It is sufficient to say that there is obvious need for more intensive investigation in the entire field of spurious travel documents.

There are numerous reasons why deportation investigations will increase in the coming fiscal year. Increased international tension always results in increased overstays on the part of temporary visitors, seamen, students, and so forth. Many of these who are now maintaining status it is believed will be tempted to remain when their stay expires during the time to come. In addition, many new cases of

unlawfully resident aliens will come to light as the result of the annual registration of current address recently inaugurated under section 35 of the Alien Registration Act, as amended by the Internal Security Act of 1950. While the full effect of this registration will not be known for some time, it is presently clear that numerous deportation investigations will result from the facts that (1) many aliens long sought will have revealed their present whereabouts; (2) many aliens who had never theretofore registered are impelled by the publicity given the act to come into service offices to inquire about their immigration status, and many are found to be deportable.

### DISPLACED PERSONS

In addition, the recent amendment to the Displaced Persons Act of 1948 has created an additional ground for deportation in the cases of displaced persons who abandon their contractual employment under circumstances indicative of an initial fraudulent intent.

An increase can be anticipated in the number of investigations incident to suspension of deportation. Many of the aliens whose unlawful presence is disclosed as a result of the registration under the Alien Registration Act will doubtless apply for suspension of deportation. In addition, as additional numbers of aliens achieve the 7-year-residence requirement of section 19 (c) of the 1917 act, they will be tempted to disclose their unlawful presence and apply for suspension of deportation.

We do not assume that there will be a diminution in the number of private bills introduced in behalf of unlawfully resident aliens. Quite the contrary, the trend is upward and the factors which make for such a trend are still operative, namely, increasing tension abroad and decreasing desire on the part of aliens to return to their own troubled lands.

### FAILURES TO REGISTER AS ALIENS

As an additional burden we shall have the cases of aliens who failed to register as required by law and who will have to be investigated to determine whether criminal prosecution, the only guarantor of effective enforcement, will be instituted. We also expect a continued heavy volume of cases involving entries without inspection, illegal entry after deportation, smuggling, fraudulent documents, and stowaways.

The number of naturalization petitions which will be filed in the coming fiscal year will doubtless be larger than heretofore, with a resultant increase in naturalization investigations required. This increase in naturalization filings is predicated on the fact that the large volume of postwar immigration (war brides, displaced persons, and so forth) is just about starting to achieve the residential requirements prerequisite to naturalization, viz 2 years in the case of those married to citizens and 5 years in the case of all others.

Even without any increase in the number of investigations, the number of investigators currently authorized is insufficient to maintain equilibrium between the new cases arising and the cases disposed of.

### PERSONNEL

Senator McCARRAN. I notice that you are not asking for any additional personnel.

Mr. MACKEY. No, sir. You authorized that under the $3,000,000 supplement, giving us 627 additional employees.

### CASE-LOAD PROBLEM

The case load carried by each investigator is so large that he cannot conduct all the investigations required within a reasonable period of time. As a result, he is required to give attention to cases on a priority basis, leaving to the last those considered least pressing. Thus, the backlog of cancellation investigations keeps mounting, since these cases do not have a high priority. Yet, in times like the present, when practically every facet of our work involves some security factor, it is highly undesirable to leave any phase of the work for the indefinite future. With an increasing number of investigations in the offing, it is obvious that the case load of the individual investigator is bound to increase unless additional personnel are authorized.

Moreover, the fact that the time of each investigator is more than fully taken up with cases assigned leaves no time for free-lance investigating. Investigation of the latter nature is essential to any well-integrated investigational organization, for it not only permits the development of additional sources of information but, most important, often results in avenues of inquiry not within the pattern required by specific cases assigned.

The naturalization potential in the United States is on the increase. Most of the 92,405 war brides admitted prior to July 1, 1948, under the act of December 28, 1945, are eligible for naturalization. This group, plus the 165,202 displaced persons admitted during the last 2 years and the increase in the number of other immigrants admitted, signals an upward trend in naturalization work for the next few years. Last year 93,497 persons filed declarations of intention to become citizens of the United States—three times the number filed 5 years ago.

### CURTAILMENT OF IMMIGRATION DURING EMERGENCY PERIODS

Senator McCARRAN. Mr. Mackey, let me put a question to you that has been in my mind for a long time. We are in a war status whether we are in a war or not. We are assembling an army of 3.5 million or 4 million. You are relating to us here hour after hour the problems that you have to deal with in this immigration work. Do you not think that there should be a very decided curtailment of admissions into this country during this war period?

Mr. MACKEY. I think that should be explored.

### CITIZENSHIP APPLICATIONS

Applications for certificates of arrival and preliminary forms for declarations of intention were received during 1950 from 117,436 aliens, an increase of 36 percent over the 86,416 received during 1949.

I think we can expect heavy demands upon the naturalization force as a result of conversion of industry to defense production and the

concurrent increase in manpower requirements. Based upon experience during the last war literally thousands of aliens will take steps to obtain citizenship in order to meet the status requirements for defense industry employment. During the last period of defense production both employers and prospective employees continually beseeched the Service to take prompt action on applications concerned with naturalization.

With the present emphasis upon matters affecting internal security, the Service recognizes the increased importance of thorough and painstaking examination of naturalization applicants and their witnesses so that United States citizenship will not be conferred upon those who would destroy our form of government. Last year our officers represented the Government in 69,573 final hearings accorded by courts to applicants for citizenship. The courts followed the recommendations of the officers of the Immigration and Naturalization Service in 99.8 percent of the cases presented for final hearing. Naturalization was denied in 2,558 of these cases.

Aside from the stake of conferring citizenship upon undesirable aliens, experience has shown that there is a great deal of difficulty in depriving a person of his illegally or fraudulently procured naturalization. Judgments of naturalization were revoked and certificates of naturalization canceled in 415 cases during 1950, an increase of 125 percent over the 184 cases during the prior year.

The Internal Security Act of 1950 adds to the qualifications for citizenship that the applicant (1) demonstrate an ability not only to speak the English language as heretofore required, but also to read and write the English language, and (2) indicate under oath a willingness to bear arms or to perform noncombatant service on behalf of the United States when required by law. If the applicant establishes that by reason of religious training and belief he cannot take this oath he is then permitted to take an oath simply offering his true faith and allegiance to the Constitution and laws of the United States. Pursuant to this new law the Service must call in and re-examine upwards of 15,000 applicants whose petitions are now pending.

Senator McCARRAN. There is another phase to that, Mr. Mackey, that has interested me; and that is the character of the witnesses who testify as to the good moral character of an applicant for citizenship. It seems to me that we are exceedingly lax in that. In other words, some fellow comes in and just testifies that this man is a man of good moral character, but you do not know who the witness is. There is no screening of him.

Mr. MACKEY. Since we have had the Internal Security Act and have had the authority, Mr. Chairman, we have issued appropriate instructions to all district officers.

Senator McCARRAN. I am glad of that.

Senator ELLENDER. I believe there is a laxity on the part of the judges in the interpretation of the writ of habeas corpus.

Mr. MACKEY. Of course, Senator, as I say, we are short of manpower. I am very reluctant to come here and ask for money and say that we need additional personnel because I know it costs money. I am very sensitive to the fact that apparently each year we are asking for more money than we requested for the previous year. But if we are to thoroughly investigate every witness who appears in a natural-

**138**   STATE, JUSTICE, COMMERCE, JUDICIARY APPROPRIATIONS, 1952

ization proceeding, you can readily understand the burden that is imposed upon an investigating agency.

Senator McCarran. Mr. Mackey, why would it not be possible to reduce the central force in view of the decentralization to the field?

Mr. Mackey. We have decentralized much of the central office work; but with the Internal Security Act of 1950 and the Alien Registration Act, Senator, we had to take on additional help, most of which is temporary.

### RESEARCH AND EDUCATION DIVISION

Senator McCarran. What would you say specifically are the costs of operating the Research and Education Division?

Mr. Mackey. I will have to ask Mr. Loughran to comment on that.

Senator McCarran. Tell us what you had in 1950 and in 1951 and what is proposed for 1952.

Mr. Mackey. Mr. Loughran will answer.

Senator McCarran. All right, Mr. Loughran.

Mr. Loughran. The estimate for 1952 is $254,335.

Senator McCarran. What is done in that Division of Research and Education?

Mr. Loughran. They take care of the education of the aliens and——

Senator McCarran. The education of the aliens?

Mr. Loughran. They issue textbooks.

Senator McCarran. Will you give me that again: The education of the aliens?

Mr. Loughran. The education of the aliens who apply for citizenship. Citizenship textbooks are prepared and distributed throughout the country.

Senator McCarran. Is not that done largely by voluntary service throughout the country?

Mr. Loughran. They do not prepare the textbooks. In fact, we have innumerable requests from Congressmen and other interested persons, both in Washington and throughout the States, for additional textbooks.

Mr. Mackey. I might say that that Division coordinates the various citizenship and Americanization schools throughout the country. That is one of its functions, and, of course, it prepares and distributes the citizenship textbook.

Senator McCarran. I know of places where teachers in the public schools volunteer their services without compensation to educate these aliens and take them on at night school.

How many textbooks are prepared each year and at what cost? How many are used each year?

Mr. Mackey. Will you let us give you those facts for the record, Senator?

Senator McCarran. Yes. I would like to have that. I would like to see the figures on the cost.

Mr. Mackey. I think we can supply that for the record rather than guessing.

(The information requested is as follows:)

| Fiscal year | Copies of citizenship textbooks | | |
|---|---|---|---|
| | Distributed | Purchased | Cost |
| 1970 | 190,038 | 103,500 | $19,707 |
| 1919 | 146,528 | | |
| 1948 | 149,600 | 194,000 | 35,504 |

Mr. LOUGHRAN. That Division is also responsible for the statistical studies of the Service. They take care of the preparation of statistics, the gathering of statistics, and they also handle special studies on immigration and population trends.

### DECENTRALIZATION PROGRAM

Senator McCARRAN. Now, on page 23 of the first justifications submitted to the committee, I note that as of March 1, 1950, you have decentralized the Service. What are the specific accomplishments of this decentralization, Mr. Mackey? What would you say has been accomplished by it?

Mr. MACKEY. It served a very useful purpose in many respects, Senator, by delegating authority to field officers to handle and dispose of certain types of cases at field-office level.

### RESEARCH AND EDUCATION DIVISION

Senator McCARRAN. What are the functions of the 73 positions in the Research and Education Division shown on page 8 of the supplemental justifications?

Mr. MACKEY. May we submit that for the record, sir?

Senator McCARRAN. Yes.

(The information requested is as follows:)

#### FUNCTIONS OF THE RESEARCH, EDUCATION, AND INFORMATION DIVISION

Responsible for promoting instruction and training in citizenship responsibilities of applicants for naturalization, as authorized by section 327 (e), Nationality Act of 1940, including supervision of the preparation, publication, and distribution of the citizenship textbook authorized by said subsection, and by section 344; preparing and analyzing data on the work of the Service as directed by section 345 of said act of 1940, and other acts. The responsibilities of this Division, under such statutes, include cooperating with public schools and other agencies in the development of public-school programs of education for adult aliens; sending to such schools the names of candidates for naturalization; assisting the Commissioner of Immigration and Naturalization in deciding upon the nature and scope of the examination of petitioners for naturalization to determine their understanding of the fundamental principles of the Constitution for the purpose of making appropriate recommendations to the naturalization courts; conducting special technical studies of immigration and naturalization; maintaining an index-digest system embracing the laws, regulations, opinions, and decisions relating to the technical work of the Service; preparing and maintaining manuals on immigration and nationality from the data recorded in such index-digest system; preparing the material for compilation of the laws and regulations of the Service; supervising the editing of such publications and related publications of the Service; preparing regulations for inclusion in title 8 of the Code of Federal Regulations, and Operations Instructions; handling applications for the certification of any part of the naturalization records and for information from

-cr-00018-RMR   Document 31-7   Filed 07/01/22   USDC Colorado   Pag
20-cr-00134-RMP   ECF No. 78-7   filed 12/22/21   PageID.980   Page 2

**140**     STATE, JUSTICE, COMMERCE, JUDICIARY APPROPRIATIONS, 1952

the records of the Service; furnishing information where advisable from Service files by telephone and personally to individuals making application therefor; conducting all public-relations work of the Service; editing the Monthly Review of the Service; and compiling and analyzing statistics of the operations of the Service and of the fields of immigration and nationality generally.

### The Assistant Commissioner for Research, Education, and Information

Responsible for encouraging, promoting, and expanding the public-school program of education to assist adult aliens throughout the United States in qualifying for citizenship, by cooperating with public schools and other agencies; coordinating such educational program with the naturalization work as conducted by the Service; publishing citizenship text materials for use in public-school classes by naturalization candidates; advising, where practicable, in the organization of I Am An American Day activities; assisting in the development of more meaningful court induction ceremonies for new citizens, as specified in the resolution of Congress approved May 3, 1940; making appropriate contacts with news agencies, motion picture, and television representatives, and conducting the public-relations work of the Service, acting as technical adviser to motion-picture companies in the preparation of movie scripts on matters relating to Service activities; and carrying on correspondence and conferences incident to the foregoing.

### Statistics Section

Responsible for the definition, collection, presentation, analysis, and interpretation of statistics of the Service concerning immigration and nationality, covering data on (1) migration of aliens and citizens; (2) naturalization of aliens, derivative citizenship, repatriation, and expatriation; (3) alien registration; (4) law enforcement, i. e., exclusion of nonadmissible aliens; apprehension and deportation of aliens illegally in the United States; (5) adjudicative functions delegated to the Service by law and regulations.

Data obtained for the classes above are presented to show relationships in terms of nationality, geographic distribution, occupation, age, sex, marital status, and other categories determined by applicable statutes and regulations. Statistical analyses and technical studies are made (1) for administrative use and guidance in determining administrative procedures and policies; (2) for evaluating the effectiveness of the various parts of the immigration and nationality laws passed by Congress; (3) for general information for reports to Congress, for budget estimates, for congressional committees and the public interested in migration and citizenship; and (4) for the use of other Government agencies. Consult and advise staff and operating officials regarding procedures, statistical studies, workloads, and other operating functions; clear requests to the field for tabulations and reports; represent the Service on interdepartmental committees to coordinate the statistical work of this Service with that of other Government agencies; represent the Service in interdepartmental committees for the improvement of international migration statistics.

### Digest and Manual Section

The work of the Digest and Manual Section includes two principal areas of responsibility: (1) The immigration and nationality manuals; and (2) the index-digest system. The immigration and nationality manuals are analytical and expository presentations in the nature of source books issued for the guidance of the Service. They reflect accepted practices and policies, and incorporate the substance of applicable statutes, regulations, instructions, judicial, and administrative decisions, and other pertinent materials—all in integrated form. It is the function of this section to revise such manuals by preparing new materials to keep them current by replacements and additions, requiring constant and continued surveys and court decisions. The index-digest system is a compilation of digested judicial and administrative instructions, appropriately indexed, maintained to guide operating officers and other Service officials to authorities pertinent in determining the cases presented to them. The Digest and Manual Section maintains the index-digest and keeps it current by analyzing, digesting, and indexing all important pertinent judicial and administrative decisions and other authorities.

### General Research Section

The work of the General Research Section falls into four principal areas: (1) Preparing technical studies needed for the information and guidance of the Service, utilizing pertinent statistical data and other materials, as well as

-cr-00018-RMR Document 31-7 Filed 07/01/22 USDC Colorado Pag
20-cr-00134-RMP ECF No. 78-7 filed 12/22/21 PageID.981 Page

STATE, JUSTICE, COMMERCE, JUDICIARY APPROPRIATIONS, 1952    141

research publications of other Government agencies and individual scholars; (2) supplying—in response to requests from Members of Congress, other Government agencies, and private individuals and organizations—technical articles, compilations, and special reports concerning the regulation of immigration and naturalization, and the foreign-born in the United States, particularly the alien population; such materials dealing with the various social, economic, and demographic characteristics of the foreign-born population of the United States; (3) editing the Immigration and Naturalization Service Monthly Review; (4) carrying out revised literacy test reading cards with translations into the various languages used by immigrants.

*Information and Instructions Section*

Responsible for the functions of drafting and preparing regulations for inclusion in title 8 of the Code of Federal Regulations, and Operations Instructions.

Responsible for the handling of applications for the certification of any part of the naturalization records of any court or of any certificate of naturalization or citizenship for use in complying with any statute, State or Federal, or in any judicial proceeding as provided for in section 341 (e) of the Nationality Act of 1940; applications for information from, or copies of, the records of the Service, either certified or not, as provided for under section 342 (b) (8) of the Nationality Act of 1940; application for information of a general and routine nature; prepares confidential abstracts of information contained in Service files in response to inquiries from the Federal Bureau of Investigation of all correspondence relative to the foregoing functions.

Responsible for maintaining an information office for the furnishing of information from Service files by telephone and personally to individuals making application therefor, and for the reception of individuals wishing to see Service officials.

## CENTRAL OFFICE PERSONNEL

Senator McCarran. I note that an increase in the central office force occurred after the decentralization took place. Why should this be?

Mr. Mackey. They were employees that were necessary in connection with the processing of the alien registration cards received from the field. Up to the moment we have received around 2,300,000 such cards. As we get those cards they are processed through by tabulating machines. Then we have to match them up with the files; and, if we get a file where there is no card, we have reason to believe that that alien did not register. We will send him a nice note telling him to register.

Senator McCarran. Alien registration seems to have required an increase of 10, while the Administration Division has required an increase of 16. Likewise, the Enforcement Division has required an increase of 20 and the Adjudication Division, 29.

Mr. Loughran. The increase of 16 positions in the Administration Division is part of the 627 permanent positions granted us by the Congress as a result of the Internal Security Act. Those 16 positions follow the staffing standards prescribed by the Bureau of the Budget—so many for personnel, so many for services and supplies, and so many for bookkeeping and payroll.

The other increase there is for the additional central office positions allowed by the Congress as a result of the Internal Security Act of 1950. There is a large increase in temporary personnel in the central office, as Mr. Mackey has explained. They are to handle and process the alien registration address cards.

Senator McCarran. Why should the greater number, 29, be applied to the Adjudication Division?

Mr. MACKEY. That is because of the backlog of cases that has accumulated there, Senator. We are right on top of that. I had a survey made of the Adjudication Division; and I am thinking now, Senator, of reorganizing the Division. But right now we have a backlog of so-called suspension cases that we have had to backlog in order to give attention to other cases that were of more urgent priority.

### PROPOSAL TO REMOVE EXEMPTION UNDER ADMINISTRATIVE PROCEDURES ACT

Senator McCARRAN. Now, last year, Mr. Mackey, there was a rider put in by the House exempting the Immigration Service from the provisions of the Administrative Procedure Act, in order to overcome the effect of the Sung decision in the Supreme Court. You will recall that this decision called for a separation of hearing and examining officers in deportation proceedings. I note on page 7 of your supplemental justifications that you are requesting no increase in personnel for 1952. Now, I propose to recommend the deletion of this rider. What do you think about that?

Mr. MACKEY. I should like to have our general counsel, Mr. Winings, answer that.

Senator McCARRAN. All right. In other words, your Department was eliminated from the effects of Administration Procedure Act.

Mr. MACKEY. Yes, sir.

Senator McCARRAN. But the Supreme Court laid down a certain regulation which should be accomplished, and the House sought to carry that out.

Mr. MACKEY. That is right, sir.

Senator McCARRAN. Now, you are not asking for any additional personnel, so it looks to me as though you are abandoning that this year.

### SEARCH FOR COMPETENT HEARING OFFICERS

Mr. MACKEY. Oh, no; we are not abandoning that. Here is what we are doing, Senator: We made a service-wide canvass of all persons whom we thought might be eligible as hearing officers. I think some 600 of the employees applied for those positions.

A board, the members of which were composed of one from the Department of Justice, one from my central office, the district director at Detroit, and a member of the Civil Service Commission, went over all of these applications. I think that out of the 600 we got around 197.

Senator McCARRAN. What functions do they perform?

Mr. MACKEY. They will sit and hear warrant and exclusion proceedings. However, being conscious of the dissenting opinion of the Sung decision, when we handle subversive cases or criminal and immoral cases we follow the procedures required under the Administrative Procedure Act. You see, we will use the hearing officer and the examining officer. However, in the great majority of cases, there will be only one hearing officer.

There is another thing, Senator, that I should like to get into the record. With regard to these thousands of Mexicans who are now coming across the border, many of them now, on the advice of counsel—and some attorneys are even going so far as advertising—are becoming conscious of their right to hearings. When we ask them whether they will depart to Mexico voluntarily, they will say, "No, I

want a hearing," knowing that they will be permitted to remain here either in detention or on bond.

Now, we simply do not have the detention facilities to hold them, and we are releasing them on bond. While they are on bond, they work.

Senator McCarran. Who puts up their bond?

Mr. Kelly. Most of them are out without bond because we have no alternative. We have no place to detain them, and we must release them.

Mr. Mackey. They cannot put up a bond, and we have no place to detain them. Of course, once they demand a hearing, the case has to stay in a pending status until the hearing officer can reach that case. Many of them are applying for suspension of deportation.

Senator McCarran. Can you not detain them back across the line in Mexico?

Mr. Mackey. They could be; yes, sir.

Now, as far as the Mexican laborer is concerned, he is a harmless individual. I think the dollar is worth about 8.6 pesos. He will come over with his pregnant wife; and, in a few months, the baby is born. So then he applies for a suspension of deportation on the ground that his deportation would result in a serious economic detriment to a citizen of the United States; to wit, his son or his daughter.

Senator Ellender. There are tricks in all trades.

### CONFIDENTIAL FUND

Senator McCarran. I noticed, Mr. Mackey, that you want an increase in the amount to meet unforeseen emergencies.

Mr. Mackey. That is the confidential fund.

Senator McCarran. There you are asking for an increase from $20,000 to $50,000. It is within your general appropriation.

Mr. Mackey. Yes; no more money is requested.

### AUTOMOBILES

Senator McCarran. You were granted authority during the current year to purchase 150 automobiles. Next year you want authority to purchase 212 automobiles. What is the justification for this item?

Mr. Loughran. You will recall that during the recent war we were not able to purchase automotive equipment, as most of the other agencies could not. Then at the end of the war we were allowed to buy a number of cars because our old equipment had completely worn out. The result is that many of our cars—in fact, a little over 24 percent of our fleet—more than meets the standard of 60,000 miles set by the Bureau of the Budget. In other words, approximately 25 percent of our fleet would be completely worn out, and it just would not pay the Government to have them constantly repaired.

Senator McCarran. How many cars have you altogether?

Mr. Loughran. 893.

Senator McCarran. Are they scattered all over the United States?

Mr. Loughran. Yes, sir.

Senator McCarran. And you want to increase them by 212?

-cr-00018-RMR  Document 31-7  Filed 07/01/22  USDC Colorado  Pag
20-cr-00134-RMP  ECF No. 78-7  filed 12/22/21  PageID 984  Page 2

144    STATE, JUSTICE, COMMERCE, JUDICIARY APPROPRIATIONS, 1952

Mr. LOUGHRAN. No; we just want authority to replace 212 rather than 150. We have had authority for a number of years to replace 150 cars. We are asking for authority to replace, not 150 but 212.

Senator MCCARRAN. Have you anything further you want to say, Mr. Mackey?

Mr. MACKEY. That is about all at this time.

Senator MCCARRAN. Are there any questions, Senators?

### MEXICAN BORDER PATROL

Senator ELLENDER. I would like to ask, Mr. Mackey, whether you are going to come back to us for more help on this Mexican border patrol?

Mr. MACKEY. We may have to come back, Senator Ellender; I do not know about that. I think the proposed legislation, if enacted, will help us a lot.

Senator ELLENDER. You mean in running them down?

Mr. MACKEY. That is right. That is your bill.

Senator ELLENDER. That was my idea, and Senator McCarran has it in his.

Mr. MACKEY. I was so happy when I heard that you were going down to Mexico City to attend that conference.

Senator MCCARRAN. Are there any further questions, gentlemen?

Senator ELLENDER. I have nothing further.

Mr. MACKEY. I only hope, Senator, you will give us all we ask for.

Senator MCCARRAN. Well, we will do the best we can under the circumstances. We have an everlasting obligation to try to curtail expenditures.

Mr. MACKEY. We will try to do the best we can with whatever you give us.

Senator MCCARRAN. We thank you.

Mr. MACKEY. Thank you, Mr. Chairman and gentlemen of the committee.

Senator MCCARRAN. The committee will recess at this time and reconvene at 10 o'clock tomorrow morning.

(Whereupon, at 12 o'clock noon, Thursday, March 8, 1951, a recess was taken, the subcommittee to reconvene at 10 a. m., Monday, March 12, 1951.)