*United States v. Duron-De Luna*

United States District Court
District of Colorado

Case No. 22-cr-00018-RMR

### Exhibit J

Statement of Wade J. Henderson
before the Subcommittee on Immigration and Refugee Affairs
of the Committee on the Judiciary

U.S. Senate
April 14, 1988



S. Hrg. 100-1060

# IMPLEMENTATION OF IMMIGRATION REFORM

# HEARING

BEFORE THE

## SUBCOMMITTEE ON IMMIGRATION AND REFUGEE AFFAIRS

OF THE

## COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

ONE HUNDREDTH CONGRESS

SECOND SESSION

ON

THE IMPLEMENTATION OF THE IMMIGRATION REFORM AND CONTROL ACT

APRIL 14, 1988

Serial No. J-100-60

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE
96-155           WASHINGTON : 1989

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

S521-47

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 3 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.987   Page 3 of 19

34

STATEMENT

OF

WADE J. HENDERSON

ASSOCIATE DIRECTOR

WASHINGTON OFFICE

ON BEHALF OF

THE

AMERICAN CIVIL LIBERTIES UNION

ON

CRIMINAL ALIENS AND INS ENFORCEMENT ACTIVITIES

S. 972; S.973; S.974; S.975;

AND

S. 976

BEFORE

SUBCOMMITTEE ON IMMIGRATION AND REFUGEE POLICY

COMMITTEE ON THE JUDICIARY

UNITED STATES SENATE

APRIL 14, 1988

Case 1:22-cr-00018-RMR Document 31-10 Filed 07/01/22 USDC Colorado Page 4 of 19
Case 2:20-cr-00134-RMP ECF No. 78-8 filed 12/22/21 PageID.988 Page 4 of 19

35

Mr. Chairman and Members of the Subcommittee:

On behalf of the American Civil Liberties Union, I want to thank you for inviting me here today to present the ACLU's views on S.972; S.973; S.974; and S.975, bills to amend the Immigration and Nationality Act regarding the apprehension, detention, and deportation of alien felons. In addition, we have been asked to review S. 976, which would authorize access by the Immigration and Naturalization Service (INS) to the National Crime Information Center and to other information compiled in appropriate computerized indexes maintained by federal law enforcement agencies. The ACLU is a nationwide organization of 250,000 members committed to the protection of the bill of rights.

I am Wade Henderson, Associate Director of the ACLU Washington office. Janlori Goldman, staff attorney with the ACLU's Privacy and Technology Project, and Antonio Califa, legislative counsel with the ACLU, assisted in the preparation of this testimony.

Introduction

The proposals under consideration today involve two of the most complex, challenging, and seemingly unrelated issues facing our nation: the public's fear of crime and concern over the implementation of federal immigration policy regarding the disposition of suspected alien felons. The issue of "illegal alien felons" and their relationship to crime in this country is the driving force behind today's discussion. The sponsor of

-1-

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 5 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.989   Page 5 of 19

36

these proposals, Senator Lawton Chiles (D-FL), has expressed the view that "the fact that a good number of persons committing crimes in the United States are illegal aliens is complicating and frustrating an already overburdened legal and penal system". See, 133 Cong. Rec. S4999 (daily ed. April 9, 1987) (statement of Sen. Chiles).

### Senator Chiles' Proposals

Out of an obvious concern for this issue, Senator Chiles has introduced several bills which are intended to strengthen our nation's immigration laws against the problems posed by "illegal alien felons."

The first bill, S.972, would require mandatory detention of aliens convicted of aggravated felonies in the United States. Aggravated felonies would be defined as murder, rape, kidnaping or attempts at such, and any trafficking of illegal drugs. Mandatory detention would deny voluntary departure and conditional parole in the immigration process to persons convicted of these crimes. To the extent that an alien is held in custody by state or local authorities, the bill would also require the Attorney General to take custody of these persons, and for immigration officials to give priority to cases involving felons in the overall immigration system.

The second proposal, S.973, would impose stricter criminal penalties upon aliens who reenter the United States after having been deported. This provision is intended to strengthen immigration law by creating a greater deterrent to alien drug traffickers who are considering illegal entry into the country.

**37**

The third bill, S.974, would make it a criminal offense for refusal to appear at immigration proceedings including deportation and exclusion hearings with penalties up to five years in prison, fines up to $5,000 or both. Its purpose is to encourage the appearance of the alien at any future immigration proceeding; but should the alien choose to abscond, he would be subject to criminal prosecution.

The fourth proposal, S.975, would impose criminal penalties against those who knowingly aid or conspire to assist alien felons in obtaining entry into the United States. The stated purpose of the bill is directed to those persons in this country who allegedly recruit aliens for the purpose of dealing drugs in the United States.

The final bill, S.976, is intended to give statutory authority to a process which is being developed between the INS and other federal law enforcement agencies. This bill would require linkage of INS computers and the National Crime Information Center and other computerized criminal indexes. It is argued that the bill is needed to permit an efficient, two-way channel of information between the INS and law enforcement agencies to enhance efforts to apprehend and prosecute aliens who commit immigration violations, as well as other criminal offenses.

### Misperceived Problem

Senator Chiles' proposals are offered as a modest step at correcting perceived flaws in the existing system of immigration law enforcement. Most Americans support effective enforcement of

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 7 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.991   Page 7 of 19

38

the nation's immigration laws; and since many of these same Americans are also deeply concerned about crime, the bills under consideration today may have initial appeal. However, the bills misperceive the problem. There is only limited evidence to suggest that the magnitude of the criminal alien problem is as significant as the proposed legislation would suggest.

Obviously, perceptions may vary. For example, a November 1987 report from the General Accounting Office which examined the INS' enforcement activities against criminal aliens found that although no reliable data exist on how many criminal aliens there are, law enforcement officials and INS representatives in the five cities [studied] believe that alien involvement in crime is a serious problem" [emphasis added]. See, GAO Report, *Criminal Aliens: INS' Enforcement Activities*, November 1987.

The GAO also found generally that crime statistics identify individuals as foreign-born rather than as aliens. Accordingly, the GAO report examined the problem by using FBI arrest statistics related to foreign-born individuals (which includes aliens and naturalized citizens) reported by law enforcement agencies as an indicator of the problem. As a result, in cities which have experienced immigration-related demographic change, the percentage of criminal aliens may seem higher in comparison to localities which have not experienced such demographic change.

For example, FBI statistics indicate that in fiscal year 1985, in Harris County (Houston) and Los Angeles County, more than 20 percent of the arrests in which the offender's place of birth was known involved foreign-born individuals. In Dade

County (Miami) the comparable figure was 38 percent. However, each of these localities has recently experienced a relatively high volume of immigration and each has changed dramatically within the last several years which may render percentage assessments of this kind somewhat meaningless.

Upon introduction of the legislation last year, Senator Chiles noted that "...[in 1986] over 100,000 illegal aliens were arrested for criminal offenses. Yet, only 12,000 were deported. I think those two figures -- 100,000 versus 12,000 -- clearly describes the immense problems such felons have presented to our law enforcement system... Our criminal systems must respect the rights of all individuals but also must acknowledge the threat illegal alien felons are to our communities."

Admittedly, crime in America is a serious problem, one that tears at the fabric of society. The increasing prevalence of illicit drugs in the United States and the vast underground economy spawned by this illegal activity has added a profoundly disturbing element to the crime problems confronting our nation.

Like other concerned Americans, the members of the ACLU also want effective solutions to the problem of increasing crime in our society. We seek a common goal toward a just society -- that our streets are safe, our homes secure, our families unthreatened and unafraid. The debate has rarely been over what to do, but rather how to do it. We realize that effective solutions do not come easily; they are illusive and difficult to craft.

However, as a general matter, the bills under consideration today raise troubling concerns for civil liberties. At best, the

Case 1:22-cr-00018-RMR Document 31-10 Filed 07/01/22 USDC Colorado Page 9 of 19
Case 2:20-cr-00134-RMP ECF No. 78-8 filed 12/22/21 PageID.993 Page 9 of 19

40

==bills are unnecessary;== at worst, they may be counterproductive in terms of our immigration policy objectives.

In a March 1987 report, GAO recommended to the Commissioner of the INS that he should ensure INS systems contain the data needed to help the INS identify deported aliens at ports-of-entry. In August 1987, the INS said it had implemented the suggestions contained in the March GAO report. The GAO offered no further recommendations in this area in its November 1987 report to this Subcommittee.

Drugs and Immigration Policy

At the outset, it is important that we frame the debate on these proposals in an appropriate context. Thus far, the need for this legislation has been discussed in the context of enhanced criminal law enforcement. In reality, these proposals are modifications of existing immigration law with far reaching implications for present immigration policy.

More importantly, however, the proposals seem redundant given recent changes in the law. For example, under the provisions of the Anti-Drug Abuse Act of 1986 and the Immigration Reform and Control Act of 1986, the INS is already placing primary emphasis on the expeditious removal of aliens convicted of serious crimes.

In fact, modifications made in the law as recently as 1986, as well as longstanding immigration policy objectives, would now be altered by the thrust of proposals under consideration today. For example, Section 242 (h) of the Immigration and Nationality Act provides, in part, that "an alien sentenced to imprisonment

-6-

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 10 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.994   Page 10 of 19

41

shall not be deported until such imprisonment has been terminated by the release of the alien from confinement." In addition, Section 242 (c) of the INA requires that upon arrest and detention of an alien by the INS, custody conditions (i.e. bond) must be set.

Section 241 of the INA sets forth the statutory provisions under which an alien may be deported from the United States. Current law already provides several grounds of deportability arising specifically from criminal acts committed in this country. Included are crimes involving moral turpitude, prostitution, alien smuggling, and narcotics offenses. The Anti-Drug Act of 1986 extended coverage for deportability to so-called "designer drugs" as well.

An examination of Senator Chiles' bills reveals other seemingly contradictory policy objectives between criminal and immigration law enforcement.

S.972

Present Law

8 USC 1252(a) - allows the Attorney General to release aliens who are in custody upon posting of a bond. The provision also allows the Attorney General to conditionally parole an alien held in custody. Senator Chiles' proposal would prohibit conditional bail or parole of an alien in custody, awaiting a determination whether he is deportable for having been convicted of an "aggravated felony" -- murder, kidnapping, rape or any attempt thereof, or any illicit trafficking in a controlled substance (as defined in Sec. 102 of the Controlled Substances

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 11 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.995   Page 11 of 19

42

Act).

In evaluating this proposal, one threshold question might well be whether the change in law is actually needed. If the question is whether the Attorney General has presently the authority to detain an alien suspected of an "aggravated felony" pending a determination of deportability, the answer is unquestionably yes.

The present Immigration Act endows the Attorney General with wide discretion in controlling the alien's custody. During pendency of the deportation proceeding, the purpose of this control is to assure the alien's availability and to prevent his causing harm to others.

S.972 would add only marginally to the authority of the Attorney General to detain an alien pending determination of deportability. However, the prohibition on the release of the class of aliens specified in the bill would limit substantially the Attorney General's discretion to release an individual on bond in appropriate circumstances. While Congress may increase the penalties imposed on aliens for the commission of certain crimes, the decision to limit the Attorney General's discretion in this matter should not be undertaken lightly. The restrictions proposed would add little to the authority already available and could have significant impact in restricting limited space available for alien detention. Given recent events involving detained Mariel Cubans and the obvious shortage of INS detention space, such a decision should not be made without a complete assessment of the impact of that decision on the

-8-

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 12 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.996   Page 12 of 19

43

detention question.

S.973

Present Law

8 U.S.C. 1326. An alien who has been arrested and deported, or excluded and deported, and who is subsequently apprehended attempting to enter the United States illegally, shall be guilty of a felony punishable by imprisonment of up to two years, a fine of $1,000, or both. Senator Chiles' proposal would increase penalties against aliens deported after conviction of the commission of an aggravated felony could be imprisoned for a maximum of 15 years and fined up to $20,000. Aliens who were deported after a felony conviction could receive prison terms of 5 years and be fined up to $10,000.

While Senator Chiles' proposal raises no new civil liberties concerns, the question presented is whether stiffer fines or greater prison terms will itself solve the problem presented by the failure to deport "illegal alien felons." The answer may well be that such a proposal will have only a marginal impact on the problem since the real difficulty seems to be found in the INS' inability to adequately identify and apprehend persons subject to deportation.

S.974

Similar arguments could be raised in consideration of S.974 which would impose criminal penalties for the failure to appear at an INS proceeding. The penalties would apply to the putatively deportable or excludable alien, and also to witnesses in such a proceeding. Obviously, the provision is intended to

-9-

Case 1:22-cr-00018-RMR Document 31-10 Filed 07/01/22 USDC Colorado Page 13 of 19
Case 2:20-cr-00134-RMP ECF No. 78-8 filed 12/22/21 PageID.997 Page 13 of 19

44

encourage individuals to appear at future immigration proceedings. And, it should be noted, of course, that criminal penalties would apply only if the alien were notified by the INS and capable of appearing. However, the real question presented is whether the increased penalty is needed to achieve the underlying purpose of the bill. Virtually no information has been presented to suggest that aliens, if properly notified, fail to appear at immigration proceedings merely because penalties faced are considered inconsequential. It would appear that for those aliens with an intent to abscond because they have committed a serious crime, even an increase in penalty would not necessarily encourage their future participation in further immigration proceedings. In that sense, there is little to suggest that the change in law would be an effective solution to the problem.

## S.975

**Present Law**

8 U.S.C. 1327. Prohibits any person from knowingly aiding an alien excludable under 8 U.S.C. 1182 (a)(27)(28) or (29) to enter the United States. These provisions generally apply to aliens excludable for national security reasons. Conviction of aiding an alien in this category could impose punishment of up to 5 years in prison or a fine of $5,000, or both. Senator Chiles' proposal would add to the category of excludable aliens covered under these provisions, aliens convicted of crimes involving moral turpitude, or who have been convicted of two or more offenses, or who have been convicted of possession or trafficking

Case 1:22-cr-00018-RMR Document 31-10 Filed 07/01/22 USDC Colorado Page 14 of 19
Case 2:20-cr-00134-RMP ECF No. 78-8 filed 12/22/21 PageID.998 Page 14 of 19

45

in narcotics or marijuana. Thus, helping these aliens would now become a felony under Senator Chiles' proposal.

S.975 is particularly troubling since it would seem to impose a standard of strict liability for any assistance provided to an alien seeking to enter the United States, if the alien were subsequently found to have a criminal record and otherwise covered by categories set forth under the bill. Of course, it seems unlikely that an individual would know of an alien's conviction record for activities here in the United States and, therefore, would penalize such action even where a lack of actual knowledge were present.

Moreover, S.975 raises questions with regard to domestic and international legal obligations to assist refugees fleeing persecution.

### S.976: The NCIC Problem and INS Authority

S. 976 would amend the Immigration and Nationality Act to establish a connection between the FBI's National Crime Information Center (NCIC)--the FBI's central, computerized repository of criminal history record information, containing nearly 20 million records--and the INS' computerized indexes containing information on deportable aliens. The bill proposes two changes to the Immigration and Nationality Act. First, the bill would give the INS on-line access to the NCIC and to "other information compiled in appropriate computerized indexes maintained by law enforcement agencies." Second, it would authorize the INS to enter information on aliens into these databases.

-11-

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 15 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.999   Page 15 of 19

46

Since the INS already has access to this system, the first proposal is unnecessary. The second proposal, to enter information on all deportable aliens into the NCIC database would go beyond the present scope of the NCIC, would pose serious civil liberties concerns, and would set a precedent for an agency charged with a combination of law enforcement, civil and administrative responsibilities to enter information into the NCIC database.

It would be inconsistent with the function of the NCIC to store in the system information related to administrative or civil INS warrants of deportation. There are many reasons aliens can be deported other than for conviction of a crime. For instance, an alien may be deported for entering the United States without inspection, or if they stay in the country beyond the permitted time. These may be deportable offenses by INS standards but they are far different from the traditional criminal history record currently stored in the NCIC. Under current law, only information on serious and/or significant offenses may be stored in the NCIC system; nonserious offenses and those committed by juveniles are excluded.

Again, such a deportation file within the NCIC would not be limited to people who are deportable for criminal law enforcement purposes. Entry of noncriminal warrants into the NCIC would dramatically alter the NCIC's role.

### INS Databases

INS currently maintains four major databases for a variety of purposes, including providing information on aliens who may

-12-

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 16 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.1000   Page 16 of 19

47

be ineligible to enter the United States (NALIS), providing enforcement and intelligence information on those known or suspected to be in violation of immigration laws (OASIS) and the main system (CIS) which contains information on persons other than those temporarily residing in the country.

The INS databases are known to have very serious data quality problems, many of which have been documented in recent GAO reports. As one GAO report on "Criminal Aliens" concluded:

> The two INS systems used to detect previously deported criminal aliens... do not contain all of the needed identification and/or deportation information. As a result, INS's ability to exclude these aliens if they attempt to reenter the country at a port-of-entry is severely limited. The report finds that internal documentation and oversight problems within the INS are the cause of the poor record quality. Even the INS believes that the information in its databases "is not generally in a format that would be appropriate for general queries by criminal justice agencies." (Letter from R.M. Kisor, INS Associate Commissioner to D.F. Nemecek, FBI NCIC Chief, 8/87)

The proposed bill would, in effect, permit the transfer of poorly kept INS records into the NCIC system.

The establishment of a file within the NCIC on "deportable" aliens raises strong civil liberties concerns about the creation of an FBI tracking and surveillance system. The use of the NCIC for tracking purposes is a matter of great debate in the law enforcement and civil liberties community. A panel comprised of technical, law enforcement and civil liberties experts advising the House Subcommittee on Civil and Constitutional Rights sharply criticized the NCIC tracking proposals, calling for strict statutory controls. It should be noted that the FBI's own Advisory Policy Board recently rejected a more limited proposal

ase 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 17 of 1
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.1001   Page 17 of 19

48

due to their concerns about data quality. The addition of the INS file would set a dangerous precedent of expanding the NCIC's current function of exchanging criminal history records to include a tracking system on people who may or may not be suspected of a crime.

For the above reasons, the ACLU urges this subcommittee to reject S. 976 on the grounds that the legislation is unnecessary, would dramatically alter the function of the NCIC and raises fundamental civil liberties concerns about data quality, privacy and due process.

### INS Drug Enforcement Efforts

There is an important collateral issue which is raised by Senator Chiles' proposals and which we would hope could be considered by the subcommittee. It involves the increasingly active role played by the INS in our nation's drug enforcement effort.

While Senator Chiles' proposals would increase penalties for certain aliens apprehended by INS, it should be noted that there is already some doubt as to the statutory authority of the INS' drug and other enforcement activity that INS Commissioner Alan Nelson summarized in his March 18 press statement. In that statement, the Commissioner said that INS is "in the forefront in the battle to keep drugs from surreptitiously entering the United States."

However, Assistant Attorney General John Bolton noted in a letter to Vice President Bush of October 9, 1987 regarding the

-14-

Case 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 18 of 19
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.1002   Page 18 of 19

49

need for a statutory clarification of INS activities, noted:

> ...the Immigration and Nationality Act is not specific in the delegation of authority to INS officers to enforce the multitude of violations which they encounter in the course of their primary jurisdictional duties. Many of the activities currently being conducted by INS officers in the performance of their duties are performed through implied authority and legal interpretation. INS officers presently have no statutory authority in drug enforcement....

(See Appendix A.)

The Immigration and Nationality Act is specific in the delegation of authority to INS officers to enforce only immigration laws. One reason for the limited delegation of authority to enforce other criminal laws appears to be the broad police authority of INS officers under the INA, operating under a relaxed standard of the Fourth Amendment and with wide deference from federal courts, pursuant to Section 287 of the INA. When coupled with a general arrest authority and responsibility for enforcement of other federal criminal laws, INS agents would have almost unprecedented arrest authority denied to other law enforcement agencies like the FBI, and state and local law enforcement officers.

The point here is that the INS has an important responsibility for the enforcement of the nation's immigration laws. The agency was never intended to become a front-line soldier in the war on drugs. To the extent that the INS may play a role in the enforcement of other criminal laws, this function should not overshadow the agency's principal mission. In that regard, proposals for change in the present immigration law should be evaluated first on the merit of its impact on

-15-

ase 1:22-cr-00018-RMR   Document 31-10   Filed 07/01/22   USDC Colorado   Page 19 of 1
Case 2:20-cr-00134-RMP   ECF No. 78-8   filed 12/22/21   PageID.1003   Page 19 of 19

50

immigration policy.

## Conclusion

The public has a right to expect that the government will work to reduce the crime rate, not simply give lip service to that goal. Effective crime control and individual rights are not necessarily inconsistent. We can have both. The American people have a right to expect both.

The bills under consideration today, however, are not likely to advance individual rights nor are they likely to effectively address the problems posed by criminal elements in our communities.