IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00018-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

OSCAR DURON-DELUNA,

      Defendant.

---

**SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S ORDER**

---

      The United States of America, by and through Cole Finegan, United States Attorney for the District of Colorado, and Albert Buchman, Assistant United States Attorney, respectfully submits this supplemental brief in accordance with the Court's Order, ECF No. 32, and in further response to Defendant's Motion to Dismiss, ECF No. 25. This brief supplements but does not concede the positions taken in the government's first Response to the Motion to Dismiss, ECF No. 28.

      The sole question addressed in this brief is "whether section 1326 would have been adopted even had the purportedly impermissible purpose not been considered" under the second step of *Arlington Heights*' inquiry. The answer is yes. Regardless of its history, section 1326 is integral to the enforcement of immigration laws. By criminalizing illegal re-entry, this provision creates a meaningful deterrent against repeated attempts to enter and remain in the country unlawfully. The prevalence of similar statutes worldwide confirms that illegal entry laws are essential to the

successful enforcement of immigration laws, and that these laws are regularly enacted independent of any impermissible purpose. Consequently, the Court should reject the defendant's claim that Congress would not have reached this result but for racial animus.

## I. CONGRESS HAD NUMEROUS LEGITIMATE REASONS TO ENACT SECTION 1326 REGARDLESS OF ANY DISCRIMINATORY INTENT.

Under *Arlington Heights*, a facially neutral law does not violate the Equal Protection Clause unless there is "[p]roof of racially discriminatory intent or purpose." *Vill. of Arlington Heights v. Met. Housing Dev. Corp.*, 429 U.S. 252, 265-268 (1977); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976). The initial burden is on the law's challenger to make that showing.

If the challenger can prove that the law was motivated in part by such intent, the burden shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270-71 n.21. The government must prove its burden by a preponderance of the evidence, using either direct or circumstantial evidence. *Hunter v. Underwood*, 471 U.S. 222, 225, 227-28 (1985); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Arlington Heights*, 429 U.S. at 266.

The second step of the *Arlington Heights* test thus presents a counterfactual inquiry. The court must ask whether it is more likely than not that the legislature would have enacted the same provision in the absence of any discriminatory intent. In other words, the question here is whether Congress would still have chosen to criminalize illegal re-entry independent of any impermissible purpose. In making this determination, courts have naturally and logically examined the "legitimate noninvidious purposes" underlying the laws at issue. *See, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1225 (11th Cir.

2005); *Hayden v. Paterson*, 594 F.3d 150, 167-68 (2d Cir. 2010); *United States v. Carrillo-Lopez*, 555 F. Supp.3d 996, 1022-1025, 1027 (D. Nev. Aug 18, 2021).

**A.   Regardless of Discriminatory Intent, Congress Would Still Have Enacted Section 1326 Because It Serves the Valid Objective of Deterring Repeated Violations of U.S. Immigration Laws.**

Controlling unlawful immigration is a normal regulatory function of the sovereign. It is long settled that "the right to exclude or to expel all alien, or any class of aliens, absolutely or upon certain conditions, in war or in peace," is "an inherent and inalienable right of every sovereign and independent nation." *Fong v. United States*, 149 U.S. 698, 711 (1893). As the Supreme Court has repeatedly emphasized, this authority is "essential to [a country's] safety, its independence, and its welfare," as "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation." *Id.*; *Arizona v. United States*, 567 U.S. 387, 395 (2012). Thus, "for more than a decade, it has been universally acknowledged that Congress possesses authority over immigration policy as an 'incident of sovereignty.'" *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998).

Regardless of its history, section 1326 promotes this indisputably valid objective. Imposing sanctions on those who repeatedly violate immigration laws and trespass territorial boundaries is a basic feature of a controlled border. As the Ninth Circuit has explained, section 1326 is "the stick" that encourages noncitizens to comply with civil immigration laws. *Hernandez-Guerrero*, 147 F.3d at 1078. The law uses the threat of criminal prosecution "to give teeth to civil immigration statutes and . . . ensure compliance with civil deportation orders." *Id.* Consequently, section 1326 is "a *necessary* piece of the immigration-regulation framework." *Id.* (emphasis added). "[W]ithout the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would

3

be fatally undermined — all bark and no bite." *Id.*

The importance of section 1326 is borne out by the existence of similar laws across the world. This provision is not a unique feature of American law that can only be explained by historical racism. To the contrary, the majority of countries have criminalized unlawful entry in some form. *See* Ex. 1 (*Criminalization of Illegal Entry Around the World*, Law Library of Congress, August 2019). The list of countries spans nearly every continent: it includes Canada, Cuba, and Chile; India, China, Japan, South Korea, and Russia; Egypt, Ethiopia, Kenya, and Morocco; as well as the United Kingdom, France, Germany, Denmark, and Finland.

These laws strongly suggest that section 1326 would have been enacted regardless of discriminatory intent. *See Hayden*, 594 F.3d at 167-68 (reasoning that the existence of similar disenfranchisement laws in virtually every other state indicated that New York's legislature would have reached the same result absent any impermissible purpose). Each of the countries on this list has its own unique history, demographics, and geography. As a result, it defies logic to conclude that all of these countries would not have passed such laws but for the intent of their legislators to discriminate against other races. Instead, the far better conclusion is that most nations cannot successfully enforce their territorial boundaries without some kind of criminal sanctions "to give teeth" to civil immigration regulations. Because the United States is among those countries with the highest number of illegal immigrants, it strains credulity to think that Congress would never have made re-entry illegal but for some impermissible purpose.

All of this is similarly confirmed by the history of section 1326's predecessor provision. Prior to 1929, there was no criminal punishment for most noncitizens who had previously been deported but re-entered the country again. In other words, the punishment for illegally entering the

United States for the first time was exactly the same as it was for entering the second, third, or fifteenth time — deportation. Thus, once noncitizens were deported, there was little to discourage them from returning to the United States as soon as possible. They had almost nothing to lose by re-entering the country immediately and working harder to evade official detection this time. And if they failed again, they could keep trying until they succeeded.

Like the majority of countries worldwide, Congress recognized that there was a simple solution to this problem. The easiest way to re-align the incentives facing previously deported noncitizens was to impose a harsher punishment for their return. *See* S. Rep. No. 70-1456, at 1 (Jan. 17, 1929) ("The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department [the Department of Labor] is compelled to resort to deportation proceedings for the same alien on several succeeding occasions."); *id.* (emphasizing the issue of "aliens who had been deported four or five times" because there was "no provision of law under which a penalty, other than repeated deportation," could be imposed).

Congress's response to this problem was to make reentry after deportation a felony offense punishable by up to two years in prison. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018. Instead of simply being deported again, any previously deported noncitizen who persisted in violating immigration laws could now be imprisoned.

Both the history of this law and the prevalence of its analogues in other countries thus confirms what the Ninth Circuit has already recognized: that the threat of criminal prosecution created by section 1326 is vital to the enforcement of immigration laws. Accordingly, it is more likely than not that Congress would have reached the same result — i.e., the criminalization of

illegal re-entry — regardless of any role played by discriminatory intent.

**B.    Subsequent Legislative History Confirms that Section 1326 Would Have Been Enacted Regardless of Any Discriminatory Intent.**

The history of section 1362 further confirms that this provision would ultimately have been enacted independent of any discriminatory intent.

**1.    The Immigration and Nationality Act of 1952 Would Still Have Been Passed Absent Any Underlying Racial Animus.**

Section 1362 became law through the Immigration and Nationality Act of 1952. That law was designed to address the immigration issues of the time, and it reflects the 82nd Congress's careful, deliberate, and comprehensive approach to achieving immigration reform.

The 1952 INA "was Congress's response to a massive nine-hundred-page report that identified problems with current U.S. immigration policy and laid out recommendations for how to best address them." *United States v. Machic-Xiap*, F. Supp. 3d 1055, 1069 (D. Ore. Aug. 3, 2021) (citing Jia Lynn Yang, *One Might and Irresistible Tide: The Epic Struggle Over American Immigration 1924-1965* 155 (2020)); Marion Bennett, *The Immigration and Nationality (McCarran-Walter) Act of 1952, as Amended to 1965*, 367 ANNALS OF THE AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE 127 (1966) ("[The 1952 INA] was the product of the most extensive Congressional study of the subject in the nation's history").

The Committee on the Judiciary ("subcommittee"), chaired by the Senator who sponsored the final bill, authored the report entitled "the Immigration and Naturalization Systems of the United States." Ex. 2 (report in full). Given its immense influence, the report provides direct evidence of those immigration concerns motivating the 82nd Congress to enact this law. In its report, the subcommittee examined a wide range of issues regarding immigration and the statistics

supporting them. These included problems related to national security and crime, the employment conditions of both American and foreign workers, foreign relations, public health, and deterring recidivist breaches of the country's sovereign borders while promoting compliance with court and government orders. *See* Ex 2. The text of the final law reflects these motivations. *See* Pub. L. No. 82-414, 66 Stat. 203 (quota system regarding skilled labor); 212 (outlining ineligibility due to medical concerns, criminal backgrounds, and skills).[1]

With respect to illegal re-entry specifically, the committee outlined the growing nature of this problem. To that end, the report provides statistics that illustrate the lack of resources and resulting backlog among border patrol and investigators, along both the southern and the Canadian borders. *Id.* at 633-634 (anticipating problems with enforcing the Canadian border).

The subcommittee then made various recommendations regarding criminal laws. *Id.* at 655. However, the report did not recommend increased criminal penalties but merely stated that the illegal reentry provision from the 1929 law "should be carried forward in one section and apply to any alien deported for any reason and provide the same penalty." *Id.* at 656. These recommendations provide strong evidence that section 1362 would still have been passed based solely on legitimate concerns.

Significantly, the report also recommended that "race and sex be eliminated as a bar to immigration and naturalization." 367 ANNALS at 129. In fact, the subcommittee specifically announced that "the time has come to erase from our statute books any discrimination against a

---

[1] Immigration qualifications based on these concerns still regulate visa issuance and exclusion today. *See* 8 U.S.C. §§ 1181 (inadmissible aliens include those with risks involving national security, criminal backgrounds, medical ailments, and likelihood to become public charges); 1184 (admissible nonimmigrants include those with skills or family relations to citizens).

person desiring to immigrate to this country or to become a naturalized citizen, if such discrimination is based solely on race." Ex. 2 at 739.  Despite the report's ultimate recommendation that the system of national-origin quotas continue, the statutory quota system was not restricted based on race, and Mexican and other Western Hemisphere immigrants were excepted from quotas.[2]  *See* Pub. L. No. 82-414, 66 Stat. 201-207 (1952) (quota categories not based on race), 101(27) (defining "nonquota immigrants" as excluding Western Hemisphere countries).  Rather, the law created a new visa-preference system based on occupation (skilled labor) and family relations to United States citizens.  *Id.* at 203 (visas shall be made available "to qualified quota immigrants whose services are determined by the Attorney General to be needed urgently in the United States because of the high education, technical training, specialized experience, of the ability of such immigrants and to be substantially beneficial prospectively to the national economy, cultural interests, or welfare of the United States").

Notably, even vocal opponents of the national-origin quotas supported the illegal-reentry provision.  During deliberations, a group of thirteen senators introduced an alternative proposal that included more liberal national-origin provisions.  The bill's sponsors were among the most outspoken critics of the INA's national-origin quotas.  *See* 98 Cong. Rec. 5169 (May 14, 1952) (Senator Lehman criticizing the national-origin provision as stemming from "a discredited theory of racial superiority"); 98 Cong. Rec. 5170-71 (May 14, 1952) (similar statement from Senator Humphrey); 98 Cong. Rec. 5768 (May 22, 1952).  But despite criticizing national-origin quotas

---

[2] The subcommittee was concerned with large volume of non-quota immigration from Western Hemisphere countries but believed those concerns could be regulated by qualitative conditions applicable to all immigrants. Ex. 2, p. 474.  Dr. Kang notes that the first cap on migration from the Western Hemisphere did not occur until 1965. ECF No. 25-3, p. 24 (Ex. C).

as xenophobic, the alternative bill contained its own illegal-reentry provision, which is a word-for-word copy of the law later passed and codified as section 1326. *See* S. 2842 (1952). This represents additional evidence that the 82nd Congress would have maintained criminal sanctions for illegal re-entry independent of any racial animus.

Finally, the historical background of labor migration provides further support for the idea that Congress would have reach the same result. By the early 1950s, illegal labor migration had dramatically increased, touching on many issues not founded on racial animus. *See* Special Message to Congress on the Employment of Agricultural Workers from Mexico (July 13, 1951) ("Special Message"); Hearings Before the Committee on Appropriations, U.S. Senate, 82nd Congress, First Session, on H.R. 5215. Congress sought to address these labor issues through immigration reform. Congress passed the 1952 INA just months after enacting separate bills to authorize the Mexican agricultural worker program, Pub. L. No. 82-78, 65 Stat. 119 (1951), to criminalize the harboring of illegal aliens and equip the INS with enhanced enforcement authority, Pub. L. No. 82-283, 66 Stat. 26 (1952), and to provide an increase in appropriations for border enforcement activities, Pub. L. No. 82-375, 66 Stat. 103 (1952). These laws are necessarily interconnected and provide context to the passage of the 1952 Act — namely, that Congress was concerned with legitimate issues created by labor migration.

2. **Amendments to, and Re-Enactments of, the 1952 Law Eliminate Any Potential Taint from Racial Animus and Establish that Congress Would Have Reached the Same Result Independently of Any Discriminatory Intent.**

Post-1952 Congresses have repeatedly amended the law for well-documented, legitimate purposes. Each of those amendments is evidence that subsequent Congresses, who cannot be shown to be motivated by racial animus, adopted section 1326 for independent and legitimate

reasons. The repeated decision to maintain this statute over the years demonstrates that the legislature would have reached this result regardless of any impermissible considerations.

The defendant summarily dismisses the impact amendments to the 1952 law that carried section 1326 forward by arguing that *Arlington Heights* limits the inquiry to the Congress that first enacted the unlawful reentry statute. ECF No. 31, p. 20. He also asks the Court to impute discriminatory intent by silence from the 70th Congress in 1929 to every subsequent Congress that has reenacted or amended the statute. *Id.* at 29 (repeating his silence-by-acquiescence argument that these "amendments 'demonstrate that lawmakers made no effort to examine and acknowledge the legacy of racism of [the 1929 and 1952 acts]'").

The Court should reject these arguments. An inquiry into each amendment is proper, as each represents a decision to refine and re-affirm section 1326. Because those amendments remain active today, they represent the "challenged decision" under *Arlington Heights.*

The case law supports this approach. Courts examining equal protection claims have regularly found amendments highly relevant to this analysis. In *Johnson v. Governor of State of Fla.*, for example, the Eleventh Circuit considered Florida's felon disenfranchisement law, which had been enacted in 1868 and reenacted in 1968. 405 F.3d 1214, 1223-24 (11th Cir. 2005). The Eleventh Circuit reasoned that subsequent legislative reenactment could serve to eliminate taint from a law that was originally enacted with discriminatory intent. *Id.* at 1224. Applying that concept, the court found that legitimate reasons in 1968 supported the law, making it likely the law would have been enacted absent racial animus. *Id.* at 1225-1226. In that analysis, the court emphasized the distance in time from the 1868 to 1968 legislatures, which made it "not reasonable to assign any impermissible motives held by the 1868 Florida legislators to the 1968

legislators." *Id.* at 1225-26. Because there was no evidence of discriminatory intent on the part of the 1968 legislature, the court concluded that the state would have enacted the provision despite any improper consideration that might have motivated the 1868 provision. *Id.*[3]

The Second Circuit took the same approach in *Hayden*. In *Hayden*, that court assessed a challenge to the New York 1821, 1846, and 1874 constitutional felon disenfranchisement provisions. The court reasoned that because there was no discriminatory intent shown for the active 1894 amendment — which was the current law — the plaintiffs could not link that current version to any discriminatory intent inherent in previous versions. Or, as the Second Circuit put it, the law's challengers could not build the "bridge necessary … to trace any disparate impact of New York Election Law § 5-106(2) … to 'a purpose to discriminate on the basis of race.'" 594 F.3d at 167 (quoting *Feeny*, 44 U.S. at 260).

Given this, the repeated amendments to the 1952 law are highly significant.

In 1965, Congress redefined immigration law through an explicit anti-discriminatory lens by passing the Immigration and Nationality Act of 1965. See Pub. L. No. 89-236, 79 Stat. 911 (Oct. 3, 1965). Though the 1965 Act did not amend section 1326, it created a statutory ban on discrimination based on "race, sex, nationality, [or] place of birth" in the immigration setting. Pub. L. No. 89-236, 66 stat 175, § 911 (1965) (codified at 8 U.S.C. § 1152(a)(1)(A)). Quotas and their elimination necessarily impact against whom section 1326 is enforceable, and therefore

---

[3] Notably, the *Johnson* court did not specifically find discriminatory intent on the first step of the *Hunter*/*Arlington Heights* inquiry. Instead, the court assumed it and found the state had nonetheless met its burden in showing that state would have "enact[ed] without an impermissible motive" according to the reasoning above. *Id.*, *see also Hayden*, 594 F.3d at 166 (stating that *Johnson* had "assumed, without deciding, that racial animus motivated the 1868 law).

represent an indirect but substantive change to the statute.

Congress has specifically amended section 1326 several times since 1952 — in 1988, 1990, 1994, and twice in 1996. *See* the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345, 102 Stat. 4181 (1988); the Immigration Act of 1990 (IMMACT), Pub. L. No. 101-649, § 543, 104 Stat. 4978 (1990); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001, 108 Stat. 1796 (1994); the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 441, 110 Stat. 1214 (1996); the Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 324, 110 Stat. 3009 (1996).

In 1988, Congress passed the Anti-Drug Abuse Act, an act aimed at reducing the manufacture, distribution, and use of illegal drugs. The Act created a category of "aggravated" felonies under 8 U.S.C. § 1101(a)(43), which applied to aliens previously convicted of murder, as well as offenses involving drug, firearm, and destructive device trafficking. *Id.* § 7342. The law also amended section 1326 to add increased penalties under subsection (b)(2) of that statute for those having newly defined aggravated felonies. Pub. L. No. 100-690, § 7345. Additionally, it updated expedited civil deportation and created a bar on entry for this new category of alien. *See id.* § 7347, 7349. The plain text of these amendments shows that Congress strengthened section 1326 in response to a new and unique category of dangerous aliens such as drug traffickers.

In 1990, Congress again overhauled the 1952 INA by passing the IMMACT. Immigration in Two Acts, Bipartisan Policy Center, at 3 (Nov. 2015), available at https://bipartisanpolicy.org/download/?file=/wp-content/uploads/2019/03/BPC-Immigration-Legislation-Brief.pdf (explaining the Act resulted from social and civil rights movements that expressed dissatisfaction with an immigration system "that many felt was outdated at best and

discriminatory and racist at worst") ("Immigration in Two Acts"), at 6. Among other things, IMMACT updated and strengthened enforcement measures. *Id*. at 11. This included section 1326; Congress reconsidered this provision and decided to increase the fine. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. In the context of equal protection claims, courts have found that IMMACT was an "about face away from the racist trope that accompanied the enactment of the 1929 immigration law." *United States v. Gallegos-Aparicio*, 2020 WL 7318124 at *3 (S.D. Cal. Dec. 11 2020); *see also United States v. Rios-Montano*, 2020 WL 7226441 at *5 (S.D. Cal. Dec. 8, 2020).

Accordingly, the Court may resolve this case using the same approach as the Second Circuit in *Hayden* and the Eleventh Circuit in *Johnson*. Because the 1952 INA and its amendments to section 1326 were passed for legitimate reasons, they serve to eliminate any racial animus that may have motivated the predecessor 1929 Act. Put another way, these amendments establish that Congress would have enacted the present-day section 1326 at some point in the last century even absent discriminatory intent.[4]

---

[4] *Carrillo-Lopez* distinguished *Johnson* on the erroneous grounds that subsequent amendments have not changed the operation of section 1326 and were thus not substantive. 555 F. Supp. 3d at 1025. But the 1952 INA and its amendments are substantive updates to the 1929 Act because (1) the 1952 INA added a third ground for liability in Section 1326; (2) the amendments consistently increased penalties for section 1326; (3) subsection (b)(2) changed the operation of section 1326 by creating a sentencing enhancement based on aggravated felonies that require a court to determine the statutory maximum based on past criminal history, *see Almendarez-Torres v. United States*, 523 U.S. 224, 235 (1998); (4) any amendments to Section 1326 necessarily require Congress to evaluate existing policy, assess any imbalances, and alter laws accordingly, reflecting a deliberative process under *Johnson* and *Hayden*; (5) the 1952 INA and amendments changed alienage classifications which underlies who is liable under Section 1326 and necessarily impacts its operation. *Carrillo-Lopez* is deeply misguided to the extent that it suggests that amendments to the already race-neutral section 1326 had to make it *more* race-neutral for those amendments to qualify as substantive changes. *See* ECF No. 28-1, p. 45.

Finally, at least one district court has already found these amendments persuasive under the *Arlington Heights* analysis. In *United States v. Calvillo-Diaz*, the Northern District of Illinois wrote that:

> In the absence of any argument from the defendant regarding a discriminatory purpose underlying these later amendments, the government can show that the law would have been enacted notwithstanding the racial animus of the 1920's.
>
> That the law was made more punitive during these years, free of any discussion that indicates an invidious motive, suggests that Congress's concern was deterring unauthorized migration, inarguably a constitutionally legitimate motivation. Moreover, these amendments came decades after the 1965 adoption of the current Immigration and Nationality Act, which abolished the quota system and forbade discrimination on the basis of "race, sex, nationality, place of birth, or place of residence[.]" It is just as plausible that Congress, instead of deliberately ignoring the discriminatory animus underlying the 1929 criminalization of illegal entry or disingenuously papering over it, was aware of that history and nonetheless thought that retaining § 1326 and stiffening its penalties was consistent with the objectives of the 1965 INA.

2022 WL 1607525, *11 (N.D. Ill. May 20, 2022).

## II. AN EVIDENTIARY HEARING IS NOT WARRANTED.

The Court has ordered an evidentiary hearing on Defendant's Motion to Dismiss. ECF No. 33. An evidentiary hearing is unnecessary if the claim can be resolved on the record. *Torres v. Mullin,* 317 F.3d 1145, 1161 (10th Cir. 2003). The Court has already received detailed information from the defendant's proposed experts. Furthermore, as in *Johnson*, the Court can rule on the defendant's *Arlington Heights* claim by finding sufficient legitimate, noninvidious reasons that show that Congress more likely than not would have passed section 1326 absent any discriminatory intent. The United States respectfully requests the Court vacate the evidentiary hearing.

## **CONCLUSION**

For the reasons and authorities stated above, the United States respectfully again requests that this Court deny Defendant's Motion to Dismiss the Indictment on its face, finding no need to hold an evidentiary hearing.

Dated this 5th day of August, 2022.

                                             Respectfully submitted,

                                             COLE FINEGAN
                                             United States Attorney

                                           */s/ Albert Buchman*
                                           ALBERT BUCHMAN
                                           Assistant United States Attorney
                                           United States Attorney's Office
                                           1801 California Street, Suite 1600
                                           Denver, Colorado 80202
                                           Telephone: (303) 454-0100
                                           E-mail: al.buchman@usdoj.gov

                                           Attorney for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

By: */s/ Deana Ambrosen*
DEANA AMBROSEN
LEGAL ASSISTANT