IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 22-cr-00018-RMR

UNITED STATES OF AMERICA,

       Plaintiff,

v.

OSCAR DURON-DE LUNA,

       Defendant.

---

**DEFENDANT'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL BRIEF
IN RESPONSE TO COURT'S ORDER [DOC. #35]**

---

Defendant Oscar Duron-De Luna, through undersigned counsel, respectfully submits the following Response to the government's Supplemental Brief in Response to Court's Order [Doc. #35].

## I.    Introduction:

On July 26, 2022, this Court ordered the government to file supplemental briefing addressing the second prong of the *Arlington Heights* test, "whether section 1326 would have been adopted even had the purportedly impermissible purpose not been considered." Importantly, this Court further ordered the government to include within the supplemental briefing "any evidence on which it wishes to rely for the purposes of meeting its burden." But instead of presenting actual evidence to show that *the same law* would have passed *at the same time* without discriminatory

intent[1], the government instead offers two plausible race-neutral reasons why "it is more likely than not that Congress would have reached the same result" eventually.[2]

The government's resort to these purportedly race-neutral reasons, the prevalence of analogues in other countries, and subsequent amendments to the Immigration and Nationality Act of 1952 conflates its burden under *Arlington Heights* with rational-basis review. Under rational-basis review, courts consider only whether a challenged provision is "rationally related to a legitimate governmental purpose."[3] *Arlington Heights*, however, requires the government to provide actual evidence – not theoretical conclusions – that racial animus was not a motivating factor *at the time it was taken*.[4]

The lack of rebuttal evidence to satisfy the government's burden under *Arlington Heights*, alone, is fatal to the government's position.[5] Moreover, the government's reliance on contemporary rationales – present criminal statutes in foreign countries and events occurring in the succeeding 70 years – has been rejected by the United States Supreme Court:

> At oral argument in this Court, the appellants' counsel suggested that, regardless of the original purpose of § 182, events occurring in the succeeding 80 years had legitimated the provision. Some of the more blatantly discriminatory selections, such as assault and battery on the wife and miscegenation, have been struck down by the courts, and appellants contend that the remaining crimes—felonies and moral turpitude misdemeanors—are acceptable bases for denying the franchise. Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*.[6]

---

[1] *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 n.21 (1977).
[2] Government's Supplemental Brief, page 5.
[3] *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 446 (1985).
[4] *Arlington Heights*, 429 U.S. at 270 n.21.
[5] *Castaneda v. Partida*, 430 U.S. 482, 498 (1977)
[6] *Hunter v. Underwood*, 471 U.S. 222, 232-233 (1985).

Without actual evidence that shows Congress would have enacted *the same law* at *the same time* without discriminatory intent, the government has failed to meet its burden under the second prong of the *Arlington Heights* test. As such, this Court should find that section 1326 violates equal protection under *Arlington Heights*.

> II. **Contemporary foreign immigration laws have no bearing on the question of whether section 1326 would have been passed in similar form and fashion absent the mountain of evidence showing its original enactment was motivated by a desire to discriminate against Mexicans and Latin Americans.**

As noted above, the use of contemporary laws, here foreign immigration laws, is insufficient evidence to meet the government's burden under *Arlington Heights*. As in *Hunter*, the government here suggests that, regardless of the original discriminatory purposes that motivated the passage of section 1326, it was "more likely than not" that Congress would still have criminalized illegal re-entry. In support, the government produces a chart that illustrates the various immigration laws imposed by foreign countries to seemingly suggest that it was inevitable that the United States would have also passed a similar law.

For starters, whether or not criminalizing illegal re-entry was inevitable, and whether it would be valid if enacted today, or any time subsequent to its earlier enactment without any impermissible motivation, is not the question *Arlington Heights* poses. Instead, *Arlington Heights* requires the government to prove that the same law would have passed at the same time absent discriminatory intent. Here, the original enactment of section 1326 was motivated by a desire to discriminate against Mexicans and Latin Americans on account of race, and it continues to have that disparate impact to this day. The existence of contemporary foreign immigration laws does not erase this.

Additionally, the government's suggestion that the United States would have inevitably passed legislation making illegal re-entry a criminal offense, especially in its current form, absent racial animus toward Mexicans and Latin Americans, is suspect, at best. Section 1326 was born out of racial animosity towards Mexican and Latin American migrants. The legislative history uncovered by Dr. Kang and her contemporaries makes it abundantly clear that the 1929 legislature criminalized reentry to specifically target Latino migrants.[7] And, by 1952, it was clear that the 1929 legislature had achieved its goals with exacting precision.[8] The statistics provided by the government in their supplemental briefing show that Congress in 1952 was fully aware of the disparate impact the 1929 Undesirable Aliens Act had on Latino migrants.[9] Despite this knowledge, Congress in 1952 decided to perpetuate this disparate impact through the codification of the Undesirable Aliens Act within the 1952 McCarran-Walter Act.

And like the law analyzed by the Supreme Court in *Hunter*, the current version of section 1326 continues to this day to have the large disparate impact on Mexican and Latin American defendants that was intended by the 1929 Congress. An overwhelming percentage of prosecutions for illegal reentry – regularly surpassing 99% per year – are against Mexican and Latin American defendants.[10] The disparate impact of the current version of section 1326 is stark. Succinctly put, the government's assumption that such a problematic law would have inevitably been passed by Congress despite its racist origin is questionable, to say the least. Perhaps some

---

[7] *See* Defendant's Motion to Dismiss the Indictment, Exhibit C, Doc. #25.
[8] *See* Exhibit A, attached, Dr. S. Deborah Kang's Affidavit specifically addressing this Court's question of whether the 1952 McCarran-Walter Act would have been passed *as-is* absent racial animus.
[9] *See* Supplemental Brief in Response to Court's Order, Exhibit 2 [Doc. #35-2], Report of the Committee on the Judiciary,
[10] *See, e.g., Quick Facts: Illegal Reentry Offenses, Fiscal Year 2020,* United States Sentencing Commission, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.

type of immigration related offense might have inevitably been passed by Congress, but not one that so clearly and disparately impacts Latino migrants.

The assumption made by the government as to the inevitability of a law criminalizing reentry being passed by Congress, despite racial animus, is also suspect given that Congress has never, to date, criminalized a particular population in the United States that makes up a large part of those living here unlawfully – individuals who have overstayed their visas. As the government acknowledges, the United States relies on administrative enforcement when dealing with visa issues, not criminal penalties.[11]  Not surprisingly, given the racist origins of section 1326, the overstay population, which is on the rise in the United States, is primarily comprised of individuals from countries other than Central America and Mexico.  Yet their illegal status within the United States is not criminal.

> According to Pew Research Center:
>
> In recent years, immigrants from countries outside of Mexico and Central America accounted for almost 90% of overstays, and in 2017, there were more than 30 overstays for every border apprehension for these countries. Although the Census Bureau data Pew Research Center uses to estimate the size of the unauthorized immigrant population does not indicate directly whether someone arrived with legal status, the origin countries of immigrants in these sources provide indirect evidence. From 2007 to 2017, the share of newly arrived unauthorized immigrants (those in the U.S. five years or less) from regions other than Central America and Mexico – the vast majority of whom are overstays – increased from 37% to 63%. At the same time, the share of new unauthorized immigrants from Mexico fell from 52% to 20%.[12]

Given the fact that Congress has not criminalized a large portion of unauthorized immigrants within the United States, immigrants who just so happen to be primarily from countries other than Mexico and Central America, cuts against the government's assumption that

---

[11] Government's Supplemental Brief, Doc. #35 at 7, n.1.
[12] https://www.pewresearch.org/fact-tank/2021/04/13/key-facts-about-the-changing-u-s-unauthorized-immigrant-population/

5

section 1326, along with its stark disparate impact on Mexicans and Latin Americans, would nevertheless have been enacted in its exact shape and form without the racial animosity that clearly motived its original enactment.

### III. The 1950 Senate Report is actually evidence of the racial animosity motivating the codification of the 1929 Undesirable Aliens Act in the 1952 McCarran-Walter Act.

The government has submitted the 1950 Senate Report commissioned by Senator McCarran as evidence that the 1952 McCarran-Walter Act would, more likely than not, have still be enacted without the racial animus that clearly motivated its enactment. However, the 1950 Senate Report, in conjunction with the historical and legislative records, make it patently clear that had there been no racist animus in 1952, the McCarran-Walter Act, as we know it, would not have passed. The law that would have passed would have been fundamentally different in substance and in spirit.[13]

The 1950 Senate Report by McCarran, relied on for the 1952 McCarran-Walter Act, is replete with racism, starting with the introductory chapter dividing the world population into various races.[14] The report goes on to make it clear that entering illegally after being deported is "principally a southern border problem."[15] McCarran's report further denigrated Latino immigrants as particularly undesirable due to alleged low-percentage of English speakers; inability to assimilate to the "Anglo-American" culture and education, with Latino students believed to be

---

[13] Dr. Kang's attached affidavit details the anti-Mexican racism that motivated the 1952 reenactment of criminal penalties for unauthorized reentry.
[14] S. Rep. 18-1515.
[15] *Id*. at 364-365.

"as much as 3 years behind;" and a high number receiving "public relief."[16]  The overt racism of the report spilled over into both the House and Senate debates of the 1952 McCarran-Walter Act.[17]

In addition to the overt racism within the 1950 Senate Report, the fact that key recommendations were excluded from the final Act is quite telling - with the most telling being that the final Act exempted employers of undocumented migrants from criminal penalties despite reports to both the President and Congress from the INS indicating their belief that employer penalties would be one of the most potent means of stopping undocumented immigration.  But such an exemption would take a toll on the availability of the cheap exploitable labor force that illegal immigrants provided to businesses along the southern border.

To this point, an interesting exchange is highlighted by Dr. Kang in her attached affidavit. Senator Hubert Humphrey (D-MN) pointedly argued that the inclusion of the employer exemption contradicted the immigration law enforcement aims of the McCarran omnibus bill.  In doing so, Senator Humphrey quipped,

> "It is very interesting to me to note that some Senators who are sponsors for the McCarran bill were the very ones who were not at all exercised or disturbed about whether a million illegal entrants came across the border from Mexico with the resultant loss of jobs by native American workers.  I cannot quite understand the logic of those Senators on this issue. Here is a bill which supposedly will put up barriers against legal immigration; yet only a month and a half ago on the floor of the Senate efforts were being made by some Senators to check illegal immigration, and some of the sponsors of S. 2550 voted against our efforts; voted to check our efforts to stop the illegal entry into the United States of Mexican wetbacks, who would destroy the domestic labor market and, at the same time, abrogate the immigration laws. To me, it does not make much sense."[18]

---

[16] *Id.* at 150-152.

[17] *See, e.g.,* 98 Cong. Rec. 5773-74 (1952) (statement of Sen. George: "Mr. President, I hope the time has not come when one must apologize for being a hateful Anglo-Saxon.").

[18] 98 Cong. Rec. 5168 (May 14, 1952).

Succinctly put, Senator Humphrey was highlighting the fact that the 1952 McCarran-Walter Act, as proposed, and eventually passed, was an actual deviation from the recommendation from the INS contained in the 1950 Senate Report and, along with the exclusion of Mexicans from eligibility for deportation relief, the passed Act sent a powerful message about the diminished status of Mexican "wetbacks" in the United States.

Additionally, the government's claim that the 1952 McCarran-Walter Act's quota system was not based on race is mistaken. The quota system recommended by the 1950 Senate Report reflected biases against southern and eastern Europeans and subjected them to lower quotas. The report also recommended a quota system based on a 1920 population count that excluded Blacks and Native Americans. The Asia Pacific Triangle quota was also based on race, limiting Asian descent admissions on the basis of race rather than country of birth. Furthermore, not all Western Hemisphere migrants were exempted from the quotas. Blacks from European colonies in the Caribbean were subject to a quota of 100. And persons of mixed-descent, Asian-Canadian, and Asian-Latin American, among others, were also subject to quotas of 100. In short, the government's claim that the quota system "was not restricted based on race" is not accurate.

Lastly, the uptick in undocumented migration in the 1950s, referenced in the 1950 Senate Report and relied upon by the government as a race-neutral rationale for the passage of the 1952 McCarran-Walter Act, was actually attributable in large part to congressional lawmakers - Senator McCarran in particular - reducing appropriations for border enforcement and the exemption of employers from criminal penalties for hiring undocumented workers. Congress continually weakened border enforcement for a racist reason – the longstanding belief that the Mexican migrant made the ideal farm laborer.[19] The civil and criminal penalties provided by

---

[19] Kang Affidavit, attached, page 3-4.

Congress were essentially a labor management tool for southwestern growers. If the Mexican migrants tried to remain after the growing season or displeased the growers in any way, the civil and criminal penalties could be used to threaten them and/or remove them from the country.[20]

In short, the 1950 Senate Report is not evidence that the 1952 McCarran-Walter Act would have been passed, as it was, absent racial animus. The 1950 Senate Report actually supports undersigned counsel's argument that both the 1929 Undesirable Aliens Act and the 1952 McCarran-Walter Act were both motivated by racial animus toward Latino migrants and that absent that racial animus, as Dr. Kang opines, there would have been a far different bill, both in substance and in spirit.

### IV. The codification of the 1929 Undesirable Aliens Act and the 1952 McCarran-Walter Act did nothing to dispel the racial animosity towards and the resulting disparate impact on Mexicans and Latin Americans.

> "The subcommittee did not, as I understand it endeavor to use this codification bill to effect a general substantive revision of our immigration and naturalization statutes. Rather it is an attempt to codify and clarify existing law. Because of this fact, the bill reiterates existing immigration policies decided upon by Congress in previous sessions."[21]

Representative Yorty (D-CA), April 25, 1952.

Congress originally enacted the illegal reentry provision in 1929, then codified an almost identical provision within the 1952 McCarran-Walter Act. As Representative Yorty noted, the 1952 codification bill was not intended as a substantive revision of the immigration and naturalization laws of the United States. Rather, it was simply an attempt to codify and clarify existing law. Accordingly, the 1952 McCarran-Walter Act merely *reiterates existing immigration polices decided upon by Congress in previous sessions* - importantly, to include the 1929 Undesirable Aliens Act.

---

[20] *Id*.
[21] 98 Cong. Rec. 4441 (April 25, 1952).

Contrary to the government's claims, the passage of time and legislator changes matter little here. For starters, several key legislators remained the same, including representatives who served on the 1929 Immigration Committee. These continuing Congressmen actually praised their 1952 colleagues for preserving the purpose of the 1929 Undesirable Aliens Act. In particular, Senator George reminded colleagues that when he voted for the 1920s immigration laws, the purpose was to "preserve something of the homogeneity of the American people" and the "desire to protect American labor.["]22 Additionally, Representative Jenkins praised colleagues for maintaining the 1920s immigration laws he had promulgated, stating the House debate "has been reminiscent of the days of 20 years ago when the wishes of the Members was to keep away from our shores the thousands of undesirables just as it is their wish now."[23]

Furthermore, even had there been a completely clean slate of legislators when the 1952 Congress restated immigration and naturalization laws in the McCarran omnibus bill, the 1929 enactment motivated by a clear racial animus toward Mexicans and Latin Americans would still be relevant for the Court's analysis under *Arlington Heights* today. As the Supreme Court has explained in a trio of recent cases, when a legislature reenacts a statute without significantly altering it, the later legislature's intent does not supplant the earlier legislature's.[24] "It will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed."[25]

---

[22] 98 Cong. Rec. 5774 (1952).
[23] 98 Cong. Rec. 4442 (1952).
[24] *See Ramos v. Louisiana*, 140 S.Ct. 1390, 1410 (2020) (Sotomayor, J. concurring in part); *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2274 (2020) (Alito, J., concurring); *Hunter*, 471 U.S. at 233; *cf. Abbott*, 138 S.Ct. at 2325.
[25] *Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 198-99 (1912); *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) (We do not presume that the revision worked a change in the underlying substantive law unless an intent to make such a change is clearly expressed); *United States v. Ryder*, 110 U.S. 729, 740 (1884)(It will not be inferred that the legislature, in revising

In *Hunter*, the Supreme Court faced a challenge to a facially neutral Alabama voter disenfranchisement law adopted in 1901 with the intent to "establish white supremacy" in the state.[26] This challenge was made despite some of the more blatantly discriminatory portions of the 1901 law having been struck down by courts in the decades after its original enactment. Of course, the government countered, as the government does here, that these changes over the years to the 1901 law purged it of the original racially animus intent. Chief Justice Rehnquist, writing for a unanimous court, rejected this argument, reasoning "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect."[27]

Next, in *Ramos v. Louisiana*, the Supreme Court was faced with a challenge to Louisiana's non-unanimous jury verdict system originally adopted in 1898 for the avowed purpose "to establish the supremacy of the white race."[28] Despite focusing primarily on the Sixth Amendment, *Ramos* still analyzed the racially discriminatory reasons for adopting the nonunanimous jury verdict system in the first place. And the discriminatory motivation for the adoption of Louisiana's non-unanimous jury verdict system ultimately led the plurality in *Ramos* to explicitly reject Justice Alito's dissenting opinion arguing that the subsequent recodification of the non-unanimous jury verdict rule, untainted by racism this time, purged it of its original taint. Taint that Justice Alito could not even ignore or argue did not exist.

---

and consolidating the laws, intended to change their policy, unless such intention be clearly expressed).
[26] *Hunter*, 471 U.S. at 227-29.
[27] *Id*. at 233; *see also Abbott*, 138 S.Ct. at 2325.
[28] *Ramos*, 140 S.Ct. 1394.

In rejecting Justice Alito's dissent, *Ramos* asks, "[b]ut if the Sixth Amendment calls on judges to assess the functional benefits of jury rules, how can that analysis proceed to ignore the very functions those rules were adopted to serve?"[29]  "Nor can our shared respect for rational and civil discourse supply an excuse for leaving an uncomfortable past unexamined."[30]  Importantly, Justice Sotomayor concurred in *Ramos* to elaborate on how a law with a racist origin could eventually be free of the original racial bias.  "Where a law otherwise is untethered to racial bias – and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it – the new law may well be free of discriminatory taint."[31]  Justice Sotomayor, however, concluded that Louisiana had made no meaningful effort to confront the non-unanimous jury verdict rule's tawdry past.

In *Espinoza*, the Supreme Court was asked to review the State of Montana's Supreme Court decision to exclude religious schools from the state's scholarship program.  Reversing the Montana Supreme Court's decision, the Supreme Court examined the "checkered tradition" and "shameful pedigree" of similar religious exclusions born of anti-Catholic bigotry in the 1870s.[32]  And despite the State of Montana having reenacted its religious exclusion in the 1970s for reasons purportedly unrelated to anti-Catholic bigotry, the Supreme Court rejected the reenactment as being a relevant consideration in its First Amendment analysis.  In doing so, the Supreme Court noted, "the no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."[33]

---

[29] *Id*. at 1401, n.44.
[30] *Id*.
[31] *Id*. at 1410.
[32] *Espinoza*, 140 S.Ct. at 2251.
[33] *Id*. at 2258.

In summation, these three Supreme Court cases - *Hunter, Ramos, and Espinoza* - stand for the proposition that a statute's prior versions, when known to have been motivated by racial animus, infect the current version unless Congress actively confronts the statute's tawdry past and chooses to reenact it for race-neutral reasons.[34] Here, the 1952 McCarran-Walter Act simply reiterated already existing immigration and naturalization laws, to include the 1929 Undesirable Aliens Act, despite Congress knowing full well about the stark disparate impact the law had on Latino migrants. In reiterating the 1929 Undesirable Aliens Act, the 1952 Congress did not confront its tawdry past. To the contrary, several members of the legislature actually applauded their 1952 colleagues for adopting the motivation of the 1929 Congress to keep the undesirables out of the United States.

The racist origins of the 1929 Undesirable Aliens Act are undisputed. The government, however, urges this Court to find that the codification of section 1326 in the 1952 McCarran-Walter Act purged the law of its tawdry past. Essentially, the government is asking this Court to adopt Justice Alito's dissent in *Ramos* – that is, subsequent recodification of a clearly racist law is sufficient to purge it of its racist intent. But the Supreme Court has repeatedly rejected this argument. Instead, requiring the government to produce actual evidence that Congress confronted the racist origins of the law first and, despite the racist origins, reenacted the law untethered to any racial bias – a task the government has failed to do.

Mexican and Latin American racism motivated the 1929 Undesirable Aliens Act. The same Mexican and Latin American racism motivated Congress to codify the 1929 Undesirable Aliens Act with the 1952 McCarran omnibus bill. Instead of confronting the racist origins of the 1929 Undesirable Aliens Act, Congressmen openly praised their colleagues for carrying on the

---

[34] *Hunter*, 471 U.S. at 232-33.

torch of Mexican and Latin American racism that the 1929 Congress lit when it passed the 1929 Undesirable Aliens Act. Accordingly, the government stands in the same position that Louisiana found itself in *Ramos* – codification of a racist law, alone, cannot and should not purge the law of its tawdry past - especially if the law continues to this day to have the exact disparate and racially motivated impact upon the exact group of people that the original law was intended to target in the first place.

## V. The post-1952 amendments relied on by the government failed to purge section 1326 of its racial animus and have carried forward the core language of the 1929 Undesirable Aliens Act.

Despite no evidence that Congress has ever confronted the racist origins of section 1326 or its stark disparate impact on Mexican and Latin Americans to this day, the government persists in advancing Justice Alito's losing argument that subsequent reenactment of a racist law, without more, is sufficient to purge the law of its tawdry past. It is not. Simply expanding the reach of section 1326 and ratcheting up the severity of the punishments for the status offense (far in excess of the foreign countries cited by the government in their Supplemental Brief) does not provide evidence that Congress confronted the racist origins of the law prior to amending it and then consciously untethered the law from its racist origins. As the Supreme Court explained in *Abbott*, the discriminatory taint of a law remains unless something is done to "alter the intent with which the [original] article, *including the parts that remained*, had been adopted."[35]

None of the amendments relied on by the government sought to grapple with the racist history of section 1326 or remove its influence on the legislation. Nor did any of the amendments to section 1326 reflect any change of Congressional intent, policy, or reasoning. Instead, the amendments are built on the foundation of the racial animus that motivated the passage of the

---

[35] *Abbott*, 138 S.Ct. at 2325 (emphasis added).

1929 Undesirable Aliens Act and its subsequent reenactment in the 1952 McCarran-Walter Act, only serving to enhance the criminal and/or civil penalties for undocumented reentry, furthering and increasing the stark punitive effect of the racially motivated provision. Thus, the amendments relied on by the government, without evidence showing that Congress confronted the tawdry past of section 1326, do nothing to cleanse the original law of its discriminatory intent.

Furthermore, none of the subsequent amendments relied on by the government here substantively altered the original provision or changed the operation of section 1326. Of note, when describing the 1990 amendment to section 1326, the Supreme Court called it mere "housekeeping."[36] Analyzing the legislative history for the amendments, the Supreme Court noted that the amendments merely increased penalties and "updated and simplified" the statute.[37] The Supreme Court held that the "history" of the amendments "contains no language at all that indicates Congress intended to create a new substantive law."[38]

Given the above, it is unsurprising that the district court in *Carrillo-Lopez*, when faced with the exact argument that the government is advancing here, concluded that the "amendments do not reflect any change of Congressional intent, policy, or reasoning" from "the racism that initially motivated the Act of 1929 or the discriminatory intent that was contemporaneous with the 1952 restatement.[39] As the Supreme Court has made clear through *Hunter*, *Ramos*, and *Espinoza*, a racist law cannot be shielded from an equal protection review by a legislature simply reenacting the law or amending the law without any debate.

---

[36] *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998).
[37] *Id*. at 223.
[38] *Id.* at 234.
[39] *United States v. Carrillo-Lopez*, 555 F.Supp.3d 996, 1026 (D. Nevada 2021).

Furthermore, as detailed at great length in Dr. Kang's attached *Amicus Curaie* brief filed with the Ninth Circuit Court of Appeals in support of *Carrillo-Lopez*, not only do the subsequent amendments to section 1326 fail to acknowledge, examine, or expunge the statute's racist origins, they also carry with them their own racial animus.[40]  For instance, the 1988 Chiles amendment, which added seriously stiff penalties for aliens with prior felony convictions, was premised on the unfounded belief that alien involvement in crime was a serious problem – especially Jamaican posses and Haitian crack syndicates.[41]

This same unfounded belief that Cuban and Haitian asylum seekers in Florida were committing serious criminal offenses and overcrowding the prison system motivated the 1990 Graham amendment increasing the fines in section 1326.[42]  Keeping the Florida streak alive, the McCollum amendments in 1994 and 1996 increased the penalties for unauthorized reentry and limited collateral attacks on the underlying deportation order.  Much like his Floridian predecessors Chiles and Graham, McCollum was motivated by the still unfounded belief that Cuban and Haitian asylum seekers and refugees were just a bunch of lawbreakers and criminals. "Find a hole in our fence at Guantanamo and push these aliens [Cuban refugees] through it.  And maybe we can do something similar with the Haitians."[43]

Most telling of all the amendments, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the last amendment to section 1326, brings us full circle back to the 1929 Undesirable Aliens Act.  Again, increasing the severity of the available penalties,

---

[40] Brief of Amicus Curiae Dr. S. Deborah Kang in Support of Defendant-Appellee for Affirmance, *United States v. Carrillo-Lopez*, No. 21-10233 (9th Cir. April 14, 2022). Attached as Exhibit B.
[41] *Id*. at 15.
[42] *Id*. at 16-17.
[43] *Id*. at 19-25.

Representative Lamar Smith (R-TX) aimed to curtail "undesirable" immigration to the United States.[44] Given the disparate impact of section 1326, this meant increased civil and criminal penalties directed at Mexicans and Central Americans. The overt racist motivation for the final amendment to section 1326 did not go unnoticed:

> Let there be no mistake: This Nation has every right and obligation to control our borders and to enforce our immigration laws. But absurd boondoggles, like building a giant fence, mindless cruelty, like sending legitimate refugees back to be murdered or tortured by their oppressors, and good old-fashioned Xenophobia, have nothing to do with legitimate protection of our borders.

Representative Jerrold Nadler (D-NY), 142 Cong. Rec. H2390.[45]

In short, Congress has failed at every step along the way to acknowledge, examine, confront, and expunge section 1326's racial animus. Throughout the years, Congress has never evidenced a desire or motivation to substantively change the law that was first enacted in 1929 and codified in 1952. Each amendment, however, has ratcheted up the severity of the penalties that are primarily doled out on Mexicans and Central Americans. The stiffening of these penalties over the years has all been motivated by racial animus and the unfounded, in fact, refuted belief that illegal immigrants are a bunch of criminals and lawbreakers. To the contrary, "contemporary and historical data, including investigations carried out by major government commissions over the past century, have shown repeatedly and systematically that immigration is actually associated with *lower* crime rates."[46]

The government has provided no evidence that Congress has confronted the racist past of section 1326 during any of the debates leading up to the passing of the late twentieth century amendments. The government has further failed to provide any evidence that these subsequent

---

[44] *Id.* at 26.
[45] *Id.* at 27.
[46] *Id.* at 31.

amendments made any real, substantive changes to the core of section 1326. As such, the government's attempt to shift this Court's focus from the 1929 Undesirable Aliens Act, as codified in the 1952 McCarran-Walter Act, should be rejected.

### VI. Evidentiary Hearing:

Undersigned counsel has provided this Court with affidavits from numerous experts who have provided findings based on the relevant historical scholarship, the events leading to the legislation, and legislative history of 8 U.S.C. § 1326. These findings contain ample evidence for this Court to rely on in determining whether Mr. Duron-De Luna has met his initial burden under *Arlington Heights* - that is, discriminatory intent was a motivating factor in the decision to enact and codify section 1326. The burden now rests with the government to produce evidence showing that the same decision would have resulted even if the impermissible purpose had not been considered. Their supplemental brief lacks such evidence.

Accordingly, if this Court were to grant the government's request to vacate the hearing, it would seem fatal to the government's cause. It is not sufficient that the government opines that, more likely than not, Congress would have criminalized illegal reentry. It is not sufficient for the government to simply show that foreign countries have similar contemporary immigration laws. And it is not sufficient for the government to kick the can down the line to amendments that neither confronted the racist origins of the law nor substantively changed the law as enacted in 1929. Rather, the government must meet its burden and produce actual, not theoretical, evidence that proves the 1952 Congress, when codifying the 1929 Undesirable Aliens Act, would have passed the same law absent discriminatory intent.

18

Assuming this Court proceeds with the Evidentiary Hearing on August 24, 2022, in addition to the exhibits provided to this Court through the various filings, undersigned counsel intends to call Dr. S. Deborah Kang to testify on Mr. Duron-De Luna's behalf. However, due to obligations Dr. Kang has the day prior to the hearing, she is only available to testify via video. Government counsel has indicated that they do not oppose Dr. Kang appearing via video. As such, undersigned counsel requests approval of this Court to proceed in this manner, assuming the Evidentiary Hearing proceeds as ordered by this Court.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


*/s/ Matthew K. Belcher*
MATTHEW K. BELCHER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Matthew_Belcher@fd.org
Attorney for Defendant

**CERTIFICATE OF SERVICE**

       I certify that on August 12, 2022, I electronically filed the foregoing ***Defendant's Response to Government's Supplemental Brief in Response to Court's Order [Doc. #35]*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

    Brian Michael Dunn, Assistant U.S. Attorney
    Email:  Brian.Dunn@usdoj.gov

and I will serve the document or paper to the following non-CM/ECF participant in the manner indicated:

    Oscar Duron-De Luna (via mail)

                                */s/ Matthew K. Belcher*
                                MATTHEW K. BELCHER
                                Assistant Federal Public Defender
                                Office of the Federal Public Defender