*United States v. Duron-De Luna*

United States District Court
District of Colorado

Case No. 22-cr-00018-RMR

---

## **Exhibit A**

Affidavit of Dr. S. Deborah Kang

Affidavit

Dr. S. Deborah Kang
Associate Professor of History
University of Virginia
sdkang@virginia.edu
August 10, 2022

I have been asked to research the legislative history of 8. U.S.C. § 1326 and address the

question of whether racial animus motivated its reenactment under the 1952 McCarran-Walter

Act.[1] This affidavit provides a report of my findings regarding the relevant historical

background, the events leading to the legislation, and the legislative history of the measure.[2] I

conclude that anti-Mexican racism motivated the 1952 reenactment of the criminal penalties for

unauthorized reentry. In completing the research for this declaration, I relied upon primary and

secondary sources as well as a longer declaration filed on December 22, 2021.[3] I also draw upon

extensive historical research conducted for my books and journal articles on the history of the

Immigration and Naturalization Service (INS), undocumented immigration, and immigration

legalization.[4]

---

[1] An Act To revise the laws relating to immigration, naturalization, and nationality; and for other purposes, Pub. L. 82-414, 66 Stat. 163 (1952).

[2] *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. at 265 (1977).

[3] Affidavit of Dr. S. Deborah Kang, United States of America v. Marciano Muñoz-De La O, No: 2:20-CR-134-RMP-1 (E.D. Wash. 2021). Although I have not been asked to recount the complete history of 8 U.S.C. § 1326 in this declaration, I am prepared to testify on the late twentieth-century amendments to the law under the Anti-Drug Abuse Act of 1988, the Immigration Act of 1990, the Violent Crime Control and Law Enforcement Act of 1994, the Antiterrorism and Effective Death Penalty Act of 1996, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. This testimony would reiterate the points made in my December 2021 declaration in which I conclude that a combination of anti-Latinx and anti-Black racism drove the passage of the 1988, 1990, 1994, and 1996 amendments.

[4] S. Deborah Kang, The *INS on the Line*: *Making Immigration Law on the U.S.-Mexico Border* (New York: Oxford University Press, 2017); "Sovereign Mercy: The Legalization of the White Russian Refugees and the Politics of Immigration Relief," *Journal of American Ethnic History* (forthcoming); Danielle Battisti and S. Deborah Kang, eds., *Hidden Histories: Undocumented European Migrants in the United States* (contract under negotiation, University of Illinois Press, 2023).

**Historical Background: The Expansion of Anti-Mexican Racism in American Immigration Law, 1929-1952**

*The Disparate Impact of the 1929 Undesirable Aliens Act and the Forced Removals of the 1930s*

The 1952 reenactment of the 1929 Undesirable Aliens Act occurred against a backdrop of anti-Mexican racism and the widespread exploitation of Mexican labor that had existed in the United States for decades.[5] Indeed, by the 1930s, anti-Mexican animus worsened due to the disproportionate impact of the 1929 law on Mexican immigrants.[6] Likewise, a 1950 study commissioned by Senator Patrick McCarran (D-NV), concluded that between 1924 and 1948, Mexicans constituted 90% of deportation and voluntary departure cases.[7] As historian Mae Ngai has concluded, immigration law enforcement in this period created a negative stereotype of Mexican immigrants as the nation's iconic illegal alien.[8]

A few months after Congress passed the Undesirable Aliens Act, the onset of the Great Depression compounded the racism experienced by ethnic Mexicans. During the economic crisis, ethnic Mexican communities became a source of resentment among nativists looking for a scapegoat. Wrongly blamed for taking the jobs of native-born Americans and consuming an unfair share of welfare benefits, the federal government, states, and localities used scare tactics to force undocumented Mexican immigrants into leaving the United States.[9]  These campaigns

---

[5] David G. Gutiérrez, *Walls and Mirrors: Mexican Americans, Mexican Immigrants, and the Politics of Ethnicity* (Berkeley: University of California Press, 1995).

[6] Eric S. Fish, "Race, History, and Immigration Crimes," *Iowa Law Review,* vol. 107, n. 3 (2022): 1090.

[7] *The Immigration and Naturalization Systems of the United States*, Report of the Committee on the Judiciary pursuant to S. Res. 137,  S. Rpt. No. 1515, April 20, 1950, 635.

[8] Mae Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton: Princeton University Press, 2004).

[9] Abraham Hoffman, *Unwanted Mexican Americans in the Great Depression: Repatriation Pressures, 1929-1939* (Tucson: University of Arizona Press, 1974); Francisco E. Balderrama and Raymond Rodríguez, *Decade of Betrayal: Mexican Repatriation in the 1930s* (Albuquerque: University of New Mexico Press, 1995); Deirdre Maloney, *National Insecurities: Immigrants and U.S. Deportation Policy Since* 1882 (Chapel Hill: University of North Carolina Press, 2012); Cybelle Fox, *Three Worlds of Welfare Relief: Race, Immigration and the American Welfare State, from the Progressive Era to the New*

generated so much fear that Mexican American citizens and Mexican immigrants, as well as undocumented Mexican migrants, were driven out of the country; by 1940, it's estimated that nearly half a million ethnic Mexicans were forcibly repatriated.[10] The impacts of the removal drives were devastating as thousands lost their homes and businesses, were separated from their families, and exiled to a country many never knew.[11] In 2006, the State of California acknowledged the harms caused by the expulsion drives by issuing an official apology. Signed by Governor Arnold Schwarzenegger, SB 670 described the repatriations as discriminatory, illegal, and violations of the civil liberties and constitutional rights of persons of Mexican ancestry.[12]

*The Exploitation of Mexican Braceros and Undocumented Mexican Workers, 1942-1964*

As the forced removals stigmatized persons of Mexican descent,[13] southwestern agribusiness, on the eve of World War II, began to revive racist arguments for the admission of Mexican immigrant farm workers.[14] First articulated by southwestern growers and their congressional allies in the 1920s, these arguments, drawing upon eugenicist theories, claimed that Mexican migrants made the ideal farm labor workforce because they were genetically inclined to undertake "stoop labor" rather than skilled and white-collar work. As an additional advantage, farmers argued that Mexicans were akin to so-called birds of passage and therefore

---

Deal (Princeton: Princeton University Press, 2012); Adam Goodman, *The Deportation Machine: America's Long History of Expelling Immigrants* (Princeton: Princeton University Press, 2020).
[10] Goodman, *Deportation Machine,* 46.
[11] "Decade of Betrayal": How the U.S. Expelled Over a Half Million U.S. Citizens to Mexico in the 1930s, KCET, accessed August 7, 2022, https://www.kcet.org/shows/democracy-now/clip/how-the-u-s-expelled-over-a-half-million-u-s-citizens-to-mexico-in-1930s.
[12] Apology Act for the 1930s Mexican Repatriation Program, Cal Gov Code § 8720 (West 2006).
[13] Erika Lee, *America for Americans: A History of Xenophobia in the United States* (New York: Basic Books, 2019), Kindle Loc. 3007.
[14] Mireya Loza, *Defiant Bracero: How Migrant Workers Fought for Racial, Sexual, and Political Freedom* (Chapel Hill: University of North Carolina Press, 2016), 34.

would never settle in the United States and pursue American citizenship.[15] If, however, they tried to remain or displeased growers in any way, the civil and criminal penalties for undocumented entry could be used to threaten Mexican migrants and remove them from the country.

From the late 1930s onwards, government officials responded to grower demands for Mexican immigrant workers with much doubt. Federal studies demonstrated the pervasiveness of anti-Mexican racism in the United States[16] and as a result, high level figures such as George S. Messersmith, the US ambassador to Mexico, questioned the wisdom of admitting Mexican workers when "the question of discrimination against Mexicans in the United States is one of the few outstanding problems we have with Mexico."[17] In light of the recent repatriation drives, the Mexican government also was fully cognizant of the anti-Mexican animus in the United States. Thus, in negotiating what would become the Bracero Program, it obtained guarantees from the United States that its nationals would receive fair wages and humane working and living conditions and that Texas, where anti-Mexican racism took particularly violent forms, would be excluded from the Program.[18]

Upon the signing of the Bracero accords in 1942, both nations pronounced that it marked a fresh chapter in US-Mexico relations, a chapter in which the two nations would act as wartime

---

[15] Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* (Princeton: Princeton University Press, 2002)*,* Kindle Loc. 226-262; Lawrence A. Cardoso, *Mexican Emigration to the United States,*1897-1931 (Tucson: University of Arizona Press, 1980), 125 (paraphrasing statements of farmers interviewed by Paul S. Taylor).

[16] For an account of these studies, see Emilio Zamora, *Claiming Rights and Righting Wrongs in Texas: Mexican Workers and Job Politics During World War II* (College Station, Tex.: Texas A & M Press, 2010), 73-75; 89-93.

[17] Justin Hart, "Making Democracy Safe for the World: Race, Propaganda, and the Transformation of U.S. Foreign Policy during World War II," *Pacific Historical Review,* vol. 72, n. 1 (February 2004):59, 62 (quote: 65) (citing George S. Messersmith to the Secretary of State, November 12, 1942, 811.4016 Decimal File, 1940-1944, RG 59, National Archives, College Park, MD).

[18] Zamora, *Claiming Rights and Righting Wrongs in Texas*, 68-71.

allies and in which Mexican national workers would be treated with dignity and respect.[19] Yet, from the start of the Program, Mexican braceros faced widespread discrimination and abuse. They complained about "receiving 'a lower rate of pay for the same work'; on-the-job segregation between Mexicans and Anglos; separate recreational and toilet facilities; and a glass ceiling that prevented them from advancing beyond 'certain low-paying jobs.'"[20] In a widely circulated op-ed, Sumner Welles, former Under Secretary of State to President Franklin Delano Roosevelt, excoriated the "poisoning discriminations" faced by bracero workers and equated their experiences with the "Juan Crow" racism[21] faced by ethnic Mexicans in the United States:

> . . . Mexican children are not permitted in some places to attend the public schools. They do not realize that Mexicans are not permitted in certain regions to travel in cars set aside for "white persons." They do not know that in some communities they are not permitted entrance into hotels or moving-picture theaters. They would be amazed to learn that only recently a high official of the Mexican government was refused service in the restaurant of a leading hotel in one of our Southwestern States. They would be shocked to hear that the proprietors of a public recreation center announced that they would not permit the entrance of Mexicans or persons of Mexican origin, "regardless of their state of culture, either social or economic." They are probably not aware that the slum conditions in which many thousands of Mexicans are forced to live in some of our Southwestern States are solely due to the unwillingness of the authorities and residents of those communities to afford them the same opportunity for betterment afforded their neighbors of United States origin. They do not know of the exploitation to which some Mexican laborers have been subjected."[22]

---

[19] The Bracero Program lasted twenty-two years and resulted in the admission of approximately 4.5 million Mexican nationals.

[20] Hart, "Making Democracy Safe for the World," (citing Ernest W. Trimble to Lawrence Cramer, October 26, 1942, 811.4016, Decimal File, 1940-1944, RG 59 NARA; William P. Blocker, "Some Places Where Mexicans are Discriminated Against in Texas Either by Denying Them Service or by Segregating Them from Anglo-Americans," January 15, 1945, in *ibid.*). See also, Kang, The *INS on the Line*, 134.

    For photos of the working and living conditions faced by Bracero workers, see, Smithsonian National Museum of American History, "Broken Promises/Promesas Rotas," Bittersweet Harvest: The Bracero Program 1942-1964/Cosecha Amarga Cosecha Dulce: El programa Bracero 1942-1964, Digital history exhibit, accessed December 6, 2021, https://americanhistory.si.edu/bracero/introduction.

[21] So-called Juan Crow racism was patterned after Jim Crow racism, the laws and practices that sanctioned the segregation of Blacks in the United States.

[22] Sumner Welles, "Mexican Nationals: Unfriendly Treatment," *Washington Post*, February 16, 1944, 10.

During the twenty-two-year course of the Bracero Program, multiple investigations and complaints filed by the braceros themselves demonstrated its failure to protect workers from workplace abuses and discrimination.[23]

By 1943, the Bracero Program triggered an unprecedented increase in the number of undocumented entries; between 1942 and 1964, approximately five million undocumented immigrants would cross the U.S.-Mexico border. By serving as an indicator of the availability of jobs in the United States, the Bracero Program acted like a magnet, drawing workers to the country. Yet, the overwhelming demand for Bracero contracts and the dehumanizing screening process created strong incentives for migrants to pursue employment outside of the confines of the Program. Photographer Leonard Nadal, for example, documented the fumigation of braceros with DDT at the processing centers in the United States.[24] During their medical exams, US officials, "squeezed their arms, their legs. They saw if their hands had calluses. They opened their mouths and then they chose the strongest, youngest and healthiest, just as they did with the Black slaves."[25] Braceros found themselves further humiliated by growers and their representatives who applied a racist logic in selecting hires; as Elvon De Vaney, a contractor for Texas cotton growers explained:

> There was only one type of individual or group of individuals we kinda shied away from and this was the little bitty short Indian fellas from way down on the southern end of Mexico. . . . So we had to shy away from them little guys especially in the [irrigation]. . .

---

[23] Maggie Elmore, *In the Name of the Father: Catholic Bureaucrats and Human Rights in the Borderlands* (Place: Publisher, forthcoming), 63-121.

[24] Leonard Nadel, "Braceros were fumigated with DDT while others stand in line at the Hidalgo Processing Center, Texas," in Bracero History Archive, Item #3000, accessed December 6, 2021, http://braceroarchive.org/items/show/3000. For a short documentary on the history of "gasoline baths" used against Mexican migrants and braceros, see Ranjani Chakraborty, "The dark history of "gasoline baths" at the border: Toxic chemicals—and Nazis—are part of US border history," *Vox,* July 29, 2019, https://www.vox.com/2019/7/29/8934848/gasoline-baths-border-mexico-dark-history.

[25] Selene River, "A former bracero farmworker breaks his silence, recalling abuse and exploitation," *Los Angeles Times,* July 18, 2022 (citing Mexican historian Zárate Macias), https://www.latimes.com/california/story/2022-07-18/former-bracero-farmworker-breaks-silence.

. They were kinda dwarf, midget type . . . .We tried to get boys. . . if they were from the states of Durango or Zacatecas, San Luis Potosi. . . what we'd call the mountain states . . . those boys were generally bigger and stronger. They were meat eaters, ranch country-type folk. . . . They were bigger and stronger and more stable. A lot of time, Chihuahua and border state boys were kinda rascals, just a little bit a lot of times, so if we had a choice we'd get your mountain type fellars."[26]

More recently, hundreds of former braceros have attested to their experiences of abuse and discrimination in oral histories collected by the Bracero History Archive, a digital repository that serves as one of the primary sources of information about the Bracero Program.[27]

In crossing without a Bracero contract, many Mexicans sought not only to avoid the indignities of the contracting process but also were encouraged by southwestern growers to make unauthorized entries. Due to the state's banishment from the Program, Texas growers increased their hiring of undocumented Mexican workers. Given that of all farmworkers in the US, undocumented Mexicans typically received the lowest wages and endured the worst working conditions, many other growers preferred to hire unauthorized workers rather than be bound by labor protections stipulated in the Bracero contracts.[28] Growers had become so dependent on this workforce that many, echoing the language of Southern slaveholders, felt that it was their right to employ Mexicans whom they pejoratively referred to as "wetbacks."  As the *New York Times* observed, "They [the farmers] assert boldly that this 3,000 square-mile agricultural empire, with 300,000 inhabitants and an annual income of more than $3,000,000, was built on cheap

---

[26] Loza, *Defiant Bracero,* 43 (citing Interview with Elvon De Vaney by Jeff Townsend on March 9, 1974, SWC).

[27] Roy Rosenzweig Center for History and New Media, George Mason University, the Smithsonian Institution National Museum of American History, Brown University, and the Institute of Oral History at the University of Texas at El Paso, *Bracero History Archive*, accessed December 17, 2021, http://braceroarchive.org/.

[28]      Of undocumented Mexican workers, a government investigation wrote, "Last in order of security and first in order of exclusion from the community is the illegal Mexican alien, commonly referred to as a "wet back." Under constant threat of apprehension and deportation, his life is one of furtive insecurity.  In the hands of employers inclined to make use of the wetback's disabilities, the result is virtually peonage." President's Commission on Migratory Labor, *Migratory Labor,* 5, 65-89, 105, 130, 137.

'wetback' labor like the Southern slave owners of a century ago—it is a violation of their rights to take it away even if the 'wetbacks' are lawbreakers."[29]

During the Bracero era, Braceros and undocumented Mexican workers "became a new class of 'indispensable outcasts'."[30] As an indicator of their second-class status, the American public and policymakers employed the racist slur "wetback" to refer to Mexican farmworkers. A 1953 exchange between Austin E. Anson, the Executive Manager of the Texas Citrus and Vegetable Growers and Shippers Association of Harlingen, Texas, and Senator James Eastland (D-MS) demonstrates lawmakers' awareness of the negative connotations of the term:

> Senator Eastland: What is a wetback?
>
> Mr. Anson: That is a dirty word in Texas.
>
> Senator Eastland: I know, but when you say "wetbacks," in your statement, what do you mean?
>
> Mr. Anson: I try never to use the term, but the "wetback" is a coined word that means a man who crossed the Rio Grande River illegally to find work in the United States.[31]

They both concurred that the slur did not apply to undocumented Texans who had lived in the state for decades. The meanings of the word were so negative that if applied to such a Texan, the speaker, as Anson explained, "would have an awful time."[32] Despite these negative connotations, the INS, members of Congress, and the White House, among other policymakers, routinely used the slur during the deliberations regarding the McCarran-Walter Act of 1952.

---

[29] Juan Ramon García, *Operation Wetback: The Mass Deportation of Mexican Undocumented Workers in 1954* (New York: ABC-CLIO, 1980), 214 (citing Gladwin Hill, "'Wetback' Drive Irks 'The Valley,'" *New York Times*, August 2, 1954, 8.)

[30] Alina R. Méndez, "More Than Victims or Villains: Representations of Mexican Migrant Men in the Imperial Valley-Mexicali Borderlands, 1942-1954," *California History,* vol. 98, n. 3 (2021): 33.

[31] Extension of the Mexican Farm Labor Program, Hearings before the Committee on Agriculture and Forestry United States Senate on S. 1207, 83d Cong., 1st Sess., March 23, 24, 1953, 47.

[32] Extension of the Mexican Farm Labor Program, 47.

During the Bracero era (1942-1964), the US government adopted an approach to immigration law enforcement that protected grower access to a steady supply of both legal and undocumented Mexican labor and, more broadly, sustained longstanding racist stereotypes of Mexican migrants as an exploitable low-skilled workforce.[33]  This approach began to take shape in the 1940s as the Mexican government, concerned about losing a source of low-cost labor for its own domestic economy, stipulated that future extensions of the Bracero Program would be contingent on US efforts to control undocumented migration. To keep the Bracero Program alive, the US government, via the INS, implemented two enforcement strategies: 1) at the end of harvest season, the sporadic mass deportation of undocumented workers; and 2) a legalization procedure, pejoratively termed "drying out," that did not provide undocumented Mexican migrants with a pathway to citizenship, but instead funneled them back into the Bracero Program. Thus, for example, during the infamous "El Paso Incident" of October 1948, the INS unilaterally opened the border to the thousands of bracero hopefuls who had gathered upon a rumor that a new recruiting center would open along the line. But instead of granting them bracero contracts, the INS allowed them to cross illegally, arrested them on the spot, and then paroled them to waiting employers. By 1950, these legalizations had become so widespread that they outpaced Bracero admissions by a factor of 5.[34]

*Border Enforcement, The "Wetback Bill," and the Demise of Employer Penalties, 1951-1952*

For much of the Bracero era, federal officials facilitated grower access to undocumented labor.[35] Yet, in the late 1940s, some began to adopt a harder vision of immigration law

---

[33] Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1949*, 32.

[34] Kang, *INS on the Line*, 112-113; Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1952*, 25.

[35] Kitty Calavita, *Inside the State: The Bracero Program, Immigration, and the I.N.S.* (New York: Routledge, 1992*; Kang, *INS on the Line.*

enforcement thanks to the lobbying efforts of the INS.[36] Frustrated by grower defiance of the immigration laws and motivated by persistent anti-Mexican animus within its ranks,[37] the agency won the ear of the Truman administration and, as a result, played a central role in helping it to define a response to undocumented immigration on the U.S-Mexico border.[38] This response included the following policy proposals: the increased statutory authority for the INS to enter places of employment to locate undocumented migrants; the creation of employer penalties; a ban on the legalization of undocumented migrants for the purposes of employment in the United States; and a bilateral approach to migration control that included immigration enforcement support from the government of Mexico.

The Truman administration adopted these recommendations in a 1951 report titled, *Migratory Labor in American Agriculture*.[39] Even though the report used the term "wetback" and described undocumented Mexican migration as an "invasion," it tried to present a sensitive portrait of undocumented immigrants. It explained the hardships that led many to seek employment in the United States and the discrimination and exploitation they faced as farmworkers. Moreover, the report argued that American growers created the conditions that drew undocumented migrants to the United States in the first place and recommended that they, rather than the migrants themselves, bear the principal responsibility for the so-called crisis on

---

[36] Kang, *INS on the Line*, 114-138.
[37] On the anti-Mexican animus within the INS and the Border Patrol, see Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol* (Berkeley: University of California Press, 2010); Martinez, *The Injustice Never Leaves You.* During the Bracero era, the agency frequently characterized undocumented Mexican migrants as "wetbacks" and an "invasion." In a 1949 tribute to the Border Patrol, agency leaders reiterated negative stereotypes of Mexican migrants as passive and unintelligent laborers, ". . . each year the number of Mexican farm laborers illegally entering the United States is alarmingly larger than that of the preceding year. The reasons, of course, are that the Mexican farm laborers are more docile and are willing to work for lower wages than are the domestic farm laborers." Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1949*, 32.
[38] Kang, *INS on the Line*, 114-138.
[39] President's Commission on Migratory Labor, *Migratory Labor in American Agriculture* (Washington, D.C.: U.S. Government Printing Office, 1951).

the border. From the administration's perspective, immigration enforcement measures—and, particularly, employer penalties, were needed to prevent the irregular entry and subsequent exploitation of Mexican nationals in the United States.

Although the Truman administration appeared to take a more humanitarian approach to immigration law enforcement, it is important to note that it was far from averse to adopting punitive measures vis-a-vis undocumented migrants. As historians have observed, the Truman administration and Truman's wing of the Democratic Party adopted a bifurcated approach to immigration policy.[40] On the one hand, Truman's Cold War priorities led him to advocate for the dismantling of the racist national origins quota system of 1924, which barred Asian immigration and limited migration from southern and eastern European nations. Yet, on the other hand, the Party's labor union constituents compelled it to adopt a hardline approach to immigration law enforcement, one that included more funding for the Border Patrol, a robust deportation policy, an extensive detention system, and employer penalties. In short, it was an approach that perpetuated the so-called deportability of Mexican migrants.  When the Truman administration failed to win passage of an employer sanctions measure in Congress, it made clear its commitment to deportation as an alternative response to undocumented Mexican immigration; in a telephone call with Border Patrol supervisor Willard F. Kelly, David Stowe, assistant to President Truman, declared, "we should enforce the law and continue to enforce it as hard as we can, and clean out every wetback in the United States, right now."[41]

---

[40] Kang, *INS on the Line,* 114-138.
[41] Typed notes regarding meeting between Willard F. Kelly and David Stowe at the White House, July 6, 1951, 3:30pm, file 56321/448, RG 85, National Archives. At the same time, the administration, northern Democrats, and the INS worked closely, albeit in vain, to craft a bill that would appropriate $12 million for the construction of immigration detention facilities. Kang, *INS on the Line,* 133.

Ultimately, congressional conservatives, particularly southern and western Democrats, played a key role in weakening or blocking immigration enforcement bills, including measures that increased appropriations for the Border Patrol and penalized employers for hiring undocumented immigrants.[42] For this political faction, maintaining the status quo in the Southwest aligned with their views on Jim Crow racism in the American South. Segregation and easy access to Mexican immigrant labor were two halves of a whole; both policies reinforced a racist worldview that relegated ethnic and racial minorities to the bottom of the socioeconomic ladder and justified the denial of their civil and human rights. Thus, during a conference committee on P.L. 78 (the 1951 statute that authorized the extension of the Bracero Program until its termination in 1964), Senator Allen Ellender (D-LA), chair of the Senate Committee on Agriculture, deleted an amendment that would have penalized employers for hiring undocumented immigrants. The son of Louisiana plantation owners, a lifelong segregationist who opposed civil rights legislation,[43] and an "aggressive [ally] of agribusiness,"[44] Ellender played a key role in ensuring that growers had unimpeded access to Mexican labor. He not only

---

[42] Tichenor, *Dividing Lines*, Kindle Loc. 269.

[43] On his racism, Ellender's biographer writes: "For his treatment of black Americans alone, he fell short, even if one makes a scrupulous effort to judge him by the standards of his times. During his tenure of office, many striking changes in race relations occurred; he simply refused to change with the times and recognize that most Americans had reached a consensus and agreed at least that racial segregation should end and blacks be given the right to vote. Ellender favored racial segregation all his political life. By this measurement alone, he could never be considered a great senator." Thomas A. Becnel, "Allen J. Ellender, Consensus Politician," *Louisiana History: The Journal of the Louisiana Historical Association*, vol. 32, n. 3 (1991): 237-238.

On Ellender's staunch opposition to desegregation and civil rights, his biographer recounts: Ellender believed in segregation to the end and denounced decisions that struck down laws to reenforce segregation. He liked blacks as individuals, but he feared giving the race special legal status. Starting with his 1937 filibuster of antilynch legislation, Ellender maintained a consistent policy on race: he opposed the Federal Employment Practices Commission and voted against funding it; he voted against all civil rights bills passed by Congress from 1947 to 1968, he opposed the Voting Rights Act of 1965, and he signed the 1956 Southern Manifesto which denounced the 1954 Brown decision." Thomas Becnel, "Louisiana Senator Allen J. Ellender and IWW Leader Covington Hall: An Agrarian Dichotomy," *Louisiana History: The Journal of the Louisiana Historical Association*, vol. 23, n. 3 (1982): 268.

[44] Calavita, *Inside the State,* 45.

defeated the employer sanctions amendment to P.L. 78, he also successfully convinced reluctant Mexican officials to sign a new set of Bracero accords in 1951, facilitated the swift passage of S. 984 (P.L. 78), and blocked increased appropriations for the Border Patrol.[45]

Anti-Mexican sentiments also suffused an ensuing set of debates regarding employer sanctions. Three months before the passage of the McCarran-Walter Act of 1952, congressional lawmakers engaged in heated deliberations regarding the so-called wetback bill (S. 1851).[46] Ellender and a powerful group of southern and western Democrats refused to vote for the measure without the inclusion of a "Texas Proviso"; while S. 1851 created criminal penalties for those who those who willfully or knowingly harbored, transported, or concealed unauthorized immigrants, the Texas Proviso expressly excluded employment from the definition of harboring.[47] Thanks to the Proviso, S. 1851 gave growers "*carte blanche* for the continued use of undocumented workers."[48] As lawmakers on both sides of the aisle aired their views on the Proviso, they expressed anti-Mexican animus in explicit terms. They described undocumented Mexican migration as a "distinct menace"[49] and "stinking cesspools"[50] and compared the migrants themselves to "stray dog[s]."[51] Rep. John Rankin (D-MS), who was a member of Congress when it passed the 1924 national origins quota system and the 1929 Undesirable Aliens Act, alleged that Mexican migrants had no interest in their own civil rights because they had no

---

[45] Calavita, *Inside the State*, 43-45.

[46] An Act to assist in preventing aliens from entering or remaining in the United States illegally, Pub. L. 82-283, 66 Stat. 26 (1952). On the reference to S. 1851 as the "wetback bill," see 98 Cong. Rec. 4403 (April 24, 1952).

[47] Section 274(4) specifically states, "That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring."

[48] Emphasis in original. Calavita, *Inside the State,* Kindle Loc. 1460.

[49] 98 Cong. Rec. 1340 (February 25, 1952) (statement of Rep. John Rankin, [D-MS])

[50] 98 Cong. Rec. 1413 (February 26, 1952). (statement of Rep. John Frances Shelly [D-CA])

[51] 98 Cong. Rec. 1346 (February 25, 1952). (statement of Rep. Emmanuel Celler, [D-NY])

capacity to think beyond their subsistence needs.[52] Rep. Thomas A. Jenkins (R-OH), a member of Congress in 1929, expressed his antipathy for the very presence of Mexicans in the United States, stating, "But I am sure that if it were not for the fact that we did not want to impose a quota on Canada we would have imposed a quota on Mexico and some of the other Western Hemisphere countries."[53] The anti-Mexican vitriol was so extreme that Antonio M. Fernández (D-NM) asked Rep. Emmanuel Celler (D-NY) to refrain, "I do not think it is necessary in order to pass this bill to excoriate here on the floor those poor Mexican workers and their families and the farmers who employ them."[54]

Long known for his antisemitism, racism, and xenophobia, McCarran created policies that maintained anti-Mexican animus in American immigration law.[55] Indeed, as the chair of the Senate Judiciary Committee and a member of the Senate Appropriations Committee, he wielded his considerable influence to win passage of measures that cemented the second-class status of ethnic Mexicans. In the Senate Appropriations Committee, McCarran worked with Ellender to defend grower interests in weak border enforcement and the hiring of undocumented Mexican

---

[52] 98 Cong. Rec. 1339 (February 25, 1952).

[53] 98 Cong. Rec. 1349 (February 25, 1952). Jenkins supported the national origins quota system of 1924 and by the late 1930s, he would call for the detention of unauthorized immigrants in "camps where their liberty would be restricted drastically." He also supported quotas on Mexican migration and Filipino exclusion. See, S. Deborah Kang, "Sovereign Mercy: The Legalization of the White Russian Refugees and the Politics of Immigration Relief," *Journal of American Ethnic History,* forthcoming.

[54] 98 Cong. Rec. 1347 (February 25, 1952).

[55] As a testament to McCarran's infamous legacy, in February 2021, the Clark County Board of Commissioners voted unanimously to rename the McCarran International Airport as the Harry Reid International Airport. The change not only paid tribute to Reid but also recognized McCarran's "documented legacy of racism, antisemitism and xenophobia that included restrictive immigration policies that limited immigration for Jewish refugees after the Holocaust." Sean Golonka and Jazmin Orozco Rodriguez, "Clark County Commissioners approve renaming McCarran airport after Sen. Harry Reid, federal approval needed next," *The Nevada Independent,* February 16, 2021, https://thenevadaindependent.com/article/clark-county-commissioners-approve-renaming-mccarran-airport-after-sen-harry-reid-federal-approval-needed-next.

labor.[56] Here, the Senator regularly heard INS leaders plead for increased appropriations that would allow the agency to strengthen its enforcement capacities along the US-Mexico border. The agency specifically requested funds for the hiring of more Border Patrol agents, the execution of more deportations via air, and the construction of detention facilities for the processing of deportees and incarceration of those awaiting criminal prosecution. Agency leaders particularly stressed that by augmenting the airlift program and building detention centers, it could control the increasing number of undocumented Mexican entries along the U.S.-Mexico border.[57] Yet, like his fellow western and southern Democrats, McCarran worked to remove obstacles to the unsanctioned crossings of Mexican workers. In the Senate Appropriations Committee, he and his allies routinely supported reductions in funding for border enforcement operations.[58]

McCarran's support of INS budget cuts were not motivated by a desire to reform the racially discriminatory features of US immigration law with respect to Mexican nationals. Instead, McCarran preserved a system of labor exploitation premised upon racist notions of Mexican migrants as expendable farmworkers. Indeed, during a 1951 appropriations hearing McCarran himself referred to both legal and undocumented Mexicans as "wetbacks":

> Except when you get down to the Mexican boundary. Of course, you have all kinds of
> deportations there and removals from the territory of the United States. But that is a
> come-and-go proposition. In other words, there is a flood of people who come across the
> boundary. They are called wet-backs, and they come across legally or illegally during the

---

[56] Von V. Pittman, Jr., "Senator Patrick A. McCarran and the Politics of Containment," (Ph.D. diss., University of Georgia, 1979): 1.
[57] See, for example, Hearings before the Subcommittees of the Committee on Appropriations House of Representatives: The Supplemental Appropriation Bill for 1952, Part 2, 82d Cong., 1st Sess., May 29, 1951, 751-56.
[58] Calavita, *Inside the State*, 36. See also García, *Operation Wetback*, 121. (citing Ernesto Galarza, *Merchants of Labor: The Mexican Bracero Story* [Charlotte: McNally and Loftin, 1964], 61).

various harvest seasons. Then they go back, and so you have this come-and-go drifting there.[59]

Relying on this racial slur, McCarran justified a 1952 denial of an INS appropriations request by explaining that the "desire for these wetbacks" among growers in US border states took precedence over the agency's enforcement needs.[60] In the same hearing, Ellender complained about the strictures imposed by the Bracero Program: "the Mexican Government has gone so far as to make us, in a contract, agree to feed these people while en route, take them back, provide minimum wages, and give them health insurance, and all that. It is something they do not get at home." In reply, McCarran added that growers' demands for undocumented Mexican workers superseded the well-being of the migrants themselves; as Ellender concurred, McCarran stated, "The wetback is little interested in that sort of thing. In other words, a farmer can get a wetback and he does not have to go through that red tape."[61]

*Barring Mexicans from Deportation Relief, 1948-1949*

Meanwhile, as the chair of the Senate Judiciary Committee, McCarran worsened the precarious condition of mixed-status Mexican families by thwarting their suspension of deportation applications under the Act of July 1, 1948.[62] The suspension of deportation originated in the 1930s when federal lawmakers sought to expand various forms of immigration relief for migrant families who experienced hardships after the deportation of a loved one.[63]

---

[59] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: Making Appropriations for the Departments of State, Justice, Commerce, and the Judiciary for the Fiscal Year ending June 30, 1952, Part I, 82d Cong., 1st Sess., March 8, 1951, 124.
[60] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: H.R. 4974-Making Appropriations for the Departments of State, Justice, and Commerce for the Fiscal Year ending June 30, 1954, 83d Cong., 1st Sess., March 25, 1953, 245.
[61] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: H.R. 4974, 246.
[62] Act of July 1, 1948, Pub. L. 80-863, ch. 783, sec. 19(c), 62 Stat. 1206.
[63] For a history of various forms of immigrant relief granted to immigrant families, see Yuki Oda, "Family Unity in U.S. Immigration Policy, 1921-1978" (Ph.D. diss., Columbia University, 2014).

Initially, the Commissioner General of Immigration used his administrative discretion to stay deportations in these hardship cases. By 1940, Congress authorized suspensions of deportation under the Alien Registration Act.[64] By 1948, Congress broadened the law by removing the racial bar to suspension and granted eligibility to lone individuals who had lived in the country for 7 years. Even though Mexicans were eligible for what would be termed 19(c) relief, in 1949, McCarran rejected the suspension petitions of 32 Mexican families submitted in 1947 and 1948.[65] In its June 1949 analysis of McCarran's rejections, the INS concluded:

> It would appear from the action taken on these 6 cases that a policy is being established to refuse suspension of deportation in the case of aliens who are from nearby nonquota countries and who have recently illegally entered the United States, and who seek suspension of deportation on the basis of an alleged serious economic detriment to a native born citizen child. It was stated at the executive session of the House Subcommittee that the subjects could easily return to their native countries and there apply for nonquota immigration visas under section 4c of the Immigration Act of 1924.[66]

The 32 Mexican cases subsequently served as a "guide" for the INS, as it indicated in its 1949 Annual Report and its own internal correspondence.[67] The latter stipulated: "The analysis which follows reflects the Congressional attitude in these 32 cases, which will serve us as a 'guide' in

---

[64] Under the Alien Registration Act individuals eligible for a suspension had to prove "good moral character for the preceding five years" and have a citizen or resident alien spouse, parent, or minor child who would experience serious economic hardship upon the removal of the deportee. Individuals who were ineligible for naturalization and those deportable on criminal, mental, physical, or subversive grounds were deemed ineligible for suspensions. Smith Act, Pub. L. 76-670, ch. 439, Title II, sec. 20(c), 54 Stat. 670 (June 28, 1940).

[65] James A. Hamilton to A.R. Mackey, Deputy Commissioner, June 20, 1949, file 56086/550F, RG 85, National Archives (referring to S. Con. Res. 22, 81st Cong., 1st Sess., March 16, 1949, and S. Con. Res. 40, 81st Cong., 1st Sess., May 16, 1949. In the House, Rep. Frances Walter [D-PA] oversaw the review and passage of both Senate resolutions on March 22, 1949 and May 24, 1949, respectively.)

[66] James A. Hamilton to A.R. Mackey, Deputy Commissioner, June 20, 1949, file 56086/550F, RG 85, National Archives.

[67] Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1949,* 18; Hearing Review Section, Suspension of Deportation: Suspension not favored by 81st Congress Mexican families recently arrived, October 31, 1949, file 55086/550F, RG 85, National Archives.

the disposition of similar cases hereafter."[68] INS leaders further justified the new agency

procedures:

> The composition of these Mexican families and the circumstances of their entry were the
> principal adverse features these cases presented. The spouse/parents are Mexicans
> illegally here; they have a number of minor Mexican children here illegally; they last
> came here only a few years before applying for suspension of deportation; and the parents
> seek suspension of deportation on the basis of a serious economic detriment to a citizen
> minor child.[69]

In response to these developments, Rep. Lloyd M. Bentsen (D-TX) wrote to INS Commissioner

General Watson B. Miller and characterized the 1949 restrictions on deportation relief as

discriminatory:

> As you must well know by now, we have a great number of Mexican aliens who lived in
> this country for some time and have been peaceful, law-abiding citizens, with the
> exception of their means of entry. They have left Mexico, in most cases, because they
> found they could not make a living on the slave wages in that country. During their stay
> here, they have, in many cases, given birth to children who would become American
> citizens. I realize that there is probably a larger number of these cases than had been
> anticipated in the drafting of the regulations, but if such is fair for one case, it would
> appear to be just as equitable for the other 1000.[70]

Yet, despite these objections, McCarran would pursue the permanent exclusion of Mexican

nationals from the suspension of deportation provisions of the law.


**Legislative History: Anti-Mexican Animus and the McCarran-Walter Act of 1952**

*Mexican Migrants as a Threat to the White Population of the United States*

Fears regarding the nation's changing racial composition inspired the McCarran-Walter

Act of 1952, an omnibus measure that codified the nation's immigration laws. Although

---

[68] Hearing Review Section, Suspension of Deportation: Suspension not favored by 81st Congress
Mexican families recently arrived, October 31, 1949, file 55086/550F, RG 85, National Archives.
[69] Hearing Review Section, Suspension of Deportation: Suspension not favored by 81st Congress
Mexican families recently arrived, October 31, 1949, file 55086/550F, RG 85, National Archives.
[70] Rep. Lloyd M. Bentsen, Jr. to Commissioner General Watson B. Miller, November 18, 1949, file
56086/550F, RG 85, National Archives.

Congress passed the 1924 national origins quota system to maintain the white population as it was constituted in 1920, by the early 1950s, lawmakers argued that the 1924 measure was failing in this regard. In a 1950 report, *The Immigration and Naturalization Systems of the United States*, commissioned by McCarran to stall the efforts of the Truman administration to dismantle the 1924 national origins quota system and lay the intellectual foundations for his forthcoming omnibus immigration bill,[71] McCarran explained that the quota law had succeeded in numerically restricting immigration to the United States. But "as a method of preserving the relationship between the various elements in our population," he continued, "the national origins system has not been as effective."[72] Racially desirable immigrants from northern and western European countries had used only half the immigration quotas allotted to them whereas southern and eastern European migrants had exhausted nearly all their allotments. This trend, the report warned, threatened to shift the composition of the white population in the United States, unseating northern and western Europeans as the majority in favor of less racially desirable southern and eastern Europeans.[73]

As a further threat to the white population in the United States, the sponsors of the McCarran-Walter Act expressed deep concerns about non-quota migration from the Western Hemisphere. With respect to migrants from Mexico and Central America, the 1950 Report recapitulated negative stereotypes that had been circulating in the US since the early twentieth century:

> It has been contended that many of the natives of those [Western Hemisphere] countries are of stock similar to the stock of natives of southern Europe and should, therefore, be subject to numerical restrictions similar to those on natives of southern and eastern Europe. It was stated that as a result of the nonquota policy for natives of Western

---

[71] 98 Cong. Rec. 5328 (May 16, 1952).
[72] *The Immigration and Naturalization Systems of the United States*, Report of the Committee on the Judiciary pursuant to S. Res. 137,  S. Rpt. No. 1515, April 20, 1950, 445.
[73] *The Immigration and Naturalization Systems of the United States*, 430.

Hemisphere countries, an increasing number of aliens are entering from Mexico and Central America who live barely above, or even below, the subsistence level and who are content to live on their earnings during summer months and public relief the rest of the year, since their standards of living on charity is higher than it was before they entered the United States. *It was also stated that these aliens have shown little capacity for self-government, have seldom applied for citizenship, and generally cannot be depended upon to support wholeheartedly our democratic institutions. As a matter of self-protection, it was argued, these aliens should be placed under some numerical restriction.*[74]

Other sections of McCarran's study drew a negative portrait of Mexican migrants as itinerant, uneducated, and dependent on welfare and concluded that, "As a group, Mexicans have been slow to assimilate."[75] Ultimately, the 1950 report did not call for the creation of numerical restrictions on Mexican migration but it continued to characterize Latin American migration in highly negative terms, warning, "this numerically unregulated immigration presents one of the most questionable features of our immigration system."[76]

*Excluding Mexican Nationals from Suspension of Deportation Relief*

Echoing the themes of the report, the McCarran-Walter Act bolstered the idea that Mexicans were unfit for US citizenship. In drafting his immigration bill, McCarran rendered permanent his earlier efforts to prevent undocumented Mexicans from becoming members of US society. More specifically, he amended the suspension of deportation provisions of the 1952 Act to exclude individuals from contiguous countries, as section 244(b) stated:

The provisions of this subsection relating to the granting of suspension of deportation shall not be applicable to any alien who is a native of any country contiguous to the United States or of any adjacent island, unless he establishes to the satisfaction of the Attorney General that he is ineligible to obtain a nonquota visa."[77]

While the language of the statute was race-neutral, McCarran's justification for the law was not. In *The Immigration and Naturalization Systems of the United States*, the Senator incorrectly

---

[74] Emphasis added. *The Immigration and Naturalization Systems of the United States*, 473.
[75] *The Immigration and Naturalization Systems of the United States,* 150-52, 176 (quote: 150).
[76] *The Immigration and Naturalization Systems of the United States,* 473.
[77] McCarran-Walter Act, Pub. Law 82-414, 66 Stat. 163 (1952).

explained that the suspension of deportation had been reserved for Europeans: "It does not appear that the law was prompted by any necessity to give relief to aliens who were nationals of territory adjacent to the United States. The law was enacted principally for the benefit of Europeans."[78]

As further support for his amendment, McCarran summarized the testimony of unnamed Immigration and Naturalization Service officers who supported limits to the grant of 19(c) relief. Copies of the actual testimony underscore how anti-Mexican animus inspired this provision of the McCarran-Walter Act. Invited to speak before members of the Senate Subcommittee on Immigration and Naturalization that had been charged by McCarran to collect data for *The Immigration and Naturalization Systems of the United States*,[79] multiple INS officials railed against the ethnic Mexican families who sought deportation relief. On October 1, 1948, Fred Mesmer, a staff member on the Subcommittee, asked R. B. Mathews, El Paso District Enforcement Officer, for his thoughts on the 1948 amendment that removed the racial bar to 19(c) relief. Mathews responded, "I don't like that provision of the law." He and other immigration officers at the hearing, charged that ethnic Mexicans took advantage of the immigration laws to stay in the United States:

> They enter and leave—enter and leave. On one of the occasions they have a child born in the United States and they go back and have some more born in Mexico, then come in again illegally and apply for suspension because of the birth of that child in the United States, and invariably they are given suspension.[80]

In his testimony, Taylor C. Carpenter added that the Mexican suspensions were unfair to "quota nationalities" (who, in 1948, were European immigrants) because they, he assumed, waited in

---

[78] *The Immigration and Naturalization Systems of the United States*, 600.
[79] To Make an Investigation of the Immigration System, S. Res. 137, 80th Cong., 1st Sess., July 16, 1947.
[80] Immigration and Naturalization (El Paso, Texas), Unpublished Hearings on S. Res. 137, October 1, 1948, Before the Senate Subcommittee on Immigration and Naturalization, 80th Cong., 2d Sess., 19.

line to gain legal admission.[81] Ignoring the many contributions of ethnic Mexicans to American society, immigration officials denied the possibility that they could be "quality" immigrants.[82] They also failed to acknowledge the ways that deportation generated a host of emotional, economic, and social hardships for mixed-status Mexican families.[83] From the perspective of INS officials, the applicants were not "true hardship" cases.[84] Finally, despite the constitutional protections afforded to birthright citizens under the Fourteenth Amendment, no one at the hearing expressed concerns about the impacts of the rescission of 19(c) relief upon citizen spouses and children. Even though he recognized that "nearly all of the Mexican children involved in suspension cases" were born in the United States, El Paso District Director Grover C. Wilmoth believed that "the mere fact of having a child born in the United States should not create an equity for suspension, unless, of course, a real case of hardship is otherwise established."[85]

---

[81] Immigration and Naturalization, 21 (statement of Taylor C. Carpenter, El Paso District Adjudications Officer, El Paso). On undocumented European migration see, for example, Danielle Battisti and S. Deborah Kang, *Hidden Histories;* Libby Garland, *After They Closed the Gates: Jewish Illegal Immigration to the United States, 1921-1965* (Chicago: University of Chicago, 2014).

[82] Immigration and Naturalization, 20 (statement of A. S. Hudson, Chief, Alien Control Section, El Paso). The literature on the contributions of Mexican immigrants and Mexicans Americans to US society is rich and voluminous. For a few examples, see: George J. Sanchez, *Becoming Mexican American: Ethnicity, Culture, and Identity in Chicano Los Angeles, 1900-*1945 (New York: Oxford University Press, 1995); Gutiérrez, *Walls and Mirrors*; Vicki Ruiz, *From Out of the Shadows: Mexican Women in Twentieth-Century America* (New York: Oxford University Press, 2008).

[83] For an empirical analysis of the wide range of difficulties experienced by mid-century Mexican families who endured the loss of a loved one to deportation, Natalia Molina, "Deportable Citizens: The Decoupling of Race and Citizenship in the Construction of the 'Anchor Baby'," in *Deportation in the Americas: Histories of Exclusion and Resistance*, ed. Kenyon Zimmer and Cristina Salinas (College Station: Texas A & M University Press, 2018).

[84] Immigration and Naturalization, 21 (statement of Taylor C. Carpenter, El Paso District Adjudications Officer, El Paso).

[85] Immigration and Naturalization, 22.

*The Reenactment of the "Wetback Bill" and Existing Border Enforcement Statutes*

During the April 25, 1952 congressional debates in the House, Rep. Yorty (D-CA) claimed that the purpose of the Walter bill was not to revise the immigration laws but to codify them. He specifically stated:

> The subcommittee did not, as I understand it endeavor to use this codification bill to effect a general substantive revision of our immigration and naturalization statutes. Rather it is an attempt to codify and clarify existing law. Because of this fact, the bill reiterates existing immigration policies decided upon by Congress in previous sessions.[86]

As a result, many immigration and naturalization statutes, as Walter phrased it, were "restated" in his bill and, in turn, the McCarran-Walter Act.[87] Among these statutes was S. 1851 or the so-called wetback bill.[88] Indeed, given that it was a stopgap measure passed to win Mexico's assent to the renewal of the Bracero accords, lawmakers agreed that S. 1851 would find a permanent home in the forthcoming omnibus immigration bills.[89] Thus, in the debates on the McCarran and Walter bills, the reenactment of S. 1851 faced few challenges. Yet, Senator Hubert Humphrey (D-MN) pointedly argued that the inclusion of the employer penalty exemption contradicted the immigration law enforcement aims of McCarran's omnibus bill:

> It is very interesting to me to note that some Senators who are sponsors of the McCarran bill were the very ones who were not at all exercised or disturbed about whether a million illegal entrants came across the border from Mexico with the resultant loss of jobs by native American workers. I cannot quite understand the logic of those Senators on this issue. Here is a bill which supposedly will put up barriers against legal immigration; yet only a month and a half ago on the floor of the Senate efforts were being made by some Senators to check illegal immigration, and some of the sponsors of S. 2550 voted against our efforts; voted to check our efforts to stop the illegal entry into the United States of Mexican wetbacks, who would destroy the domestic labor market and, at the same time, abrogate the immigration laws. To me, it does not make much sense.[90]

---

[86] 98 Cong. Rec. 4441 (April 25, 1952).
[87] 98 Cong. Rec. 4302 (April 23, 1952).
[88] An Act to assist in preventing aliens from entering or remaining in the United States illegally, Pub. L. 82-283, 66 Stat. 26 (1952).
[89] 98 Cong. Rec. 1350 (February 25, 1952).
[90] 98 Cong. Rec. 5168 (May 14, 1952).

The reenactment of the so-called Texas Proviso not only departed from the immigration law enforcement mandates of the McCarran-Walter Act, it, along with the exclusion of Mexicans from eligibility for deportation relief, conveyed a powerful message about the diminished status of Mexican immigrants in the United States.

The McCarran-Walter Act also reenacted existing immigration statutes that enhanced the deportability of Mexican immigrants. Section 287(a)(3) included the provisions of S. 1851 that allowed immigration officials to search without warrant private property within a twenty-five-mile radius of the nation's international boundaries. Although the law applied to all the nation's land and coastal boundaries, congressional debates regarding S. 1851 make clear that it was passed to enable the Border Patrol to access the border farms that employed undocumented Mexican workers.[91] Sec 287(a)(3) also incorporated the language of Public Law 613, a 1946 law drafted at the behest of southwestern INS officials to release them from the search and seizure requirements of the Fourth Amendment within a reasonable distance from any external boundary of the United States"; this provision of the law was interpreted by INS officials to create what is now popularly known as the 100-mile zone.[92] The 1952 law also incorporated the 1950 House appropriations rider[93] that excluded the INS from compliance with the 1946 Administrative

---

[91] Kang, *INS on the Line,* 143-49.

[92] An Act to amend the law relating to the authority of certain employees of the Immigration and Naturalization Service to make arrests without warrant in certain cases and to search vehicles within certain areas, Pub. L. 79-613, 60 Stat. 865 (1946). For a history of the so-called 100-mile zone, see Kang, *INS on the Line;* S. Deborah Kang, "Border Fiction Made Real: How Search and Seizure Laws Degrade on the 100-Mile Border Zone," November 12, 2019, KCET, https://www.kcet.org/shows/artbound/border-fiction-made-real-how-search-and-seizure-laws-degrade-on-the-100-mile-border-zone.

[93] Supplemental Appropriation Act of 1951, Pub. L. 81-843, 64 Stat. 1044, 1048 (1950). For a discussion of the rider's incorporation into the 1952 Act see, Statement of Peyton Ford, Deputy Attorney General, May 14, 1951, 711-712, Revision of Immigration, Naturalization, and Nationality Laws, Joint Hearings before the Subcommittees of the Committees on the Judiciary on S. 716, H.R. 2379, and H.R. 2816, 82d Cong., 1st Sess., March 6, 7, 8, 9, 12, 13, 14, 15, 16, 20, 21 and April 9, 1951.

Procedures Act (APA) as ordered by the Supreme Court in *Wong Yang Sung v. McGrath*.[94]

During debates over the rider, the INS justified its necessity by reference to the alleged financial

burdens created by the hearing requirement of the APA; more specifically, the INS claimed that

"under the act only two Mexican deportation hearings could be conducted in a single day, and

that 297 additional officers were needed to carry on the work formerly conducted by 65

inspectors."[95] To overcome this burden, the INS requested nearly $4 million in additional

appropriations.[96] Yet, as a cost-saving measure, the House Appropriations Committee decided to

exempt the INS from the APA hearing requirement rather than grant the additional funding.

From 1951 to the present, the rider faced much scrutiny and criticism. Yale Law School

professor Peter Schuck has asked "how could the 1950 appropriations rider possibly have

overruled *Wong Yang Sung*?"[97] Advocates like Jack Wasserman of the American Bar

Association (ABA) pursued the same line of questioning during the debates over the McCarran

and Walter bills. Testifying before the members of the House and Senate Judiciary Committees,

he criticized McCarran's bill for including the language of the rider and thereby curtailing the

rights of Mexican deportees as prescribed by the APA and the recent Supreme Court decision.

He and the ABA deflected INS claims that such hearings consumed too much time and too many

resources; they reminded Congress that most Mexican migrants accepted voluntary departure—

"in the average Mexican case, no hearing need be conducted at all. The alien desires to return to

Mexico, and we just send him across the border without a hearing."[98]  The ABA also argued that

"when we do conduct a hearing, the average case should and usually does take less than 1 hour.

---

[94] 339 U.S. 33.
[95] Revision of Immigration, Naturalization, and Nationality Laws, 681.
[96] Appropriations Hearing, July 1950, 752-755
[97] Peter H. Schuck, "The Transformation of Immigration Law," *Columbia Law Review,* vol. 84, n. 1
(1984): 33.
[98] Revision of Immigration, Naturalization, and Nationality Laws, 681.

If only two Mexican hearings can be conducted in 1 day under the Administrative Procedure Act, the fault is not with the act but with . . . our immigration officials."[99] In sum, as Wasserman testified, "we felt that an exemption from the Administrative Procedure Act had been procured by the Immigration Service by gross exaggeration."[100] Concluding his analysis, Wasserman reminded congressional lawmakers that "deportation involves a constitutional right. Where a man is in the United States, he is protected by the due process clause."[101]

The recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952 Act reiterated the anti-Mexican animus that pervaded the new measure. The McCarran-Walter Act specifically strengthened the clauses regarding unlawful entry and re-entry by making them easier to prosecute. With respect to re-entry, in section 276 it combined what had been three disparate provisions regarding anarchism, prostitution, and illegal reentry into one general illegal re-entry clause. It also revised the 1929 law by penalizing migrants for being "found in" the United States after a previous deportation. This clause allowed prosecutors to try defendants in the districts in which they were found by the INS, thereby freeing the agency and prosecutors from the task of determining the place of reentry.[102] In addition, the change saved the INS the expense of transporting Mexican defendants from the districts in which they were found to the districts in which they re-entered the United States.[103]

Congress also made a minor alteration to the illegal entry provision in the 1952 Act. It specifically lessened the penalty for a first unauthorized entry from one year to six months and thereby rendered it a petty offense. As a result of this revision, defendants, charged under section

---

[99] Revision of Immigration, Naturalization, and Nationality Laws, 681.
[100] Revision of Immigration, Naturalization, and Nationality Laws, 527.
[101] Revision of Immigration, Naturalization, and Nationality Laws, 528.
[102] Revision of Immigration, Naturalization, and Nationality Laws, 716.
[103] United States, Department of Justice, Immigration and Naturalization Service, *Regional Conference, El Paso, Texas, May* 7-10*, 1951*, 13, file 56316/925, RG 85, National Archives.

275 of the 1952 law, lost their right to a jury trial. UCLA Law School professor Ingrid Eagly explains that the INS, seeking a way to manage the increasing number of criminal prosecutions under the 1929 Act, pursued this revision; she writes, "[the INS] lobbied Congress to establish a misdemeanor court that would allow for criminal immigration enforcement 'at less expense and with a greater amount of effectiveness' than was possible with Article III courts."[104]  As part of this effort, the agency also urged Congress to lessen the sentence for a first offense. For the INS, decoupling the criminal prosecution of illegal entry cases from jury trial and grand jury indictment was essential since they typically shared the sentiments of southwestern agribusiness regarding Mexican farm workers[105] and, as a result, often refused to indict.[106] This change remained in the later amendments to the statute and led to having magistrate judges, rather than Article III judges, preside over illegal entry trials.

Congress rarely discussed the recodification of the 1929 law during the deliberations over the McCarran and Walter bills. In one of the only references to section 276, Deputy Attorney General Peyton Ford penned a letter to McCarran that expressed his support for the section but also recommended a small change that resulted in the addition of the "found in" provision.[107] The letter, more broadly, reflected the anti-Mexican animus of the times by employing the slur "wetback"; sanctioning the exemption of INS deportation hearings from the APA;[108] proposing INS warrantless search authority on private property considerably broader than that ultimately stipulated by the Act (which limited this authority to a 25-mile zone adjacent to the international

---

[104] Ingrid Eagly, "Prosecuting Immigration," *Northwestern University Law Review*, vol. 104, n. 4 (Fall 2010), 1326.
[105] For example, Eagly notes that "in El Paso, Texas in the late 1940s, over 90% of immigration crime cases sent to the grand jury were returned as 'no bills.'" Eagly, "Prosecuting Immigration," 1327.
[106] Eagly, "Prosecuting Immigration, 1327, n. 269.
[107] Statement of Peyton Ford, Deputy Attorney General, May 14, 1951, Revision of Immigration, Naturalization, and Nationality Laws, 711-722).
[108] Statement of Peyton Ford, 711-12.

boundaries);[109] and including explicit penalties for the employment of undocumented labor.[110]
As a justification for his proposed enlargement of INS enforcement capacities, Ford cited to
Truman's 1951 migratory labor report, writing, "Statutory clarification on the above points will
aid in taking action against the conveyors and receivers of the wetback."[111]

*Racism and the McCarran-Walter Act*

The anti-Mexican features of the McCarran-Walter Act supplemented the multiple forms
of racism that pervaded the law. It retained the 1924 national origins quota system which,
inspired by eugenicist theories about the inferiority of southern and eastern Europeans, limited
their admission to the United States.[112] In 1952, lawmakers also criticized the system for
excluding Blacks and Native Americans from the 1920 population count that served as the basis
for distribution of the quotas.[113] The bills inspired opposition from African Americans due to its
restrictions on Black migration from the Caribbean.[114] Although the law, as a Cold War gesture
to US allies in Asia, eliminated the racial bars to naturalization, it created new race-based limits

---

[109] Statement of Peyton Ford, 718.

[110] Statement of Peyton Ford, 716. For arguments that employer penalties would discriminate against Mexican Americans and other minority groups, see 98 Cong. Rec. 1350-51 (February 25, 1952).

[111] Statement of Peyton Ford, 718.

[112] McCarran's anti-Semitism also informed his desire to limit the entry of southern and eastern Europeans. Thus, as a co-sponsor of the Displaced Persons Act of 1948, McCarran linked European refugee admissions to the quota system. Given the volume of refugee admissions, some southern and eastern European quotas were quickly filled and many others were mortgaged for decades. McCarran also drafted the provisions that restricted the issuance of Displaced Persons visas to Jews from the Soviet Union and other Eastern European countries. Tichenor, *Dividing Lines,* Kindle Loc. 278.

[113] 98 Cong. Rec. 4473 (April 25, 1952); 98 Cong. Rec. 5111 (May 13, 1952); 98 Cong. Rec. 5164 (May 14, 1952); 98 Cong. Rec. 5413 (May 19, 1952) (enclosing letter from Paiute Tribe, Papago Tribal Council, and National Congress of American Indians protesting their exclusion from the population count and S. 2550 more generally.)

[114] The McCarran-Walter Act specifically limited the admission of persons born in European colonies in the Caribbean to 100 persons per year. It did so to block the entry of Blacks living in those colonies under the auspices of the larger European quotas. For a history of these quotas and the opposition of African American and immigration advocacy organizations, see Jane Hong, "A Cross-Fire between Minorities," *Pacific Historical Review*, vol. 87, n. 4 (2018): 667-701.

on Asian admissions.[115] In addition to restricting migration from Asia, these limits also blocked

the entry of mixed-race Asians from countries of the Western Hemisphere. During the debates on

his bill, McCarran compared these Asian-descent migrants, whom he called "orientals," to

undocumented Mexican immigrants, whom he called "wetbacks." Stoking xenophobic fears, he

asserted without evidence that 600,000 non-quota Asians constituted a new class of unauthorized

immigrants who would "reach here somehow."[116]

　　As further evidence of the racism that pervaded the debates on the McCarran and Walter

bills, supporters castigated proposals to liberalize the immigration laws. Rankin charged that

changes to the quota system would "destroy the white race," and discriminated against "White

Gentiles."[117] Rep. John Wood (R-ID) further defended the quota system, "It seems to me the

question of national origins – though I am not a follower of Hitler – there is something to it."[118]

Senator Walter George (D-GA), who, in his words, "helped to frame" the 1924 national origins

quota system, supported its goal to "preserve something of the homogeneity of the American

people."[119] Jenkins also declared his pride in having helped to author the 1924 quotas[120] and

---

[115] The McCarran-Walter Act created an area dubbed the "Asia-Pacific Triangle," which included all
countries between India and Japan and all Pacific Islands north of Australia and New Zealand. Each
country and colonial possession within the triangle received at least 100 quota slots. If the total of all
Asia-Pacific Triangle quotas exceeded 2000 (this would occur if new states emerged in the Triangle), the
minimum quota of 100 would be lowered accordingly for each country in the region.
　　Whereas the national origins quota system charged individuals to the countries of their birth, the
Asia-Pacific Triangle system charged individuals by race. Immigrants with at least one-half Asian
ancestry, regardless of their place of birth, were to be charged to the Asia-Pacific Triangle quotas. Hence,
an individual born in England of an English mother and Japanese father would be charged to the Japanese
quota rather than the British quota. Furthermore, an individual born in Mexico of a Mexican father and
Chinese mother would be charged to the Chinese quota and would not be eligible for the non-quota
immigration status conferred to all Western Hemisphere states, except colonial possessions. S. Deborah
Kang, "Overcoming the Legacy of 1924: The McCarran-Walter-Act and the Challenges to a Liberal
Conception of National Identity" (unpublished manuscript).
[116] 98 Cong. Rec. 5766 (May 22, 1952).
[117] 98 Cong. Rec. 4318, 4320 (April 23, 1952)..
[118] 98 Cong. Rec. 4313 (April 23, 1952).
[119] 98 Cong. Rec. 5773-74 (May 22, 1952).
[120] 98 Cong. Rec. 4302-3 (April 23, 1952).

argued for its preservation by denigrating southern and eastern Europeans as "less sympathetic to the ideas of the United States . . . who had no intention whatever of accepting the ideas of western Christian civilization."[121]

Leading the defense of the quota system, McCarran once again drew upon scare tactics alleging, "the cold, hard truth is that in the United States today there are hard-core, indigestible blocs who have not become integrated into the American way of life."[122] Without the national origins quota system, McCarran argued, "we will, in the course of a generation or so, change the ethnic and cultural composition of the nation."[123] A year later, McCarran declared on the Senate floor, "the national origins quota formula was a rational and logical method of numerically restricting immigration in such a manner as to best preserve the sociological and cultural balance in the population of the United States."[124] Deploying the same racist logic, Rep. Francis Walter (D-PA), would also challenge the liberal critics of the national origins quota system of 1924 and endorse its continuation under the McCarran-Walter Act:

> We believe it is a mistake to condemn any quota system based on national origins as inherently illiberal and as an expression of religious or racial prejudice. It is no reflection on the many fine American citizens of all races, creeds and national origins to recognize realistically that some nations are far closer to the United States in culture, custom and standard of living, respect for law and experience in self-government.[125]

---

[121] 98 Cong. Rec. 4442 (April 25, 1952).

[122] 98 Cong. Rec. 5330 (May 16, 1952).

[123] 98 Cong. Rec. 5330 (May 16, 1952).

[124] 99 Cong. Rec. 1517-18 (March 2, 1953)..

[125] Representative Francis E. Walter, "The Truth About the Immigration Act," *Reader's Digest,* vol. 62, n. 373 (1952): 131. In the 1950s and 1960s, Walter served as a member of two committees on genetic research; these committees were financed by Wycliffe P. Draper, a eugenicist and the founder of the Pioneer Fund, a Southern Poverty Law Center-designated hate group. Southern Poverty Law Center, "Pioneer Fund," accessed July 27, 2022, https://www.splcenter.org/fighting-hate/extremist-files/group/pioneer-fund.

*Truman's Veto and the Anti-Mexican Animus of the McCarran-Walter Act*

On June 25, 1952, President Truman vetoed Walter's H.R. 5678.[126] In his veto message, he condemned the measure for continuing the 1924 national origins quota system, declaring "The greatest vice of the present quota system, however, is that it discriminates deliberately and intentionally, against many of the peoples of the world. The purpose behind it was to cut down and virtually eliminate immigration to this country from southern and eastern Europe."[127] Truman also criticized the anti-Asian racism underlying the bill; while he recognized that it dismantled the absolute bar to Asian immigration, Truman rejected H.R. 5678 for creating race-based quotas for persons of Asian descent. The veto also rebuked its suspension of deportation provisions, as the President explained, "Native-born American citizens who are dual nationals would be subjected to loss of citizenship on grounds not applicable to other native-born American citizens. This distinction is a slap at millions of Americans whose fathers were of alien birth."[128] Although Truman did not explicitly reference the anti-Mexican animus that informed the new suspension provision, in his 1951 report on migratory labor, he stressed the importance of preserving the access of undocumented Mexican migrants to deportation relief through the suspension procedure. At the same time, he called for an end to the forms of legalization that channeled undocumented Mexicans back into the Bracero Program.[129] In sum, his stance on

---

[126] Message from the President of the United States Returning Without Approval the Bill (H.R. 5678) To Revise the Laws Relating to Immigration and Nationality, and For Other Purposes, Eighty-second Congress, Second Session, June 25, 1952.

[127] Message from the President, 3.

[128] Message from the President, 7.

[129] Truman specifically recommended that "Legalization for employment purposes of aliens illegally in the United States be discontinued and forbidden. This is not intended to interfere with handling of hardship cases as authorized by present immigration laws." (88). These hardship cases included those "Mexican illegal alien parents" who have children born in the United States; these parents, as Truman explained, "if apprehended by immigration authorities, may file a petition for stay of deportation on the grounds of hardship." (70) President's Commission on Migratory Labor, *Migratory Labor*.

these two issues challenged the anti-Mexican premises of the McCarran-Walter Act, reflecting his belief that mixed-status Mexican families were deserving of relief and an opportunity to pursue permanent residence and citizenship in the United States.

The restrictionists, however, won the day and overrode Truman's veto. The long congressional embrace of xenophobia and anti-Asian, anti-Black, anti-Mexican racism was not coincidental. Thirty lawmakers who had served in Congress in 1929 during the passage of the Undesirable Aliens Act still held their seats in 1952. They helped to extend the racist legacies of the 1920s through their vocal defense of the quota system and by voting to override Truman's veto.[130] Moreover, as political scientists have explained, nativist, pro-agribusiness congressmen had held the chairs of the Immigration and Judiciary committees in both chambers where they regularly deployed parliamentary procedures to block the passage and even release of liberal immigration reforms.[131] As the chair of the Senate Judiciary Committee, McCarran was most notable in this regard.[132] In response to Truman's reform bills, one historian has observed, "the Nevada Democrat used tactics of obstruction, amendment, and congressional investigation to challenge the presidential ascendancy."[133] During a series of joint hearings of the Senate and House Subcommittees on Immigration (which fell under the aegis of the Judiciary Committees) to discuss the McCarran and Walter bills, McCarran blocked debate on Celler's reform bill (H.R.

---

[130] 98 Cong. Rec. 8214-25 (June 26, 1952); 98 Cong. Rec. 8253-68 (June 27, 1952).
[131] Tichenor, *Dividing Lines*, Kindle Loc. 269.
[132] McCarran characterized his role as chairman of the Judiciary Committee as follows, "[t]he chairman of a committee or a subcommittee cannot always assure passage of a bill which has been referred to his group, but can almost always kill the bill if he wishes to do so." Frank Elmer Whited, Jr., "The Rhetoric of Senator Patrick Anthony McCarran," (Ph.D. diss., University of Oregon, 1973), 23.
[133] Von V. Pittman, Jr., "Senator Patrick A. McCarran and the Politics of Containment," (Ph.D. diss., University of Georgia, 1979): 1.

2816)[134] and refused to even report out the Humphrey-Lehman bill (S. 2842).[135] Ultimately, the liberals failed to pass any major amendments to the McCarran and Walter bills.  By 1956, Senator Eastland, a cotton planter, strident segregationist, and xenophobe, assumed the chair of the Senate Judiciary Committee until 1978.[136] Along with Representative Walter, the Chair of the House Judiciary Committee, Eastland blocked any major reform or repeal of the McCarran-Walter Act, staunchly opposing the elimination of the national origins quota system during debates over the Immigration and Nationality Act of 1965 and preventing the passage of an employer sanctions measure well into the 1970s.[137]

Realizing that they did not have the political clout to enact any comprehensive immigration reform, no liberal congressman introduced a bill eradicating the national origins quota system during the debates over the McCarran Walter Act.  In his autobiography, Celler, a longtime opponent of national origins, observed,  ". . . I knew that a really liberal immigration bill, particularly the discarding of the national origins theory, had no more chance of being enacted this session than could a bit of butter remain intact on a hot stove."[138]  In the Senate, Senator Herbert Lehman (D-NY) noted with regret that his amendment to the McCarran bill retained the national origins quota system "as a practical matter, designed to achieve what can

---

[134] Revision of Immigration, Naturalization, and Nationality Laws, 6.
[135] McCarran and his cohort rarely remained in chambers long enough to take questions and debate the merits of his bill. As a result, liberals held the floor for much of the two-week debate. When he was present in chambers, McCarran refused to yield to questions or simply repeated his own points in answer to a question. 98 Cong. Rec. 5765 (May 22, 1952).
[136] Eastland himself hired both legal and undocumented Mexican workers and worked directly with the INS to obtain those workers. Thus, for example, INS records reveal that in 1948, an Eastland staffer contacted A. R. Mackey to follow up on a promise that "he would get 50 Mexican laborers from Monterey."  In lieu of these legally contracted workers, however, Eastland's office indicated that the Senator could procure "50 'wetbacks'" from his uncle who had a ranch in Texas. A.R. Mackey, Memorandum of telephone call between A. R. Mackey and Mr. Payce, Staff Member for Senator Eastland of Mississippi, September 16, 1948, 1:50p.m., file 56246/339B, RG 85, National Archives.
[137] Tichenor, *Dividing Lines,* Kindle Loc. 308, 315, 337.
[138] Celler, *You Never Leave Brooklyn*, 101. See also, 98 Cong. Rec. 5102 (May 13, 1952).

and must be achieved now."[139] Thus, all of the liberal reform bills contained some variation of the national origins quota system.  Some tried to mitigate its effects by changing the base year for the calculation of the immigration ceiling from 1920 to 1950.[140]  Most of the reform bills tried to ameliorate the quota system's impact by re-pooling and redistributing unused quotas based on preference classes or for the sake of family reunification and refugee relief.[141] In short, lawmakers conceded that in 1952, eliminating the many manifestations of racial animus in the McCarran-Walter Act was impossible.

**Conclusion**

Congress passed the Undesirable Aliens Act of 1929 and its reenactment under the McCarran-Walter Act of 1952 in a historical period when anti-Mexican racism was explicit and widespread. During the debates regarding the McCarran and Walter omnibus immigration bills, members of Congress and the executive branch repeatedly referred to Mexican migrants using a racist slur. *The Immigration and Naturalization Systems of the United States,* a 1950 Senate Judiciary Committee investigation that served as the foundation for the immigration bills, drew unflattering comparisons between Mexicans and putatively racially undesirable southern and eastern Europeans. Both groups, the investigation concluded, lacked the "capacity" to participate in democratic institutions and, thus, ought to be restricted from entering the United States.

The 1952 Act also incorporated several existing immigration statutes, such as the Undesirable Aliens Act, Public Law 79-613 (which created the "100-mile zone"), the 1950 rider to Public Law 81-843 that exempted INS deportation hearings from the APA, and Public Law

---

[139] 98 Cong. Rec. 5102 (May 13, 1952).
[140] 98 Cong. Rec. 4407 (April 24, 1952).
[141] 98 Cong. Rec. 4414 (April 24, 1952); 98 Cong. Rec. 5607-10 (May 21, 1952).

82-283 (the so-called "wetback bill") that were motivated by anti-Mexican animus and reaffirmed racist stereotypes that associated ethnic Mexicans with illegality. The McCarran-Walter Act, moreover, compounded anti-Mexican racism through the racially-motivated exclusion of Mexican migrants from suspension of deportation relief. In addition, its limits on Asian migration created significant obstacles to the entry of Asian Latin Americans.

In sum, these provisions of the McCarran-Walter Act disseminated racist stereotypes about the unsuitability of ethnic Mexicans for citizenship, legitimated their exploitation as undocumented workers, and expanded their exposure to increasingly punitive civil and criminal immigration penalties. Taken together, they serve as an important reminder that the McCarran-Walter Act should be remembered not only for retaining the racist national origins quota system but also for propagating anti-Mexican animus in the nation's immigration laws.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/ *Shulamith Deborah Kang*
_____

August 10, 2022
_____

S. Deborah Kang, Ph.D.
Associate Professor of History
University of Virginia

Date