*United States v. Duron-De Luna*

United States District Court
District of Colorado

Case No. 22-cr-00018-RMR

_____

**Exhibit B**

Brief of Amicus Curiae Dr. S. Deborah Kang

No. 21-10233

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

GUSTAVO CARRILLO-LOPEZ,

*Defendant-Appellee.*

Appeal from the
United States District Court
for the District of Nevada
Honorable Miranda M. Du Presiding

## BRIEF OF AMICUS CURIAE DR. S. DEBORAH KANG IN SUPPORT OF DEFENDANT-APPELLEE FOR AFFIRMANCE

Philip L. Torrey
Rachel Landry (law student)
Crimmigration Clinic
Harvard Law School
6 Everett Street, Suite 3105
Cambridge, MA 02138
(617) 495-0638
ptorrey@law.harvard.edu

*Counsel for Amicus Curiae*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................... iii

INTEREST OF AMICUS CURIAE...........................................................1

INTRODUCTION .....................................................................................2

ARGUMENT .............................................................................................4

I.   THE LEGISLATIVE INTENT OF THE POST-1952 AMENDMENTS
     TO § 1326 MUST BE UNDERSTOOD AGAINST THE HISTORICAL
     BACKDROP OF RAMPANT RACISM AGAINST BLACK AND
     HISPANIC MIGRANTS AND ASYLUM SEEKERS....................................4

     A.   The increase in Latinx migration resulting from the 1965
          Immigration and Nationality Act, together with increased arrivals
          of Cuban and Haitian asylum seekers, produced widespread racism. ..4

     B.   Floridian and border-state legislators perpetuated racist stereotypes
          against Black and Latinx migrants in their policy agendas, including
          amending § 1326.....................................................................9

II.  THE LEGISLATIVE HISTORY OF THE POST-1952 AMENDMENTS
     TO § 1326 REVEALS THAT THE DRAFTERS OF EACH
     AMENDMENT WERE MOTIVATED BY RACIAL ANIMUS. ...............12

     A.   The Anti-Drug Abuse Act of 1988 ......................................12

     B.   The Immigration Act of 1990 ............................................16

     C.   The Violent Crime Control and Law Enforcement Act of 1994 ........18

     D.   The Antiterrorism and Effective Death Penalty Act of 1996 .............23

     E.   The Illegal Immigration Reform and Immigrant Responsibility
          Act of 1996 .......................................................................25

III. WITH EACH AMENDMENT TO § 1326, CONGRESS FAILED TO
     ACKNOWLEDGE, EXAMINE, OR EXPUNGE THE PROVISION'S
     RACIAL ANIMUS. ..........................................................................27

CONCLUSION ....................................................................................................31

CERTIFICATE OF COMPLIANCE ......................................................................33

CERTIFICATE OF SERVICE................................................................................34

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Graham v. Smith*, Case No. 81-1497-CIV-JE (S.D. Fla. 1981). .............................16

*Louis v. Meissner*, 530 F. Supp. 924 (S.D. Fla. 1981). ...........................................17

*United States v. Mendoza-Lopez*, 481 U.S. 828 (1987)...........................................24

**Statutes**

8 U.S.C § 1326 ............................................................................... passim

**Other Authorities**

139 Cong. Rec. 30466 (daily ed. Nov. 19, 1993)....................................................20

140 Cong. Rec. H7200–01 (daily ed. Aug. 9, 1994). ..............................................22

141 Cong. Rec. E325 (daily ed. Feb. 13, 1995). .....................................................25

141 Cong. Rec. H1586 (daily ed. Feb. 10, 1995)....................................................24

142 Cong. Rec. H2390 (daily ed. Mar. 19, 1996). ..................................................27

145 Cong. Rec. 23794 (daily ed. Oct. 4, 1999). ................................................29, 30

Alex Nowrasteh, *Illegal Immigrants and Crime – Assessing the Evidence*, Cato Institute, Mar. 4, 2019, https://www.cato.org/blog/illegal-immigrants-crime-assessing-evidence.................................................................................31

Alex Stepick, *The Refugees Nobody Wants: Haitians in Miami*, *in Miami Now! Immigration, Ethnicity, and Social Change* (Guillermo J. Grenier & Alex Stepick III eds., 1992). ........................................................................10

Andy Taylor, *A Bum Rap? "Marielista" fears unwarranted*, Tampa Tribune, Mar. 3, 1982. .............................................................................................20

Bill McCollum, Speech at the Dade City Chamber of Commerce (Mar. 28, 1981). ..............................................................................................................20

*Criminal Aliens: Hearing on H.R. 3333 Before the Subcomm. on Immigr., Refugees, & Int'l L. of the H. Comm. on the Judiciary*, 101st Cong. (1989). .....18

Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* (2002). ................................................................................22

Deepa Fernandes, *Targeted: Homeland Security and the Business of Immigration* (2007). ................................................................................27

*Federation for American Immigration Reform*, S. Poverty L. Ctr., https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform. .................................................................11, 12

*Haitian Narcotics Activities: Hearing on the Magnitude of Haiti's Role as a Transshipment Point for Narcotics in the United States Before the S. Caucus on Int'l Narcotics Control*, 100th Cong. (1988). .......................................16

*Implementation of Immigration Reform*: *Hearing on the Implementation of the Immigration Reform and Control Act Before the Subcomm. on Immigr. & Refugee Affs. of the S. Comm. on the Judiciary*, 100th Cong. (1988). ...............15

John Tanton, Founder, FAIR, Address at the WITAN IV Meeting (Oct. 10, 1984) (transcript available at https://www.splcenter.org/fighting-hate/intelligence-report/2015/witan-memo-iii). .......................................................11, 12

Jon Ralston, *An immigration push Reid regrets*, Las Vegas Sun, Jul. 21, 2010, https://m.lasvegassun.com/news/2010/jul/21/immigration-push-reid-regrets/. ..23

Joseph Nevins, *Operation Gatekeeper: The Rise of the "Illegal Alien" and the Making of the U.S.-Mexico Boundary* (2002). ...............................................8, 28

Lamar Smith & Edward R. Grant, *Immigration Reform: Seeking the Right Reasons*, 28 *St. Mary's L.J.* 883 (1997). .......................................................26, 30

Letter from Bob Graham to Ronald Reagan (Sept. 9, 1982) (on file with the Ronald Reagan Presidential Library). .............................................................17

María Cristina García, *Havana*, *USA: Cuban Exiles and Cuban Americans in South Florida, 1959–1994* (1997). ................................................................6

Michelangelo Landgrave & Alex Nowrasteh, *Criminal Immigrants in 2017: Their Numbers, Demographics, and Countries of Origin*, Cato Institute, Mar. 4, 2019, https://www.cato.org/publications/immigration-resgearch-policy-brief/criminal-immigrants-2017-their-numbers-demographics. .................................................31

Norman L. Zucker & Naomi Flink Zucker, *Desperate Crossings: Seeking Refuge in America* (1996). ..................................................................................8

Otto Friedrich et al., *The Changing Face of America*, Time, Jul. 8, 1985. .............13

Rubén Rumbaut & Walter A. Ewing, *The Myth of Immigrant Criminality*, Social Science Research Council, May 23, 2007, https://items.ssrc.org/border-battles/the-myth-of-immigrant-criminality/. .......................................................31

Time, Apr. 9, 1990, http://content.time.com/time/magazine/0ç,9263,7601900409,00.html. ...............8

U.S. Gov't Accountability Off., GGD-88-3, *Criminal Aliens: INS' Enforcement Activities* (1987). ..................................................................................15

U.S. Gov't Accountability Off., GGD-90-18, *Immigration Control: Deporting and Excluding Aliens from the United States* (1989). .................................................18

*United States as a Country of Mass First Asylum: Hearing on the Legal Status of the Cubans and Haitians who Have Entered the United States and the Policies and Procedures which Should be Adopted in Order to Handle Mass Asylum Cases and Crises Before the Subcomm. on Immigr. & Refugee Pol'y of the S. Comm. on the Judiciary*, 97th Cong. (1981). .................................................7, 14

William French Smith, *Law and Justice in the Reagan Administration: The Memoirs of an Attorney General* (1991). .............................................................9

## <u>INTEREST OF AMICUS CURIAE</u>

Amicus, S. Deborah Kang ("Dr. Kang"), is an associate professor in the Corcoran Department of History at the University of Virginia who teaches and regularly publishes scholarship on the history of immigration laws in the United States. She is also a member of the Nau Lab of the Democracy Initiative at the University of Virginia.

Her research focuses on both the historical and contemporary aspects of U.S. immigration and border policy. Her first book, *The INS on the Line: Making Immigration Law on the U.S.-Mexico Border 1717-1954* (Oxford University Press, 2017), traces the history of U.S. immigration agencies on the U.S.-Mexico border and won six awards and accolades. Her second book, *Pathways to Citizenship: A History of Immigration Legalization in the United States, 1906-1986* (in preparation) is a history of U.S. immigration legalization policies from the early twentieth century to the present. Her co-edited anthology, *The Hidden Histories of Unauthorized European Immigration in the United States* (under review, University of Illinois Press), will recount the little-known history of unauthorized European immigrants in the United States. She has also published numerous academic articles on the history of U.S. immigration policy. Additionally, Dr. Kang has testified as an expert on the history of amendments to 8 U.S.C § 1326 in U.S. District Court.

Dr. Kang has a professional interest in ensuring the Court is fully and accurately informed about the history behind the late-twentieth-century amendments to the criminal reentry provision at issue here.[1]

## INTRODUCTION

In this brief, amicus documents the racial animus driving the passage of the late-twentieth-century amendments to 8 U.S.C § 1326, a statutory provision enacted in 1929 that criminalized undocumented reentry. Other amici describe how racial animus motivated the passage of the initial provision criminalizing unauthorized reentry under the Undesirable Aliens Act of 1929 and its subsequent reenactment under the McCarran-Walter Act of 1952. This brief, in turn, documents the extension of that animus to the five amendments to § 1326 in the 1980s and 1990s. Section 1326 was amended in the Anti-Drug Abuse Act of 1988 ("ADAA"), the Immigration Act of 1990, the Violent Crime Control and Law Enforcement Act of 1994 ("VCCLEA"), the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA").

---

[1] Both parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored any part of the brief, and no party, party's counsel, or person, other than the amicus, contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

The late-twentieth-century amendments to § 1326 did not alter the core substance and function of the original 1929 provision criminalizing reentry. Each amendment served to enhance the criminal and/or civil penalties for undocumented reentry, increasing the punitive effect of the racially motivated provision. Moreover, each of the five times Congress amended § 1326 in the 1980s and 1990s, it did so as part of a larger piece of legislation, for which the amendments to § 1326 themselves were never a core focus.

Through analysis of historical context and legislative history drawing on historical scholarship and archival material, this brief demonstrates that the post-1952 amendments to § 1326 failed to extinguish the provision's initial racial animus. Rather, Members of Congress who introduced and secured the passage of each amendment to § 1326 were motivated by racial animus. Moreover, with each amendment to § 1326, Congress made no effort to acknowledge, examine, or expunge the criminal reentry provision's racist origins.

As a historian, amicus grounds her conclusions regarding the legislative intent behind the passage of the five amendments to § 1326 in the historical context underlying each amendment and the motivation of the amendments' drafters.

As detailed in Part I, the late-twentieth-century amendments to § 1326 were passed against a historical backdrop of virulent racism and xenophobia. Part II

demonstrates the racist motives of the drafters of each amendment to § 1326. Part

III explains that Congress did not directly grapple with the racial animus

motivating the criminalization of reentry at each opportunity, thus failing to

expunge the provision's initial animus.

## **ARGUMENT**

I.   **THE LEGISLATIVE INTENT OF THE POST-1952 AMENDMENTS TO § 1326 MUST BE UNDERSTOOD AGAINST THE HISTORICAL BACKDROP OF RAMPANT RACISM AGAINST BLACK AND HISPANIC MIGRANTS AND ASYLUM SEEKERS.**

    A.   **The increase in Latinx migration resulting from the 1965 Immigration and Nationality Act, together with increased arrivals of Cuban and Haitian asylum seekers, produced widespread racism.**

In the 1980s and 1990s, xenophobia was just as high as it was in the 1920s

when racial animus motivated the criminalization of reentry for the first time. After

the 1952 passage of the McCarran-Walter Act, which reenacted § 1326, two major

historical developments laid the foundation for a rise in xenophobia, and ultimately

the amendments to § 1326 throughout the 1980s and 1990s: (1) the passage of the

Immigration and Nationality Act of 1965 ("1965 INA"); and (2) the increase of

Haitian and Cuban asylum seekers entering, or attempting to enter, the United

States.

First, the 1965 INA dramatically changed the nation's demography,

triggering waves of nativism and racism across the United States and anti-

4

immigrant responses in Congress. The 1965 INA eliminated the discriminatory national origins quota system and outlawed discrimination in the admission of immigrants to the United States. The drafters of the 1965 INA won the law's passage by reassuring congressional detractors that it would not change the ethnic and racial composition of the United States. To this end, the drafters brokered compromises with nativist lawmakers that included the imposition of the first cap on migration from the Western Hemisphere at 120,000.

Despite these reassurances, the 1965 INA sparked an increase in migration from Asia, Latin America, and the Caribbean. The Western Hemisphere quota failed to reflect the actual number of crossings that had transpired along the U.S.-Mexico border for decades. Once the quota went into effect, migrants from the Western Hemisphere continued to come to the United States. As a result, what once would have been legal migration transformed into irregular migration overnight.

Second, beginning in the 1980s the arrival of so-called Mariel Cubans and Haitians on Florida's shores intensified the backlash against the 1965 INA, sparking a new wave of racism and nativism. Even though both groups fled political persecution, American policymakers and the public refused to see them as refugees. Anti-black racism led lawmakers to define Haitian asylum seekers as economic migrants. As a result, in the 1970s and 1980s, only 25 of the 50,000

Haitians who pursued an asylum claim succeeded. Since the 1960s, the United States had admitted Cuban refugees and granted them citizenship as part of its Cold War agenda, but it declined to extend the same welcome to Mariel Cubans because many were black, gay, and working class. Upon their arrival in the spring of 1980, Cubans were indefinitely detained on U.S. military bases throughout the country.

Federal lawmakers in Congress and the White House disseminated negative images of Mariel Cuban and Haitian refugees based on their race, class, and sexuality. Perhaps most prominently, policymakers and the public associated these refugees with criminality, even though the "vast majority were working-class men and women without any criminal background."[2] Their policies were also widely criticized for discriminating against Black and Latinx refugees. Assessing the Reagan administration's Haitian policies, Representative Shirley Chisholm (D-NY), the chair of the Congressional Black Caucus task force on refugees testified before a Senate committee in 1981, "We cannot hope to retain the respect and

---

[2] María Cristina García, *Havana*, *USA: Cuban Exiles and Cuban Americans in South Florida, 1959–1994* 54–68 (1997).

admiration of the world if our immigration and refugee policies are discriminatory on the basis of ideology or skin color."[3]

To bypass the 1980 Refugee Act, U.S. officials created a new legal status—"Cuban-Haitian entrant (status pending)." The new status created a legal fiction where asylum seekers were not considered to have technically entered the country, and thus did not merit the same level of protections, despite their physical presence on U.S. soil. This legal designation enabled U.S. officials to detain Cubans and Haitians in prisons and military bases, which became functional equivalents of the border. The "Cuban-Haitian" entrant category disparately impacted Haitians, and in a renewed effort to defer Haitian arrivals, the Reagan administration redefined them as "excludable aliens" in October 1980.

Together with the arrival of Cubans and Haitians, the influx of new immigrants resulting from the 1965 INA shifted the nation's racial balance and caused a nativist backlash. This backlash was only worsened by the economic recession of the 1990s. Capturing popular sentiment, the headline on the April 1990 cover of *Time* magazine declared, "America's Changing Colors: What Will

---

[3] *United States as a Country of Mass First Asylum: Hearing on the Legal Status of the Cubans and Haitians who Have Entered the United States and the Policies and Procedures which Should be Adopted in Order to Handle Mass Asylum Cases and Crises Before the Subcomm. on Immigr. & Refugee Pol'y of the S. Comm. on the Judiciary*, 97th Cong. 113, 115 (1981).

the U.S. Be Like When Whites Are No Longer the Majority?" and depicted an image of an American flag composed of black, brown, and yellow stripes.[4] According to public opinion polls, by the early 1990s, Americans harbored "the highest level of hostility toward immigrants 'since the heyday of nativism in the 1920s.'"[5]

Yet, the anti-immigrant sentiment of the 1990s did not reach all post-1965 immigrant arrivals. Asian immigrants were increasingly represented as so-called model minorities, but Latin American migrants—particularly Mexican migrants— were represented in negative terms that cemented the association between a Mexican identity and undocumented status. Given the popular embrace of anti-immigrant sentiment, policymakers began to adopt stronger approaches to immigration law enforcement.

Liberal, as well as conservative lawmakers, advanced anti-immigrant agendas in the 1980s and 1990s. Tight elections and the rightward swing of the American electorate compelled liberal factions in both political parties to adopt the rhetoric and policies of immigration restrictionists. In particular, the passage of

---

[4] Time, Apr. 9, 1990, http://content.time.com/time/magazine/0ç,9263,7601900409,00.html.
[5] Joseph Nevins, *Operation Gatekeeper: The Rise of the "Illegal Alien" and the Making of the U.S.-Mexico Boundary* 90 (2002) (*quoting* Norman L. Zucker & Naomi Flink Zucker, *Desperate Crossings: Seeking Refuge in America* 104 (1996)).

California's Proposition 187, a 1994 ballot initiative that prohibited undocumented immigrants in California from receiving non-emergency medical care, attending public schools, and qualifying for social services, conveyed a powerful message regarding the strength of nativism at the polls. As a result, many liberals, particularly congressional Democrats and President Clinton, authored and supported highly aggressive immigration enforcement measures that they had once condemned as racist or inhumane.

### B.    Floridian and border-state legislators perpetuated racist stereotypes against Black and Latinx migrants in their policy agendas, including amending § 1326.

The demographic shifts produced by the 1965 INA and the arrival of Haitian and Cuban asylum seekers strengthened xenophobia and racism particularly in the border states. Senator Lawton Chiles (D-FL), Senator Bob Graham (D-FL), Representative Bill McCollum (R-FL), and Representative Lamar Smith (R-TX) authored amendments to § 1326 responding to a perceived crisis that the nation had "lost control of its borders."[6]

At the same time, the Civil Rights movement slowly instantiated a cultural shift that rendered unacceptable overt expressions of racism. Lawmakers thus often turned to race-neutral proxies, like the language of criminality and the War on

---

[6] William French Smith, *Law and Justice in the Reagan Administration: The Memoirs of an Attorney General* 194–95 (1991).

Drugs, to express their antipathies toward immigrants. The very notion of the "criminal alien" emerged in response to some of the most virulent strains of racism in the twentieth century.

Racial animus led the Florida congressmen (Chiles, Graham, and McCollum) to use the immigration laws to prevent Cuban and Haitian refugees from becoming members of their communities under the guise of race-neutral proxies. Many Floridians scapegoated the Haitians, blaming them for the economic and public health crises of the 1970s and 1980s. As one contemporary observed, "[N]egative stereotypes and fears of Haitians became firmly embedded in the general South Florida population. Haitians were perceived by many to be not only disease-ridden, but also uneducated, unskilled peasants who could only prove [to be] a burden to the community."[7]

Chiles, Graham, and McCollum thus drew upon racist stereotypes to characterize Haitian and Cuban refugees as lawbreakers, criminals, and public health threats. Reliance upon the race-neutral vocabularies—for example, population control, English-only campaigns, or the War on Drugs—rationalized race-motivated exclusion and expulsion.

---

[7] Alex Stepick, *The Refugees Nobody Wants: Haitians in Miami*, in 58–60 *Miami Now! Immigration, Ethnicity, and Social Change* (Guillermo J. Grenier & Alex Stepick III eds., 1992).

Similarly, Texas congressman Smith aimed to reverse the trajectory of U.S. immigration brought about by the 1965 INA through his legislative agenda, including amending § 1326.

Legislators, including Chiles, McCollum, and Smith worked closely with the Federation for American Immigration Reform ("FAIR"), a Southern Poverty Law Center-designated hate group, that aggressively pursued an anti-immigration policy agenda and played a pre-eminent role in the effort to "[upend] the Immigration and Nationality Act of 1965."[8]

Founded by ophthalmologist and eugenicist John Tanton in 1979, FAIR aimed to reduce non-white immigration to the United States. Dan Stein, who assumed leadership of FAIR in 1988, characterized the 1965 INA as "retaliat[ion] against Anglo-Saxon dominance."[9] Meanwhile, Tanton expressed alarm that Latin American migrants would outnumber white Americans. As he put it, "this is the first instance in which those with their pants up are going to get caught by those with their pants down."[10] He also believed that Latinx migrants would "bring with

---

[8] *Federation for American Immigration Reform*, S. Poverty L. Ctr., https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform.

[9] *Id.*

[10] John Tanton, Founder, FAIR, Address at the WITAN IV Meeting (Oct. 10, 1984) (transcript available at https://www.splcenter.org/fighting-hate/intelligence-report/2015/witan-memo-iii).

them the tradition of the mordida (bribe), the lack of involvement in public affairs," and a Catholic faith that would undermine the separation of the church and state.[11]

By 2009, Stein boasted "boasted that FAIR leaders had testified before Congress about 100 times."[12] FAIR also regularly met with individual Members of Congress and their staff, published op-eds and advertisements, appeared on national television, and spoke on radio shows. It made a particular effort to disseminate its policy proposals among lawmakers from border states, including California, Arizona, Texas, and Florida, where, FAIR believed, voters would be more amenable to nativist messaging.

In these public venues, FAIR made a concerted effort to cloak its white supremacist agenda in neutral terms to appeal to ordinary Americans. FAIR referred to the impacts of immigration on the environment, population growth, and the economy in order to make its extremist message more palatable.

## II.   THE LEGISLATIVE HISTORY OF THE POST-1952 AMENDMENTS TO § 1326 REVEALS THAT THE DRAFTERS OF EACH AMENDMENT WERE MOTIVATED BY RACIAL ANIMUS.

### A. The Anti-Drug Abuse Act of 1988

---

[11] *Id.*
[12] S. Poverty L. Ctr., *supra.*

The Anti-Drug Abuse Act of 1988 ("ADAA") was a legislative centerpiece of President Reagan's War on Drugs. Chiles drafted the amendment to § 1326 under the ADAA. This amendment added subsection (b), which increased penalties for those with prior felony convictions.

Despite not being a major focus of the ADAA, the amendments to § 1326 marked the culmination of Chiles's longstanding efforts to exclude migrants, particularly from Haiti, and to halt the increases in Mexican migration wrought by the 1965 INA. In this regard, Chiles coordinated with FAIR, speaking at its congressional events and sponsoring legislation that advanced the organization's anti-immigrant agenda.

His views also propagated eugenicist ideas elaborated by FAIR. In a 1985 *Time* magazine cover story on the increasing number of legal and undocumented arrivals, Chiles spoke in an "alarmist" tone about undocumented migration along the U.S.-Mexico border, stating, "If we do not regain control of our borders . . . I think that within ten years, we will not recognize the United States as the United States we see today."[13]

Fueling the nativist fears about the ways in which Haitian and Cuban migration were changing the demographic character of South Florida, Chiles

---

[13] Otto Friedrich et al., *The Changing Face of America*, Time, Jul. 8, 1985, at 26.

declared during a 1981 hearing of the Senate Subcommittee on Immigration and

Refugee Policy:

> There is a new bumper sticker that you will see on more and more cars in the Miami area. It says, "Will the last person to leave please bring the flag." That sums up a lot of the feeling of frustration . . . and . . . the tremendous movement that we have in Florida. . . . [P]eople . . . are leaving the county. This is bad. It is a situation that we have to reverse.[14]

As Chiles defended a package of legislative measures that included S. 973

amending § 1326, he used the racist proxy of the War on Drugs. Chiles presented

amendments to § 1326 as an essential tool to engage the nation's immigration laws

and the Immigration and Naturalization Service ("INS") in the work of criminal

law enforcement: it would enhance the capacities of the federal government to

pursue and prosecute so-called criminal aliens.

He explained how his legislative measures would help states like Florida

penalize undocumented immigrants for the nation's putative drug crisis. In so

doing, he racially profiled Florida's Haitian and Jamaican migrant communities as

the sources of the state's so-called drug problem.

Appearing before the Senate Subcommittee on Immigration and Refugee

Affairs to explain his series of legislative proposals, Chiles began: "A year ago

when I introduced my package on alien felons, I found I had to describe these

---

[14] *United States as a Country of Mass First Asylum*, *supra*, at 48.

14

criminals. Today, I simply have to say: Jamaican posses. Haitian crack syndicates. [A]nd there is immediate recognition."[15] Chiles called one local law enforcement witness to testify about the role of Haitians in the drug trade, yet he offered no statistical support for his claims.

During the Senate subcommittee hearings, the American Civil Liberties Union ("ACLU") reviewed Chiles's legislative package, including S. 973, and challenged Chiles's claims linking Haitian immigrants to criminality. Wade Henderson, Associate Director of the ACLU Washington office noted that "Chiles' proposals . . . misperceive the problem. There is only limited evidence to suggest that the magnitude of the criminal alien problem is as significant as the proposed legislation would suggest."[16] Indeed, in 1987, the General Accounting Office had concluded that there was no objective basis for the belief that "alien involvement in crime is a serious problem."[17] But, the INS validated Chiles's bills as the best solution to the problem of Haitian drug trafficking. The INS lauded Chiles for

---

[15] *Implementation of Immigration Reform*: *Hearing on the Implementation of the Immigration Reform and Control Act Before the Subcomm. on Immigr. & Refugee Affs. of the S. Comm. on the Judiciary*, 100th Cong. 26 (1988).
[16] *Id.* at 38.
[17] U.S. Gov't Accountability Off., GGD-88-3, *Criminal Aliens: INS' Enforcement Activities* (1987).

"look[ing] for loopholes in the existing law that would allow for Immigration and Naturalization Service to get a better handle on criminal aliens."[18]

With the passage of the ADAA, the INS and Chiles won the day, creating the foundations for the ensuing amendments to the criminal penalty provisions of the nation's immigration laws.

### B. The Immigration Act of 1990

Another member of the Florida's congressional delegation, Graham authored the amendment to § 1326 in the Immigration Act of 1990. This amendment to § 1326 removed the $1,000 cap on the fine for irregular reentry and authorized greater fines.

Like Chiles, Graham adopted a hardline strategy on immigration enforcement in response to Cuban and Haitian migrants in Florida in the 1980s and 1990s. Prior to joining the Senate, and during his time as Florida's governor, Graham sued the Reagan administration for failing to prevent the entry of Cuban and Haitian asylum seekers and asserted that federal inaction led to the overcrowding of Dade County jails.[19] The lawsuit caused the forced transfer of Cuban and Haitian asylum seekers to facilities run by the INS and the Bureau of

---

[18] *Haitian Narcotics Activities: Hearing on the Magnitude of Haiti's Role as a Transshipment Point for Narcotics in the United States Before the S. Caucus on Int'l Narcotics Control*, 100th Cong. 44 (1988).
[19] *Graham v. Smith*, Case No. 81-1497-CIV-JE (S.D. Fla. 1981).

16

Prisons, a move later enjoined by a federal court for curtailing refugees' access to asylum and legal representation.[20]

Graham long perpetuated racist stereotypes of Haitians and Cubans as criminals and drug traffickers. In a 1982 letter to President Reagan, then-governor Graham wrote: "More than two years ago, I proposed a plan to return these criminals and other undesirables through the gates at our Naval base at Guantanamo Bay . . . . By taking action on the matter of these criminals, you would show all Floridians of your concern."[21] During his 1987 Senate campaign, Graham amplified his anti-immigrant rhetoric by continuing to attribute drug offenses to immigrant criminality.

Graham, like the drafters of the ADAA, worked to yoke the nation's immigration agencies in the work of criminal law enforcement, particularly to make use of these agencies' broad legal authority to detain and expel unwanted Cuban and Haitians in the War on Drugs.  For example, in May 1988, Graham co-chaired the Senate committee hearing on "Haitian Narcotics Activities," which blamed prison overcrowding in seven states on noncitizens and worked to create greater coordination between state prisons and the INS across the nation.

---

[20] *Louis v. Meissner*, 530 F. Supp. 924 (S.D. Fla. 1981).
[21] Letter from Bob Graham to Ronald Reagan (Sept. 9, 1982) (on file with the Ronald Reagan Presidential Library).

Seeking additional mechanisms to remove Cuban and Haitian asylum seekers, Graham, along with Chiles, co-chaired a bipartisan task force on law enforcement and interdiction that culminated in the passage of the ADAA.

Yet, many policymakers, including Graham, soon argued that the ADAA did not go far enough. Graham thus drafted amendments to the law that would remedy the perceived lapses of the ADAA and federal immigration enforcement more generally. As Graham explained in broader terms: "All too often, these nomadic criminals—who are involved in the drug trade—slip away from justice because they move faster than our immigration system."[22]

Graham incorporated these amendments into two drug bills, S. 1711 and S. 2652, which would eventually be integrated into S. 358, the Immigration Act of 1990.  He also co-sponsored a "sense of the congress" recommendation to the Federal Sentencing Commission to "upgrade the penalty for an aggravated criminal felon who after conviction returns to the United States in violation of federal law."[23] It is also likely that his "sense of the Congress" recommendation to the Federal Sentencing Commission led to the 1990 modifications of § 1326.

### C. The Violent Crime Control and Law Enforcement Act of 1994

---

[22] U.S. Gov't Accountability Off., GGD-90-18, *Immigration Control: Deporting and Excluding Aliens from the United States* (1989).
[23] *Criminal Aliens: Hearing on H.R. 3333 Before the Subcomm. on Immigr., Refugees, & Int'l L. of the H. Comm. on the Judiciary*, 101st Cong. 120 (1989).

Representing a deeply conservative and predominately white district in Central Florida, McCollum authored the amendments to § 1326 under the Violent Crime Control and Law Enforcement Act of 1994 ("VCCLEA") and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The amendments to § 1326 under the VCCLEA and AEDPA increased penalties for unauthorized reentry. The amendments under the AEDPA also limited collateral attacks of the underlying deportation order.

Informed by anti-Black and anti-Latinx animus, McCollum dedicated his career to the reconfiguration of the nation's criminal and immigration laws. McCollum found common cause with legislators, particularly from border states, who lobbied for tough sanctions against undocumented Mexican immigrants. Their combined efforts led to the amendment of § 1326 under the VCCLEA in 1994 and AEDPA in 1996.

McCollum applied the logic and language of the criminal law to his immigration law enforcement proposals because he believed that many asylum seekers and refugees were lawbreakers and criminals. As he sought to end what he called the "revolving door" in the criminal law context, he also pursued tough criminal penalties for undocumented entry and reentry.

McCollum harbored few qualms about the indefinite detention of low-level offenders, children and teenagers, asylum seekers, and undocumented immigrants

or, in his words, "lock[ing] them up and throw[ing] away the key."[24] To eliminate

what he considered time-consuming and frivolous appeals, McCollum worked

vigorously to end collateral attacks in challenges to deportation orders.

In a 1981 speech delivered before the Dade City Chamber of Commerce,

McCollum offered a crude overview of his legislative strategy when he

recommended that President Reagan "find a hole in our fence at Guantanamo and

push these aliens [Cuban refugees] through it. And maybe we can do something

similar with the Haitians."[25]

In the ensuing years, McCollum proposed numerous measures that barely

veiled his racial animus. In these endeavors, McCollum worked with FAIR,

speaking at its congressional briefings, sponsoring its measures, and receiving the

organization's endorsement for his own bills.

For example, McCollum fought to excise the legalization provisions of the

1986 Immigration Reform and Control Act ("IRCA") by stoking racist fears that

legalization would lead to the migration of one-third to one-half of the entire

population of Mexico to the United States. He also drafted bills that barred the

entry of individuals diagnosed with AIDS—bills that fueled racist stereotypes that

---

[24] 139 Cong. Rec. 30466 (daily ed. Nov. 19, 1993).

[25] Andy Taylor, *A Bum Rap? "Marielista" fears unwarranted*, Tampa Tribune, Mar. 3, 1982, at A1 (*quoting* Bill McCollum, Speech at the Dade City Chamber of Commerce (Mar. 28, 1981)).

associated Haitians with disease. McCollum further promoted an anti-Hispanic immigration policy agenda by co-sponsoring English-only legislation and legislation that would deny birthright citizenship to children of undocumented immigrants.

By 1993, McCollum was the ranking member of both the House of Representatives ("House") Subcommittee on Crime and the Subcommittee on International Law, Immigration, and Refugees. As such, McCollum was well positioned to consolidate his interests on these issues by advancing amendments to the nation's immigration laws via the major crime measures of the late twentieth century.

McCollum thus introduced H.R. 1459, which sought to enlarge the class of individuals subject to criminal prosecution for unauthorized entry and limit collateral attacks on underlying deportation orders. Although H.R. 1459 never became law, its proposed modifications to the criminal penalties for irregular reentry served as the basis for its reenactment under the 1994 VCCLEA and 1996 AEDPA.

While instrumental in securing immigration-related provisions in the 1994 crime-bill, McCollum himself voted against the legislation, which ultimately did not include the addition of limiting collateral attacks under § 1326. McCollum and

other Republicans charged that the bill was "soft" on crime and that its crime prevention programs functioned as forms of welfare.[26]

Given the widespread xenophobia in this period, "neither Republican nor Democratic leaders wanted to appear lax" with respect to immigration enforcement.[27] As a result, during the debates over the VCCLEA, Senator Harry Reid (D-NV) sanctioned amending § 1326 and proposed to do so in his own immigration enforcement bill, S. 1351. Reid, however, later regretted proposing this legislation, which never became law, cognizant of the racism underlying his bill.

Reid's proposed amendment of § 1326 was more stringent than McCollum's version. For example, whereas McCollum's bill (H.R. 1459) subjected to criminal prosecution those who had committed three or more misdemeanors, Reid's bill (S. 1351) would have included those who had committed two or more misdemeanors. By altogether barring collateral attacks, Reid's bill went further than McCollum's which limited them. The amendment would have also revoked birthright citizenship for children born to undocumented immigrants.

---

[26] 140 Cong. Rec. H7200–01 (daily ed. Aug. 9, 1994).
[27] Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* 282 (2002).

In 2006, Reid apologized for introducing S. 1351 and for his September 1993 floor speech defending the bill's proposal to strip birthright citizenship from children born to undocumented immigrants. Cognizant of the racism underlying his proposal, Reid explained, "A group of people . . . convinced us that the thing to do would be to close the borders between Mexico and the United States; in effect, stop people from coming across our borders to the United States." He conceded that the bill was "the biggest mistake I ever made."[28]

Dissatisfied with the VCCLEA, McCollum immediately began pursuing further amendments to the nation's criminal and immigration laws, including amending § 1326 to limit collateral attacks on deportation orders.

### D. The Antiterrorism and Effective Death Penalty Act of 1996

Two months after the VCCLEA's passage, the political landscape tilted in McCollum's favor. The Republican party had taken control of Congress for the first time in forty years. Two Republicans, with longstanding ties to FAIR, supplanted Democrats from the chairs of the Senate and House immigration committees. McCollum now chaired the House Subcommittee on Crime and led the Political Asylum Working Group of the Congressional Task Force on

---

[28] *Quoted in* Jon Ralston, *An immigration push Reid regrets*, Las Vegas Sun*, Jul. 21, 2010, https://m.lasvegassun.com/news/2010/jul/21/immigration-push-reid-regrets/.

Immigration Reform and introduced several pieces of legislation in response to the VCCLEA.

Critically, McCollum introduced H.R. 668, which amended § 1326 to limit collateral attacks on deportation orders, because the VCCLEA, in his words, had "not gone far enough."[29] The Supreme Court had previously held that noncitizens have a constitutional right to collaterally attack their predicate removal orders in a § 1326 prosecution.[30] McCollum's amendment cabined that right by adding requirements of judicial review and administrative exhaustion.

H.R. 668 received strong bipartisan support and passed in the House on February 10, 1995 by a 380-20 margin. After passage in the House, H.R. 668 was incorporated into S. 735, the AEDPA.

In addition to McCollum's proposed changes to § 1326, the House agreed to a last-minute amendment proposed by Representatives Mark Foley (R-FL) and Richard Burr (R-NC). Both first-term congressmen, they quickly established their restrictionist credentials through this proposal as well as their sponsorship of measures that would have denied birthright citizenship to children of undocumented immigrants. Responding to the concerns of border states regarding the perceived lapses in federal immigration law enforcement, Foley and Burr

_____

[29] 141 Cong. Rec. H1586 (daily ed. Feb. 10, 1995).
[30] *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987).

amended H.R. 668 to magnify the civil and criminal penalties for undocumented entry.

With respect to § 1326, they created a new section (c) that mandated incarceration for individuals who reentered after being deported. Their amendment would also authorize the deportation of noncitizens convicted of nonviolent crimes prior to the completion of their sentences and it would preclude the early release of noncitizens convicted of violent crimes.

During the few congressional debates on § 1326, policymakers made clear that the amended section, like H.R. 668 as a whole, aimed to streamline the deportation process, reproducing the language of criminality. As Smith explained:

> The deportation process can be years in length. H.R. 668 will streamline the process by eliminating frivolous challenges to deportation orders . . . . This bill addresses the concerns of the American people by giving the INS and prosecutors the tools they need to expedite the deportation of criminal aliens.[31]

Ultimately, the amendments to § 1326 were incorporated into what became the AEDPA, which passed with broad bipartisan support.

### E. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996

Smith, the chair of the House Immigration Subcommittee, introduced H.R. 2202, the bill that would ultimately become the Illegal Immigration Reform and

---

[31] 141 Cong. Rec. E325 (daily ed. Feb. 13, 1995).

Immigrant Responsibility Act ("IIRAIRA"), including the final amendment to §
1326. Like prior amendments, the changes to § 1326 under the IIRAIRA involved
increased penalties. IRAIRA also broadened the scope of persons who could be
prosecuted under § 1326. Smith introduced H.R. 2202 to correct what he perceived
to be the missteps of the 1965 INA and to alter the "pace and direction" of
migration to the United States.[32]

A member of FAIR's National Board of Advisors, Smith believed that the
INA of 1965 rendered "immigration as a form of 'civil right' . . . without regard to
objective criteria of selection based in the national interest."[33] He aimed to cure the
"excesses of multiculturalism" and concluded that "there exists an inchoate sense
among the American people that our culture is changed by immigration and that
the pace of and direction of that change ought to be debated more openly."[34]

Through H.R. 2202, Smith sought to course correct the changing face of the
United States and limit both legal and undocumented immigration. He would do so
by curtailing "undesirable" immigration to the United States and expanding the
civil and criminal penalties for undocumented entry and reentry, particularly vis-à-
vis Mexican nationals.

---

[32] Lamar Smith & Edward R. Grant, *Immigration Reform: Seeking the Right
Reasons*, 28 *St. Mary's L.J.* 883, 905 n.4 (1997).
[33] *Id.* at 888.
[34] *Id.* at 905–06.

While Smith was the congressional face of what would become the IIRAIRA, Cordelia A. Strom—chief counsel to the House Immigration Subcommittee and former staff attorney at FAIR's nonprofit litigation arm—was credited with "ghostwriting" the bill.[35] Former INS commissioner, Doris Meissner was more emphatic about Strom's role and declared "she [Strom] directly wrote it."[36] In fact, Strom's work led immigration scholar Ira Kurzban to conclude that "Lamar Smith, in effect, turned the congressional immigration subcommittee over to FAIR."[37]

During floor debates, the bill was regularly criticized as racist and cruel. Representative Jerrold Nadler (D-NY), for example, criticized H.R. 2202:

> Let there be no mistake: This Nation has every right and obligation to control our borders and to enforce our immigration laws. But absurd boondoggles, like building a giant fence, mindless cruelty, like sending legitimate refugees back to be murdered or tortured by their oppressors, and good old-fashioned Xenophobia, have nothing to do with legitimate protection of our borders.[38]

## III.   WITH EACH AMENDMENT TO § 1326, CONGRESS FAILED TO ACKNOWLEDGE, EXAMINE, OR EXPUNGE THE PROVISION'S RACIAL ANIMUS.

---

[35] *Quoted in* Deepa Fernandes, *Targeted: Homeland Security and the Business of Immigration* 216, 218 (2007).
[36] *Quoted in id.*
[37] *Quoted in id.* at 217.
[38] 142 Cong. Rec. H2390 (daily ed. Mar. 19, 1996).

Chiles, Graham, McCollum, and Smith did not act alone. Members of Congress across the aisle were willing participants in each reenactment and amendment to § 1326. With each amendment to § 1326, there is no evidence in the Congressional Record that Congress acknowledged or otherwise sought to expunge the racial animus that informed the initial enactment and subsequent reenactments of the criminalization of irregular reentry.

At times, the passage of the reenactments rested upon the complicity of both liberal and conservative lawmakers who co-opted racist and restrictionist talking points to improve their election day chances. With the anti-immigrant fervor of the early 1990s, congressional Democrats and Republicans "began tripping over one another to take a tough stand on boundary enforcement and unauthorized immigration."[39] By taking an aggressive stance on immigration enforcement, politicians saw their own poll numbers rise and increased their chances of reelection.

The pressure to appear tough on undocumented immigration was particularly acute in 1996—an election year—when the AEDPA and IIRAIRA were passed. During the debates over legislation that would eventually become the AEDPA, not only were policymakers reluctant to raise questions about laws that could cost

---

[39] Nevins, *supra*, at 89.

them votes on election day, but instead they deployed restrictionist and often racist arguments.

At other times, pro-immigration lawmakers conceded that structural factors—such as Republican majorities in 1994—led them to compromise their own values and vote for racist measures. During debates over the IIRAIRA, for example, Democrats acknowledged the racism of the bill generally but lacked leverage against the Republican bill.

The ballot box and congressional balance of power thus led lawmakers to conclude that any attempt to examine and cleanse the racial animus from the nation's immigration laws would be futile and even antithetical to their own survival in Congress.

That even those who spearheaded amendments to § 1326 came to regret their hardline stance on immigration is telling. McCollum, for example, expressed his regrets about the punitive turn in the nation's immigration laws. Speaking about the IIRAIRA, he stated, "The 1996 law went too far. We are a just and fair nation and must strike a just and fair balance in our immigration laws."[40]

On October 1, 1999, McCollum introduced H.R. 2999, "The Fairness for Permanent Residents Act of 1999," a measure that would enable permanent

---

[40] 145 Cong. Rec. 23794 (daily ed. Oct. 4, 1999).

residents convicted of minor crimes to receive a waiver of deportation. It also would provide relief for permanent residents indefinitely detained and awaiting deportation for crimes committed in the past. He explained that his measure would "'right' a wrong that was created by the 1996 changes to the immigration law." [41]

McCollum, however, never retracted anything with respect to his revisions of § 1326 under the VCCLEA and AEDPA. Perhaps most tellingly, McCollum sought relief for two permanent residents from Global North countries from the 1996 law.

By 1999, Smith also thought the IIRAIRA went too far. Smith wrote that it was "the toughest legislation against illegal immigration enacted in our lifetimes." [42] He, along with twenty-eight Members of Congress, penned a letter to the Attorney General and INS urging the use of prosecutorial discretion in the case of legal permanent residents with U.S. citizen children.

Fundamentally, numerous social science studies have undermined the assumptions that drove the passage of the IIRAIRA, AEDPA, VCCLEA, and ADAA, among others. For decades, social scientists have found no evidence to support the claim that immigrants are more likely to commit crime than the native born.

---

[41] *Id.*
[42] Smith & Grant, *supra*, at 913.

A widely cited 2007 study found that "contemporary and historical data, including investigations carried out by major government commissions over the past century, have shown repeatedly and systematically that immigration is actually associated with *lower* crime rates."[43] When it comes to incarceration rates, the Cato Institute found in 2019 that "All immigrants have a lower incarceration rate and there are lower crime rates in the neighborhoods where they live, according to the near-unanimous findings of the peer-reviewed evidence."[44]

A 2017 study estimated that undocumented immigrant incarceration rates were approximately half those of native-born Americans.[45] Yet, between 1996 and 2013 immigration prosecutions, primarily under § 1325 and § 1326, increased by a factor of ten.

## CONCLUSION

For the foregoing reasons, we respectfully request that this Court affirm the ruling of the district court.

---

[43] Rubén Rumbaut & Walter A. Ewing, *The Myth of Immigrant Criminality*, Social Science Research Council, May 23, 2007, https://items.ssrc.org/border-battles/the-myth-of-immigrant-criminality/.

[44] Alex Nowrasteh, *Illegal Immigrants and Crime – Assessing the Evidence*, Cato Institute, Mar. 4, 2019, https://www.cato.org/blog/illegal-immigrants-crime-assessing-evidence.

[45] Michelangelo Landgrave & Alex Nowrasteh, *Criminal Immigrants in 2017: Their Numbers, Demographics, and Countries of Origin*, Cato Institute, Mar. 4, 2019, https://www.cato.org/publications/immigration-resgearch-policy-brief/criminal-immigrants-2017-their-numbers-demographics.

DATED: April 14, 2022                 Respectfully submitted,


                                      */s/ Philip L. Torrey*
                                      Philip L. Torrey
                                      Rachel Landry (law student)
                                      Crimmigration Clinic
                                      Harvard Law School
                                      6 Everett Street; Suite 3105
                                      Cambridge, MA 02138
                                      Phone: (617) 495-0638
                                      Email: ptorrey@law.harvard.edu

## **CERTIFICATE OF COMPLIANCE**

On April 14, 2022, I certify that: Pursuant to Fed. R. App. P. 32(a)5)(a) and (a)(6) this brief complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface in Times New Roman, 14-point font. Pursuant to Fed. R. App. P. 29(a)(5), this brief complies with the type-volume limitations because it contains 6,484 words. (The maximum number of words is 7,000 for an *amicus* brief in connection with a principal brief, which has a word limit of 14,000 words under Ninth Circuit Rule 32-1(a)).

DATED: April 14, 2022                    */s/ Philip L. Torrey*
                                         Philip L. Torrey
                                         Crimmigration Clinic
                                         Harvard Law School

## **CERTIFICATE OF SERVICE**

I, Philip L. Torrey, hereby certify that I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system.  I certify that all participants in the

case are registered CM/ECF users and that service will be accomplished by the

appellate CM/ECF system.

DATED: April 14, 2022                                   */s/Philip L. Torrey*
                                                        Philip L. Torrey
                                                        Crimmigration Clinic
                                                        Harvard Law School