**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 22-cr-00018

UNITED STATES OF AMERICA,

v.

OSCAR DURON-DE LUNA,

      Defendant.

---

## ORDER

---

This matter is before the Court on the Defendant's Motion to Dismiss the Indictment, ECF 25. The Government has responded to the motion, and the Defendant has replied. The Court ordered additional briefing on the motion, at ECF 32. Supplemental briefing was filed at ECF Nos. 35 and 37. The matter has been fully briefed and is ripe for review. For the following reasons, the Defendant's motion is **DENIED**.

## I.    BACKGROUND

The Government charges the Defendant Oscar Duron-De Luna with one count of illegal reentry of a removed alien in violation of 8 U.S.C. §1326(a). The indictment alleges that the defendant is an alien who "was found in the United States after having been denied admission, excluded, deported, and removed from the United States on or about April 14, 2021, and without the express consent of the proper legal authority to reapply

for admission to the United States." ECF 1. The indictment also contains a notice of enhanced penalty pursuant to § 1326(b)(1), alleging that the Defendant's "denial of admission, exclusion, deportation and removal was subsequent to a conviction for a felony offense." *Id.*

The Defendant has filed a motion to dismiss the indictment against him. The Defendant argues that 8 U.S.C. § 1326 is unconstitutional because it violates the Constitution's guarantee of equal protection.

## II.    LEGAL STANDARD

The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017). Thus, both the Fourteenth Amendment and the Fifth Amendment contain equal protection guarantees. *See Buckley v. Valeo*, 424 U.S. 1, 93, 96 (1976) (noting that the "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."). These protections extend to individuals charged with violating section 1326. *Plyler v. Doe*, 457 U.S. 202, 210.

Under the Fifth Amendment's equal protection guarantee, a law can violate equal protection in three ways: (1) a law can discriminate on its face (*see, e.g., Loving v. Virginia*, 388 U.S. 1 (1967)); (2) authorities can apply a facially neutral law in a discriminatory manner *(see, e.g., Yick Wo v. Hopkins*, 118 U.S. 356 (1886)); or (3) a

2

legislature may enact a facially neutral law with a discriminatory purpose in a way that disparately impacts a specific group (*see, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)). The Defendant here argues that section 1326 violates his right to equal protection as specified in *Arlington Heights*, and he asks the Court to apply the strict scrutiny framework set forth for analyzing alleged equal protection violations therein.

The Government argues that the standard set forth in *Arlington Heights* does not apply. Instead, the Government argues, the Court need only apply rational basis review. In so doing, the Court need only determine whether section 1326 is rationally related to any legitimate government interest.   The Government argues that "[t]he expansive *Arlington Heights* inquiry is antithetical to the long-standing principle that, regarding congressional immigration policy, it is 'not the judicial role … to probe and test the justifications for the legislative decision.' [] There is no probe more exacting than *Arlingotn Heights*, which invites inquiry into 'circumstantial and direct evidence of intent,' the 'historical background of the decision,' the 'specific sequence of events leading up to the challenged decision,' and the 'legislative or administrative history.'" ECF 28, p. 14 (internal citations omitted).

The Supreme Court has held that, because the Fifth Amendment's focus is persons rather than citizens, non-citizens present in the United States are entitled to the Fifth Amendment's protections. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (holding that non-citizens present in the United States are entitled to the protection of the

Fifth Amendment). When considering this precise issue in *United States v. Sanchez-Felix*, Chief Judge Brimmer observed that "[O]nce an alien arrives in the United States and begins establishing ties to the country, the [Supreme] Court has recognized certain constitutional protections extend to those persons, even if their presence is 'unlawful, involuntary, or transitory.' " *United States v. Sanchez-Felix,* No. 21-CR-00310-PAB, 2021 WL 6125407, at *2 (D. Colo. Dec. 28, 2021) (citing *California v. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1018 (N.D. Cal. 2020)).  As a result, courts have noted that there is a distinction between cases that concern "the political branches' authority to decide who to admit to the United States" and those that concern the government's "authority over noncitizens already present." *Id.* (citing *United States v. Machic-Xiap*, 2021 WL 3362738, at *9 (D. Or. Aug. 3, 2021)).

"In light of the distinction between non-citizens present in the United States and those outside the borders," Judge Brimmer determined that "the government is mistaken that § 1326 should be reviewed under the rational basis standard." *United States v. Sanchez-Felix*, at 3. Because § 1326 applies to aliens who are already in the United States, the government cannot entirely rely on Congress' plenary power doctrine to uphold the statute. *Id.* This Court agrees with the Chief Judge's analysis and ultimate conclusion and finds that *Arlington Heights* applies to the Defendant's challenge.

## A. Arlington Heights

Under *Arlington Heights*, the Defendant must establish by a preponderance of the evidence that racial discrimination was a substantial motivating factor in the adoption of

the statute. *Arlington Heights*, 429 U.S. at 266. Under *Arlington Heights*, a court considers both whether a law disparately impacts a particular group and whether that law was enacted with a discriminatory purpose. *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* To determine discriminatory intent, the Court considers all direct and circumstantial evidence, including the historical background of the decision, the specific sequence of events leading up to the challenged decision, and the legislative or administrative history. *Id.*

If the Defendant meets his burden of establishing that racial discrimination was a substantial motivating factor, the burden shifts to the Government to establish that "the same [governmental] decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21.

### III.    ANALYSIS

#### A.    Disparate Impact

Whether the impact of an official action disparately impacts one race may provide an important starting point in the *Arlington Heights* analysis. *Id.* Disparate impact is established where the law's impact "bears more heavily on one race than another." *Id.* The Defendant argues that section 1326 meets this test because it disparately impacts one race, Latinxs. The Defendant argues that "Latin-Mexican nationals" comprised between 85 and 99 percent of defendants in unlawful reentry prosecutions under the Undesirable Aliens Act of 1929 and "the disparate impact upon Mexicans and other

5

Latinos has not shifted in the intervening decade, including after congress enacted section 1326." ECF 25, p. 11.

The Defendant has cited to evidence that, since 2005, 99.45% of defendants charged with at least one count of a violation of section 1326 were from Latin America, and 96.64% were Hispanic. ECF 25-16, Table 1. In 2020, over 99.11 percent of those convicted of illegal reentry were considered Hispanic.

The Government argues that the high percentage of illegal reentry prosecutions of Mexican and Latin American defendants is not proof of disparate impact and discrimination because "[t]hose numbers are a product of geography, not discrimination." ECF 28, p. 20. The Government here relies on *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891 (2020). Chief Judge Brimmer also addressed this issue, explaining that

> Although the Supreme Court in *Regents* acknowledged that the Deferred Action for Childhood Arrivals ("DACA") recipients alleged the "disparate impact of the recission [of DACA] on Latinos," the Court held that, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. . . . Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." [] While *Regents* does not foreclose defendant's disparate impact argument, it does indicate that disparate impact is not sufficient for his equal protection claim.

*See Sanchez-Felix, 2021 WL 6125407 at *10*. The Chief Judge further observed "[i]n *Arlington Heights* itself, the Court found that zoning restrictions limiting the building of low-cost housing may have disparately impacted African Americans, even though the impact was disparate because African Americans were disproportionately represented among those eligible for low-cost housing." *Id.* Judge Brimmer thus concluded that, under *Arlington Heights*, "disparate impact is not eliminated because the government may later

6

show a race-neutral explanation." *Id.* at * 11. This Court agrees, and the Government's geography argument is thus not determinative of the issue of disparate impact.

The Defendant has also cited to evidence that, while Mexicans, Hondurans, Salvadorans, Guatemalans, Colombians, Brazilians, and Venezuelans made up 66.9% of the unauthorized population in 2018, they made up 97.67% of section 1326 defendants. This evidence further undermines the Government's argument that geography alone accounts for the disproportionate impact.

Based on the evidence identified by the parties, the Court finds that the statute "bears more heavily on one race than another." As such, the Defendant has established disparate impact.

### B.    Discriminatory Intent

Proof of disparate impact alone, however, is not dispositive. Under *Arlington Heights*, the Defendant must also establish that section 1326 was enacted in part to due to racial animus. In analyzing discriminatory intent, the court considers all direct and circumstantial evidence that may indicate Congress's motivations, including the historical background of the decision, the specific sequence of events leading up to the challenged decision, and the legislative or administrative history.

The challenged statute here, section 1326, has a long history. The statute was originally enacted as part of the Undesirable Aliens Act of 1929. The statute was later reenacted as part of the Immigration and Nationality Act, in 1952. The parties dispute the importance of the 1929 act. The Defendant argues that the 1929 act is relevant to—if not

dispositive of—the issue of discriminatory intent. The Government argues that the statute at issue here was enacted in 1952, and the 1929 statute therefore is not relevant.

As set forth in greater detail, *infra*, the Court finds that the 1929 Act is relevant to this Court's analysis of discriminatory intent. So too, however, are all of the circumstances and actions surrounding the 1952 reenactment. Upon review of all of the evidence, the Court finds that the Defendant has met his burden of establishing by a preponderance of the evidence that racial discrimination was at least a motivating factor in the enactment of section 1326.  The Court will address the evidence presented by the parties and will explain why each fact or group of facts indicates discriminatory or nondiscriminatory intent (or is neutral).

1.   The Undesirable Aliens Act: 1929

The reentry law, today section 1326, was originally enacted in 1929 as part of the Undesirable Aliens Act. The Defendant argues that the totality of the circumstances suggests that "racial animus was a, if not *the*, motivating factor in the criminalization of reentry." ECF 25, p. 15.

 The exhibits cited by the Defendant detail the racially discriminatory history and motivations behind the 1929 law. The Declaration of Kelly Lytle Hernandez, Exhibit A, describes the events leading to the passage of the 1929 Act. She explains that the Undesirable Aliens Act of 1929 came on the heels of the National Origins Act of 1924. With the National Origins Act, Nativists—many of whom endorsed the theory of eugenics—sought to limit the number of certain unwanted immigrants into the United States. This act specifically set forth a system of national quotas that limited the total

number of immigrants allowed to enter the country each year. ECF 25-2, p. 4. "The quota system constituted what historian John Higham described as a 'Nordic victory' by narrowing the pathways of legal immigration to allow only a particular portion of the world's population to enter: 96 percent of all quota slots were reserved for European immigrants." *Id.*

The National Origins Act, however, did not include a quota for Mexican immigration. By the time of the passage of the National Origins Act, Western states had become increasingly dependent on Mexican labor, and employers in the West thereby opposed any quota that would cut their access to Mexican labor. *Id.* Over the next few years, a series of bills were enacted to attempt to add Mexico's migrant workers to the quota system. *Id.* These proposed bills were rooted in racist and eugenicist ideology, with bill proponents arguing that "[Mexican] amalgamation with our people will cause a general weakening, physically and mentally, of our civilization." ECF 25-8, 3.

After the proposed bills were defeated by agribusiness employers, Senator Coleman Blease, an outspoken white supremacist, introduced a compromise which would eventually become the Undesirable Alien Act of 1929. Citing to the large number of unauthorized border crossings made by Mexicans each year, Senator Blease proposed criminalizing unlawful entry into the United States instead of focusing on quotas. ECF 25-1, p. 8. The 1929 act was adopted to allow for "Mexican deportability" without interfering with the American Southwestern need for Mexican labor for agribusiness. Hernandez explains that the 1929 Act "was introduced into Congress as a measure to control and

punish unlawful Mexican immigrants, in particular." ECF 25-1, p. 8. The Declaration of Benjamin O'Brien, Exhibit B, further identifies the racial motivations underpinning the 1929 law. He explains that the debate around the Undesirable Aliens Act was driven by eugenicist narratives of racial inferiority. ECF 25-2, p. 12. Statements from proponents of the bill highlight the discriminatory underpinnings thereof. One farmer and lobbyist explained to congress that "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." ECF 25-2, p. 7. Rep. John Box, another proponent of the bill, viewed the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." ECF 24, p. 19. Albert Johnson, the chairman of the House Immigration and Naturalization Committee, had preciously admitted into the congressional record a letter from a constituent urging legislators to keep out "the scoff and scum, the mongrel, the bootlegger element from Mexico." ECF 25-7, p. 30. Prior to the passage of the 1929 Act, the Committee heard from prominent eugenicist Dr. Laughlin, who advocated for deportation of the "undesirable individual" because otherwise "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." ECF 25-6. During the debate on the bill, congressman stated that Mexican immigrants were "poisoning the American citizen," that they were "undesirable," and that they were "objectionable as immigrants when tried by the tests applied to other aliens." ECF 25-13, p. 8. The evidence presented

by the Defendant convinces this Court that the Undesirable Aliens Act of 1929 was undoubtedly substantially motivated by racism.

2. <u>Adoption of the Immigration and Nationality Act of 1952</u>

The Undesirable Aliens Act, however, is not the specific law at issue before this Court. In 1952, Congress consolidated the country's immigration laws by passing the INA (also known as the McCarran-Walter Act). Under the INA, the Undesirable Alien Act's criminalization of reentry provision became 8 U.S.C. § 1326. The version of the statute included in the INA was nearly identical, except that the 1952 enactment expanded the class of non-citizens eligible for prosecution to include those excluded as well as deported.

a. *Relevance of 1929 Statute*

The Court is thus faced with its first dilemma—To what extent, if any does the discriminatory thrust of the 1929 law impact this Court's analysis under *Arlington Heights* given that the law was reenacted in 1952? The Defendant asks the Court to find the evidence dispositive. The Government asks the Court to find the evidence irrelevant. Neither party is entitled to the sweeping ruling requested.

The Defendant directs the Court to *Hunter v. Underwood*, 471 U.S. 222, 233 (1985). In *Hunter*, the Supreme Court considered a challenge to an Alabama Constitutional provision disenfranchising those convicted of crimes involving "moral turpitudes." The Court determined that discrimination against African Americans was a motivating factor in the adoption of the provision. Appellant's counsel argued that, regardless of the original purpose of the provision, "events occurring in the succeeding

11

80 years had legitimated the provision…[because] the more blatantly discriminatory selections…have been struck down by the courts…and the remaining crimes [] are acceptable bases for denying the franchise." *Id.* The Supreme Court rejected this argument, finding that "the original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*." *Id*. *Hunter* is relevant, but it is not dispositive. Notably, the Court in *Hunter* considered the very same law that had been adopted in 1901, and which the lower court deemed had been adopted with discriminatory intent.

In *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018), the Supreme Court considered its ruling in *Hunter*. In *Abbott*, the Supreme Court considered multiple iterations of a Texas districting plan. The first iteration of that plan, from 2011, had been found to be the product of discriminatory intent harbored by the 2011 legislature. A lower court invalidated districts from later 2013 plans that corresponded with the districts in the 2011 plan because there was "no indication that the Legislature looked to see whether any discriminatory taint remained in the plans." *Id*. The Supreme Court reversed, finding that the lower court had impermissibly shifted the burden to the government. The Supreme Court explained that a finding of discriminatory intent as to a predecessor law is not necessarily an original sin that infects later iterations of a law. The Court's analysis in *Abbott* suggests that a finding of discrimination by a predecessor law does not, by itself, establish a prima facie case of discriminatory intent, such that the burden shifts to the government. Instead, the

"historical background" of a legislative enactment is "one evidentiary source" relevant to the question of intent. *Id.* at 2325. While the past discrimination was relevant to the question of intent in *Abbott*, the Court nonetheless found that the challenger could not prove discriminatory intent vis a vi the 2013 policy because "the legislature did not reenact the plan previously passed by its 2011 Legislature. Instead, it enacted, with only very small changes, plans that had been developed by the Texas court pursuant to instructions from this Court not to incorporate any legal defects." The Court pointed to evidence of the intent of the 2013 legislature, specifically, and explained that the 2013 legislature had adopted those particular plans because it "wanted to bring the litigation about the State's districting plans to an end as expeditiously as possible[, and] the attorney general advised the Legislature that the best way to do this was to adopt the [2013] plans." *Id.* 2327

Distinguishing *Hunter*, the Court explained that "*Hunter* involved an equal protection challenge to an article of the Alabama Constitution adopted in 1901 at a constitutional convention avowedly dedicated to the establishment of white supremacy… The article was never repealed, but over the years, the list of disqualifying offenses had been pruned, and the State argued that what remained was facially constitutional. [] This Court rejected that argument because the amendments did not alter the intent with which the article, including the parts that remained, had been adopted." *Id.* at 2325. The Court went on to explain that *Abbott* was not like *Hunter*, nor was it "a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature." Instead, the 2013 Texas Legislature enacted plans "that had been developed by the

Texas court pursuant to instructions from this Court 'not to incorporate…any legal defects." *Id.*

The case before this Court would appear to sit somewhere between *Hunter* and *Abbott*. And, arguably, the Court's dicta in *Abbott* would appear to suggest that this case lies closer to *Hunter* than to *Abbott.* The question thus remains—how do *Hunter* and *Abbott* impact this Court's analysis?

*Hunter* instructs that neither the passage of time nor subsequent amendment to a law can legitimate a law that was initially enacted with discriminatory intent. *Abbott* instructs that the fact that a predecessor law may have been enacted with discriminatory intent does not necessarily establish that later iterations of that same law also suffer from discriminatory intent. We therefore have two ends of the same spectrum. In *Hunter*, the original intent was dispositive, because the law challenged was the very same law adopted. In *Abbott*, the intent was relevant, but it was ultimately outweighed by evidence of nondiscriminatory motives relevant to the adoption of the later-enacted law.

Here, the discriminatory intent underpinning the adoption of the 1929 law is relevant to this Court's *Arlington Heights* analysis. When considering the Defendant's burden at this time, the 1929 history provides some support for a finding that racial discrimination was motivating factor in the adoption of section 1326. An adequate *Arlington Heights* analysis requires the Court to take into consideration all evidence of intent; and the Court's inquiry thus does not end here.

### 3.      Congressional Silence At Reenactment

When the criminal reentry statute was reenacted in 1952, it was reenacted without substantive debate about its provisions, nor were there any statements regarding the reasons for the adoption. *See e.g.*, *U.S. v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ( "[a]n exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of June 27, 1952, but §§ 1325 and 1326 were not among the debated sections."). The parties here dispute whether this Congressional silence is indicative of discriminatory motive or lack thereof.

The Defendant argues that Congressional silence should be interpreted as an implicit adoption of the racial motivations of the 1929 law. The Defendant argues that the reenactment of the statute thus did not "break the chain of discriminatory causation." Thus, while *Hunter* found that the underlying discriminatory motivations *necessarily remained* with the law, the Defendant here asks the Court to find that, even if the motivations did not remain connected to the law per se, Congress' silence at the adoption of the new law should be viewed as an implicit adoption of the racial motivations of their Congressional predecessors.

The Defendant argues that "Supreme Court case law reflects the understanding that questions of legislative intent with respect to a reenactment should normally be viewed through the lens of Congressional intent at the time of the original enactment." ECF 25, p. 26. The Defendant directs the Court to *United States v. Ryder*, 110 U.S. 729, 740 (1884), in which the Supreme Court instructed that "[i]t will not be inferred that the

15

legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed." The Defendant also directs the Court to *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) and *State of Ga. v. Rachel*, 384 U.S. 780, 802 (1966). *Keene* considered whether a change "in phraseology" of a statute could be read to work a change in the underlying substantive law. Finding that it did not, the Court explained that it would not "presume that the revision worked a change in the underlying substantive law unless an intent to make such a change is clearly expressed." *Id.* (internal quotation marks omitted). Likewise, in *Rachel*, the Court considered a decades-old statute that had been subsequently modified and reenacted. The Court observed that "[t]here is no suggestion that the modifications in the statute since 1874 were intended to effect any change in substance. Hence, for the purposes of the present case, we are dealing with the same statute that confronted the Court in the cases interpreting [the prior version of the statute]." While these cases deal with the substantive application of the law and not with the motivations underlying a law, they are instructive in that they set forth the proposition that courts should not presume changes in laws simply due to subsequent modifications or reenactments.

The Government, unsurprisingly, disagrees, and suggests that the reenactment of the statue without any discussion creates a kind of blank slate. The lack of explicitly discriminatory rhetoric surrounding the adoption, the Government contends, creates a neutral, nondiscriminatory starting point for this Court's analysis.

16

Interpreting Congressional silence as indicative of discriminatory intent, the Government argues, runs afoul the Supreme Court's directive against drawing meaning from Congressional silence. The Government directs the Court to *Kimbrough v. United States*, 552 U.S. 85, 103 (2007), *United States v. Wells*, 519 U.S. 482, 496 (1997), and *Zuber v. Allen*, 396 U.S. 168, 185 (1969) in support of its contention. These cases, however, appear aimed more directly at the directive that silence generally is not appropriately interpreted to create requirements in a statute that are otherwise not explicit therein. For example, in *Kimbrough*, the court considered a statute setting forth mandatory minimum and maximum sentences for certain offenses. The defendant in the lower court was sentenced below the guideline range, but within the mandatory minimum and maximum range, because the judge disagreed with the guideline sentencing disparities between crack and powder cocaine. The government appealed, arguing that the sentencing courts were required to impose sentences in accordance with the crack cocaine/powder cocaine provisions of the sentencing guidelines. The Court declined to impose such a requirement, explaining that "[t]he statute says nothing about the appropriate sentences within these brackets, and we decline to read any implicit directive into that congressional silence." In *Wells*, the Respondent asked the court to find that a statute implicitly required a showing of materiality, the Court declined to assume such a requirement noting "[w]e [] have at most legislative silence on the crucial statutory language, and we have frequently cautioned that it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Wells*, at 496.

17

These cases do suggest, however, that context is important when considering legislative silence. The *Well's* court acknowledged that "the significance of subsequent congressional action or inaction necessarily varies with the circumstances." *Id.* at 495. So, too, does the Court in *Zuber* instruct that context is important when interpreting congressional silence. *See Zuber* at 185 n.21 ("[Silence's] significance is greatest when the area is one of traditional year-by-year supervision… Even less deference is due silence in the wake of unsuccessful attempts to eliminate an offending interpretation by amendment... Where, as in the case before us, there is no indication that a subsequent Congress has addressed itself to the particular problem, we are unpersuaded that silence is tantamount to acquiescence…").

While the Court finds that case law cited by the Defendant is more closely analogous to the case at bar, neither party has identified case law specifically on point. Considering the case law cited by the parties and the facts presented here, the Court

finds that the legislative silence at the reenactment of the statute was, at most, neutral, and not indicative of either discriminatory intent or nondiscriminatory intent.[1] [2]

### 4. Historical Background Relevant to INA

Both parties have identified evidence relating to the historical background at the time of the adoption of the 1952 Act. The Defendant argues that the relevant history supports a finding that racial discrimination was a motivation for the adoption of section 1326.

The Defendant contends that, between 1929 and 1952, there were two major historical events bearing on the Latinx population: the "repatriation drives" of the Great

---

[1] The Government's argument on this issue largely responds to the court's ruling in *Carillo-Lopez*. The Government argues that the *Carillo-Lopez* court misapplied *Abbott* by finding that Congress, by remaining silent, had failed to repudiate the original racial taint of the 1929 act, thereby staining section 1326 with the same discriminatory intent. The Government contends that the *Carillo-Lopez* court erred in finding that the law needed to be "substantially altered" in order for a presumption of good faith to apply. The Government argues that, even under this improper framework, it succeeds.

The Government here creates and attacks a strawman. This Court did not decide *Carillo-Lopez*, and this court is not bound to follow that decision. Nor is this Court suggesting that an originally discriminatory law need be "substantially altered" in order for a presumption of good faith to apply. Indeed, the parties' focus on the "presumption of good faith" is misplaced. Both parties appear to suggest that the presumption of good faith is separate from the test set forth in *Arlington Heights*. But that is not so.

The *Arlington Heights* test takes into account that congressional actions are presumed to be taken in good faith. It is for this very reason that burden rests with the challenger of the law to prove discriminatory intent. The burden does not shift to the government until the Court has determined, based on all the relevant direct and circumstantial evidence, that the challenger has established by a preponderance of the evidence that congress was motivated by a discriminatory purpose.

[2] The Government, in passing, argues that Congress may not have debated the bill because it was "uncontroversial." ECF 28, p. 28. The Government does not explain, however, nor can the Court glean, how that would be relevant to the motivations for adopting the law at issue.

Depression and the subsequent Bracero Program. These events, the Defendant argues, "demonstrate the United States' intent to preserve the white racial majority and purity by preventing Latinx migrants' permanent settlement and exerting control over a temporary and exploitable Latinx workforce." The Defendant has provided the Court with evidence that, during the Great Depression, an estimated 400,000 to 1 million Mexicans and Mexican-Americans were coerced and threatened into leaving the United States in informal raids of Mexican-American communities known as "repatriation drives." As described by Dr. Kang, in ECF 78-2, in the Depression Era, Mexican and Mexican-American communities "became a source of resentment among nativists who sought a scapegoat for the economic crisis. Wrongly blamed for taking the jobs of native-born Americans and consuming an unfair share of the welfare benefits, the feral government, states, and localities used scare tactics to force undocumented Mexican immigrants into leaving the United States." Indeed, in 2006, California enacted the *Apology Act for the 1930s Mexican Repatriation Program*, which states that "Beginning in 1929, government authorities and certain private sector entities in California and throughout the United States undertook and aggressive program to forcibly remove persons of Mexican ancestry from the United States."

The Defendant secondarily references economic programs like the Bracero program, which targeted Mexican immigrant labor, and subjected Mexican workers who entered the country lawfully to degrading and inhumane treatment, including gassing

them with DDT upon entry and requiring them to strip naked for inspection. ECF 25-4, pp. 75-78.

The Defendant has also provided evidence related to the enforcement of the Undesirable Aliens Act. Dr. Kang explains that, in the decade following the law's passage 71% of all Mexican federal prisoners were charged with immigration crimes. ECF 78-2, p. 7. The Defendant has provided testimony suggesting the threat of deportation was used to make Mexican workers more exploitable.

The Government argues that the historical background relating to section 1326 "shows Congress was motivated not by racial animus but by legitimate goals of protecting national security, improving the employment conditions of American and foreign workers, maintaining positive foreign relations, improving public health, and deterring recidivist breaches of the country's sovereign borders while promoting compliance with court and government orders." ECF 28, p. 33. While these other motivations may have existed, the Government's evidence does not disprove or dispute that underlying racial animus also motivated the passage of the law.

The Government explains that, "[b]y the early 1950s, illegal labor migration had dramatically increased, touching all of these issues." *Id.* The Government cites to the Special Message to Congress on the Employment of Agricultural Workers from Mexico (July 13, 1951). This document, however, would appear to affirm the Defendant's contention that the goals of Congress at this time were at least in part focused on stemming *Mexican* immigration, in particular. Indeed, the Special Message cited by the

Government specifically, and exclusively, addresses Mexican immigration, stating that "[t]he really crucial point…is the steady stream of illegal immigrants from Mexico, the so-called "wetbacks," who cross the Rio Grande or the western stretches of our border." *Id.* The document calls for Immigration and Naturalization services "to expand its personnel in the southwest so that all types of enforcement work can be stepped up—including apprehension, investigation, and deportation of illegal immigrants." Notably, nothing is said of the northern border of the country. The Government also directs the Court to statements from A.R. Mackey during a 1952 appropriations committee hearing, in which he states: [t]he best we could do with our skeleton force was to put them back across the river." ECF 28, p. 33. Yet again, the "them" referred to appear to be Mexican immigrants, and the "river" the Rio Grande.

Indeed, the Government argues that "President Truman approved the agricultural workers bill on the express assurance by Congressional leaders that supplemental legislation and appropriations would be passed to address the 'influx' of illegal Mexican laborers and to give INS sufficient authority and resources to step up their enforcement activities."

The Government's evidence here does not contradict the Defendant's evidence suggesting that the INA's passage was at least in part intended to stem Mexican immigration, in particular. This, along with the evidence presented by the Defendant, provides at least some support for a finding that the passage of the Act was motivated by racial discrimination.

5.      "Wetback Bill"

The Defendant argues that the 1952 Congress' debate and passage of the so-called "Wetback Bill" just two months before the passage of the INA reveals Congress' discriminatory intent. Senate Bill 1851, nicknamed the "Wetback Bill," was passed March 20, 1952, just a few months before the INA, by the same Congress that passed the INA. Pub. L. No. 82-283, 66 Stat. 26 (1952). The bill was specifically addressed to anti-harboring, and its stated aim was to "assist in preventing aliens from entering or remaining in the United States illegally." *Id*.

Testimony provided by the Defendant suggests that "the term 'wetback' is one that is racially derogatory [and] was recognized as being racially derogatory at the time." ECF 25-4, p. 90. "Across the period of the 1940s and 1950s, this term [was] almost synonymous with Mexicans." *Id*. Professor O'Brien testified that "throughout the debate [on the bill], Mexican undocumented entrants [were] regularly referenced as wetbacks," and "the debate focused on the "wetback problem," with some legislatures suggesting that individuals "may be criminals because they are wetbacks." ECF 25, p. 37. The Defendant argues that the very fact that the nickname of the bill included the racial slur, "wetback," is suggestive of racial animus.

The Defendant also argues that the passage of the bill "represents an illogical and counter-intuitive substantive irregularity leading up to the enactment of § 1326." ECF 25, p. 38. While the stated aim of the bill was to prevent the harboring of illegal immigrants, the bill itself shielded employers from prosecution for employing undocumented

employees. Such protection, the Defendant argues, is inconsistent with the stated aim of the bill. The Defendant argues that by safeguarding the interests of agribusiness owners, the bill "was in fact furthering the racist compromise introduced by the 1929 Congress: preserving American industry's access to cheap and exploitable Latinx labor while punishing the Latinx migrants who provided that labor." The Defendant argues that the bill conflicted with its stated aim of preventing aliens from entering or remaining in the United States because it safeguarded the interests of agribusinesses by shielding employers from prosecution for employing undocumented employees.

The Government responds that the bill was "non-controversial" and was a product of "long conferences between the State Department, the executive Department, the farm labor management groups … and a [] legislative council." ECF 28, p. 34. The Government argues that Congressmen had varying reasons to support the bill—"none racially animated." The Government points to a statement from Representative Graham that "[t]his bill is perfectly simple. It is to apply to all our borders and applies against every type of person who has the intent of concealing or harboring aliens." *Id.* The Government also observes that "Congress considered and rejected language that would have criminalized only the harboring and transportation of Mexican non-citizens…" *Id.* The Defendant's evidence also addresses this proposal, noting that "Senator George Aiken of Vermont question[ed] whether Congress could 'discriminate constitutionally against the aliens of one particular nation,'" before noting that while the law should apply to all illegal entrants, he knew "…of no instances of illegal employment of Canadians." ECF 25-2, pp. 17-18.

It is difficult for the Court to take seriously the argument that the bill is not indicative of *any* racial animus, when the very name of the bill included a racial slur directed toward Mexicans. The Court finds that, while not dispositive, the context in which Mexican immigration was being discussed by Congress at the time of the passage of the INA is relevant in considering the intent of that same congress when passing the INA immediately thereafter. The rhetoric surrounding Mexican immigration at the passage of the 1952 bill appears largely unchanged from that at the passage of the 1929 bill. While the bills may purport to be facially neutral, the discussion of the bills, the aims of the bill proponents, and the impact of these bills are all directed to and felt by Mexican and Latinx immigrants, specifically. The passage of the so-called "wetback bill" mere months before the passage of the INA provides some support for the Defendant's claim that the reenactment of the unlawful reentry statute was at least in part motivated by racial discrimination.

6.        Legislative History of Section 1326

The Defendant identifies four ways in which it contends the legislative history of the INA supports a finding of discriminatory intent.

First, the Defendant argues, is "the ways in which Patrick McCarran and Francis Walter exerted their considerable influence over the legislative process and other congressmen to achieve their racist aims in relation to the [INA]." ECF 25, p. 40. Dr. Kang has provided testimony that Senator Pat McCarran, a cosponsor of the McCarran-Walter Act of 1952 (which became the INA), "defended a widespread system of labor exploitation premised upon racist notions of Mexican migrants as expendable farmworkers." ECF 25-

3, p. 18. Kang points to evidence that, during a 1951 appropriations hearing, McCarran referred to both legal and undocumented Mexicans as "wetbacks," stating that, at the Mexican border, "there is a flood of people who come across the boundary. They are called wet-backs, and they come across legally or illegally during the various harvest season." *Id.* Indeed, in June 2020, members of U.S. Congress from Nevada wrote to the governor of the state requesting that the governor "replace the Patrick Anthony McCarran statute," noting his "dark legacy of virulent racism, antisemitism, and xenophobia." ECF 25-15.

The Government argues that the use of the term "wetback" is not necessarily indicative of anti-Mexican racism because "it carried a specific meaning pertaining to all illegal entrants in the context of a debate about the Mexican contract labor program and the accompanying problem that migrants were circumventing those contracts through illegal entry." ECF 28, p. 38. The Government cites to a 1951 statement by Senator Ellender, defining "wet-back" and stating "the wetback swims the river. He comes in illegally, whereas others come in under contract." *Id.* Likewise, the Government points to a statement by Rep. Cooley in 1951 that "[m]any of the so-called wetbacks have been exploited by selfish landlords." While the evidence cited by the Government suggests that the use of the term might have ubiquitous, it does not necessarily follow that the term was is not indicative of animus. The evidence cited by the parties suggests that the term "wetback" was used by the proponents of the INA to describe both legal and illegal Mexican immigrants.

The Government does not necessarily address Senator McCarran's history of racism, but it directs the Court to statements from McCarran that the law "does not contain one iota of racial or religious discrimination." ECF 28, p. 38. It also points to statements by Rep. Walter that "[t]he equality of all races, the final repeal of all racial discrimination now contained in our immigration and naturalization laws, as well as the repeal of all discrimination based on sex, nationality, etc., are the basic features of my bill." *Id.* While not dispositive, the racism of the bill sponsors is at least marginally relevant as evidence in support of the Defendant's position here.

The Defendant secondarily argues that discriminatory intent is indicated by "the fact that the Act preserved the quota system but also continued Western Hemisphere immigration quota-free, necessitating section 1326 to prevent Latinx migrants from settling permanently in the United States." ECF 25, p. 40. The Defendant essentially argues that the INA perpetuated the racist goals of ensuring the southwestern states' access to cheap labor, while providing a means for deporting that labor when needed. This socio-political context, which the Court found to be relevant at the passage of the 1929 law, appears to have continued to be relevant into the 1950s. The evidence, while circumstantial, that the illegal reentry statute was intended to specifically address Mexican immigration without impacting labor availability, is relevant to assessing the motivations of the congress that passed the INA, and section 1326 therein.

Third, the Defendant directs the Court to President Truman's veto of the McCarran Walter Act. Truman's veto statement, attached to the Defendant's motion at ECF 25-18,

states that "[the legislation] would perpetuate injustices of long standing against many other nations of the world, hamper the efforts we are making to rally the men of East and West alike to the cause of freedom, and intensify the repressive and inhumane aspects of our immigration procedures." Truman observed that, under the bill "Our resident aliens would be more easily separated from homes and families under grounds of deportation, both new and old, which would specifically be made retroactive… To make refugees from oppression forever deportable on such technical grounds is shabby treatment indeed." He further explained, "Many of the aspects of the bill which have been most widely criticized in the public debate are reaffirmations or elaborations of existing statutes or administrative procedures. Time and again, examination discloses that the revisions of existing law that would be made by the bill are intended to solidify some restrictive practice of our immigration authorities, or to overrule or modify some ameliorative decision of the Supreme Court or other Federal courts. By and large, the changes that would be made by the bill do not depart from the basically restrictive spirit of our existing laws—but intensify and reinforce it." Congress overrode President Truman's veto and enacted the law.

The Government argues that "President Truman's decision to veto the INA in 1952, and Congress's decision to override that veto, is not further evidence that Congress passed Section 1326 out of racial animus as suggested by the Defendant." ECF 28, pp. 29-30. The Government first argues that considering the statements from President Truman "violates the rule against placing undue weight on an opponent's comments."

*See e.g.*, *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1075 (D. Or. 2021) (courts generally should not place much weight on the statements of those who oppose the legislation.). The Government also argues that "the handful of senators who expressed problematic rhetoric during debate preceding the override of President Truman's veto all voted against the veto override, 'rendering whatever discriminatory purpose those eleven may have held inapplicable to the Act's passage.'" ECF 28, p. 30. Finally, the Government argues that the statement is not relevant because it says "nothing about what President Truman thought about Section 1326 specifically." *Id.* at 31.

The Court is mindful that the statements of those opposed to the bill may not be indicative of the motivations of that bill. While the Court does not accept the statements of President Truman for their truth, it nonetheless finds that they are relevant in that they may have highlighted for the bill proponents the more potentially problematic aspects of the INA. The Government has argued that it would be unrealistic for the legislature to have taken an "active response" to allegations of discriminatory intent, "where the legislature has no notice of allegations that a law it is revisiting was motivated by racial animus." ECF 28, p. 27. The Government references the Eleventh Circuit's observation that, "demanding legislative engagement with a law's history in such cases 'establishes an insurmountable burden' because it is 'unlikely that the present day legislators would be aware of the past discrimination' that supposedly taints the law." *Id.* The Government argues that "[t]hat concern is directly implicated here, where *Carillo-Lopez* identified no

evidence that the 1952 Congress—which had experienced a 96% turnover since 1929—was even aware of the alleged taint to the 1929 Act." *Id.*

The evidence identified by the Defendant, both as to President Truman's statements, and also as to the statements of the bill proponents, calls into question this argument. The evidence identified by the Defendant at the very least may be indicative of indifference to the racist and discriminatory motivations of the adopters of the 1929 Act and certain proponents of the 1952 Act.

The Defendant finally argues that the discriminatory intent may be established because "the one and only substantive change to the section 1326 statute was generated in response to a letter providing the views of the Department of Justice that include the racial slur 'wetback.'" ECF 25, p. 46 (citing 25-16). The Defendant has also provided the Court with a letter of support from Deputy Attorney General Gerald Peyton Ford, which includes use of the racially derogatory word "wetback" as well as testimony in support of expanding the grounds for prosecution and conviction of unlawful reentry under Section 1326. As to the use of the term "wetback," the Court does not import too much weight, as the term appears to have been included in portion of the letter quoting from the report of the President's Commission on Migratory Labor in American Agriculture, March 26, 1951, which says: "Statutory clarification on the above points will aid in taking action against the conveyors and receivers of the wetback. These clarifications of the statute, together with increased funds and personnel for enforcement, are possibly all that are needed to deal effectively with the smuggler and the intermediary." The Court has already found that the

use of the term "wetback" may indicate intent to the extent that it reflects the context in which Mexican immigrants were being discussed at the time of the enactment of section 1326. Each individual instance of the use of the derogatory term, however, does not provide cumulative evidence of racial animus.

The Defendant argues that the Ford letter is further instructive because it is the only comment on what is now section 1326, and it sought only to expand the unlawful reentry statute so that venue would lie wherever a reentering immigrant was found, noting that the previous version of the law caused problems "in cases in which it is not possible for the Immigration and Naturalization Service to establish a place of reentry, and hence the proper venue." ECF 25-16.

The Government argues that the Defendant misunderstands Ford's letter. The Government argues that Ford did not propose the relevant language, he instead wrote in response the Senate Committee's request for the Justice Department's views on a draft bill that already contained the "found in" clause. The Government further argues that the use of the term "wetback" is not indicative of racial animus because "[a]t most, it shows that the word has a complex history that carried a particularized non-racial meaning in the context of the Congressional immigration debate over illegal migrant labor." ECF 28, p. 32.

On review of Ford's letter, it does appear that Ford was responding to a proposed change to the existing law to create an offense where one is "found in" the United States, and further proposing that the law create an offense when one "enters, attempts to enter,

or is at any time found in, the United States." ECF 25-16, p. 7. This particular distinction, however, is not particularly relevant here. The relevant fact is that the law was amended at its reenactment to expand the grounds for deportation by addressing the issue of jurisdiction that arose under the 1929 version of the law. The Court does not find, however, that this fact is indicative of discriminatory intent. Ford's letter, and the "found in" addition to the statute, addressed a procedural hurdle created by the prior version of the law. While the proposed amendments may have made a purportedly discriminatory law easier to enforce, they are not themselves indicative of any racial animus. This fact is therefore neutral.

### 7.    Subsequent Amendments

The Defendant argues that subsequent amendments to section 1326 "did not break the chain of discriminatory causation, and therefore support a finding of discriminatory motivation." The Government argues that increasing a statute's deterrent value is not evidence of animus, and further argues that  "Congress has increased Section 1326's deterrent value while simultaneously eschewing forms of racial discrimination." ECF 28, p. 40. Ultimately, these arguments are not relevant. Neither party appears to argue that the amendments provide relevant proof of intent at the time of the enactment of the law. *See* ECF 25, p. 48 ("Because the amendments of the 1980s and 1990s did not change § 1326 in any meaningful way, there is no need for this Court to assess these later amendments…"); ECF 28, p. 40 ("Defendant asserts that increasing a statute's deterrent value is evidence of animus, while citing no case law for this novel proposition".) Under *Arlington Heights*, the Defendant has the burden of establishing that the law was

*enacted* with discriminatory motivations. The Court does not find that subsequent amendments have any bearing on its determinations of the motivations of Congress at the time of enactment.

### 8.      Defendant has met his burden

A review of all of the evidence suggests that the Defendant has met his burden of proving by a preponderance of the evidence that Congress was at least in part motivated by racial discrimination at the enactment and reenactment of the unlawful reentry statute. Let us revisit the evidence identified and the implications thereof. First, the evidence suggests that the passage of the 1929 Act was motivated in large part by discriminatory intent. The act was aimed at maintaining the southern states' access to cheap Mexican labor while ensuring a process by which those laborers would be disallowed from remaining in and returning to the United States. Pursuant to *Hunter* and *Abbott*, the discriminatory intent of the originally-enacted law provides some evidence of discriminatory intent as to the reenacted law. This fact therefore weighs in favor of a finding of discriminatory intent.

The fact that Congress was silent at the reenactment of the statute is not indicative of a discriminatory motive, nor is it indicative of a non-discriminatory motive. At most, the fact is neutral.

The historical context provided for the period surrounding the 1952 reenactment is at least somewhat indicative of discriminatory intent. The Defendant has cited to evidence of the repatriation drives and the bracero drives. He also cited to evidence of anti-Mexican rhetoric and stereotyping. The evidence also suggests that the motivations underpinning

33

the 1929 Act—a desire to curb Mexican settlement while simultaneously ensuring that agribusiness had access to cheap Mexican labor—continued to motivate legislatures in the 1950s. So too, does the evidence identified by the Government suggest that the relevant immigration policies at that time were specifically intended to stem immigration from Mexico.

The debate and passage of the "Wetback Bill" two months before the passage of the INA is also at least circumstantially indicative of discriminatory intent.  The bill and debate thereabout reflects animus toward Mexican immigrants, and its protection of employers further reinforces the intent to punish Mexican immigrants themselves while protecting the employers exploiting them.

The open racism of the INA proponents is also at least somewhat indicative of motive. There does not appear to be any dispute that Senator McCarran, himself, was a known and outspoken racist. His statements regarding the bill reflect animus toward both legal and illegal Mexican immigrants.

Truman's veto of the INA provides very slight additional evidence of motive because it would have provided lawmakers of notice of the discriminatory motivations and consequences of the bill as enacted.

Attorney General Ford's letter does not provide additional evidence of discriminatory motive, nor does it provide any evidence of a nondiscriminatory motive. It is therefore neutral. The subsequent amendments to the Act are also neutral to this court's analysis.

The defendant here bears the burden of establishing that section 1326 was motivated at least in part by racial animus. The Defendant has provided evidence of such motivations. The Government has not identified any evidence contradicting the evidence set forth by the Defendant on this issue. Thus, notwithstanding that the Defendant bears the burden on this issue, the Defendant here has met that burden.

### C.    Would Congress Have Enacted 1326 Anyway

Having found that the Defendant met his burden under *Arlington Heights*, the burden shifts to the Government to establish by a preponderance of the evidence that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n. 21. In the initial briefing submitted to this Court, neither party addressed this issue thoroughly. The Court therefore ordered additional briefing.

In its supplemental brief, ECF 35, the Government argues that section 1326 would have been adopted even if the purportedly discriminatory motivation had not been considered. The Government first argues that Congress had numerous legitimate, non-discriminatory reasons to enact section 1326. The Government contends that the provision would have been adopted because it serves the valid objective of deterring repeated violations of U.S. immigration laws.

The Government first points to the long-standing right of the sovereign to make laws governing immigration. The Government argues that "[i]mposing sanctions on those who repeatedly violate immigration laws and trespass territorial boundaries is a basic

feature of a controlled border." ECF 35, p. 3. The thrust of section 1326, the Government argues, is not a unique feature of American law; a majority of countries have criminalized unlawful entry in some form. The Government has identified evidence (ECF 35-1) of similar laws in nearly every continent, including: Canada, Cuba, Chile, India, China, Japan, South Korea, Russia, Egypt, Ethiopia, Kenya, Morocco, the United Kingdom, France, Germany, Denmark, and Finland.

The Government has identified evidence that, in 1929, Congress acknowledged that "deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels," noting the frequency with which the government "is compelled to resort to deportation proceedings for the same alien on several succeeding occasions." ECF 35, p. 5 (citing S. rep. No. 70-1456 (Jan. 17, 1929)).

The Defendant argues that the evidence identified by the Government is not relevant. The Defendant argues that "the original enactment of section 1326 was motivated by a desire to discriminate against Mexicans and Latin Americans on account of race, and it continues to have that disparate impact to this day. The existence of contemporary foreign immigration laws does not erase this." ECF 37, p. 3. The Defendant's argument, however, appears to advance the very position rejected by the Supreme Court in *Abbott.* Pursuant to *Abbott,* the Government is not required to provide evidence that it purged any discriminatory taint from the law. Instead, at the second prong of the *Arlington Heights* analysis, the Government bears the burden of establishing that the law would have been adopted even if the discriminatory intent had not been present.

The Defendant's argument on this issue continues to address the first prong of the *Arlington Heights* test, which has already been resolved. In much of its supplemental briefing, the Defendant continues to argue that the adoption of section 1326 was motivated in part by discriminatory intent. The Court does not disagree, but that is not the end of the Court's inquiry. The evidence identified by the Government on this issue provides support for its argument that the provision would have been adopted even in the absence of discriminatory intent, and the Defendant does not identify contradictory evidence.

In his supplemental reply, the Defendant does raise an interesting issue of timing. The Defendant argues that the burden is on the government to establish that the same law would have passed *at the same time* even in the absence of discriminatory intent. However, the case law cited by the Defendant in support of this assertion is not directly on point. The Defendant directs the Court to footnote 21 of *Arlington Heights*, which states:

> Proof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision. But in this case respondents failed to make the required threshold showing.

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at 271. This footnote does not necessarily provide instruction regarding the issue of timing. It instead seems to merely

restate the general test asserted by the Court in *Arlington Heights*. The Defendant has not identified additional case law, and the Court is not aware of any other case law, specifically addressing the issue of timing. Nor is the Court aware of any case law specifically adopting or rejecting the Defendant's proposed interpretation of the rule.

The Court declines to adopt the bright line rule presented by the Defendant here simply because such an adoption doesn't appear necessary at this time. Even assuming that the Government must establish that it would have adopted the law at the same time— here, 1952—the Government has provided evidence supporting such a finding.

The Court first considers the Government's Exhibit 2 to its motion, ECF 35-2, a report titled "The Immigration and Naturalization Systems of the United States." The Report identified the problems with the then-current U.S. immigration policy and laid out recommendations for how to best address them. The Government argues that "the report provides direct evidence of those immigration concerns motivating the 82nd Congress to enact this law." ECF 35, p. 6. As the Government accurately summarizes, the report addressed "problems related to national security and crime, the employment conditions of both American and foreign workers, foreign relations, public health, and deterring recidivist breaches of the country's sovereign borders while promoting compliance with court and government orders." *Id*.

The Report addresses "deportation problems" at both the northern and southern U.S. border. While the report acknowledges that "the problem of illegal entries from Canada is not serious now, due to the fact that Canada has a fairly good economy…," it

notes that "Europeans arriving in Canada who will seek to effect illegal entry into the United States" may confront the northern border patrol. ECF 35-2, p. 634.   In the "Recommendations" portion of the Report, it was recommended that the illegal reentry provision originally enacted in 1929 be reenacted. Here, the problems identified by the report, and the solution proposed, are not rooted in discriminatory animus. The report thus provides support for the Government's position that the illegal reentry provision would have been adopted even if the discriminatory motivations had not been considered.

The Defendant argues that the report does not support the Government's position. The report, the Defendant argues, "is replete with racism, starting with the introductory chapter dividing the world population into various races. [] The report goes on to make clear that entering illegally after being deported is principally a southern border problem." ECF 37, p. 7.  The suggestion that the problem was more prevalent at the southern border, however, does not itself provide evidence of racial animus. The report specifies why the problem is less prevalent at the northern border, and it also identifies the potential that the problem at the northern border might expand.

The Defendant also argues that "the fact that key recommendations were excluded from the final Act is quite telling – with the most telling being that the final Act exempted employers of undocumented migrants from criminal penalties despite reports to both the President and Congress from the INS indicating their belief that employer penalties would be one of the most potent means of stopping undocumented immigration." *Id.* The

Defendant points to statements by Senator Hubert Humphrey highlighting that the INA, as passed, deviated from the recommendation in the Report. This, the Defendant argues, provides further evidence of the discriminatory motivations of the law.

The Defendant here essentially argues that, had Congress actually wanted to address immigration issues, they could have done more in the INA. The Court understands the argument that the Defendant is making. But, considering the specific question posed by part two of *Arlington Heights*, the Court fails to see how the argument addresses the issue at this stage. The Defendant again points to the discriminatory motivations for passing the law. The second prong of the *Arlington Heights* test, however, essentially requires the Court at this stage to ignore the discriminatory motivations and instead to consider only those permissible motivations. Looking only at the permissible motivations, the Court must determine whether the law would have been adopted anyway. Here, the Government has identified evidence suggesting that, notwithstanding the discriminatory motivations underpinning the adoption of the law, the law would have been adopted anyway for separate, permissible reasons.

The Government has offered evidence that vocal opponents of national-origin quotas and other seemingly racially motivated aspects of the bill also supported the illegal-reentry provision. The Government has provided evidence that an alternative version of the INA was submitted by senators who opposed the perceived racism of the Act. This alternative version included an illegal reentry provision. *See* 98 Cong. Rec. 5169 (May 14, 1952). The Court finds this evidence to be supportive of the Government's

argument here. The alternative proposal would appear to address the "taint of racial animus" of the original statute, but it would nonetheless have kept the provision at issue here. This provides support for a finding that, even had discrimination not been a motivating factor behind the passage of the statute, the statute still would have been passed.

The Government finally argues that amendments to and reenactments of section 1326 eliminate any potential taint from racial animus and establish that Congress would have reached the same result independent of discriminatory intent. The Defendant argues that subsequent amendments and reenactments are not relevant to the Court's inquiry because the Court must determine whether the subject law would have been enacted at the same time that it was actually enacted. As stated, *supra*, the authority provided by the Defendant on this issue is not necessarily clear. Nonetheless, the Court does not find that a ruling on this issue is necessary. Even if the Court only considers evidence prior to the adoption of the Act in 1952, the Court finds that the Government has met its burden.

## IV.    CONCLUSION

*Arlington Heights* imposes a burden on both the government and the Defendant. Here, both parties have met their respective burdens. The Defendant has established that the illegal reentry statute was indeed adopted at least in part due to racial animus. The Court recognizes that, in making this finding, it is an outlier. Many courts have considered this issue, and many courts have come to a different conclusion. This Court, however, is

bound to consider the evidence presented to it in this case. Based on the evidence presented in this case, the Defendant has undoubtedly met his burden here.

So too, however, has the Government met its burden. While the statute itself may indeed have been motivated in part by racial animus, there were also legitimate reasons for its enactment. The evidence establishes that, even if the discriminatory motivations did not exist, section 1326 still would have been adopted for those other legitimate reasons.

For these reasons, the Defendant's Motion to Dismiss, ECF 25, is **DENIED.**

DATED:  October 4, 2022                          BY THE COURT:

                                                 _____
                                                 REGINA M. RODRIGUEZ
                                                 United States District Judge